# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| CATCH CURVE, INC.,<br><br>Plaintiff and Counterclaim Defendant,<br><br>v.<br><br>INTEGRATED GLOBAL CONCEPTS, INC.,<br><br>Defendant and Counterclaim Plaintiff,<br><br>And<br><br>MEIXLER TECHNOLOGIES, INC.,<br><br>Defendant. | ) | Case No. 1:06-CV-02199<br><br>Judge Clarence Cooper<br>Jury Trial Demanded |
| INTEGRATED GLOBAL CONCEPTS, INC.,<br><br>Counterclaim Plaintiff,<br><br>v.<br><br>J2 GLOBAL COMMUNICATIONS, INC., RICHARD RESSLER, MICHAEL WILLIAM MCLAUGHLIN, IP INVESTMENTS GROUP, RYAN STRONG, AUDIOFAX, INC., AUDIOFAX IP LLC, MARK BLOOMFIELD, DAVID A. KENNEDY, NEHEMIA ZUCKER, R. SCOTT TURICCHI, STEVEN J. HAMERSLAG, IPAC LLC, KEVIN SHULTZ, AND FTI CONSULTING, INC.,<br><br>Added Counterclaim Defendants. | ) | |

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES, AND DEFENDANT IGC'S COUNTERCLAIMS FOR PATENT INVALIDITY, NON-INFRINGEMENT, UNENFORCEABILITY, AND FOR ANTI-TRUST AND OTHER VIOLATIONS

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES, AND DEFENDANT IGC'S COUNTERCLAIMS FOR PATENT INVALIDITY, NON-INFRINGEMENT, UNENFORCEABILITY, AND FOR ANTI-TRUST AND OTHER VIOLATIONS

Defendants INTEGRATED GLOBAL CONCEPTS, INC. ("*IGC*") and MEIXLER TECHNOLOGIES, INC. ("*MTI*") (collectively "*Defendants*"), respectfully and timely file and serve herewith their Answer to the (Second) Complaint filed on September 15, 2006, pursuant to the ruling of September 20, 2007, denying Defendants' motion to dismiss or transfer, together with their Affirmative Defenses and with IGC's Counterclaims for invalidity, non-infringement, and unenforceability of the asserted patents as well as for Antitrust and other violations committed jointly by Plaintiff as a Counterclaim Defendant and by the added Counterclaim Defendants as named herein.

## ANSWER TO THE COMPLAINT

1. Admitted.

2. With respect for the ruling of September 20, 2007, denied.

3. With respect for the ruling of September 20, 2007, denied.

4. Admitted.

5. Admitted.

6. Admitted.

7. Admitted.

8. Admitted that IGC offers to its customers throughout the United States, from its web site at www.MaxEmail.com, fax-to-email services using inbound area codes including some Georgia area codes, and that it has some users located in Georgia, but denied that any of IGC's activities infringes any patent of Catch Curve, and admitted that the Court has determined that personal jurisdiction exists over IGC.

9. Admitted.

10. Denied.

11. Admitted that MTI offers to its customers throughout the United States, from its web site at www.GreenFax.com, fax-to-email services provided by and under contract with IGC, using inbound area codes including some Georgia area codes, and that it has some users located in Georgia, but denied that any of MTI's activities infringes any patent of Catch Curve, denied that MTI receives or processes any facsimile transmissions, and admitted that the Court has determined that personal jurisdiction exists over MTI.

12. Admitted.

13. Admitted.

14. Admitted that Defendants IGC and MTI operate under the trademarks stated, but denied that their services infringe the ‘926 patent.

15. Admitted that Defendants operate under the trademarks stated, but denied that their services infringe the ‘302 patent.

16. Admitted that Defendants operate under the trademarks stated, but denied that their services infringe the ‘584 patent.

17. Admitted that Defendants operate under the trademarks stated, but denied that their services infringe the ‘034 patent.

18. Admitted that Defendants operate under the trademarks stated, but denied that their services infringe the ‘021 patent.

19. Defendants IGC and MTI repeat and incorporate herein their above responses to paragraphs 1-18 of the Complaint as if set forth fully herein.

20. Denied.

21. Admitted as to IGC’s receipt of notice, but denied there was any infringement to abate.

22. Admitted as to MTI’s receipt of notice, but denied there was any infringement to abate.

23. Denied.

24. Denied.

25. Denied.

26. Defendants repeat and incorporate herein their above responses to paragraphs 1-25 of the Complaint as if set forth fully herein.

27. Denied.

28. Admitted as to IGC's receipt of notice, but denied there was any infringement to abate.

29. Admitted as to MTI's receipt of notice, but denied there was any infringement to abate.

30. Denied.

31. Denied.

32. Denied.

33. Defendants repeat and incorporate herein their above responses to paragraphs 1-32 of the Complaint as if set forth fully herein.

34. Denied.

35. Admitted as to IGC's receipt of notice, but denied there was any infringement to abate.

36. Admitted as to MTI's receipt of notice, but denied there was any infringement to abate.

37. Denied.

38. Denied.

39. Denied.

40. Defendants repeat and incorporate herein their above responses to paragraphs 1-39 of the Complaint as if set forth fully herein.

41. Denied.

42. Admitted as to IGC's receipt of notice, but denied there was any infringement to abate.

43. Admitted as to MTI's receipt of notice, but denied there was any infringement to abate.

44. Denied.

45. Denied.

46. Denied.

47. Defendants repeat and incorporate herein their above responses to paragraphs 1-46 of the Complaint as if set forth fully herein.

48. Denied.

49. Admitted as to IGC's receipt of notice, but denied there was any infringement to abate.

50. Admitted as to MTI's receipt of notice, but denied there was any infringement to abate.

51. Denied.

52. Denied.

53. Denied.

Further answering the Complaint, Defendants IGC and MTI deny that Judgment may be entered for Plaintiff and against the Defendants or either of them and deny that any relief is merited or justified on the Complaint as filed.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Complaint, and each purported claim for relief therein, fails to state a claim on which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Catch Curve's claims of infringement are barred because any pertinent patent claims are invalid under 35 USC §§102, 103, and/or 112.

### THIRD AFFIRMATIVE DEFENSE

Catch Curve’s claims of infringement are barred because neither of Defendants’ systems respond, literally or under the doctrine of equivalents, to each and all the recitation of any claim, properly interpreted, of any of the asserted patents.

## FOURTH AFFIRMATIVE DEFENSE

Catch Curve is misusing each of its patents by attempting to extend them beyond any lawful scope which Catch Curve knows or reasonably knows exists.

## FIFTH AFFIRMATIVE DEFENSE

The Complaint, including each purported claim for relief therein, is barred by the doctrines of waiver and/or estoppel.

## SIXTH AFFIRMATIVE DEFENSE

The Complaint, including each purported claim for relief therein, is barred by the doctrine of laches.

## SEVENTH AFFIRMATIVE DEFENSE

The Complaint, including each purported claim for relief therein, is barred because Catch Curve has entered this action with unclean hands.

## EIGHTH AFFIRMATIVE DEFENSE

Defendants may have additional defenses that cannot be articulated due to (1) Catch Curve's failure to particularize how its claims read, if they can, on any of Defendant’s services; (2) Catch Curve's failure to provide specific information concerning the nature of the patents it allegedly holds and the scope of those patents; (3) Catch Curve's failure to specifically allege what damage Defendants' actions have caused; (4) the fact that discovery has not yet commenced; and (5) the

fact that Defendants have not completed their investigation relating to this action. Defendants therefore reserve the right to assert additional defenses.

## COUNTERCLAIMS

Integrated Global Concepts, Inc. (*"IGC"* or *"Counterclaim Plaintiff"*), by its attorneys, alleges for its Counterclaims against Plaintiff and Counterclaim Defendant Catch Curve, Inc. (*"Catch Curve"*) and against added Counterclaim Defendants j2 Global Communications, Inc. (*"j2"*), Richard Ressler (*"Ressler"*), Michael William McLaughlin (*"McLaughlin*"), IP Investments Group (*"IPIG"*), Ryan Strong (*"Strong"*), AudioFAX, Inc. (*"AudioFAX"*), AudioFAX IP LLC (*"AudioFAX IP"*), Mark Bloomfield (*"Bloomfield"*), David A. Kennedy (*"Kennedy"*), Nehemia Zucker (*"Zucker"*), R. Scott Turicchi (*"Turicchi"*), Steven J. Hamerslag (*"Hamerslag"*), IPAC LLC (*"IPAC"*), Kevin Shultz (*"Shultz"*), and FTI Consulting, Inc. (*"FTI"*) (collectively the *"Counterclaim Defendants"*), upon knowledge with respect to its own acts and where investigated by counsel and upon information and belief with respect to all other matters, as follows:

### SUMMARY OF THE COUNTERCLAIMS

1. This is an action for declaratory judgment of invalidity, unenforceability, and non-infringement of each of the patents in suit and also for

judgment as to antitrust and other violations against all the named Counterclaim Defendants.

2. Counterclaim Defendants have been asserting against and thereby harassing Counterclaim Plaintiff and others in the United States with claims of infringement of the patents in suit and other patents that Catch Curve, j2, Dynamic Depth, and others know are not infringed, are invalid in view of prior art patents and publications, and are unenforceable due to frauds committed on the US Patent Office. Counterclaim Defendants have used the patents in suit and others to increase the market shares of Counterclaim Defendant j2 by the anticompetitive acts also complained of herein.

3. j2 is the dominant provider of Internet facsimile services that deliver fax messages via the Internet to home and small offices (which is the "*Relevant Product Market*") in the United States (the "*Relevant Geographical Market*"). Catch Curve, the current titleholder of certain patents, is one of j2's accomplices in a campaign to restrict trade and eliminate all of j2's competitors. IPIG and its "predecessor" IPAC, licensing companies attempting to locate licensees for the j2 and Catch Curve patents, are key facilitators of the conspiracy. McLaughlin and Strong, principals and/or employees of Catch Curve, IPIG, and IPAC, conspired with the other Counterclaim Defendants and have initiated and implemented the

fraudulent plan of, and conspiracy for, enforcing the fraudulently obtained patents in suit to unlawfully create and maintain a monopoly by intimidation against j2's competitors, including IGC, beginning prior to the year 2004 and continuing through today.

4. The Relevant Product Market is Internet facsimile services provided to home offices and small offices. Companies competing in this market provide individuals and small businesses, for a fee, with facsimile numbers and server functions that allow users to send facsimile messages directly from their computers (typically through fax cards or systems), and/or to receive fax messages directly to their computers in the form of attachments to e-mails.

5. j2 and IGC offer services in the Relevant Product Market to customers throughout the United States. The Relevant Geographic Market is the fifty (50) states of the United States, plus the District of Columbia and Puerto Rico. The Relevant Product Market and Relevant Geographic Market are, together, the Relevant Markets.

6. Counterclaim Defendant j2 has in excess of 90 percent share of the Relevant Markets in Internet facsimile services for home and small business users.

7. j2 competes in the Relevant Markets under, among others, the brand eFAX. eFAX is by far the dominant brand of Internet facsimile services available

in the United States today. Counterclaim Defendants targeted IGC and other j2 competitors in the Relevant Markets with a scheme of fear and intimidation to crush competition, raised the competitors' costs of operation, eliminated them as competitors in the Relevant Markets entirely, and has substantially raised the cost of fax to e-mail services to consumers.

8. j2 plans to remain the dominant provider, not by offering a better, more attractive service at a competitive price, but by waging a campaign of acquisitions, extortion, and sham litigation unrelated to the operation of its business and outside the scope of normal competitive practices, which campaign was and is designed to raise its rivals' costs and prevent them from offering competitive services altogether. j2 has accomplished this goal through its own efforts and through the efforts of the other Counterclaim Defendants through a collaborative plan with its co-conspirators and all of the Counterclaim Co–Defendants.

9. j2, Catch Curve, the present and former executive officers of j2, Ressler, Zucker, Hamerslag, Turicchi, and other Counterclaim Defendants AudioFAX, Bloomfield, Kennedy, McLaughlin, Strong, IPAC, IPIG, Shultz, and FTI have within the past four years undertaken and accomplished a series of consolidations and acquisitions of smaller, direct competitors of j2, assets of competitors, and patents from various businesses as part of their anticompetitive

scheme. The effect of these acquisitions has been to dramatically reduce competition and increase j2 market share. j2 also owns several patents which it fraudulently procured within the past four years, and which it claims cover the Relevant Markets, through the mailing of fraudulent documents through the United States Postal Service (*"USPS"*) to the United States Patent and Trademark Office (*"USPTO"*).

10. Most recently, j2 and the other Counterclaim Defendants have within the past four years waged a fraudulent and vicious campaign to intimidate providers of Internet facsimile services into paying money to j2 and/or Catch Curve for licenses of patents that the defendants know do not cover the competitors' activities but to achieve a settlement which costs less than litigating the issues. j2, Catch Curve, AudioFAX, Bloomberg, Kennedy, McLaughlin, Strong, IPIG, IPAC, FTI and their employees each have internal documents explaining in detail why j2's competitors do not infringe the patents. When competitors, such as IGC and others, refuse to capitulate to this extortion, Catch Curve and j2 or the previous patent owners file sham lawsuits for patent infringement that are objectively baseless -- in that any reasonable litigant or reasonable person would know that the competitors' activities do not infringe the patents asserted. Catch Curve's litigation has been initiated with the intent to

cause harm to competitors based not on the outcome of the judicial process, but solely by use of the judicial process itself. Recently, the United States District Court for the Central District of California confirmed that the claims of the patents being asserted by Catch Curve are not infringed by j2's competitors using e-mail forwarding systems for faxes.

11. Co-conspirators Catch Curve, and its predecessor in interest AudioFAX, have within the past four years filed numerous lawsuits in the United States District Court for the Northern District of Georgia, where most of the named competitors therein, including IGC, have no regular and established place of business, merely to increase the cost of defense of litigation to those defendants and thereby to force settlements. AudioFAX created a separate, wholly owned entity, AudioFAX IP, which it used as a party to the litigation. All of the competitors that have recently settled will testify that they knew they did not infringe any of Counterclaim Defendants' patents, but settled only to avoid the high costs of litigation.

12. j2 and Catch Curve have often timed the filing of their sham infringement actions in order to prevent j2's competitors in the Relevant Markets from consummating contracts with major potential customers, acquisitions, and/or

making stock offerings that would boost their efficiency and competitiveness and allow lower prices to consumers.

13. As a result of the above actions and tactics, the Counterclaim Defendants have obtained benefits as individuals, as well as for their respective corporate entities, and have gone outside the scope of the operation of their Internet facsimile business to engage in the actions and tactics described herein.

14. As a result of the above actions and tactics, j2 has come to dominate the Relevant Markets with a market share exceeding 90 percent. The Counterclaim Defendants have wrongfully raised the costs of their rivals, including IGC, through fraud, intimidation, litigation, and interference with their reasonable business expectancies and, in so doing, have prevented j2's competitors from offering better, more innovative services to consumers at prices that would reflect a fully competitive market.

## JURISDICTION AND VENUE

15. Jurisdiction of the claims for declarations of patent invalidity, unenforceability, and non-infringement (Counts I through III) is proper under 28 U.S.C. § 1338(a) and 28 U.S.C. § 2201. This Court has jurisdiction over the claim for relief arising under the Clayton Act (Count IV) pursuant to 15 U.S.C. § 22 since each Counterclaim Defendant is a co-conspirator in a scheme being actively

pursued by each of them in this state and in this district that has resulted in tortious injury to IGC. In addition, each Counterclaim Defendant has purposely established contacts and transacts business in this state and in this district. This Court has jurisdiction over these claims for relief arising under the Racketeer Influenced and Corrupt Organizations Act (*"RICO"*), 18 U.S.C. §§ 1961 *et seq.* (Count V), pursuant to 18 U.S.C. §§ 1964 and 1965. This Court has jurisdiction over the claims for relief arising under the Mail Fraud Statute pursuant to 18 U.S.C. § 1341. This Court has jurisdiction over the claims for relief arising under the Wire Fraud Statute pursuant to 18 U.S.C. §1343. This Court has jurisdiction over the claims for relief arising under the Hobbs Act pursuant to 18 U.S.C. §1951. This Court has jurisdiction over the claims for relief arising under the Sherman Act, 15 U.S.C. §§ 1 and 2 (Count VI through IX), pursuant to 15 U.S.C. § 4 and 28 U.S.C. §§ 1331 and 1337. This Court has supplemental jurisdiction over the related state law claim for relief (Count X) pursuant to 28 U.S.C. § 1367. All these claims were discovered by IGC within the past four years, as on and after the date when IGC was first sued in Georgia for patent infringement, and could not have been reasonably discovered sooner.

16. Venue is proper in this district pursuant to 28 U.S.C. § 1391, 15 U.S.C. §§ 15 and 22, and 18 U.S.C. § 1965 because each of the Counterclaim Defendants

is transacting and doing business and conducting or otherwise transacting affairs in this district. Each of the Counterclaim Defendants is a co–conspirator and they each and collectively have performed acts in furtherance of their illegal and wrongful conduct as alleged in this Counterclaim in this state which have had substantial damaging effects in this district and elsewhere, and a substantial part of the events giving rise to the claims in this action occurred in this district.

## PARTIES

17. Counterclaim Plaintiff IGC is a corporation organized under the laws of the State of Illinois with its principal place of business at 1501 N. Cleveland, # 1F, Chicago, Illinois 60610. IGC provides Internet facsimile services to its customers in the Relevant Markets.

18. Counterclaim Defendant j2 is a corporation organized under the laws of the State of Delaware with its principal place of business at 6922 Hollywood Boulevard, Suite 500, Los Angeles, California, 90028. j2 provides Internet facsimile services and communications services to individuals and businesses in the Relevant Markets. j2 offers these services under brand names including eFax, eFax Corporate, eFax Broadcast, jConnect, Onebox, Electric Mail, eVoice, PaperMaster, Consensus, M4Internet, Protofax, and jBlast. All of these brands were previously owned by smaller, direct competitors of j2 who are no longer in

business as independent companies, after being acquired by j2, resulting in j2 increasing its market share. j2 claims that as of April 26, 2006, it had a portfolio of more than 30 issued U.S. patents and numerous other pending patent applications.

19. Plaintiff and Counterclaim Defendant Catch Curve is a corporation organized under the laws of the State of Delaware with its principal place of business at Atlantic Center Plaza, Suite 2400, 1180 W. Peachtree Street NE, Atlanta, Georgia 30309. Catch Curve was incorporated in January 2005 to acquire the assets of AudioFAX to aid in j2's efforts to: 1) illegally interfere with the business of j2's competitors in the Relevant Markets; and 2) illegally obtain and maintain j2's monopoly power within the Relevant Markets.

20. Counterclaim Defendant Ressler is currently the Chairman of the Board of j2, having previously served as the President of the Company, after he was installed by a private equity fund he controlled, from 1997 to 2000. During this period Ressler orchestrated, with the other j2 officers and outside consultants, the purchase of many competitors, including eFax, j2's largest competitor at the time. Since becoming chairman Ressler has actively managed the scheme in concert with the other Counterclaim Defendants to achieve and maintain j2's monopoly in the Relevant Markets. Ressler is a resident of California, having a residence or place

of business at 6922 Hollywood Boulevard, Suite 500, Los Angeles, California, 90028.

21. Counterclaim Defendant McLaughlin is currently the President of Catch Curve. McLaughlin is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state. McLaughlin is a resident of Georgia, having a residence or place of business at Atlantic Center Plaza, Suite 2400, 1180 W. Peachtree Street NE, Atlanta, Georgia 30309.

22. Counterclaim Defendant IPIG is a business organized under the laws of the State of Georgia and having principal offices at The Biltmore, Suite 205, 817 West Peachtree Street NW, Atlanta, Georgia 30368. IPIG is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state.

23. Counterclaim Defendant Strong is an officer or principal of IPIG and he is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state. Strong is a resident of Georgia, having a residence or place of business at The Biltmore, Suite 205, 817 West Peachtree Street NW, Atlanta, Georgia 30368.

24. Counterclaim Defendant AudioFAX, a corporation formed under the laws of the State of Georgia, having a principal place of business at 1640 Powers Ferry Road, Marietta, Georgia, is the former owner of the patents in suit, known as the *"AudioFAX Patents"* described in Paragraph 48, below. AudioFAX is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC. AudioFAX thus transacts business in this state.

25. Counterclaim Defendant AudioFAX IP is a limited liability company formed under the laws of the State of Georgia, having a principal place of business at 1640 Powers Ferry Road, Marietta, Georgia. AudioFAX IP is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state.

26. Counterclaim Defendant Bloomfield, a resident of Florida, having a residence at 697 Ponte Vedra Blvd, Ponte Vedra Beach, Florida, was an officer and principal in AudioFAX and AudioFAX IP during the time periods pertinent hereto. Bloomfield is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state.

27. Counterclaim Defendant IPAC is a corporation formed under the laws of the State of Georgia, having a principal place of business at Atlantic Center Plaza, Suite 2400, 1180 W. Peachtree Street NE, Atlanta, Georgia 30309. IPAC is

a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state.

28. Counterclaim Defendant Kennedy is the founder and a principal of IPAC, having a principal place of business at Atlantic Center Plaza, Suite 2400, 1180 W. Peachtree Street NE, Atlanta, Georgia 30309. Kennedy is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state.

29. Counterclaim Defendant Zucker is the current Co-President and Chief Operating Officer of j2 and he is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state. Zucker is a resident of California, having a residence or place of business at 6922 Hollywood Boulevard, Suite 500, Los Angeles, California 90028.

30. Counterclaim Defendant Turicchi is the current Co-President of j2 and he is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state. Turicchi is a resident of California, having a residence or place of business at 12340 El Camino Real, Suite 450, San Diego, California 92130.

31. Counterclaim Defendant Hamerslag is the former CEO and President of jFax, the predecessor of j2 Global Corporation. Hamerslag is a resident of California, having a residence or place of business at 2010 Main Street, Suite 600, Irvine, California. Hamerslag is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state.

32. Counterclaim Defendant FTI is a corporation organized under the laws of the State of Maryland and has a regular and established place of business at 1201 W. Peachtree Street NW, Suite 500, Atlanta, in this district. FTI has advised Counterclaim Defendant j2 and the other Counterclaim Defendants and has conspired with Ressler, Zucker, and others, and has actively and knowingly engaged in a scheme being actively pursued in this state with the other Counterclaim Defendants designed to achieve anticompetitive ends.

33. Counterclaim Defendant Shultz is an employee of Counterclaim Defendant FTI and has advised Counterclaim Defendant j2 on its acquisition strategy to create a monopoly in the Relevant Markets. Schultz is a resident of California, having a residence or place of business at 633 West 5th Street, Suite 1600, Los Angeles, California 90071-2027.

## BACKGROUND ALLEGATIONS

34. This is a Counterclaim both for relief from baseless patent infringement charges and also to recover damages of Seventy Million Dollars ($70,000,000.00) and obtain injunctive relief based upon the illegal, anticompetitive, monopolistic, racketeering and other illegal activities of the Counterclaim Defendants. Counterclaim Defendants are monopolists and patent trolls, have acquired and now maintain their monopoly in the Relevant Markets through illegal, exclusionary, and anticompetitive means in violation of Sections 1 and 2 of the Sherman Act, Section 7 of the Clayton Act, the RICO Act, and the Georgia Uniform Deceptive Trade Practices Act. Counterclaim Defendants have violated and continue to violate federal patent and antitrust laws, and federal and state unfair competition laws with the intent to monopolize the Relevant Markets and to harm competition, all to the detriment of manufacturers, distributors, vendors, operators, and customers of the services in the Relevant Markets. Counterclaim Defendants have engaged in a series of exclusionary and anticompetitive acts and strategies in the United States and this District designed to increase their rivals' costs of doing business, raise barriers to entry and to expansion, and otherwise to entrench themselves as monopolists, injuring the competitive process and consumers. Because of Counterclaim Defendants' anticompetitive and exclusionary conduct, IGC and

other Internet fax service providers have been delayed, prevented, and hindered in competing against Counterclaim Defendants, to the detriment of consumers.

35. The Counterclaim Defendants have engaged in an illegal scheme to unfairly compete with IGC and others in the Relevant Markets. Counterclaim Defendants have violated the patent and the antitrust laws of the United States including the Sherman and Clayton Acts, the RICO laws of the United States, and the Georgia Uniform Deceptive Trade Practices Act, among other violations. In addition, j2 has breached its Software License Agreement with IGC. In furtherance of their scheme, the Counterclaim Defendants have conspired among themselves and with others and have:

A. Fraudulently obtained the patents in suit and others, directly or through those who prosecuted the patents in suit, and baselessly asserted them against IGC and others in the Relevant Markets when each such patent is known by them to be invalid and not infringed by IGC and the others.

B. Obtained control of patents as described herein so as to illegally restrain trade and seek to eliminate all competition in the Relevant Markets by:

i. Using and controlling AudioFAX and AudioFAX IP to acquire the AudioFAX Patents (described in Paragraph 48) from the alleged inventors;

ii. Using AudioFAX and AudioFAX IP to illegally extend the lives of the patents-in-suit by fraudulently filing and prosecuting continuation and continuation-in-part applications for patent; and

iii. Contorting the alleged invention on telephony (Circuit-Switched Network) transmission and sending of facsimile data in an attempt to cover non–telephony (Packet-Switched Network) transmission, for sending and receiving fax data over the Internet;

C. Created a new corporation, Catch Curve, while illegally and fraudulently hiding j2's ownership interest in Catch Curve from j2 shareholders and the SEC;

D. Intimidated competitors in the Relevant Markets by instituting objectively baseless litigation and by threatening to sue competitors of j2 although those competitors do not infringe any of the patent claims;

E. Acquired competitors in violation of § 7 of the Clayton Act;

F. Committed fraud on the USPTO with the intent to deceive by applying for and obtaining invalid patents to be asserted against their competitors and by refusing to cite highly relevant and material prior art, provided to them by IGC, to the USPTO with the intent to deceive the USPTO;

G. Harassed competitors, including IGC, in the Relevant Markets with patent infringement litigation over patents that Counterclaim Defendants know are invalid, not infringed, and obtained by fraud;

H. Violated the Racketeer Influenced and Corrupt Organizations Act (*"RICO"*), 18 U.S.C. § 1962 *et seq*., by engaging in an enterprise affecting interstate commerce, the sole purpose of which enterprise was and is to illegally and fraudulently put competitors out of business;

I. Tortiously interfered with the business relations of IGC and others through a campaign of fear, threats, and intimidation based upon invalid and fraudulently procured patents, all in order to further erode competition and gain market share in the Relevant Markets;

J. Disseminated false information to the industry and the USPTO as it relates to the validity and applicability of Counterclaim Defendants' patents;

K. Engaged in other unfair, anticompetitive and illegal actions as described herein; and

L. Breached j2's Software License with IGC.

**Internet Facsimile History**

36. During the 1980s, the transfer of documents by facsimile became commercially successful. Transmission of documents by facsimile required the sender to have a fax machine connected to an ordinary telephone line and a recipient to also have a standard fax machine, which was also connected to a standard telephone line. In order to send a fax, the sender merely dialed the phone number of the recipient's fax machine, and the scanned image was sent over the public circuit-switched telephone network to the recipient's fax machine, where it was printed out. This type of fax delivery became known as Fax-to-Fax technology.

37. In the mid-1980s, several Japanese companies introduced in Japan and in the United States more sophisticated fax machines with advanced capabilities. Panasonic began selling its UF-250 and UF-270 models utilizing Group III facsimile protocol and including a storage feature, so the machine would "store" a document if the recipient machine were "busy" and send it later when the recipient's line became free.

38. Also, in 1983 the Panamail System (Fax Mailing System) was introduced. The Panamail System provided a "store and forward" system between the transmitting facsimile machine and the receiving facsimile machine and was designed to receive and transmit using the Group III facsimile protocol.

39. In September of 1988, the alleged inventors of the AudioFAX Patents (described in Paragraph 48) filed a first patent application claiming to have invented a "store and forward facility" to be embedded in the public switched telephone network to receive and store facsimile data when the recipient's fax machine was in use or "busy." Once a recipient's fax machine was no longer busy, the store and forward facility would redial the recipient's fax machine number and send the stored data to it over the switched telephone network.

40. At the time the first application for one of the patents in suit was filed, the inventors did not conceive of any method of transmitting facsimile data except over a public switched telephone network. This was because standard facsimile machines only worked by connecting them directly to one another over ordinary telephone lines, and, as a result, the inventors limited the disclosure and the scope of protection of any patent to issue on the alleged invention to the sending and receiving of facsimile data over switched telephone networks using facsimile protocol. The inventors have admitted that they did not conceive of any other

method of transmitting the facsimile data except using facsimile protocol over a public switched telephone network, and, in particular, did not conceive of transmitting facsimile data over a packet–switched network such as the then-nascent Internet.

41. Unknown to the alleged inventors was the prior development and public use in the United States of a totally different and unique, public, packet-switched network, the ARPANET, in 1969, which is now known as the Internet. The Internet was initially primarily used by military and educational institutions from the early 70s through the 1980s. In 1972, researchers in the United States and other countries began to develop additional computer-based systems for communication over the Internet. Standard fax machines could not and still cannot communicate with one another over this packet-switched network of the Internet.

42. In 1979, IBM created and introduced in the United States a "store and forward" network that was used for e-mail and list servers for use on a packet-switched network.

43. In the early 1980s, other companies and researchers in the United States developed computer-based systems that incorporated the store and forward developments of IBM, so that facsimile data could be sent over the Internet, stored if necessary, and then forwarded on to a recipient's computer. Thereafter, Internet

facsimile services developed computer-based systems whereby their customers could utilize a standard fax machine to transmit a facsimile to an Internet facsimile service, which in turn converted the documents into data files, stored them, and then forwarded them to their customers' e-mail addresses over the Internet using the TCP/IP protocol of this packet-switched network. Since the Internet facsimile services do not transmit or send the facsimile data to their customers over the public switched telephone network as required by every claim of the patents in the asserted AudioFAX Patents, none of their products or services, including IGC's, can infringe any of the claims of the patents.

44. All of these developments using store and forward technologies on the Internet were publicly known in the United States for many years and certainly more than a year before the first application for an AudioFAX Patent was filed in 1988.

45. These Internet facsimile services enabled a consumer connected to the Internet to receive a fax document as an attachment to an email, obviating the need for a telephone line and traditional fax machine.

**Patents: Inequitable Conduct, Invalidity, and Non-Infringement**

46. Before filing this lawsuit, Catch Curve (through its predecessor entity, AudioFAX) committed fraud and inequitable conduct with respect to each of those

patents. Each of the patents, further, is invalid on the prior art, and none of them is infringed by any method or product of IGC or MTI.

47. Counterclaim Defendant Bloomfield allegedly created some technology to deliver faxes over the Internet but he could not obtain broad patent protection, since the concept was not new. When he learned that F-Mail Associates had obtained some earlier patents relating to Fax-to-Fax technology, he purchased the three patents from F-Mail. However, Bloomfield knew that Fax–to–Fax over telephone lines was a waning technology because of newer forms of communication, like e-mail, so he decided to attempt to augment the patents by filing continuing applications in an attempt to expand them to cover the Fax-to-email industry, which was not conceived by the inventors. He knew the patents did not cover this technology, so he called in Kennedy, an intellectual property consultant and co-founder of InteCap Inc., to assist. Together, they decided to file and prosecute fraudulent patent applications with the intent to deceive the USPTO.

48. Together, Bloomfield and Kennedy filed additional applications and developed the following patent portfolio (the *"AudioFAX Patents"*), consisting of five patents:

A. Patent No. 6,785,021 (the *"'021 Patent"*), entitled "Facsimile Telecommunications System and Method," issued to Richard J. Gordon and James R. Kennedy on August 31, 2004;

B. U.S. Patent No. 6,643,034 (the *"'034 Patent"*), also entitled "Facsimile Telecommunications System and Method," issued to Richard J. Gordon and James R. Kennedy on November 4, 2003;

C. U.S. Patent No. 5,459,584 (the *"'584 Patent"*), also entitled "Facsimile Telecommunications System and Method," issued to Richard J. Gordon and James R. Kennedy on October 17, 1995;

D. U.S. Patent No. 5,291,302 (the *"'302 Patent"*), also entitled "Facsimile Telecommunications System and Method," issued to Richard J. Gordon and James R. Kennedy on March 1, 1994; and

E. U.S. Patent No. 4,994,926 (the *"'926 Patent"*), also entitled "Facsimile Telecommunications System and Method," issued to Richard J. Gordon and James R. Kennedy on February 19, 1991.

49. Then, instead of immediately threatening companies in the Relevant Markets with litigation, Bloomfield and Kennedy, through AudioFAX, AudioFAX IP, and IPAC, initially attempted to convince j2's competitors to participate in a friendly licensing program, but would then bring litigation if they

refused. Bloomfield instructed the AudioFAX attorneys to file numerous additional fraudulent patent applications with the USPTO and pursued many of j2's competitors that they knew were not infringing any of these patents. This process yielded benefit to both Bloomfield and Kennedy individually and was not in the scope of their roles as employee or agent of their employers.

50. Bloomfield, Kennedy, McLaughlin, Strong, IPAC, and AudioFAX, and now Catch Curve, j2, Ressler, Zucker, Turicchi, Hamerslag, Schultz, IPIG and FTI, have refused to cite to the USPTO the highly relevant, material prior art references provided to them by IGC. The Counterclaim Defendants did not inform the USPTO of this prior art, knowing that the USPTO would reject their pending applications based on the disclosures in the prior art. This prior art included the Panafax Systems and Panamail Systems from the early- and mid-1980s. In June of 2003, IGC provided to the Counterclaim Defendants information about the UF-250 and UF-270 Panasonic Fax machines with store and forward capabilities sold in Japan and the United States more than one year before the earliest of the AudioFAX Patents was filed. Strong contacted IGC in Chicago and informed IGC that the Counterclaim Defendants would not make the USPTO aware of this prior art and, in fact, they did not cite it during the prosecution of the '021 patent. In addition, the Counterclaim Defendants were also aware of the

1983 Panamail UX4800 HV System and the UF-650 fax machines with store-and-forward capabilities and willfully did not cite them to the USPTO, acting with an intent to deceive. The User Manuals and Service Manuals for these fax machines disclosed or made very obvious every feature of the alleged inventions claimed in the AudioFAX Patents. The Counterclaim Defendants' actions constitute fraud on the USPTO, as they were done with the intent to deceive the USPTO, and they succeeded. Each of the Counterclaim Defendants willfully utilized the U.S. mails to carry out their scheme to defraud the USPTO in violation of 18 U.S.C. § 1341. This process yielded benefit to Bloomfield, Kennedy, McLaughlin, Strong, Ressler, Zucker, Turicchi, Hamerslag, and Schultz individually as well as in their roles as employees or agents of their employers.

51. In 2004, Bloomfield, Kennedy, McLaughlin, and Strong decided to structure a new relationship with j2 whereby Counterclaim Defendant Catch Curve was established to nominally hold title to the AudioFAX Patents while sharing with these others income from licensing of the patents and from litigation settlements. The financial structure of Catch Curve (with its "conspiracy partners" Bloomfield, McLaughlin, and Strong) is such that it does not share a unity of interest with j2 or any other Counterclaim Defendant.

52. More recently, Bloomfield, Kennedy, McLaughlin, and Strong have conspired with j2 and Counterclaim Defendants Ressler, Zucker, Turicchi, FTI, Schultz, and Catch Curve to file and prosecute additional fraudulent patent applications with the intent to deceive the USPTO and to assist in the creation and maintenance of j2's monopoly by pursuing an anticompetitive, fraudulent scheme to intimidate j2's competitors to either enter into license agreements for the AudioFAX Patents or sell out to j2, all while knowing the patents to be invalid, not infringed, and unenforceable for having been obtained by fraud on the USPTO. The action of each Counterclaim Defendant are independent and for their own benefit as each does not share a unity of interest with another of the Counterclaim Defendants.

53. The patent applications fraudulently submitted and fraudulently prosecuted by the Counterclaim Defendants, as well as the objectively baseless litigation brought or fostered by Catch Curve and j2, are acts independent from j2's business of providing Internet facsimile services to individuals and small businesses and are therefore outside or beyond the scope of j2's normal business operations.

54. Bloomfield and AudioFAX set up AudioFAX IP to implement a licensing program in the Fax-to-Fax industry. Bloomfield, Kennedy, McLaughlin,

and Strong conspired to file and prosecute additional fraudulent patent applications based on the original AudioFAX Patents, with the intent to deceive the USPTO. Bloomfield, Kennedy, McLaughlin, and Strong used AudioFAX IP to convince j2's competitors to participate in a licensing program, and would bring litigation if any competitor refused. More recently, AudioFAX, AudioFAX IP, Bloomfield, Kennedy, McLaughlin, and Strong have conspired with j2 and Ressler, Zucker, Turicchi, FTI, Schultz, and Catch Curve to file and prosecute the additional fraudulent patent applications with the intent to deceive the USPTO and assist in the creation of j2's monopoly by pursuing an anticompetitive, fraudulent scheme to intimidate j2's competitors to either enter into license agreements for the AudioFAX Patents or sell out to j2, all while knowing the patents to be invalid, not infringed, and unenforceable for having been obtained by fraud on the USPTO.

55. IPAC obtained the services of Kennedy, McLaughlin, and Strong to pursue the conspiracy complained of herein to eliminate all of j2 competitors, and it continues to actively and knowingly engage in such scheme with the other Counterclaim Defendants to achieve anticompetitive ends. IPAC, McLaughlin, and Strong have conspired with j2 and Ressler, Zucker, Turicchi, FTI, Schultz, and Catch Curve to file and prosecute fraudulent patent applications with the

intent to deceive the USPTO and assist in the creation of j2's monopoly by pursuing an anticompetitive, fraudulent scheme to intimidate j2's competitors to enter into license agreements for the AudioFAX Patents, while knowing the patents to be invalid, not infringed and unenforceable for having been obtained by fraud on the USPTO.

56. Pursuant to federal regulations and applicable law, each individual associated with the filing and prosecution of a patent application, including those associated with the filing and prosecution of re-examinations (collectively, "Patent Seekers"), has duties of candor and good faith to the US Patent and Trademark Office ("PTO"). The PTO relies on each such individual to honor those obligations. Included in those obligations is the duty to submit prior art that is "material" and of which the individual is aware. That duty exists when the patent application is filed, and it continues until the patent issues; the duty also exists when the PTO is reexamining a patent. Each of the patents-in-suit is unenforceable in light of inequitable conduct.

***The '926 Patent***

57. Before the first '926 reissuance, the '926 Patent Seekers were aware of information material to the patentability of claims of the first reissuance of the '926 patent, but they withheld and/or concealed that information from the PTO with the

intention of deceiving the PTO. The withheld/concealed information includes, without limitation:

(a) Kurihara et al., "Control Methods for Facsimile Store and Forward Communication Services";

(b) U.S. Patent No. 4,613,907 to Yoshimoto;

(c) "Document Distribution System," Internal Technology Disclosures, Vol. 6, No. 5, at p.2 (May 25, 1988); and

(d) the Panasonic UF-250 and UF-270 models and the Panamail System described herein.

***'926 and Kurihara***

58. Kurihara was published in November 1987, before the '926 patent filing date (September 22, 1988) and before the first '926 reexamination was filed. Kurihara is prior art to the first '926 reexamination.

59. The '926 Patent Seekers knew of Kurihara before they initiated the first '926 reexamination, on October 20, 1997. For example, they had cited Kurihara in an Information Disclosure Statement ("IDS") they submitted to the PTO on October 14, 1991. The patent attorney who filed that IDS also filed the '926 application (U.S. Patent Application No. 07/248,798) on behalf of the same '926

inventors. The ‘926 Patent Seekers had also cited Kurihara again in a January 23, 1993 IDS submitted to the PTO.

60. Kurihara was material to the prosecution of the first reexamination of the ‘926 patent. For example, the ‘926 claims typically require a “store and forward facility” or “store and forward facilities.” The named inventors and/or persons associated with the prosecution of the first reexamination had previously described Kurihara as “disclos[ing] the concept of store and forward techniques….” In addition, during the first ‘926 reexamination, the examiner distinguished particular prior art — Ejiri — on the grounds that “Ejiri does not teach a store and forward facility coupled to a switched telephone network, as claimed in (926).” As persons associated with the prosecution of the first ‘926 reexamination knew or should have known, Kurihara discusses a store and forward facility coupled to a switched telephone network in, for example, Figure 1 and the associated text.

61. Although they knew about Kurihara, the ‘926 Patent Seekers failed to disclose Kurihara to the PTO during the first ‘926 reexamination, and, on information and belief, did so with intent to mislead the PTO. The deception succeeded, and the PTO later issued a reexamination certificate for the ‘926 patent.

***‘926 and Yoshimoto***

62. U.S. Patent No. 4,613,907 issued to Yoshimoto et al. on September 23, 1986. Yoshimoto is prior art to the first ‘926 reexamination.

63. The ‘926 Patent Seekers knew of Yoshimoto before they initiated the first ‘926 reexamination, on October 20, 1997. For example, they cited Yoshimoto in at least three IDSs submitted on their behalf to the PTO, on January 8, 1993, February 23, 1995, and April 22, 1997. The first ‘926 patent reexamination request and subsequent ‘926 reexamination PTO notices and decisions were mailed to the same attorney of record, Louis Isaf, who filed the April 22, 1997 IDS identifying Yoshimoto.

64. Yoshimoto was material to the prosecution of the first reexamination of the ‘926 patent. For example, ‘926 patent claim 12 requires “wherein said computer means of said at least one store and forward facility is programmed, upon being unsuccessful in making a transmission to an intended receiving facsimile machine, to transmit a message to the transmitting facsimile machine.” Likewise, Yoshimoto’s Abstract, for example, discusses a fax receiver that automatically confirms whether the fax transmission is successful: “[a] facsimile receiver provides with confirmation means whether or not there exists transmission mistake at the transmitter side.” In addition, during the second reexamination, the

PTO used Yoshimoto in combination with another reference to reject and cancel claims of the ‘926 patent.

65. Although they knew about Yoshimoto, the ‘926 Patent Seekers failed to disclose Yoshimoto to the PTO, and, on information and belief, did so with intent to mislead the PTO. The deception succeeded, and the PTO later issued a reexamination certificate for the ‘926 patent.

***‘926 and Document Distribution System***

66. The industry publication “Internal Technology Disclosures” published an extract entitled “Document Distribution System” on May 25, 1988 (“Document Distribution System”). Document Distribution System is prior art to the first ‘926 reexamination.

67. Before they initiated the first ‘926 reexamination, on October 20, 1997, the ‘926 Patent Seekers knew of Document Distribution System. For example, in a January 8, 1993 IDS filed on their behalf with the PTO, they stated that they were providing every reference associated with the prosecution history of U.S. Patent No. 5,136,634 — but in fact they omitted Document Distribution System, although it had been cited in the ‘634 patent prosecution.

68. Document Distribution System was material to the first ‘926 reexamination. For example, ‘926 claim 3 requires “the step, in response to

instructions received from a system subscriber, of transmitting facsimile messages stored in that subscriber's mailbox to a facsimile machine designated by that subscriber in the instructions." Likewise, Document Distribution System describes a "microcomputer-based system which uses voice generation circuitry to invite a person calling in to the system to specify the document needed by pushing particular keys of his/her touch-tone telephone. Upon ascertaining the identity of the document in question, the computer transmits the document to the caller in standard facsimile form, either over the telephone connection already established if the telephone call was initiated from a telephone connected with a facsimile machine, or to a different telephone number specified by the caller."

69. Although they knew about Document Distribution System, the '926 Patent Seekers failed to disclose Document Distribution System to the PTO during the '926 reexamination, and, on information and belief, did so with intent to mislead the PTO. The deception succeeded, and the PTO later issued a reexamination certificate for the '926 patent.

***The '302 Patent***

70. The '302 patent is unenforceable because it was obtained by inequitable conduct. Before the '302 patent issued, the '302 Patent Seekers were aware of information material to the patentability of claims of the '302 patent, but withheld

and/or concealed that information from the PTO with the intention of deceiving that Office. The withheld/concealed information includes, without limitation: U.S. Patent No. 5,065,254 to Hishida.

71. Hishida was filed on November 24, 1989, more than one year before the '302 filing date or that of its parent. Hishida is prior art to the '302 patent.

72. The Patent Seekers knew of Hishida before the '302 patent issued. Hishida was cited in the search reports of the European counterpart to the '302 patent — specifically, the International Preliminary Examination Report for the EP Appl. No. 92907076 (Pub. No. 0572525). This examination report was completed on February 9, 1993, and the European Patent Office received it on July 6, 1993; in the normal course it would have been mailed to the applicant shortly after. Even though the PTO's regulations specifically "encourage[] applicants to carefully examine: … prior art cited in search reports of a foreign patent office counterpart application," the Patent Seekers did not cite Hishida to the PTO during the prosecution of the '302 patent.

73. Hishida is material prior art to the '302 patent. For example, '302 patent claim 24 requires "transmitting facsimile messages stored in the mass storage means to intended receiving facsimile machines." Likewise, Hishida discloses a center fax machine that stores and relays fax messages to other fax

machines, and that each fax machine includes a central processing unit and program memory.

74. Although they knew about Hishida, the '302 Patent Seekers failed to disclose Hishida during the '302 prosecution, with, on information and belief, the intent to deceive the PTO. The deception succeeded, and the PTO issued the '302 patent on March 1, 1994 without considering this reference.

***The '034 Patent***

75. The '034 patent is unenforceable because it was obtained by inequitable conduct. Before the '034 patent issued, the '034 Patent Seekers were aware of information material to the patentability of claims of the '034 patent, but withheld and/or concealed that information from the PTO with the intention of deceiving that Office. The withheld/concealed information includes, without limitation "Document Distribution System" and U.S. Patent No. 5,033,079 to Catron et al. ("Catron").

***'034 and Document Distribution System***

76. As noted above, Document Distribution System was published on May 25, 1988. Document Distribution System is prior art to the '034 patent.

77. Before October 11, 2000, when they filed for the '034 patent, the '034 Patent Seekers knew of Document Distribution System. For example, in a

January 8, 1993 IDS filed on their behalf with the PTO, they stated that they were providing every reference associated with the prosecution history of U.S. Patent No. 5,136,634 — but in fact they omitted Document Distribution System, although it had been cited in the ‘634 patent prosecution.

78. Document Distribution System was material to the ‘034 prosecution. For example, ‘034 patent claim 14 requires “the step of, in response to instructions received from a subscriber, transmitting facsimile messages stored in that subscriber’s mailbox to a facsimile machine designated by that subscriber in the instructions.” Likewise, Document Distribution System describes a “microcomputer-based system which uses voice generation circuitry to invite a person calling in to the system to specify the document needed by pushing particular keys of his/her touch-tone telephone. Upon ascertaining the identity of the document in question, the computer transmits the document to the caller in standard facsimile form, either over the telephone connection already established if the telephone call was initiated from a telephone connected with a facsimile machine, or to a different telephone number specified by the caller.”

79. Although they knew about Document Distribution System, the Patent Seekers failed to disclose Document Distribution System to the PTO during the ‘034 patent’s prosecution, and, on information and belief, did so with intent to

mislead the PTO. The deception succeeded, and the PTO later allowed the ‘034 patent to issue.

***‘034 and Catron***

80. U.S. Patent No. 5,033,079 was filed on August 24, 1989, and issued to Catron et al. on July 16, 1991. Catron is prior art to the ‘034 patent.

81. Before October 11, 2000, when they filed for the ‘034 patent, the Patent Seekers knew of Catron. For example, Mark Bloomfield, who at various times was the President or Managing Director, or both, of Catch Curve (when it was known as AudioFAX) was aware of Catron from the prosecution of his U.S. Patent No. 6,157,464, which was filed on June 24, 1996 and in which Catron was cited, as the face page of the ‘464 patent reflects.

82. Catron was material to the ‘034 prosecution. For example, the ‘034 patent’s Abstract states that “[a] subscriber to the system delivers an outgoing facsimile message to the store and forward facility with which it is associated, which records the fax message together with data as to originating facsimile machine and destination facsimile machine. The store and forward facility then delivers the facsimile message to the intended receiver facsimile machine, either directly or through another store and forward facility. If unsuccessful on an initial attempt, the store and forward facility periodically retries to send the facsimile

message." Likewise, Catron discloses that "[f]or customers who prefer an automatic connection to a store and forward facility on busy, the busy indicator 174 on CCS message 172 can be used to set up the connection to the store and forward facility automatically."

83. Although they knew of Catron, the '034 Patent Seekers failed to cite Catron to the PTO during the '034 patent's prosecution, and, on information and belief, did so with intent to mislead the PTO. The deception succeeded, and the PTO later allowed the '034 patent to issue.

***The '021 Patent***

84. The '021 patent is unenforceable because it was obtained by inequitable conduct. Before the '021 patent issued, the '021 Patent Seekers were aware of information material to the patentability of claims of the '021 patent, but withheld and/or concealed that information from the PTO with the intention of deceiving that Office. The withheld/concealed information includes, without limitation, Document Distribution System and Catron.

***'021 and Document Distribution System***

85. As noted above, Document Distribution System was published on May 25, 1988. Document Distribution System is prior art to the '021 patent.

86. Before November 2, 2000, when they filed for the '021 patent, the '021 Patent Seekers knew of Document Distribution System. For example, in a January 8, 1993 IDS filed on their behalf with the PTO, they stated that they were providing every reference associated with the prosecution history of U.S. Patent No. 5,136,634 — but in fact they omitted Document Distribution System, although it had been cited in the '634 patent prosecution.

87. Document Distribution System was material to the prosecution of the '021 patent. For example, '021 claim 26 requires "the step, in response to instructions received from a mailbox subscriber, of transmitting the image stored in that subscriber's mailbox to a fax device." Likewise, Document Distribution System describes a "microcomputer-based system which uses voice generation circuitry to invite a person calling in to the system to specify the document needed by pushing particular keys of his/her touch-tone telephone. Upon ascertaining the identity of the document in question, the computer transmits the document to the caller in standard facsimile form, either over the telephone connection already

established if the telephone call was initiated from a telephone connected with a facsimile machine, or to a different telephone number specified by the caller."

88. Although they knew of Document Distribution System, the '021 Patent Seekers failed to disclose Document Distribution System to the PTO during the '021 patent's prosecution, and, on information and belief, did so with intent to mislead the PTO. The deception succeeded, and the PTO later allowed the '021 patent to issue.

***'021 and Catron***

89. As noted above, Catron issued on July 16, 1991. Catron is prior art to the '021 patent.

90. Before November 2, 2000, when they filed for the '021 patent, the Patent Seekers knew of Catron. For example, Mark Bloomfield, who at various times was the President or Managing Director, or both, of Catch Curve (when it was known as AudioFAX) was aware of Catron from the prosecution of U.S. Patent No. 6,157,464, which was filed on June 24, 1996 and during which Catron was cited, as the face page of the '464 patent reflects.

91. Catron was material to the prosecution of the '021 patent. For example, '021 claim 31 requires "the step of establishing in storage associated with the store and forward facility a linked queue spooling all stored images intended for a

particular destination, and transmitting all the spooled images intended for that particular destination upon successfully making contact with the destination." Likewise, Catron discloses that "[f]or customers who prefer an automatic connection to a store and forward facility on busy, the busy indicator 174 on CCS message 172 can be used to set up the connection to the store and forward facility automatically."

92. Although they knew of Catron, the '021 Patent Seekers failed to cite Catron to the PTO during the '021 patent's prosecution, and, on information and belief, did so with intent to mislead the PTO. The deception succeeded, and the PTO later allowed the '021 patent to issue.

93. Discovery will show additional bases for the unenforceability of the patents-in-suit, and IGC will amend or supplement, with the Court's approval if appropriate, IGC's unenforceability allegations after that discovery.

***Other Prior Art Known to the Counterclaim Defendants***

94. In June of 2003, IGC provided to the Counterclaim Defendants information about the UF-250 and UF-270 Panasonic Fax machines with store and forward capabilities that were sold in Japan and in the United States more than one year before the earliest of the AudioFAX Patents was filed. Strong contacted IGC in Chicago and informed IGC that the Counterclaim Defendants would not make

the USPTO aware of this prior art and, in fact, they did not cite it during the prosecution of the ’021 patent. Finally, admitting that the UF-270 was material prior art to all of the AudioFax patents, the Counterclaim Defendants cited it to the USPTO during the prosecution of the recently issued U.S. Patent No. 7,202,978. However, in furtherance of their fraudulent scheme, the Counterclaim Defendants did not include the entire document and did not inform the USPTO of its publication date with the intent to mislead the USPTO.

95. In addition, the Counterclaim Defendants were also aware of the 1983 Panamail UX4800 HV System and the UF-650 fax machines with store-and-forward capabilities and willfully did not cite them to the USPTO, acting with an intent to deceive. The User Manuals and Service Manuals for these fax machines fully disclosed and/or made obvious every feature of the alleged inventions claimed in the AudioFAX Patents.

96. The Counterclaim Defendants’ actions constitute fraud on the USPTO, as they were done with the intent to deceive the USPTO, and they succeeded. Each of the Counterclaim Defendants willfully utilized the U.S. mails to carry out their scheme to defraud the USPTO in violation of 18 U.S.C. § 1341.

**AntiTrust Summary**

97. j2 now dominates the Relevant Markets with a market share of over 90%. Therefore, customers desirous of these services have little choice when selecting an Internet facsimile service.

98. As a result of its illegally acquired and maintained market dominance, j2 has been able to charge artificially high prices for its services (which were recently increased by another $4 per month for individuals), reducing competition in these markets and precluding new competitive offerings to consumers. The Counterclaim Defendants have damaged consumers by attempting to eliminate competition and by quashing innovation in the Relevant Markets with costly, objectively baseless patent infringement lawsuits founded on invalid, non-infringed, and/or unenforceable patents.

99. j2 conspired with McLaughlin, Strong, and Schultz to further the scheme to eliminate all of j2's competitors, and they continued to actively and knowingly engage in such scheme with the other Counterclaim Defendants to achieve anticompetitive ends. j2, McLaughlin, and Strong have conspired with Ressler, Zucker, Turicchi, FTI, and Catch Curve to file and prosecute fraudulent patent applications with the intent to deceive the USPTO and assist in the creation of j2's monopoly by pursuing an anticompetitive, fraudulent scheme to intimidate

j2's competitors to enter into license agreements for the AudioFAX Patents, while knowing the patents to be invalid, not infringed, and unenforceable for having been obtained by fraud on the USPTO.

100. As described above, the conspiracy of the Counterclaim Defendants is kaleidoscopic in nature, with agents or employees of the various Counterclaim Defendants conspiring, both as individuals and as employees or agents, with others of the Counterclaim Defendants.

101. j2 has obtained a number of patents in order to foreclose or hinder competition with it in the Relevant Markets. It committed fraud on the USPTO in applying for some of these patents. In fact, two of j2's patents are currently being reexamined by the USPTO because of the existence of prior art that was known by j2 but not properly disclosed by j2 to the USPTO examiner during prosecution of the applications for those patents. j2 acted with the intent to defraud the USPTO, and its fraudulent motives render the patents unenforceable.

102. j2 filed applications in 1997 and 1998 that ultimately matured into United States Patents Nos. 6,208,638 (the *"'638 patent"*) and 6,597,688 (the *"'688 patent"*), respectively. The initial claims on the application for the '688 patent were rejected by the USPTO, and j2 cancelled all of the claims in favor of claims having claim limitations that ultimately issued as part of the '688 patent.

103. The USPTO rejected several of the newly added claims of the application for the ’688 patent because the specification of the application did not support them as required by 35 U.S.C. § 112, first paragraph. J2 conceded that the specification of the application lacked the required support but asserted that an attached appendix containing the specification of the ’638 patent provided the required support. The ’638 patent and the application that matured into the ’688 patent, however, did not share common inventors, and j2 knew this when it made its assertion of support to the USPTO. Therefore, j2 knew that the ’638 patent was prior art to the ’688 patent under 35 U.S.C. § 102(e). Nevertheless, j2 still advanced an argument of patentability even though it knew that the claims of the application giving rise to the ’688 patent were facially invalid based on the teachings of the ’638 patent. The USPTO relied upon j2's fraud in issuing the ’688 patent.

104. j2 also committed fraud on the USPTO in obtaining the ’638 patent. j2 advanced claims of patentability while knowing that relevant prior art expressly taught each and every element of one or more claims of the patent application. Specifically, the inventors of the ’638 patent worked with fax server boards sold and marketed under the brand names Brooktrout, Gammalink, and/or Dialogic prior to the filing of the application for the ’638 patent, yet failed to disclose the

functionality of these fax server boards to the USPTO. Each of the fax server boards incorporated functionality that directly anticipated at least one of the independent claims of the ’638 patent. The USPTO relied upon j2’s fraudulent misrepresentations and omissions, resulting in the issuance of the ’638 patent.

105. Aware of the invalidity and unenforceability of the ’638 and ’688 patents, j2 sought additional patents to assert against its competitors in the Relevant Markets. To that end, j2 purchased a portfolio of patents from NetOffice Solutions, Inc. -- the *“Bobo patents”*-- in 2004. These included, in part, U.S. Patent Nos. 6,350,066 (the *“’066 patent”*) and 6,564,321 (the *“’321 patent*”). j2 has begun to assert these patents against its competitors in the Relevant Markets in a campaign to obtain and maintain its dominant market share in the Relevant Markets.

106. Finding itself still without a reliable portfolio of patents to wield against its competitors, j2 acted quickly and surreptitiously to continue its scheme, and it began a conspiracy with others to maintain its dominant market position. In 2005, j2, Bloomfield, Ressler, Zucker, Turrichi, AudioFAX, McLaughlin, IPIG, and Strong created Catch Curve without disclosing its creation to j2’s shareholders or to the SEC in its public filings. Catch Curve then acquired a patent portfolio, known as the AudioFAX Patents, that, according to a press release announcing the

acquisition, covers "a range of inventions that incorporate fax store–and-forward technologies."

**j2's History of Fraud and Purchase of eFax**

107. Previously, in 1999, the then-owner of the AudioFAX Patents sued jFax.com, Inc. (*"jFax"*), the predecessor to j2, for infringement, asserting that the jFax Internet facsimile service (fax to e-mail) infringed the patents. jFax counterclaimed, alleging that all of the AudioFAX Patents were invalid and were not infringed by the jFax Internet fax service. In particular, Counterclaim Defendants Ressler, Hamerslag, Zucker, and Turrichi asserted that the AudioFAX Patents were invalid and were not infringed by j2, based on their internal investigation and documents showing that the AudioFAX Patents were limited to Fax-to-Fax systems using telephone lines to deliver facsimiles and did not cover the Internet delivery systems of the Internet facsimile services. These Counter-claim Defendants refer to the AudioFAX Patents as "FAX-to-FAX Patents" since they do not cover Internet facsimile services.

108. In 2000, Counterclaim Defendant j2's predecessor jFax sought to acquire a competitor at that time known as eFax.com. eFax.com (*"eFax"*) had previously entered into a co-location agreement with IGC, whereby IGC would perform many of the "backroom operations" for eFax. eFax provided Internet

facsimile services under the eFax brand, and IGC, in accordance with its contract with eFax, would receive facsimiles from eFax customers and, using its own systems, would convert them to data files, which would be thereafter transmitted to the e-mail addresses of the eFax customers as an attachment.

109. jFax was desirous of terminating the co-location agreement between IGC and eFax after its acquisition of eFax. In addition, jFax wanted to accomplish a smooth transition of the eFax customer base and the services being provided by IGC in the year 2000 and before. Therefore, jFax negotiated with IGC and entered into an agreement to transfer the service capabilities and further fulfill all of the obligations of the agreements that eFax owed to IGC. However, IGC wanted to be protected from charges of infringement under the AudioFAX patents, so it negotiated a warranty of non-infringement from jFax. As a result of these negotiations, jFax entered into a Software License Agreement (*"Software License"*) with IGC on June 30, 2000, whereby it warranted to IGC that none of the systems and software being used by IGC infringed any patents of which jFax was aware. However, at the time the Agreement was executed, jFax was a defendant in a lawsuit alleging infringement of the AudioFAX Patents and was therefore well aware both of the existence of those patents and that a lawsuit would be brought against IGC. Therefore, the negotiations resulted in j2's predecessor jFax

providing IGC an on-going warranty, which j2 has assumed, that IGC's activities did not and do not infringe the AudioFAX Patents. By causing Catch Curve to file a patent lawsuit alleging that IGC infringes the AudioFAX Patents, j2 breached the Software License when the Complaint in this case was filed in 2005.

110. In 2001, the AudioFAX litigation with jFax was settled. Thereafter, Counterclaim Defendants j2, McLaughlin, Strong, Ressler, Zucker, Hamerslag, Turicchi, FTI, and Schultz organized an even more aggressive litigation scheme, which is now being vigorously pursued by all the Counterclaim Defendants. In accordance with this conspiracy, the Counterclaim Defendants agreed that j2 would nominally acquire title to the AudioFAX Patents and use them, in addition to patents already owned by j2, to quash competition by suing j2's competitors, even though they did not infringe the patents, since the competitors would not have the resources to deal with such sham patent litigation.

111. This scheme was undertaken by the Counterclaim Defendants outside of the course of their operation of the various Internet facsimile services, and used the patents held by the various parties for the purpose of extracting settlement payments by extortion, threats, and fear.

112. Thereafter, in furtherance of the conspiracy in January of 2005, j2 created Catch Curve and directed it to use patent litigation to eliminate competition

in the Relevant Markets. j2 created Catch Curve to acquire the AudioFAX Patents without drawing shareholder and public attention to its illegal scheme. j2 intentionally did not disclose its creation of Catch Curve to its shareholders or to federal regulators in its public SEC filings.

113. In February of 2005, Catch Curve acquired title to the AudioFAX Patents.

**Catch Curve's and j2's Licensing and Litigation Scheme**

114. Catch Curve is not an operating company. It functions solely as a "patent troll," filing lawsuits against Internet service providers that compete with j2 but refuse to purchase a license to use the Catch Curve patents. Since its creation in 2005, Catch Curve has held no additional patents that represent innovation or new inventions. It exists solely to extract money from j2's competitors in the Relevant Markets and to harm their efforts to compete and innovate. Such companies have long been recognized as cancerous to competition and innovation.

115. To date, j2 and Catch Curve, either alone or in conjunction with each other, have filed numerous infringement lawsuits against j2's competitors in the Relevant Markets in an extortion scheme to raise competitors' costs, drive them

out of the market entirely, and drive up prices for consumers by eliminating competition in the Relevant Markets.

116. Catch Curve has referred to this scheme to shakedown competitors of j2 as Catch Curve's "AudioFAX Patent Licensing Program" and as Catch Curve's effort to "make innovative technologies available to the public at reasonable terms and conditions." Despite its claims of innovation, Catch Curve has never conducted any research, invented any products, or provided any services or products in the market. The patents it holds were acquired from another company immediately after it was formed by j2. j2 created Catch Curve to nominally hold title to the AudioFAX Patents and also to charge infringement against companies that compete with j2 in the Relevant Markets. j2 and Catch Curve know that the asserted patents are invalid and do not cover the allegedly infringing activities. Catch Curve extracts costly licenses from companies engaged in competition with j2 in the Relevant Markets, and initiates litigation against companies that do not pay. No lawsuit ever filed by Catch Curve has resulted in a contested judicial finding of infringement by an alleged infringing competitor. Instead, Catch Curve uses the litigation process to extort license fees for the benefit of the Counterclaim Defendants that cost competitors less than the cost of litigating a case to judgment.

117. IPIG "administers" the j2/Catch Curve licensing scheme. Typically, the patent portfolio administrator identifies potential violators of its clients' patents, establishes a value for them, and handles the collection and administration of licensing fees. For the benefit of j2, Catch Curve and IPIG have utilized the licensing program specifically to raise rivals' costs by threatening and initiating objectively baseless infringement lawsuits against companies that compete with j2 in the Relevant Product Market.

118. The cost for licenses under the patents by IPIG in its licensing proposals is substantial but never high enough to encourage the targets of the conspiracy to litigate to avoid such cost. The total fees generated from this licensing program enable j2 to lower its costs of participating in the Relevant Markets at the expense of smaller rivals' businesses and while raising their costs to compete with j2.

119. Companies that have refused to pay for licenses, including IGC, have been sued by Catch Curve. Other companies, including significant competitors of j2, have been sued by j2 and/or Catch Curve without having been offered a license. These infringement lawsuits are objectively baseless. j2 and Catch Curve know that the AudioFAX Patents that they seek to monetize and enforce against companies competing with j2 in the Relevant Markets are invalid, unenforceable,

and do not cover the services sold by the competitors they have sued. They are predicated on patents that no reasonable litigant would expect to be held infringed by companies competing in the Relevant Markets. These patent infringement actions have caused j2's competitors to incur substantial litigation expenses to defend themselves against meritless allegations of infringement. They have forced companies into unnecessary and unwanted licensing arrangements for patents that cannot be construed to cover the activities Catch Curve claims are infringing.

120. Recently, after a claim construction hearing involving the AudioFAX Patents, the United States District Court for the Central District of California rendered an Opinion, dated May 11, 2007, that found that the claims of the AudioFAX Patents are not infringed by any Internet facsimile service that delivers documents to its customers by any means other than conventional telephone lines. A true copy of the Order is attached hereto as Exhibit 1.

121. IGC is just one of the latest targets of the Counterclaim Defendants' patent trolling scheme. j2 and Catch Curve have targeted IGC in an effort to impose costs on IGC that are disproportionately large compared with the total sales of IGC in the Relevant Markets, in an effort to raise IGC's costs to conduct that business and to prevent IGC from expanding its sales and market share in that market.

**Misuse of Patents in Bad Faith Infringement Lawsuits**

122. j2 is the most dominant company in the Relevant Markets. j2, however, has not been content with its dominant market position and has sought ways to use its cash and other liquid assets, which exceed Two Hundred Million Dollars ($200,000,000.00), to eliminate its remaining competitors. In order to try to gain complete control of the market, j2 has waged and continues to wage a campaign of acquiring its competitors. If a competitor refuses to be acquired, j2 sues to run that competitor out of business by crushing it with costly patent infringement litigation. j2 has filed multiple lawsuits against its competitors to force them to spend precious time, energy, and money to defend themselves.

123. Many of the competitors targeted by j2 are small businesses, with few employees, often operating out of the owners' homes.

124. The aforesaid lawsuits were and are being brought in bad faith to enforce patents that j2 knows are invalid, not infringed, or unenforceable. In the process of waging these bad faith and anticompetitive lawsuits, j2 also intimidates and harasses the customers of its competitors by threatening to include the customers in the patent lawsuits - just as Catch Curve has included MTI, a customer of IGC, in this case.

125. Such lawsuits attempt to induce the targeted competitor to make payments and employ the use of economic fear and crushing legal fees to compel the target to pay for a license. Such conduct has an adverse effect on interstate commerce.

126. Since 1999, and well prior to the time that Catch Curve acquired the AudioFAX Patents, j2 had stated that the AudioFAX Patents were invalid and inapplicable to the Relevant Markets. Specifically, in the earlier lawsuit charging jFax with infringement of the AudioFAX Patents, j2 asserted that the AudioFAX Patents cannot apply to Internet facsimile services. Yet, at present j2 and Catch Curve assert claims for infringement of the AudioFAX Patents against IGC and other entities engaging in the Relevant Markets only by using Internet capabilities. Thus, j2 and Catch Curve have asserted claims of patent infringement that they know are without merit and brought in bad faith. Litigation cases asserting the AudioFAX Patents against IGC and others in the Relevant Markets are a sham, being objectively baseless, and are deployed by each of the Counterclaim Defendants wrongfully to eliminate competition.

127. The claims which AudioFAX, j2, and Catch Curve make under the AudioFAX Patents and the manner in which they construe them are so overbroad, excessive, and unreasonable that they clearly amount to actionable extortion.

These fraudulent claims have been sent by mail and e-mail to scores and possibly hundreds of j2's competitors in violation of the Federal Mail Fraud Statute and the Federal Wire Fraud Statute. Further, the claims they make are calculated to encompass products, services, and technologies that they know are non-infringing, thereby unlawfully seeking to extend the scope of their patents. Catch Curve and each of the Counterclaim Defendants has successfully used their overly broad construction of these patents and others to mount a litigation assault on companies in the Relevant Markets to restrain and eliminate competition in the industry.

128. AudioFAX, Catch Curve, and j2 have mounted a coordinated attack on Internet service providers in the Relevant Markets that compete with j2. They have filed numerous patent infringement actions causing competitors to lose substantial income and to incur substantial litigation expenses in defending against meritless claims. They have, by their extortion, forced other companies into unnecessary and unwanted licensing arrangements for irrelevant, non-infringed patents.

129. The scheme has worked by offering licenses that were less expensive than the cost to defend the threatened litigation. Indeed, on its website (www.catchcurve.com/about), Catch Curve touts its mission as being "to license its technology without the complications and expense of litigation." Companies that

refused to pay, however, were sued in the Northern District of Georgia by Catch Curve. Many such suits were then settled for amounts less than the cost of litigation, typically less than $1 million for a lump sum, fully paid-up license. j2 and Catch Curve have successfully employed these anticompetitive suits in furtherance of their scheme to eliminate or lessen competition in the Relevant Markets, which has resulted in substantially less competition, all to the detriment of consumers who now pay higher prices.

130. j2 attempted to hide its scheme with and ownership of Catch Curve by making false statements to the public and by failing to report its activities with respect to Catch Curve in its quarterly and annual reports. For example, during a February 6, 2006 conference call with securities analysts, Counterclaim Defendant Scott Turicchi, Co-President and Chief Financial Officer of j2, described j2's relationship with Catch Curve as follows:

> STEVE FREITAS (Analyst, Harris Nesbitt Gerard): In some of these suits, it seems like you've come to it jointly with a company called Catch Curve. Can you just describe how those patents are spread among you and that entity?
>
> TURICCHI: Well Catch Curve, we have a small – we have an interest in the Catch Curve entity. They have their own team

> that goes out and either asserts the patents through litigation or attempts to, you know, generate royalty revenue through settlement. So, we have our set of patents; they have their set of patents. There are instances where we run into each other. There's maybe two or three of the litigations where it's a combination of the patents.

131. These false and misleading statements were intentionally made to, and did, conceal and cover up j2's real, financial interest in Catch Curve and they therefore constitute additional fraudulent activity in violation of 18 U.S.C. § 1343.

132. In December 2005, j2 contacted IGC suggesting that j2 was interested in purchasing IGC. After IGC provided confidential information to j2 about its business activities, customers and revenues, j2 made an offer to purchase IGC that was far below the fair value of IGC. After IGC rejected the lowball offer from j2, the Counterclaim Defendants agreed that Catch Curve should sue IGC and MTI for patent infringement. The Counterclaim Defendants sent another e-mail to IGC and its shareholders on January 3, 2006, in furtherance of their conspiracy to eliminate competition.

133. This pattern of predatory acquisition is a secondary tactic used by the Counterclaim Defendants to capture value from its competitors independently of the Counterclaim Defendants having any superior Internet facsimile services.

134. j2 and Catch Curve have demonstrably engaged in a pattern of using unlawful litigation, or the threat thereof, as part of j2's standard extortion scheme to acquire its competitors and/or to run them out of business.

135. In addition to the objectively frivolous patent infringement litigation brought against IGC and MTI in bad faith by Catch Curve, AudioFAX, j2 and Catch Curve have also filed patent infringement lawsuits against industry competitors such as Boston Technology, Inc., Cable & Wireless USA, Inc., Captaris, Inc., Cisco Systems, Inc., Delrina Corporation (subsidiary of Symantec Corporation), Digital Sound Corporation, FaxSav, Inc., Premiere Technologies, Inc. and Premiere Communications, Inc., Sprint Communications Company, Venali, Inc., EasyTel Communications, Protus IP Solutions, Mijanda, Topcall Corporation, GoDaddy.com, Inc., Graphnet, Inc., Fenestrae, Inc., Biscom, Inc., Callware Tech., Inc., Esker S.A. and Esker, Inc., Open Text Corporation, Smith Micro Software, Inc., uReach Technologies, Inc., GFI USA, Inc., Callwave and Vera Cruz Marketing Inc. Notably, three of these lawsuits were filed within weeks

of EasyTel, Protus, and Mijanda objecting to j2's efforts to register as its trademark the generic term "efax."

136. Venali has filed an Antitrust Complaint against j2 and some of the other Counterclaim Defendants in this action, prior to the full extent of the conspiracy and restraint of trade becoming known. That Complaint was transformed into a counterclaim against j2 in a suit pending in the United States District Court for the Central District of California, Case No. CV05-04820 DDP. j2's motion to dismiss that counterclaim was DENIED.

137. GoDaddy also filed a multi-count antitrust complaint against j2 and others in the United States District Court in Arizona, Case No. CV06-2474-PHX-NVW. That case has since been dismissed as part of a settlement.

**Counterclaim Defendants' Racketeering Activity**

138. j2, Catch Curve, Inc., Ressler, McLaughlin, IPIG, Strong, AudioFAX, AudioFAX IP, Bloomfield, Kennedy, Zucker, Turicchi, Shultz, and FTI, and others unknown, have conducted and are presently conducting an enterprise consisting of an association-in-fact for the purpose of procuring and exploiting patents held by or in the name of AudioFAX, j2, Catch Curve, Dynamic Depth, and others (the "*Trolling Enterprise*"). The continuing unit formed by these parties constitutes a

RICO Enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, or the activities of which affect, interstate commerce.

139. Each of the Counterclaim Defendants is associated with the Trolling Enterprise, and has managed and conducted the affairs of that Trolling Enterprise, directly or indirectly through a continuing pattern of racketeering activity, and through the repeated, continuous, and fraudulent use of the U.S. mail and the interstate use of wires in furtherance of their scheme to fraudulently obtain the issuance of patents and to illegally and wrongfully obtain the payment of money through extortion and the exploitation of patents knowingly obtained through fraud and other inequitable or unlawful conduct. Counterclaim Defendants have utilized the Trolling Enterprise for the prosecution and enforcement of invalid patents, with the common purpose to fraudulently prosecute the patents in the USPTO and to exploit those patents through extortion, repetitive threats, abusive litigation, harassment of competitors and their competitors' customers, overreaching licensing arrangements, and other strategies, all through a pattern of racketeering activity.

140. As part of this pattern of racketeering activity, patents being used in the Trolling Enterprise are being divided into multiple sets so that different sets of patents can be enforced by a different member of the Trolling Enterprise by

threats, trade disparagement, objectively baseless litigation, and other forms of intimidation. As described, among the activities of the Trolling Enterprise are the procurement and exploitation of various patents through fraud and other inequitable or unlawful conduct, with the intent and effect of defrauding Internet service providers and competitors of j2, including but not limited to IGC and MTI, and seeking to coerce and successfully coercing such persons into paying unconscionable royalty fees to the association-in-fact and its representatives.

141. The Trolling Enterprise and the Counterclaim Defendants individually have also participated in the scheme to prosecute a continued and unremitting stream of patent applications before the USPTO without full or fair disclosure of all material facts, to use and manipulate USPTO procedures to obtain the issuance of patents in the name of AudioFAX, j2, or Catch Curve, and to exploit those wrongfully obtained patents.

**Pattern of Racketeering Activity**

142. In their associations with and employment by the Trolling Enterprise, each Counterclaim Defendant has managed, conducted and participated in the affairs of that enterprise, directly or indirectly, through a continuing pattern of racketeering activity including the repeated and continuous use of the U.S. mail and the interstate use of wires in furtherance of their scheme to fraudulently obtain

the issuance of patents and to illegally and wrongfully obtain the payment of money through the assertion of patents knowingly obtained through fraud and other inequitable or unlawful conduct.

**Use of U.S. Mail and Interstate Wires**

143. Although the following is by no means exhaustive, multiple specific examples of each of the Defendants' acts of fraudulent utilization of U.S. mail and interstate wires in support of the furtherance of the extortion scheme and artifice to defraud IGC and MTI based upon the fraudulently obtained patents, in furtherance of the Trolling Enterprise, include but are not limited to the following:

a. On February 19, 2003, Bloomfield, Kennedy, AudioFAX, Strong and McLaughlin agreed with one another to, and did use, or caused to be used, the U.S. mail to send an extortion threat in the form of a letter from Atlanta, Georgia to IGC in Chicago fraudulently and falsely asserting IGC's alleged infringement of certain of the fraudulently procured patents used by the Trolling Enterprise.

b. On April 23, 2003, Bloomfield, Kennedy, AudioFAX, Strong and McLaughlin agreed with one another to, and did use, or caused to be used, the U.S. mail to send an extortion threat in the form of a letter from Atlanta, Georgia to IGC in Chicago fraudulently and falsely asserting IGC's

alleged infringement of certain of the fraudulently procured patents used by the Trolling Enterprise.

c. On June 16, 2003, Bloomfield, Kennedy, AudioFAX, Strong and McLaughlin agreed with one another to, and did use, or caused to be used, the U.S. mail to send an extortion threat in the form of a letter from Atlanta, Georgia to IGC in Chicago fraudulently and falsely asserting IGC's alleged infringement of certain of the fraudulently procured patents used by the Trolling Enterprise.

d. On August 15, 2003, Bloomfield, Kennedy, AudioFAX, Strong and McLaughlin agreed with one another to, and did use, or caused to be used, the U.S. mail to send an extortion threat in the form of a letter from Atlanta, Georgia to IGC in Chicago fraudulently and falsely asserting IGC's alleged infringement of certain of the fraudulently procured patents used by the Trolling Enterprise.

e. On November 20, 2003, Bloomfield, Kennedy, AudioFAX, Strong and McLaughlin agreed with one another to, and did use, or caused to be used, the U.S. mail to send an extortion threat in the form of a letter from Atlanta, Georgia to IGC in Chicago fraudulently and falsely asserting

IGC's alleged infringement of certain of the fraudulently procured patents used by the Trolling Enterprise.

f. On April 27, 2005, j2, Catch Curve, Ressler, IPAC, Zucker, Turrichi, Bloomfield, Kennedy, AudioFAX, Strong and McLaughlin agreed with one another to, and did use, or caused to be used, the U.S. mail to send an extortion threat in the form of a letter from Atlanta, Georgia to IGC in Chicago fraudulently and falsely asserting IGC's alleged infringement of certain of the fraudulently procured patents used by the Trolling Enterprise.

g. On June 16, 2005, j2, Catch Curve, Ressler, IPAC, Zucker, Turicchi, Bloomfield, Kennedy, AudioFAX, Strong and McLaughlin agreed with one another to, and did use, or caused to be used, the U.S. mail to send an extortion threat in the form of a letter from Atlanta, Georgia to IGC in Chicago fraudulently and falsely asserting IGC's alleged infringement of certain of the fraudulently procured patents used by the Trolling Enterprise.

h. On June 16, 2005, j2, Catch Curve, Ressler, McLaughlin, Strong, IPAC, Zucker, and Turicchi agreed with one another to, and did use, or caused to be used, the U.S. mail to send an extortion threat in the form of a letter from Atlanta, Georgia to IGC in Chicago fraudulently and

falsely asserting IGC's alleged infringement of certain of the fraudulently procured patents used by the Trolling Enterprise.

i. On October 3, 2005, j2, Catch Curve, Ressler, McLaughlin, Strong, IPAC, Zucker, and Turicchi agreed with one another to, and did use, or caused to be used, the U.S. mail to send an extortion threat in the form of a letter from Atlanta, Georgia to IGC in Chicago fraudulently and falsely asserting IGC's alleged infringement of certain of the fraudulently procured patents used by the Trolling Enterprise.

j. On November 1, 2005, j2, Catch Curve, Ressler, McLaughlin, Strong, IPAC, Zucker, and Turicchi agreed with one another to, and did use, or caused to be used, the U.S. mail to send an extortion threat in the form of a letter from Atlanta, Georgia to IGC in Chicago fraudulently and falsely asserting IGC's alleged infringement of certain of the fraudulently procured patents used by the Trolling Enterprise.

k. On January 26, 2006, j2, Catch Curve, Ressler, McLaughlin, Strong, IPAC, Zucker, and Turicchi agreed with one another to, and did use, or caused to be used, the U.S. mail to send an extortion threat in the form of a letter from Atlanta, Georgia to IGC in Chicago fraudulently and

falsely asserting IGC's alleged infringement of certain of the fraudulently procured patents used by the Trolling Enterprise.

l. On March 1, 2006, Schultz and Ressler agreed with one another to, and did use or caused to be used, the U.S. Mail to send an extortion threat in the form of a letter from Ashland, Oregon to MTI in Hatboro, Pennsylvania in furtherance of his agreement with j2 and in the course of his management of the extortion scheme regarding certain of the fraudulently procured patents utilized by the Trolling Enterprise.

m. On September 14, 2006, Schultz and FTI used or caused to be used, the U.S. Mail to send an extortion threat in the form of a letter from Los Angeles, California to MTI in Hatboro, Pennsylvania in furtherance of their agreement with j2 and management of the extortion scheme regarding certain of the fraudulently procured patents utilized by the Trolling Enterprise.

n. On January 5, 2007, Schultz and FTI used or caused to be used, the U.S. Mail to send an extortion threat in the form of a letter from Los Angeles, California to MTI in Hatboro, Pennsylvania in furtherance of their agreement with j2, Catch Curve, Ressler, IPAC, Zucker, Turicchi, Bloomfield, Kennedy, AudioFax, Strong and McLaughlin and in

connection with each person, management of the extortion scheme regarding certain of the fraudulently procured patents utilized by the Trolling Enterprise.

o. On July 24, 2007, Schultz used or caused to be used, the U.S. Mail to send an extortion threat in the form of a letter from Los Angeles, California to MTI in Hatboro, Pennsylvania in furtherance of his agreement with j2 and management of the extortion scheme regarding certain of the fraudulently procured patents utilized by the Trolling Enterprise.

p. On June 15, 2007, Schultz used or caused to be used, interstate wires to effectuate the transmission of a telephone call from Los Angeles, California to Hatboro, Pennsylvania in furtherance of his agreement with j2 and management of the extortion scheme regarding certain of the fraudulently procured patents utilized by the Trolling Enterprise.

144. Each of the Counterclaim Defendants named herein has engaged in the commission of two or more of the above-described acts within the four years prior to filing this Complaint. All of the Counterclaim Defendants participated in the violation of 18 U.S.C. § 1962(c) in one or more capacities as primary actors and/or agents and representatives of one another and/or aiders and abettors of one another.

**Violation of the Hobbs Act 18 U.S.C. 1951, *et.seq*.**

145. By making threats, engaging in trade disparagement, instituting or threatening to institute objectively baseless litigation, and engaging in other forms of intimidation, the Counterclaim Defendants have induced, or attempted to induce, their victims to part with property through the use of economic fear. This fear has had an adverse effect on interstate commerce by stifling competition in the market for Internet facsimile services.

146. All of the Defendants participated in the violation of 18 U.S.C. § 1951, *et. seq*. in one or more capacities as primary actors and/or as agents and representatives of one another and/or as aiders and abettors of one another.

**Continuity and Relatedness of Pattern of Racketeering**

147. Each of the foregoing acts of racketeering by the Counterclaim Defendants is related to the others, and the acts are continuous and part of a pattern of conduct pertaining to multiple patents, directed toward multiple victims including but not limited to IGC, commencing in and continuing over the past four years. Counterclaim Plaintiff has suffered losses of more than Three Million Dollars ($3,000,000.00) which was proximately caused by the Counterclaim Defendants' RICO violation. Counterclaim Plaintiff is informed and believes that in addition to targeting IGC, Counterclaim Defendants operated the Trolling

Enterprise through extortion, mail fraud, and wire fraud, directing similar claims of infringement, and similar threats of litigation, to, among others, Boston Technology, Inc., Cable & Wireless USA, Inc., Captaris, Inc., Cisco Systems, Inc., Delrina Corporation (subsidiary of Symantec Corporation), Digital Sound Corporation, FaxSav, Inc., Premiere Technologies, Inc. and Premiere Communications, Inc., Sprint Communications Company, Venali, Inc., EasyTel Communications, Protus IP Solutions, Mijanda, Topcall Corporation, GoDaddy.com, Inc., Graphnet, Inc., Fenestrae, Inc., Biscom, Inc., Callware Tech., Inc., Esker S.A. and Esker, Inc., Open Text Corporation, Smith Micro Software, Inc., uReach Technologies, Inc., GFI USA, Inc., register.com, and Outblaze Limited and used the U.S. mail and wires to send letters to them substantially similar to those sent to Plaintiff.

148. The fraudulent scheme furthered by these acts of racketeering is ongoing and continuous as Counterclaim Defendants have informed Counterclaim Plaintiff that Catch Curve has patent applications currently pending before the PTO which it asserts are entitled to priority based upon prior patent applications claiming priority dates dating back to 1988. Accordingly, Counterclaim Defendants have, and are, engaged in a continuing and related pattern of

racketeering activity within the meaning of 18 U.S.C. § 1961(5), which poses a threat of continued criminal activity.

**The Relevant Markets**

149. Counterclaim Defendants' anticompetitive conduct described above has had, and will continue to have, an adverse effect on the Relevant Markets, including but not limited to j2's artificially inflated pricing.

150. There are substantial barriers to entry into the Relevant Markets including, without limitation, patents owned by AudioFAX, j2, and Catch Curve. Further, there are no adequate alternative products or services for the end users in the Relevant Markets.

151. In addition to the anticompetitive effects on the Relevant Markets, the Counterclaim Defendants' anticompetitive conduct has had and is likely to continue to have restraining effects on the market for innovation in the technologies for the Relevant Markets.

**Interstate Commerce**

152. The conduct described above affects and restrains substantial amounts of interstate and foreign commerce.

## COUNT I

## Invalidity of Each of the Patents in Suit

153. IGC repeats and realleges each of the allegations contained in Paragraphs 1 through 152 above as Paragraph 153 of this Count I.

154. Each of the Patents in Suit is invalid under one or more sections of Title 35, United States Code, including section 102 (anticipation), 103 (obviousness), and 112 (indefiniteness), in view of the prior art to each such patent and the knowledge of one of ordinary skill in the art to which the subject matter pertains.

## COUNT II

## Unenforceability of Each of the Patents in Suit

155. IGC repeats and realleges each of the allegations contained in Paragraphs 1 through 154 above as Paragraph 155 of this Count II.

156. Each of the Patents in Suit is unenforceable due to the Patent Seekers' intentional concealment from the Patent Office examiner of prior art known to the Patent Seekers to be material to the examination of claims of each such patent.

## COUNT III

## Non-Infringement of Each of the Patents in Suit

157. IGC repeats and realleges each of the allegations contained in Paragraphs 1 through 156 above as Paragraph 157 of this Count III.

158. Each of the Patents in Suit is not infringed by any product or service or method of IGC or MTI, as each of the claims thereof is limited in its proper interpretation to Fax-to-Fax methods using telephony switches and cannot read, literally or under the doctrine of equivalents, on packet-switched networks such as IGC and MTI exclusively use.

## COUNT IV

## Violation of Section 7 of the Clayton Act

## Monopolization

## (j2)

159. IGC repeats and realleges each of the allegations contained in Paragraphs 1 through 158 above as Paragraph 159 of this Count IV.

160. By means of the anticompetitive conduct alleged herein directed at competitors of j2, including but not limited to IGC and MTI, j2 has achieved for itself a monopoly in the Relevant Markets.

161. j2 has violated 15 USC §§ 12-27 by acquiring or destroying competitors and thus reducing competition in the Relevant Markets. j2 has, within the last few years purchased the patents, stock, and other assets of at least the following smaller, direct competitors of j2 formerly participating in the Relevant Markets:

a. Hamilton Communication;

b. Total Telecom;

c. M4 Internet;

d. eFax;

e. Electric Mail;

f. Onebox;

g. Call Sciences, Ltd.;

h. Data On Call; and

i. Puma Unified Communications, Ltd.

162. j2 has violated 15 USC §§ 12 et seq. by using its market power to interfere in its competitors' sales, including IGC's sales, by timing its filing of sham patent litigation and its making threats of litigation to destroy prospective customers', including business prospects' and partners', interests in dealing with IGC and others in the Relevant Markets. Further anticompetitive acquisitions are

being planned to eliminate more of j2's competition and will continue unless enjoined by this Court. IGC's customer base has thus been limited by the threatened and actual, baseless litigation brought by j2 and Catch Curve, asserting the patents in suit.

163. The objectively baseless litigation instituted by the Counterclaim Defendants has had a chilling effect on the Relevant Market and has caused competitors to exit, and potential competitors to not enter, the Relevant Market.

164. By reason of the foregoing violations, competition has been substantially reduced and many competitors have been forced out of the market, and IGC has been damaged in its business and property.

## COUNT V

## Violations of RICO

## (18 U.S.C. § 1962(c) & (d))

## (Against All Counterclaim Defendants)

165. IGC repeats and realleges each of the allegations contained in Paragraphs 1 through 164 above as Paragraph 165 of this Count V.

166. Each Counterclaim Defendant is a separate entity capable of holding a legal or beneficial interest in property and, as such, constitutes a "person" within

the meaning of 18 U.S.C. § 1961(3). Each Counterclaim Defendant is distinct from the Trolling Enterprise and has participated and managed the enterprise itself.

167. Each of the Counterclaim Defendants has aided and abetted and engaged in two or more violations of the Federal Mail Fraud Statute, 18 U.S.C. § 1341, and/or the Federal Wire Fraud Statute, 18 U.S.C. § 1343, as well as the Hobbs Act, 18 U.S.C. § 1951, and have thereby engaged in predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B), within the past four years, in the United States.

168. As a direct and proximate result of the Counterclaim Defendants' participating directly in and conducting the affairs of the Trolling Enterprises through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and conspiracy to violate 18 U.S.C. § 1962(c), Counterclaim Plaintiff has been injured in its business and property caused by each of the Counterclaim Defendants' participation in the affairs of the Trolling Enterprise which is engaged in a pattern of racketeering activity and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), is thereby entitled to recover threefold the damages it has suffered, together with its costs of suit and reasonable attorneys' fees and expenses thereon, from Counterclaim Defendants.

169. j2, Catch Curve, Ressler, McLaughlin, Strong, AudioFAX, AudioFAX IP, Bloomfield, Kennedy, Zucker, Turicchi, Hamerslag, Schultz, and FTI have utilized the mail, wire, and e-mail in making fraudulent statements to third parties and to the USPTO.

170. Catch Curve, Ressler, McLaughlin, Strong, AudioFAX, AudioFAX IP, Bloomfield, Kennedy, Zucker, Turicchi, Hamerslag, Schultz, and FTI have utilized threats. Intimidation, and economic fear as tools to obtain or attempt to obtain property from the Counterclaim Plaintiffs and other competitors in the Relevant Markets.

171. By reason of the foregoing violations, IGC has been damaged in its business and property.

## COUNT VI

## Violation of Sherman Act §§ 1 and 3

## (Restraint of Trade by j2)

172. IGC repeats and realleges each of the allegations contained in Paragraphs 1 through 171 above as Paragraph 172 of this Count VI.

173. Prior to the time that Catch Curve commenced its infringement action against IGC, Catch Curve and j2 knew that the AudioFAX Patents were procured by fraud on the USPTO. j2 also knew that the claims made by AudioFAX and

Catch Curve that j2's competitors, including IGC and MTI, infringed the AudioFAX Patents were objectively baseless in that no reasonable litigant could realistically expect success on the merits.

174. Nonetheless, with the intent of restraining trade and forcing j2's competitors, including IGC and MTI, into a licensing arrangement that would make them less threatening competitors, and in bad faith, j2 and Catch Curve engaged in a contract, combination, or conspiracy and had Catch Curve commence sham infringement actions against j2's competitors, including IGC and MTI.

175. j2 has unlawfully gained in excess of 90% of the Relevant Markets by its unlawful arrangements, threats, and litigation with or against its competitors.

176. Said litigation has been brought in furtherance of a violation of the antitrust laws that is being perpetuated by j2 in the Relevant Markets.

177. j2's actions have restrained trade in the Relevant Markets.

178. By reason of the foregoing violations of the antitrust laws, IGC has been damaged in its business and property.

## COUNT VII

## Sherman Act § 1

## Contract or Conspiracy to Restrain Trade

## (All Counterclaim Defendants)

179. IGC incorporates the allegations contained in Paragraphs 1-178 above as Paragraph 179 of this Count VII.

180. Counterclaim Defendants have agreed and conspired among themselves to restrain trade in the Relevant Markets.

181. Counterclaim Defendants have acted overtly to further their conspiracy by, among other things:

- Perpetrating fraud on the USPTO in order to obtain the AudioFAX Patents;
- Threatening and instituting objectively baseless, sham infringement actions against IGC and other competitors of j2 in the Relevant Markets, with full knowledge that the patents-in-suit were invalid, unenforceable, obtained by fraud, and not infringed by IGC's or other competitors' services, for the purpose of and thereby subjecting the targets of this conspiracy to foreclosure from the

Relevant Markets and to unnecessary license fees and litigation expenses, and raising their costs while lowering j2's costs; and

- Acting to interfere with IGC's and other j2's competitors' business expectancies.

182. Counterclaim Defendants' agreement and conspiracy to restrain trade have taken place and impacted and/or affected interstate commerce and the Relevant Markets.

183. Counterclaim Defendants' agreement and conspiracy to restrain trade, in causing harm to competition and consumers, have caused a loss of revenue by Counterclaim Plaintiff IGC.

184. Counterclaim Defendants have benefited individually from their participation in the conspiracy, and have from time to time conspired with the principals and agents, as the case may be, of the other Counterclaim Defendants to carry out the goals of the conspiracy.

## COUNT VIII

## Sherman Act § 2

## (Monopolization by j2)

185. IGC incorporates the allegations contained in Paragraphs 1-184 above as Paragraph 185 of this Count VIII.

186. j2 has acted overtly to create its monopoly in the Relevant Markets by, among other things:

- Perpetrating fraud on the USPTO in order to obtain the j2 and AudioFAX Patents;
- Threatening and instituting objectively baseless infringement actions against IGC and other competitors of j2 in the Relevant Markets, with full knowledge that the patents-in-suit were invalid, unenforceable, obtained by fraud, and not infringed by IGC's and other competitors' products and services, for the purpose of and thereby subjecting the targets of this monopolization to foreclosure from the Relevant Markets and to unnecessary license fees and litigation expenses, and raising their costs while lowering j2's costs; and

- Acting to interfere with IGC's and other j2 competitors' business expectancies.

187. j2's monopoly has been achieved and has impacted interstate commerce and the Relevant Markets.

188. Counterclaim Defendants have benefited individually from their participation in the conspiracy, and they have from time to time conspired with the principals and agents, as the case may be, of other Counterclaim Defendants to carry out the goals of the conspiracy.

**COUNT IX**

**Sherman Act § 2**

**(Attempt to Monopolize by All Counterclaim Defendants)**

189. IGC incorporates the allegations contained in Paragraphs 1-188 above as Paragraph 189 of this Count IX.

190. Counterclaim Defendants have agreed among themselves to attempt to create a monopoly in j2 in the Relevant Markets.

191. Counterclaim Defendants have acted overtly by, among other things:

- Perpetrating fraud on the USPTO in order to obtain the AudioFAX Patents;

- Threatening and instituting objectively baseless infringement actions against IGC and other competitors of j2 in the Relevant Markets, with full knowledge that the patents-in-suit were invalid, unenforceable, obtained by fraud, and not infringed by IGC's or other competitors' services, for the purpose of and thereby subjecting the targets of this conspiracy to foreclosure from the Relevant Markets and to unnecessary license fees and litigation expenses, and raising their costs while lowering j2's costs; and
- Acting to interfere with IGC's and other j2's competitors' business expectancies.

192. There is a dangerous probability that j2 will obtain monopoly power in the Relevant Markets.

193. Counterclaim Defendants' agreement and conspiracy have taken place and have impacted and/or affected interstate commerce within the past four years.

194. Counterclaim Defendants' agreement and conspiracy, in causing harm to competition and consumers, has caused a loss of revenue by Counterclaim Plaintiff.

195. Counterclaim Defendants have benefited individually from their participation in the conspiracy, and have from time to time conspired with the

principals and agents, as the case may be, of other Counterclaim Defendants to carry out the goals of the conspiracy.

## COUNT X

## Sherman Act § 2

## (Conspiracy to Monopolize by All Counterclaim Defendants)

196. IGC incorporates the allegations contained in Paragraphs 1-195 above as Paragraph 196 of this Count X.

197. Counterclaim Defendants have conspired to create a monopoly in the Relevant Markets.

198. Counterclaim Defendants have acted overtly to further their conspiracy by, among other things:

- Perpetrating fraud on the USPTO in order to obtain the AudioFAX Patents;
- Threatening and instituting objectively baseless infringement actions against IGC and other competitors of j2 in the Relevant Markets, with full knowledge that the patents-in-suit were invalid, unenforceable, obtained by fraud and not infringed by IGC's or other competitors' services, for the purpose of and thereby subjecting the targets of this conspiracy to foreclosure from the Relevant Markets

and/or to unnecessary license fees and litigation expenses, and raising their costs while lowering j2's costs; and

- Acting to interfere with IGC's and other j2's competitors' business expectancies.

199. There is a dangerous probability that j2 will obtain monopoly power in the Relevant Markets as a result of this conspiracy.

200. Counterclaim Defendants' agreement and conspiracy have taken place and have impacted and/or affected interstate commerce.

201. Counterclaim Defendants' agreement and conspiracy, in causing harm to competition and consumers, have caused a loss of revenue by Plaintiff.

202. Counterclaim Defendants have benefited individually from their participation in the conspiracy, and have from time to time conspired with the principals and agents, as the case may be, of other Counterclaim Defendants to carry out the goals of the conspiracy.

## <u>COUNT XI</u>

## <u>Violation of the Georgia Uniform Deceptive Trade Practices Act</u>

**(O.C.G.A. 10-1-370 *et seq*.)**

**(All Counterclaim Defendants)**

203. Counterclaim Plaintiff repeats and realleges and incorporates by this reference Paragraphs 1 through 188 above as Paragraph 189 of this Count XI.

204. The above described acts and practices of Counterclaim Defendants constitute deceptive trade practices and unfair competition in violation of the Georgia Uniform Deceptive Trade Practices Act.

205. Counterclaim Plaintiff as well as consumers, *i.e.*, the entire public, will continue to sustain injury and damages from this unfair competition unless Counterclaim Defendants are enjoined from continuing their unlawful conduct and seeking to exact a tax on the public in the form of unlawful "license fees".

206. As a direct and proximate result of Counterclaim Defendants' violations of the Georgia Uniform Deceptive Trade Practices Act, Counterclaim Plaintiff is entitled to recover reasonable attorneys' fees and costs in connection with this claim, appropriate restitution from Counterclaim Defendants of all monies received by reason of their unlawful and deceptive and unfair business practices, an injunction barring Counterclaim Defendants from their wrongful

assertions of patent infringement against Counterclaim Plaintiff, and such other equitable relief as may be just and appropriate.

## COUNT XII

## Breach of Contract

207. Counterclaim Plaintiff repeats and realleges and incorporates by this reference Paragraphs 1 through 206 above as Paragraph 207 of this Count XII.

208. IGC and j2 entered into a Software License Agreement on June 30, 2000 whereby j2 warranted that IGC's Internet facsimile service did not infringe any patents of which j2 was aware.

209. At the time j2 executed the Software License, it was aware of the AudioFAX Patents and knew that AudioFAX and Catch Curve planned to charge IGC with infringement of those patents.

210. j2 has breached its Software License warranty by the filing of the Complaint and other actions prior to the expiration of any applicable statute of limitations on the AudioFAX patents and its warranty.

211. By reason of the foregoing breach of warranty, IGC has been damaged in its business and property.

**WHEREFORE**, Counterclaim Plaintiff IGC respectfully requests that:

A. This Court find that each of the patents in suit is invalid;

B. This Court find that each of the patents in suit is unenforceable;

C. This Court find that none of the claims of the patents in suit is infringed by any of the IGC and MTI products, services, and methods;

D. This Court enjoin j2's current antitrust activities;

E. This Court break up j2's monopoly and require the divestiture of the companies and assets acquired during the creation of its monopoly;

F. This Court order j2 to pay IGC $5 million for its breach of contract;

G. This Court dismiss Catch Curve's current claims against IGC and MTI with prejudice;

H. IGC be awarded treble damages in an amount to be determined at trial;

I. IGC be awarded punitive damages in an amount to be determined at trial;

J. IGC be awarded its reasonable attorneys' fees and costs pursuant to all available federal and state statutes or rules, including but not limited to the Sherman Act; and

K. The Court grant such other relief as it deems just and proper, pursuant to, among other things, 28 U.S.C. § 2202.

**JURY TRIAL**

Defendants and Counterclaim Plaintiff respectfully demand a trial by jury on all counts of the Complaint and on all issues so triable.

Respectfully submitted this 11th day of October, 2007.

HOLLAND & KNIGHT LLP

/s/ Gregory J. Digel
Gregory J. Digel
Georgia Bar No. 221750

2000 One Atlantic Center
1201 West Peachtree Street, N.E.
Atlanta, Georgia 30309
(404) 817-8500; (404) 881-0470 Fax

Of Counsel:

Robert J. Schneider, IL ARDC #2499223
John R. Crossan, IL ARDC #0548367
James P. Sullivan, IL ARDC # 6256746
CHAPMAN AND CUTLER LLP
111 West Monroe Street, #1700
Chicago, Illinois 60603-4080
(312) 845-3919
(312) 701-2361 Fax

## Certificate of Service

A true copy of the foregoing Defendants' Answer and Affirmative Defenses, and Defendant IGC's Counterclaims for Patent Invalidity, Non-Infringement, and Unenforceability, and for Anti-Trust and Other Violations, is being served this 11th day of October, 2007, personally on counsel for Defendant Catch Curve via the Court's ECM system and will be served on the added Counterclaim Defendants or their counsel by US Marshal or equivalent means at first opportunity.

Respectfully submitted, this 11th day of October, 2007.

HOLLAND & KNIGHT LLP

/s/ Gregory J. Digel
Gregory J. Digel
Georgia Bar No. 221750
Counsel for IGC and MTI

# 4852702_v1