# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| CATCH CURVE, INC., | ) | |
| Plaintiff and Counterclaim Defendant, | ) | |
| v. | ) | No. 1:06-CV-2199<br>Judge Clarence Cooper |
| INTEGRATED GLOBAL CONCEPTS, INC., | ) | |
| Defendant and Counterclaim Plaintiff, and | ) | Jury Trial Demanded |
| MEIXLER TECHNOLOGIES, INC., | ) | |
| Defendant. | ) | |
| ------------------------ | ) | |
| INTEGRATED GLOBAL CONCEPTS, INC., | ) | |
| Counterclaim Plaintiff, | ) | |
| v. | ) | |
| J2 GLOBAL COMMUNICATIONS, INC., AUDIOFAX, INC., AUDIOFAX IP LLC, | ) | |
| Added Counterclaim Defendants. | ) | |

**DEFENDANTS' FIRST AMENDED ANSWER AND AFFIRMATIVE DEFENSES, AND DEFENDANT IGC'S FIRST AMENDED COUNTERCLAIMS FOR PATENT INVALIDITY, NON-INFRINGEMENT, UNENFORCEABILITY, AND FOR ANTITRUST AND OTHER VIOLATIONS**

Defendants INTEGRATED GLOBAL CONCEPTS, INC. (“*IGC*”) and MEIXLER TECHNOLOGIES, INC. (“*MTI*”) (collectively “*Defendants*”), respectfully and timely file and serve herewith their First Amended Answer to the (Second) Complaint filed on September 15, 2006, pursuant to this Court’s Order of April 23, 2008 with their Affirmative Defenses and with IGC’s First Amended Counterclaims for invalidity, non-infringement, and unenforceability of the asserted patents as well as for Antitrust and other violations.

**FIRST AMENDED ANSWER TO THE COMPLAINT**

1. Admitted.

2. With respect for the ruling of September 20, 2007, denied.

3. With respect for the ruling of September 20, 2007, denied.

4. Admitted.

5. Admitted.

6. Admitted.

7. Admitted.

8. Admitted that IGC offers to its customers throughout the United States, from its web site at www.MaxEmail.com, fax-to-email services using inbound area codes including some Georgia area codes, and that it has some users located in Georgia, but denied that any of IGC’s activities infringes any patent of

Catch Curve, and admitted that the Court has determined that personal jurisdiction exists over IGC.

9. Admitted.

10. Denied.

11. Admitted that MTI offers to its customers throughout the United States, from its web site at www.GreenFax.com, fax-to-email services provided by and under contract with IGC, using inbound area codes including some Georgia area codes, and that it has some users located in Georgia, but denied that any of MTI's activities infringes any patent of Catch Curve, denied that MTI receives or processes any facsimile transmissions, and admitted that the Court has determined that personal jurisdiction exists over MTI.

12. Admitted.

13. Admitted.

14. Admitted that Defendants IGC and MTI operate under the trademarks stated, but denied that their services infringe the '926 patent.

15. Admitted that Defendants operate under the trademarks stated, but denied that their services infringe the '302 patent.

16. Admitted that Defendants operate under the trademarks stated, but denied that their services infringe the '584 patent.

17. Admitted that Defendants operate under the trademarks stated, but denied that their services infringe the ‘034 patent.

18. Admitted that Defendants operate under the trademarks stated, but denied that their services infringe the ‘021 patent.

19. Defendants IGC and MTI repeat and incorporate herein their above responses to paragraphs 1-18 of the Complaint as if set forth fully herein.

20. Denied.

21. Admitted as to IGC’s receipt of notice, but denied there was any infringement to abate.

22. Admitted as to MTI’s receipt of notice, but denied there was any infringement to abate.

23. Denied.

24. Denied.

25. Denied.

26. Defendants repeat and incorporate herein their above responses to paragraphs 1-25 of the Complaint as if set forth fully herein.

27. Denied.

28. Admitted as to IGC’s receipt of notice, but denied there was any infringement to abate.

29. Admitted as to MTI's receipt of notice, but denied there was any infringement to abate.

30. Denied.

31. Denied.

32. Denied.

33. Defendants repeat and incorporate herein their above responses to paragraphs 1-32 of the Complaint as if set forth fully herein.

34. Denied.

35. Admitted as to IGC's receipt of notice, but denied there was any infringement to abate.

36. Admitted as to MTI's receipt of notice, but denied there was any infringement to abate.

37. Denied.

38. Denied.

39. Denied.

40. Defendants repeat and incorporate herein their above responses to paragraphs 1-39 of the Complaint as if set forth fully herein.

41. Denied.

42. Admitted as to IGC's receipt of notice, but denied there was any infringement to abate.

43. Admitted as to MTI's receipt of notice, but denied there was any infringement to abate.

44. Denied.

45. Denied.

46. Denied.

47. Defendants repeat and incorporate herein their above responses to paragraphs 1-46 of the Complaint as if set forth fully herein.

48. Denied.

49. Admitted as to IGC's receipt of notice, but denied there was any infringement to abate.

50. Admitted as to MTI's receipt of notice, but denied there was any infringement to abate.

51. Denied.

52. Denied.

53. Denied.

Further answering the Complaint, Defendants IGC and MTI deny that Judgment may be entered for Plaintiff and against the Defendants or either of them and deny that any relief is merited or justified on the Complaint as filed.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Complaint, and each purported claim for relief therein, fails to state a claim on which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Catch Curve's claims of infringement are barred because any pertinent patent claims are invalid under 35 USC §§102, 103, and/or 112.

### THIRD AFFIRMATIVE DEFENSE

Catch Curve’s claims of infringement are barred because neither of Defendants’ systems respond, literally or under the doctrine of equivalents, to each and all the recitation of any claim, properly interpreted, of any of the asserted patents.

### FOURTH AFFIRMATIVE DEFENSE

Catch Curve is misusing each of its patents by attempting to extend them beyond any lawful scope which Catch Curve knows or reasonably should know exists.

## FIFTH AFFIRMATIVE DEFENSE

The Complaint, including each purported claim for relief therein, is barred by the doctrines of waiver and/or estoppel.

## SIXTH AFFIRMATIVE DEFENSE

The Complaint, including each purported claim for relief therein, is barred by the doctrine of laches.

## SEVENTH AFFIRMATIVE DEFENSE

The Complaint, including each purported claim for relief therein, is barred because Catch Curve has entered this action with unclean hands.

## EIGHTH AFFIRMATIVE DEFENSE

Defendants may have additional defenses that cannot be articulated due to (1) Catch Curve's failure to particularize how its claims read, if they can, on any of Defendant's services; (2) Catch Curve's failure to provide specific information concerning the nature of the patents it allegedly holds and the scope of those patents; (3) Catch Curve's failure to specifically allege what damage Defendants' actions have caused; (4) the fact that discovery has not yet commenced; and (5) the fact that Defendants have not completed their investigation relating to this action. Defendants therefore reserve the right to assert additional defenses.

# FIRST AMENDED COUNTERCLAIMS

Integrated Global Concepts, Inc. (*"IGC"* or *"Counterclaim Plaintiff")* respectfully states its first amended counterclaims against Plaintiff Catch Curve, Inc. (*"Catch Curve"*) and the added Counterclaim Defendants j2 Global Communications, Inc. (*"j2"*), AudioFAX, Inc. (*"AudioFAX"*), AudioFAX IP LLC (*"AudioFAX IP"*), (collectively the *"Counterclaim Defendants"*) as follows:

## SUMMARY OF THE COUNTERCLAIMS

1. The Counterclaims contain the following counts:

- Counts I - III are directed at the plaintiff Catch Curve and seek declaratory judgments of invalidity, unenforceability, and non-infringement of the patents-in-suit;
- Counts IV - V are directed at j2 and Catch Curve and seek relief under *Walker-Process* and *Handgards* theories, as well as relief from j2's monopolization of the internet facsimile market based on its predatory acquisition of competitors and anticompetitive behavior described herein;
- Count VI is directed at AudioFAX and AudioFAX IP and seeks relief under *Walker-Process* and *Handgards* theories, as well as for relief based on its hatching of the anticompetitive scheme described herein;

- Count VII is a breach of contract count arising out of a unique warranty which j2 gave to IGC in which it warranted that IGC's software did not infringe any patents.

2. As explained in greater detail below, j2, Catch Curve, AudioFAX and AudioFAX IP have engaged in an illegal scheme to monopolize the small office and home office internet facsimile services industry in the United States. The scheme violates the antitrust laws of the United States, including the Sherman Act. In furtherance of their scheme, j2, Catch Curve, AudioFAX and AudioFAX IP have: a) harassed competitors in the Relevant Markets (described below), including IGC and its resellers, by forcing them to defend against objectively baseless patent infringement litigation regarding patents that Counterclaim Defendants knew or should have known were invalid, non-infringed, and/or unenforceable; b) committed fraud on the United States Patent and Trademark Office (the "*USPTO*") by failing and refusing to cite material prior art to deceive the USPTO; and c) thereby created and maintained an illegal monopoly for j2 by forcing competitors to sell out to j2 or take licenses to patents that they do not infringe.

## JURISDICTION AND VENUE

3. Jurisdiction of the claims for declarations of patent invalidity, unenforceability, and non-infringement (Counts I through III) is proper under 28 U.S.C.

§ 1338(a) and 28 U.S.C. § 2201. This Court has jurisdiction over the claims for relief arising under the Sherman Act, 15 U.S.C. § 2 (Counts IV, V & VI), pursuant to 15 U.S.C. § 4 and 28 U.S.C. §§ 1331 and 1337. This Court has supplemental jurisdiction over the related state law claim for relief (Count VII) pursuant to 28 U.S.C. § 1367. All these claims were discovered by IGC within the past four years, on and after the date when IGC was first sued in Georgia for patent infringement, and could not have been reasonably discovered sooner.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391, 15 U.S.C. §§ 15 and 22, and 18 U.S.C. § 1965 because each of the Counterclaim Defendants is transacting and doing business and conducting or otherwise transacting affairs in this district. Venue is proper in this Court for claims of relief arising under the Antitrust laws (Counts IV, V & VI) pursuant to 15 U.S.C. § 22 since each Counterclaim Defendant inhabits, may be found, or transacts business in this district. In addition, each Counterclaim Defendant has purposely established contacts and transacts business in this state and in this district.

## PARTIES

5. Counterclaim Plaintiff IGC is a corporation organized under the laws of the State of Illinois with its principal place of business at 1501 N. Cleveland, #

1F, Chicago, Illinois 60610. IGC provides Internet facsimile services, i.e., faxes by email, to its customers in the Relevant Market.

6. Plaintiff and Counterclaim Defendant Catch Curve is a corporation organized under the laws of the State of Delaware with its principal place of business at Atlantic Center Plaza, Suite 2400, 1180 W. Peachtree Street NE, Atlanta, Georgia 30309.

7. Counterclaim Defendant j2 is a corporation organized under the laws of the State of Delaware with its principal place of business at 6922 Hollywood Boulevard, Suite 500, Los Angeles, California, 90028. j2 is a competitor of IGC and provides Internet facsimile services and communications services to individuals and businesses in the Relevant Market.

8. Counterclaim Defendant AudioFAX, a corporation formed under the laws of the State of Georgia, having a principal place of business at 1640 Powers Ferry Road, Marietta, Georgia, is the former owner of the patents in suit, known as the *"AudioFAX Patents"* described below. AudioFAX hatched an illegal scheme of licensing and litigating invalid patents against competitors that is being actively pursued and that has resulted in injury to IGC.

9. Counterclaim Defendant AudioFAX IP is a limited liability company formed under the laws of the State of Georgia, having a principal place of business at 1640 Powers Ferry Road, Marietta, Georgia.

## BACKGROUND

10. This case concerns the technology of delivering facsimiles to the intended recipients. As with much of the telecommunications and computer industries, the technologies have changed a great deal over the last three decades.

11. During the 1970s and 1980s, facsimile technology developed to where fax machines were able to send and receive faxes over telephone lines and between fax machines. This technology is known as "fax-to-fax" technology and required that both the sender and the recipient had a telephone line and a fax machine, and often a dedicated telephone line to ensure that faxes could be sent and received while another telephone line was used for voice communication.

12. In the 1980s and 1990s, inventors made a number of applications for patents directed to improvements in fax-to-fax technology that eventually matured into the AudioFAX Patents:

A. U.S. Patent No. 4,994,926 (the "*'926 Patent*"), also entitled "Facsimile Telecommunications System and Method," issued to Richard J. Gordon and James R. Kennedy on February 19, 1991;

B. U.S. Patent No. 5,291,302 (the *"'302 Patent"*), also entitled "Facsimile Telecommunications System and Method," issued to Richard J. Gordon and James R. Kennedy on March 1, 1994;

C. U.S. Patent No. 5,459,584 (the *"'584 Patent"*), also entitled "Facsimile Telecommunications System and Method," issued to Richard J. Gordon and James R. Kennedy on October 17, 1995;

D. U.S. Patent No. 6,643,034 (the *"'034 Patent"*), also entitled "Facsimile Telecommunications System and Method," issued to Richard J. Gordon and James R. Kennedy on November 4, 2003; and

E. Patent No. 6,785,021 (the *"'021 Patent"*), entitled "Facsimile Telecommunications System and Method," issued to Richard J. Gordon and James R. Kennedy on August 31, 2004.

13. The AudioFAX Patents are the patents in suit in Catch Curve's complaint against IGC and MTI.

14. But, as we know now, the cutting edge of facsimile telecommunications proved to be elsewhere. In the 1990s, use of personal computers ("PCs"), the Internet and email communications increased dramatically, soon giving rise to "fax-to-email" technology. Fax-to-email technology allows fax

machines to communicate directly with PCs, making fax-to-fax technology unnecessary, or at least much less necessary than in the 1970s and 1980s.

15. The AudioFAX Patents are directed to and cover the older fax-to-fax technology, not the more recent fax-to-email technology.

16. IGC was founded in 1992 to provide enhanced facsimile services and fax to email services to its customers. IGC is a small business with six employees based on the north side of Chicago. Today, IGC provides a service to home and small offices throughout the United States. Its customers can receive facsimiles via their email accounts by receiving the image of facsimiles sent to them over the internet as an attachment delivered to their email account. IGC is a fax-to-email provider, not a fax-to-fax provider. IGC's customers thus do not need a fax machine or a dedicated phone line to receive a fax or, indeed, to have a fax number.

17. In 1999, AudioFAX IP, the then-owner of the AudioFAX Patents, sued jFax.com, Inc. (*"jFax"*), the predecessor to j2, for infringement, asserting that the jFax Internet facsimile service (fax to e-mail) infringed the patents.

18. About the time of that litigation, the AudioFAX Patents were being licensed under threat of litigation similar to the current scheme being perpetrated by j2 and Catch Curve. See, for example, a true and correct copy of "A Kinder,

Gentler Approach", an *IP Law & Business* article, dated April 23, 2003 attached hereto as *Exhibit 1*.

19. In the *AudioFAX IP v. jFax* litigation, jFax, the predecessor to j2, counterclaimed, alleging that the AudioFAX Patents were invalid, unenforceable and were not infringed by the jFax internet facsimile service.

20. In particular, j2 and its employees and/or agents knew based on their internal investigation and documents showing that the AudioFAX Patents were limited to fax-to-fax systems using telephone lines to deliver facsimiles and did not cover the Internet delivery systems of the internet facsimile services.

21. j2 referred to the AudioFAX patents as "FAX-to-FAX" because it did not believe them to cover internet facsimile services which deliver facsimiles via email using a packet switched network.

22. j2 then settled its litigation with AudioFAX IP.

23. Later, in early 2005, j2 acquired control of the AudioFAX Patents through its subsidiary, Catch Curve.

24. As a result of its experience in its litigation with AudioFAX, j2 realized that it could extract licensing revenue from the AudioFAX Patents from smaller competitors by bringing infringement actions and monopolize the Relevant Market.

25. With the aid of Michael William McLaughlin, Ryan Strong, and David A. Kennedy, who had hatched the litigation and licensing scheme for AudioFAX IP, j2 realized that this scheme could be augmented by coupling its execution with carefully timed offers to acquire competitors to allow j2 to acquire a monopoly in the Relevant Market.

26. When competitors, such as IGC and others, refused to capitulate to their demands, Catch Curve and j2 (or previously AudioFAX and AudioFAX IP) filed sham lawsuits for patent infringement that are objectively baseless: any reasonable litigant or reasonable person would know that fax-to-email services do not infringe the fax-to-fax patents asserted.

27. Catch Curve, AudioFAX and AudioFAX IP's litigation has been initiated with the intent to cause harm to competitors based not on the outcome of the judicial process, but solely by abuse of the judicial process itself.

28. j2 and Catch Curve have often timed the filing of their sham infringement actions in order to prevent j2's competitors in the Relevant Markets from consummating contracts with major potential customers, acquisitions, and/or making stock offerings that would boost their efficiency and competitiveness and allow lower prices to consumers.

29. As a result of the above actions and tactics, j2 has come to dominate the Relevant Market with a market share exceeding 90 percent. The Counterclaim Defendants have wrongfully raised the costs of their rivals, including IGC, through fraud, intimidation, litigation, and interference with their reasonable business expectancies.

30. j2 and Catch Curve's actions have prevented j2's competitors from offering better, more innovative services to consumers at prices that would reflect a fully competitive market.

31. Because of Counterclaim Defendants' anticompetitive and exclusionary conduct, IGC and other Internet fax service providers have been delayed, prevented, and hindered in competing against Counterclaim Defendants, to the detriment of consumers.

**The Relevant Market**

32. j2 is the dominant provider of Internet facsimile services that deliver fax messages via the Internet to home and small offices (which is the *"Relevant Product Market"*) in the United States (the *"Relevant Geographical Market"*). The Relevant Product Market is Internet facsimile services provided to home offices and small companies and offices. Companies competing in this market provide individuals and small businesses, for a fee, with a dedicated phone number

that allow users to receive fax messages directly on their computers in the form of attachments to e-mails.

33. j2 and IGC offer services in the Relevant Product Market to customers throughout the United States. The Relevant Geographic Market is the fifty (50) states of the United States, plus the District of Columbia and Puerto Rico. The Relevant Product Market and Relevant Geographic Market are, together, the Relevant Market.

**j2's Monopoly**

34. j2 competes in the Relevant Market under, among others, the brand eFAX. eFAX is by far the dominant brand of Internet facsimile services available in the United States today.

35. As of December 31, 2002, j2 had only a 40 percent share of the fax-to-email market.

36. Today, Counterclaim Defendant j2 has in excess of 90 percent share of the Relevant Market in Internet facsimile services for home and small business users.

37. Counterclaim Defendants targeted IGC and other j2 competitors in the Relevant Market with a scheme of fear and intimidation to crush competition, raise competitors' costs of operation, eliminate them as competitors in the Relevant

Market entirely, and substantially raised the cost of fax-to-email services to consumers.

38. j2 plans to remain the dominant provider, and achieved its dramatic increase in market share not by offering a better, more attractive service at a competitive price, but by waging a campaign of acquisitions and sham litigation outside the scope of normal competitive practices, which campaign was and is designed to raise its rivals' costs and prevent them from offering competitive services altogether.

39. j2 has accomplished this goal through its own efforts and through the efforts of certain subsidiaries, such as Catch Curve, Dynamic Depth, and various licensing firms and individuals who further j2's litigation and licensing scheme.

40. j2 has within the past four years undertaken and accomplished a series of consolidations and acquisitions of smaller, direct competitors of j2, acquired the assets of competitors, and acquired patents from various businesses as part of their anticompetitive scheme, which it enforces through its own efforts as well as through various subsidiaries, including Catch Curve and Dynamic Depth.

41. The effect of j2's acquisitions has been to reduce competition and increase j2's market share.

42. j2, Catch Curve, AudioFAX and AudioFAX IP and their employees and/or agents each have internal documents explaining why j2's competitors do not infringe the patents.

43. The Counterclaim Defendants have engaged in sham litigation against numerous fax-to-email providers, such as IGC, over many years based on alleged infringement of the AudioFAX Patents.

44. The AudioFAX Patents are invalid, are obviously inapplicable to fax-to-email technology, and were procured by fraud on the United States Patent and Trademark Office, but because the targets of this scheme are generally small businesses like IGC, they are forced to license the inapplicable patents or sell their business to j2 rather than endure the expense of litigation and the disruption of their businesses that litigation entails.

45. Because the Counterclaim Defendants structure the licensing fees for the AudioFAX Patents to be less than the costs of defending against the infringement litigation, competitors are forced to take a license, or sell their business which often couples the litigation threat or mandatory license with an offer to acquire the company they are targeting.

46. This scheme chills competition in the market, has harmed consumers, and has allowed j2 to acquire and maintain monopoly power illegally. As a result,

j2 has obtained a 90% share of the market not through providing superior goods and services, but through sham litigation, fraud on the United States Patent and Trademark Office, and predatory and anticompetitive acquisitions, all with the intent to create an illegal monopoly in the market for providing facsimile services to small companies and home offices.

47. j2 and Catch Curve target customers or resellers of firms like IGC with sham litigation in an attempt to get the customer or reseller to cease dealing with the purported infringer.

48. In this proceeding j2 and Catch Curve have also targeted IGC's reseller, co-defendant MTI, with sham litigation and enforcement of fraudulently procured patents in an attempt to cause MTI to cease dealing with IGC and further erode IGC's customer base.

49. No lawsuit ever filed by Catch Curve has resulted in a contested judicial finding of infringement by an alleged infringing competitor.

50. Catch Curve does not provide any products or services other than extracting money from j2's competitors in the Relevant Markets through licensing and litigating the AudioFAX patents, which harms competitors' efforts to compete and innovate and stifles competition and innovation.

51. To date, j2 and Catch Curve, either alone or in conjunction with each other, have filed numerous infringement lawsuits against j2's competitors in the Relevant Markets.

52. As a result of its illegally acquired and maintained market dominance, j2 has been able to charge artificially high prices for its services (which were recently increased by another $4 per month for individuals), reducing competition in these markets and precluding new competitive offerings to consumers. The Counterclaim Defendants have damaged consumers by attempting to eliminate competition and by quashing innovation in the Relevant Markets with costly, objectively baseless patent infringement lawsuits founded on invalid, non-infringed, and/or unenforceable patents.

**Claim Construction Order**

53. In *Catch Curve, Inc. v. Venali, Inc.*, Case No. 05-4820-DDP, the United States District Court for the Central District of California held the AudioFAX Patents cannot be extended from fax-to-fax technology to fax-to-email technology. More specifically, in the *Markman* claim-construction ruling, the Court held that the AudioFAX Patents are not infringed by firms using internet-based systems to deliver facsimile files to recipients' email accounts. A copy of the Claim Construction Order entered by Judge Pregerson in *Catch Curve, Inc. v.*

*Venali, Inc*., 2007 WL 3308101 (C.D. Cal. May 11, 2007), is attached hereto as *Exhibit 2*.

54. To date, this Claim Construction Order is the only interpretation of the AudioFAX Patents that are the subject of the instant lawsuit by Catch Curve against IGC and MTI.

55. Despite requests from IGC following the Claim Construction ruling in *Catch Curve, Inc. v. Venali, Inc*., Catch Curve has refused to dismiss its infringement claims against IGC and MTI.

**Inequitable Conduct, Invalidity, and Non-Infringement**

56. In or about 1987, Counterclaim Defendant AudioFAX's principal Mark Bloomfield ("*Bloomfield*") learned that F-Mail Associates had obtained some patents relating to Fax-to-Fax technology and he purchased the patents from F-Mail.

57. However, Bloomfield knew that fax–to–fax over telephone lines was a waning technology because of newer forms of communication, like e-mail, so he decided to attempt to augment the patents by filing continuing applications in an attempt to expand them to cover the fax-to-email industry, an idea which was not conceived by the inventors.

58. He knew the patents did not cover this technology, so he called in David A. Kennedy ("*Kennedy*"), an intellectual property consultant and co-founder of InteCap Inc., to assist. Together, they conceived a scheme to file and prosecute fraudulent patent applications with the intent to deceive the USPTO in attempt to unlawfully expand fax-to-fax patents to cover fax-to-email.

59. Pursuant to federal regulations and applicable law, each individual associated with the filing and prosecution of a patent application, including those associated with the filing and prosecution of re-examinations (collectively, "*Patent Seekers*"), has duties of candor and good faith to the USPTO.

60. Together, Bloomfield and Kennedy filed additional applications and developed the AudioFAX Patent portfolio, consisting of five patents in suit.

61. Initially, instead of immediately threatening companies in the Relevant Markets with litigation, Bloomfield and Kennedy (who was then working for an intellectual property licensing firm called IPAC along with Michael McLaughlin and Ryan Strong) on behalf of AudioFAX and AudioFAX IP, initially attempted to convince targets to participate in a friendly licensing program, but then brought litigation if the competitors refused.

62. Later, Bloomfield and AudioFAX set up AudioFAX IP to implement a licensing program in the fax-to-email industry.

63. Bloomfield instructed the AudioFAX attorneys to file numerous additional fraudulent patent applications with the USPTO and pursued many of j2's competitors that they knew were not infringing any of these patents.

64. In June of 2003, IGC provided to AudioFAX IP printed documentation describing the UF-250 and UF-270 Panasonic Fax machines with store and forward capabilities and the Panafax Systems and Panamail Systems from the early- and mid-1980s. These systems were sold in Japan and the United States more than one year before the earliest of the AudioFAX Patents was filed.

65. The User Manuals and Service Manuals for these fax machines fully disclosed and/or made obvious every feature of the alleged inventions claimed in the AudioFAX Patents.

66. The Counterclaim Defendants did not inform the USPTO of this prior art, knowing that the USPTO would reject their pending applications based on the disclosures in the prior art.

67. All of the prior art references identified in paragraphs 68 through 70, among other paragraphs herein, are material to each of the AudioFAX Patents.

68. Strong contacted IGC in Chicago and informed IGC that the AudioFAX IP would not make the USPTO aware of this prior art and, in fact, they did not cite it during the prosecution of the '031 and '021 patents.

69. In addition, the Counterclaim Defendants were also aware of the 1983 Panamail UX4800 HV System and the UF-650 fax machines with store-and-forward capabilities and willfully did not cite them to the USPTO, acting with an intent to deceive. The User Manuals and Service Manuals for these fax machines disclosed or made very obvious every feature of the alleged inventions claimed in the AudioFAX Patents.

70. Catch Curve cited UF-270 to the USPTO during the prosecution of the recently issued U.S. Patent No. 7,202,978 in May of 2007.

71. However, in furtherance of their fraudulent scheme, Catch Curve did not include the entire document and did not inform the USPTO of its publication date with the intent to mislead the USPTO.

72. The Counterclaim Defendants' actions constitute fraud on the USPTO, as they were done with the intent to deceive the USPTO, and they succeeded.

73. Prior to 2005, Bloomfield, Kennedy, McLaughlin, and Strong decided to structure a new relationship with j2 whereby Counterclaim Defendant Catch Curve was established to nominally hold title to the AudioFAX Patents while sharing with these individuals income from licensing of the patents and from litigation settlements.

**j2's Fraud in Procurement of the '638, '688 and Bobo Patents**

74. j2 filed applications in 1997 and 1998 that ultimately matured into United States Patents Nos. 6,208,638 (the "*'638 patent*") and 6,597,688 (the "*'688 patent*"), respectively.

75. The initial claims on the application for the '688 patent were rejected by the USPTO.

76. j2 cancelled all of the claims in favor of claims having claim limitations that ultimately issued as part of the '688 patent.

77. The USPTO rejected several of the newly added claims of the application for the '688 patent because the specification of the application did not support them as required by the first paragraph of 35 U.S.C. § 112.

78. J2 conceded that the specification of the application lacked the required support but asserted that an attached appendix containing the specification of the '638 patent provided the required support.

79. The '638 patent and the application that matured into the '688 patent, however, did not share common inventors.

80. j2 knew this when it made its assertion of support to the USPTO.

81. Therefore, j2 knew that the '638 patent was prior art to the '688 patent under 35 U.S.C. § 102(e).

82. Nevertheless, j2 still advanced an argument of patentability even though it knew that the claims of the application giving rise to the ‘688 patent were facially invalid based on the teachings of the ‘638 patent.

83. The USPTO relied upon j2’s fraud in issuing the ‘688 patent.

84. j2 also committed fraud on the USPTO in obtaining the ‘638 patent.

85. j2 advanced claims of patentability while knowing that relevant prior art expressly taught each and every element of one or more claims of the patent application.

86. Specifically, the inventors of the ‘638 patent worked with fax server boards sold and marketed under the brand names Brooktrout, Gammalink, and/or Dialogic prior to the filing of the application for the ‘638 patent.

87. The inventors failed to disclose the functionality of these fax server boards to the USPTO.

88. Each of the fax server boards incorporated functionality that directly anticipated at least one of the independent claims of the ‘638 patent. The USPTO relied upon j2’s fraudulent misrepresentations and omissions, resulting in the issuance of the ‘638 patent.

89. Aware of the invalidity and unenforceability of the ‘638 and ‘688 patents, j2 sought additional patents to assert against its competitors in the Relevant Markets.

90. To that end, j2 purchased a portfolio of patents from NetOffice Solutions, Inc. -- the *“Bobo patents”*-- in 2004. These included, in part, U.S. Patent Nos. 6,350,066 (the *“‘066 patent”*) and 6,564,321 (the *“‘321 patent*”). j2 has begun to assert these patents against its competitors in the Relevant Market in a campaign to acquire and maintain monopoly power in the Relevant Market.

**j2 Conceals its Activities Through Catch Curve**

91. Finding itself still without a reliable portfolio of patents to wield against its competitors, j2 acted quickly and surreptitiously to continue its scheme to maintain its dominant market position.

92. In 2005, j2 created Catch Curve without disclosing its creation to j2’s shareholders or to the SEC in its public filings.

93. Catch Curve issued a press release announcing that the AudioFAX patents it had acquired cover “a range of inventions that incorporate fax store–and-forward technologies.”

94. j2 is the most dominant company in the Relevant Markets. j2, however, has not been content with its dominant market position and has sought

ways to use its cash and other liquid assets, which exceed Two Hundred Million Dollars ($200,000,000.00), to eliminate its remaining competitors. In order to try to gain complete control of the market, j2 has waged and continues to wage a campaign of acquiring its competitors.

95. Many of the competitors targeted by j2 are small businesses, with few employees, often operating out of a home office.

96. The scheme has worked by offering licenses that were less expensive than the cost to defend the threatened litigation. Indeed, on its website (www.catchcurve.com/about), Catch Curve touts its mission as being "to license its technology without the complications and expense of litigation."

97. Companies that refused to pay, however, were sued in the Northern District of Georgia by Catch Curve.

98. Many such suits were then settled for amounts less than the cost of litigation, typically less than $1 million for a lump sum, fully paid-up license. j2 and Catch Curve have successfully employed these anticompetitive suits in furtherance of their scheme to eliminate or lessen competition in the Relevant Markets, which has resulted in substantially less competition, all to the detriment of consumers who now pay higher prices.

99. j2 attempted to hide its scheme with and ownership of Catch Curve by making false statements to the public and by failing to report its activities with respect to Catch Curve in its quarterly and annual reports. For example, during a February 6, 2006 conference call with securities analysts, Scott Turicchi, Co-President and Chief Financial Officer of j2, described j2's relationship with Catch Curve as follows:

> STEVE FREITAS (Analyst, Harris Nesbitt Gerard): In some of these suits, it seems like you've come to it jointly with a company called Catch Curve. Can you just describe how those patents are spread among you and that entity?
>
> TURICCHI: Well Catch Curve, we have a small – we have an interest in the Catch Curve entity. They have their own team that goes out and either asserts the patents through litigation or attempts to, you know, generate royalty revenue through settlement. So, we have our set of patents; they have their set of patents. There are instances where we run into each other. There's maybe two or three of the litigations where it's a combination of the patents.

100. These false and misleading statements were intentionally made to, and did, conceal and cover up j2's real, financial interest in Catch Curve.

101. In addition to the objectively frivolous patent infringement litigation brought against IGC and MTI in bad faith by Catch Curve, AudioFAX, AudioFAX IP, j2 and Catch Curve have also filed patent infringement lawsuits against industry competitors such as Boston Technology, Inc., Cable & Wireless

USA, Inc., Captaris, Inc., Cisco Systems, Inc., Delrina Corporation (subsidiary of Symantec Corporation), Digital Sound Corporation, FaxSav, Inc., Premiere Technologies, Inc. and Premiere Communications, Inc., Sprint Communications Company, Venali, Inc., EasyTel Communications, Protus IP Solutions, Mijanda, Topcall Corporation, GoDaddy.com, Inc., Graphnet, Inc., Fenestrae, Inc., Biscom, Inc., Callware Tech., Inc., Esker S.A. and Esker, Inc., Open Text Corporation, Smith Micro Software, Inc., uReach Technologies, Inc., GFI USA, Inc., Callwave and Vera Cruz Marketing Inc.

102. These lawsuits were filed within weeks of the objections of EasyTel, Protus, and Mijanda to j2's efforts to register as its trademark the generic term "efax."

**Other Antitrust Complaints Against j2 and Catch Curve**

103. Targets of the scheme have begun to take a stand against j2 and several have filed, or threatened to file, counterclaims similar to those being advanced by IGC in this matter.

104. For example, Venali, Inc., a competitor in the Relevant Markets, has filed an Antitrust Complaint against j2 and Catch Curve. That Complaint was

transformed into a counterclaim against j2 and Catch Curve in a suit pending in the United States District Court for the Central District of California, Case No. CV-05-04820 DDP. Significantly, the Court DENIED j2 and Catch Curve's motion to dismiss that counterclaim permitting the counterclaim to stand. See, *Catch Curve, Inc. v. Venali, Inc.*, 519 F.Supp.2d 1028 (C.D. Cal. May 3, 2007), attached hereto as Exhibit 3.

105. GoDaddy also filed a multi-count antitrust complaint against j2 and others in the United States District Court in Arizona, Case No. CV-06-2474-PHX-NVW. That case has since been dismissed as part of a settlement.

**Injuries Flowing From the Scheme**

106. Catch Curve uses the litigation process to extort license fees for the benefit of j2 that cost competitors less than the cost of litigating a case to judgment.

107. Catch Curve and j2 have utilized IP Investments Group ("*IPIG*") to identify potential violators of its clients' patents, establish a value for them, and handle the collection and administration of licensing fees.

108. IPIG administers the AudioFAX Patent Licensing Program.

109. For the benefit of j2, Catch Curve and IPIG have utilized the licensing program specifically to raise rivals' costs by threatening and initiating objectively

baseless infringement lawsuits against companies that compete with j2 in the Relevant Product Market.

110. IPIG determines the fees to be charged for licenses in part based on the potential licensee's litigation cost.

111. The cost for licenses under the patents by IPIG in its licensing proposals is substantial but never high enough to encourage the targets of the scheme to litigate to avoid such cost.

112. The total fees generated from this licensing program enable j2 to lower its costs of participating in the Relevant Markets at the expense of smaller rivals' businesses while raising their costs of competing with j2.

113. j2 and Catch Curve have also targeted IGC's reseller, co-defendant MTI, using allegations that IGC and MTI are infringing Catch Curve's fraudulently procured patents in an attempt to cause MTI to cease dealing with IGC and further erode IGC's customer base.

114. j2 and Catch Curve have sued customers and channel partners for patent infringement despite their knowledge that the Catch Curve patents were inapplicable to the competitor's services because, among other reasons, Catch Curve's patents, the AudioFAX Patents, are directed to fax-to-fax services, not fax-to-email services.

115. For example, j2 sabotaged a prospective business relationship of Venali, Inc. with a leading provider of internet-based electronic mail service by threatening to sue to enjoin the use of internet facsimile services in the Relevant Market despite knowledge that the Catch Curve patents were invalid, non-infringed, procured by fraud or unenforceable.

116. j2 and Catch Curve also threatened GoDaddy.com with objectively baseless litigation and fraudulently obtained patents in an attempt to sabotage their initial public offering.

117. j2 and Catch Curve's scheme is often successful in forcing competitors from the market. For example, Catch Curve sued Vera Cruz Marketing ("*Vera Cruz*"), who was a reseller of Protus IP, a Canadian internet facsimile firm who was also a target of j2 and Catch Curve who did not infringe any of the Catch Curve patents.

118. Vera Cruz provided its service through the website InternetFaxProvider.com.

119. On information and belief, in May of 2006, j2 offered Vera Cruz 2x revenues for its business if Vera Cruz would sell out to j2.

120. Vera Cruz is in the process of shutting down its Fax to email business because it is impossible for it to operate within the constraints of the onerous terms imposed on it by j2 and Catch Curve.

121. In December 2005, j2 contacted IGC suggesting that j2 was interested in purchasing IGC.

122. After IGC provided confidential information to j2 about its business activities, customers and revenues, j2 made an offer to purchase IGC.

123. This offer was far below the fair value of IGC.

124. After IGC rejected the offer from j2, j2 directed Catch Curve to sue IGC and MTI for patent infringement.

125. j2 sent another e-mail to IGC and its shareholders on January 3, 2006, in furtherance of their scheme to eliminate competition.

126. This pattern of predatory acquisition is a secondary tactic used by the Counterclaim Defendants to capture value from its competitors independently of the Counterclaim Defendants having any superior Internet facsimile services.

127. Counterclaim Defendants' anticompetitive conduct described above has had, and will continue to have, an adverse effect on the Relevant Markets, including but not limited to j2's artificially inflated pricing.

128. There are substantial barriers to entry into the Relevant Market including, without limitation, patents owned or held by AudioFAX, AudioFAX IP, j2, and Catch Curve.

129. Further, there are no adequate alternative products or services for the end users in the Relevant Market.

130. In addition to the anticompetitive effects on the Relevant Markets, the Counterclaim Defendants' anticompetitive conduct has had and is likely to continue to have restraining effects on the market for innovation in the technologies for the Relevant Markets.

## FRAUD AND PRIOR ART IN THE PATENTS-IN-SUIT

### *The '926 Patent*

131. Before the first '926 reissuance, the '926 Patent Seekers were aware of information material to the patentability of claims of the first reissuance of the '926 patent, but they withheld and/or concealed that information from the PTO with the intention of deceiving the PTO. The withheld and/or concealed information includes, without limitation:

(a) Kurihara et al., "Control Methods for Facsimile Store and Forward Communication Services";

(b) U.S. Patent No. 4,613,907 to Yoshimoto;

(c) "Document Distribution System," Internal Technology Disclosures, Vol. 6, No. 5, at p.2 (May 25, 1988); and

(d) the Panasonic UF-250 and UF-270 models and the Panamail System described herein.

***'926 and Kurihara***

132. Kurihara was published in November 1987, before the '926 patent filing date (September 22, 1988) and before the first '926 reexamination was filed. Kurihara is prior art to the first '926 reexamination.

133. The '926 Patent Seekers knew of Kurihara before they initiated the first '926 reexamination, on October 20, 1997. For example, they had cited Kurihara in an Information Disclosure Statement ("IDS") they submitted to the PTO on October 14, 1991. The patent attorney who filed that IDS also filed the '926 application (U.S. Patent Application No. 07/248,798) on behalf of the same '926 inventors. The '926 Patent Seekers had also cited Kurihara again in a January 23, 1993 IDS submitted to the PTO.

134. Kurihara was material to the prosecution of the first reexamination of the '926 patent. For example, the '926 claims typically require a "store and forward facility" or "store and forward facilities."

135. The named inventors and/or persons associated with the prosecution of the first reexamination had previously described Kurihara as "disclos[ing] the concept of store and forward techniques…."

136. In addition, during the first '926 reexamination, the examiner distinguished particular prior art — Ejiri — on the grounds that "Ejiri does not teach a store and forward facility coupled to a switched telephone network, as claimed in (926)."

137. As persons associated with the prosecution of the first '926 reexamination knew or should have known, Kurihara discusses a store and forward facility coupled to a switched telephone network in, for example, Figure 1 and the associated text.

138. Although they knew about Kurihara, the '926 Patent Seekers failed to disclose Kurihara to the PTO during the first '926 reexamination.

139. On information and belief, the Patent Seekers did so with intent to mislead the PTO. The deception succeeded, and the PTO later issued a reexamination certificate for the '926 patent.

***'926 and Yoshimoto***

140. U.S. Patent No. 4,613,907 issued to Yoshimoto et al. on September 23, 1986.

141. Yoshimoto is prior art to the first ‘926 reexamination.

142. The ‘926 Patent Seekers knew of Yoshimoto before they initiated the first ‘926 reexamination, on October 20, 1997.

143. For example, they cited Yoshimoto in at least three IDSs submitted on their behalf to the PTO, on January 8, 1993, February 23, 1995, and April 22, 1997.

144. The first ‘926 patent reexamination request and subsequent ‘926 reexamination PTO notices and decisions were mailed to the same attorney of record, Louis Isaf, who filed the April 22, 1997 IDS identifying Yoshimoto.

145. Yoshimoto was material to the prosecution of the first reexamination of the ‘926 patent.

146. For example, ‘926 patent claim 12 requires “wherein said computer means of said at least one store and forward facility is programmed, upon being unsuccessful in making a transmission to an intended receiving facsimile machine, to transmit a message to the transmitting facsimile machine.” Likewise, Yoshimoto’s Abstract, for example, discusses a fax receiver that automatically confirms whether the fax transmission is successful: “[a] facsimile receiver provides with confirmation means whether or not there exists transmission mistake at the transmitter side.” In addition, during the second reexamination, the PTO

used Yoshimoto in combination with another reference to reject and cancel claims of the ‘926 patent.

147. Although they knew about Yoshimoto, the ‘926 Patent Seekers failed to disclose Yoshimoto to the PTO.

148. The Patent Seekers did so with intent to mislead the PTO. The deception succeeded, and the PTO later issued a reexamination certificate for the ‘926 patent.

***‘926 and Document Distribution System***

149. The industry publication “Internal Technology Disclosures” published an extract entitled “Document Distribution System” on May 25, 1988 (“*Document Distribution System*”). Document Distribution System is prior art to the first ‘926 reexamination.

150. Before they initiated the first ‘926 reexamination, on October 20, 1997, the ‘926 Patent Seekers knew of Document Distribution System.

151. For example, in a January 8, 1993 IDS filed on their behalf with the PTO, they stated that they were providing every reference associated with the prosecution history of U.S. Patent No. 5,136,634 — but in fact they omitted Document Distribution System, although it had been cited in the ‘634 patent prosecution.

152. Document Distribution System was material to the first '926 reexamination.

153. For example, '926 claim 3 requires "the step, in response to instructions received from a system subscriber, of transmitting facsimile messages stored in that subscriber's mailbox to a facsimile machine designated by that subscriber in the instructions."

154. Likewise, Document Distribution System describes a "microcomputer-based system which uses voice generation circuitry to invite a person calling in to the system to specify the document needed by pushing particular keys of his/her touch-tone telephone. Upon ascertaining the identity of the document in question, the computer transmits the document to the caller in standard facsimile form, either over the telephone connection already established if the telephone call was initiated from a telephone connected with a facsimile machine, or to a different telephone number specified by the caller."

155. Although they knew about Document Distribution System, the '926 Patent Seekers failed to disclose Document Distribution System to the PTO during the '926 reexamination.

156. On information and belief, the Patent Seekers did so with intent to mislead the PTO. The deception succeeded, and the PTO later issued a reexamination certificate for the ‘926 patent.

***The ‘302 Patent***

157. The ‘302 patent is unenforceable because it was obtained by inequitable conduct. Before the ‘302 patent issued, the ‘302 Patent Seekers were aware of information material to the patentability of claims of the ‘302 patent, but withheld and/or concealed that information from the PTO with the intention of deceiving that Office. The withheld/concealed information includes, without limitation: U.S. Patent No. 5,065,254 to Hishida.

158. Hishida was filed on November 24, 1989, more than one year before the ‘302 filing date or that of its parent.

159. Hishida is prior art to the ‘302 patent.

160. The Patent Seekers knew of Hishida before the ‘302 patent issued.

161. Hishida was cited in the search reports of the European counterpart to the ‘302 patent — specifically, the International Preliminary Examination Report for the EP Appl. No. 92907076 (Pub. No. 0572525).

162. This examination report was completed on February 9, 1993, and the European Patent Office received it on July 6, 1993; in the normal course it would have been mailed to the applicant shortly after.

163. Even though the PTO's regulations specifically "encourage[] applicants to carefully examine: … prior art cited in search reports of a foreign patent office counterpart application," the Patent Seekers did not cite Hishida to the PTO during the prosecution of the '302 patent.

164. Hishida is material prior art to the '302 patent.

165. For example, '302 patent claim 24 requires "transmitting facsimile messages stored in the mass storage means to intended receiving facsimile machines."

166. Likewise, Hishida discloses a center fax machine that stores and relays fax messages to other fax machines, and that each fax machine includes a central processing unit and program memory.

167. Although they knew about Hishida, the '302 Patent Seekers failed to disclose Hishida during the '302 prosecution, with, on information and belief, the intent to deceive the PTO. The deception succeeded, and the PTO issued the '302 patent on March 1, 1994 without considering this reference.

***The '034 Patent***

168. The '034 patent is unenforceable because it was obtained by inequitable conduct.

169. Before the '034 patent issued, the '034 Patent Seekers were aware of information material to the patentability of claims of the '034 patent, but withheld and/or concealed that information from the PTO with the intention of deceiving that Office. The withheld/concealed information includes, without limitation "Document Distribution System" and U.S. Patent No. 5,033,079 to Catron et al. ("*Catron*").

***'034 and Document Distribution System***

170. As noted above, Document Distribution System was published on May 25, 1988.

171. Document Distribution System is prior art to the '034 patent.

172. Before October 11, 2000, when they filed for the '034 patent, the '034 Patent Seekers knew of Document Distribution System.

173. For example, in a January 8, 1993 IDS filed on their behalf with the PTO, they stated that they were providing every reference associated with the prosecution history of U.S. Patent No. 5,136,634 — but in fact they omitted

Document Distribution System, although it had been cited in the ‘634 patent prosecution.

174. Document Distribution System was material to the ‘034 prosecution.

175. For example, ‘034 patent claim 14 requires “the step of, in response to instructions received from a subscriber, transmitting facsimile messages stored in that subscriber’s mailbox to a facsimile machine designated by that subscriber in the instructions.”

176. Likewise, Document Distribution System describes a “microcomputer-based system which uses voice generation circuitry to invite a person calling in to the system to specify the document needed by pushing particular keys of his/her touch-tone telephone. Upon ascertaining the identity of the document in question, the computer transmits the document to the caller in standard facsimile form, either over the telephone connection already established if the telephone call was initiated from a telephone connected with a facsimile machine, or to a different telephone number specified by the caller.”

177. Although they knew about Document Distribution System, the Patent Seekers failed to disclose Document Distribution System to the PTO during the ‘034 patent’s prosecution.

178. The Patent Seekers did so with intent to mislead the PTO. The deception succeeded, and the PTO later allowed the ‘034 patent to issue.

***‘034 and Catron***

179. U.S. Patent No. 5,033,079 was filed on August 24, 1989, and issued to Catron et al. on July 16, 1991.

180. Catron is prior art to the ‘034 patent.

181. Before October 11, 2000, when they filed for the ‘034 patent, the Patent Seekers knew of Catron.

182. For example, Mark Bloomfield, who at various times was the President of AudioFAX IP, was aware of Catron from the prosecution of his U.S. Patent No. 6,157,464, which was filed on June 24, 1996 and in which Catron was cited, as the face page of the ‘464 patent reflects.

183. Catron was material to the ‘034 prosecution.

184. For example, the ‘034 patent’s Abstract states that “[a] subscriber to the system delivers an outgoing facsimile message to the store and forward facility with which it is associated, which records the fax message together with data as to originating facsimile machine and destination facsimile machine. The store and forward facility then delivers the facsimile message to the intended receiver facsimile machine, either directly or through another store and forward facility. If

unsuccessful on an initial attempt, the store and forward facility periodically retries to send the facsimile message."

185. Likewise, Catron discloses that "[f]or customers who prefer an automatic connection to a store and forward facility on busy, the busy indicator 174 on CCS message 172 can be used to set up the connection to the store and forward facility automatically."

186. Although they knew of Catron, the '034 Patent Seekers failed to cite Catron to the PTO during the '034 patent's prosecution.

187. The Patent Seekers did so with intent to mislead the PTO. The deception succeeded, and the PTO later allowed the '034 patent to issue.

***The '021 Patent***

188. The '021 patent is unenforceable because it was obtained by inequitable conduct. Before the '021 patent issued, the '021 Patent Seekers were aware of information material to the patentability of claims of the '021 patent, but withheld and/or concealed that information from the PTO with the intention of deceiving that Office. The withheld/concealed information includes, without limitation, Document Distribution System and Catron.

***'021 and Document Distribution System***

189. As noted above, Document Distribution System was published on May 25, 1988. Document Distribution System is prior art to the '021 patent.

190. Before November 2, 2000, when they filed for the '021 patent, the '021 Patent Seekers knew of Document Distribution System.

191. For example, in a January 8, 1993 IDS filed on their behalf with the PTO, they stated that they were providing every reference associated with the prosecution history of U.S. Patent No. 5,136,634 — but in fact they omitted Document Distribution System, although it had been cited in the '634 patent prosecution.

192. Document Distribution System was material to the prosecution of the '021 patent. For example, '021 claim 26 requires "the step, in response to instructions received from a mailbox subscriber, of transmitting the image stored in that subscriber's mailbox to a fax device."

193. Likewise, Document Distribution System describes a "microcomputer-based system which uses voice generation circuitry to invite a person calling in to the system to specify the document needed by pushing particular keys of his/her touch-tone telephone. Upon ascertaining the identity of the document in question, the computer transmits the document to the caller in

standard facsimile form, either over the telephone connection already established if the telephone call was initiated from a telephone connected with a facsimile machine, or to a different telephone number specified by the caller."

194. Although they knew of Document Distribution System, the ‘021 Patent Seekers failed to disclose Document Distribution System to the PTO during the ‘021 patent's prosecution.

195. The Patent Seekers did so with intent to mislead the PTO. The deception succeeded, and the PTO later allowed the ‘021 patent to issue.

***‘021 and Catron***

196. As noted above, Catron issued on July 16, 1991. Catron is prior art to the ‘021 patent.

197. Before November 2, 2000, when they filed for the ‘021 patent, the Patent Seekers knew of Catron. For example, Mark Bloomfield, who at various times was the President of AudioFAX IP, was aware of Catron from the prosecution of U.S. Patent No. 6,157,464, which was filed on June 24, 1996 and during which Catron was cited, as the face page of the ‘464 patent reflects.

198. Catron was material to the prosecution of the ‘021 patent. For example, ‘021 claim 31 requires "the step of establishing in storage associated with the store and forward facility a linked queue spooling all stored images intended

for a particular destination, and transmitting all the spooled images intended for that particular destination upon successfully making contact with the destination." Likewise, Catron discloses that "[f]or customers who prefer an automatic connection to a store and forward facility on busy, the busy indicator 174 on CCS message 172 can be used to set up the connection to the store and forward facility automatically."

199. Although they knew of Catron, the '021 Patent Seekers failed to cite Catron to the PTO during the '021 patent's prosecution.

200. The Patent Seekers did so with intent to mislead the PTO. The deception succeeded, and the PTO later allowed the '021 patent to issue.

201. Discovery will show additional bases for the unenforceability of the patents-in-suit, and IGC will amend or supplement, with the Court's approval if appropriate, IGC's unenforceability allegations after that discovery.

**Interstate Commerce**

202. The conduct described above affects and restrains substantial amounts of interstate and foreign commerce. IGC as well as all of the Counterclaim Defendants offer or have offered for sale, and have actually sold services or licenses throughout the United States.

## COUNT I

### Invalidity of Each of the Patents in Suit

203. IGC repeats and realleges each of the allegations contained in its Answers, Affirmative Defenses, and Paragraphs 1-73 and 131-201 above as Paragraph 203 of this Count I.

204. Each of the Patents in Suit is invalid under one or more sections of Title 35, United States Code, including section 102 (anticipation), 103 (obviousness), and 112 (indefiniteness), in view of the prior art to each such patent and the knowledge of one of ordinary skill in the art to which the subject matter pertains.

## COUNT II

### Unenforceability of Each of the Patents in Suit

205. IGC repeats and realleges each of the allegations contained in its Answers, Affirmative Defenses, and Paragraphs 1-73 and 131-201 above as Paragraph 205 of this Count II.

206. Each of the Patents in Suit is unenforceable because of the Patent Seekers' intentional concealment from the Patent Office examiner of prior art known to the Patent Seekers to be material to the examination of claims of each such patent.

## COUNT III

**Non-Infringement of Each of the Patents in Suit**

207. IGC repeats and realleges each of the allegations contained in its Answers, Affirmative Defenses, and Paragraphs 1-73 and 131-201 above as Paragraph 207 of this Count III.

208. Each of the Patents in Suit is not infringed by any product or service or method of IGC or MTI, as each of the claims thereof is limited in its proper interpretation to fax-to-fax methods using telephony switches and cannot read, literally or under the doctrine of equivalents, on fax-to-email transmissions on packet-switched networks such as the transmissions and networks that IGC and MTI exclusively use.

## COUNT IV

**Sherman Act § 2**
**(Monopolization by j2 and Catch Curve)**

209. IGC incorporates the allegations contained in Paragraphs 1-202 above as Paragraph 209 of this Count IV.

210. j2 has illegally acquired and maintained a monopoly in the Relevant Market by, among other things:

- Perpetrating fraud on the USPTO in order to obtain the j2 and AudioFAX Patents;

- Threatening and instituting objectively baseless infringement actions against IGC and other competitors of j2 in the Relevant Markets, with full knowledge that the patents-in-suit were invalid, unenforceable, obtained by fraud, and not infringed by IGC's and other competitors' products and services, for the purpose of, and thereby subjecting the targets of this monopolization to, foreclosure from the Relevant Market and unnecessary license fees and litigation expenses, and raising their costs while lowering j2's costs;
- Using the threat of baseless litigation to intimidate competitors and force them to sell their business to j2 or leave the market; and
- Acting to interfere with IGC's and other j2 competitors' business expectations.

211. j2's monopoly has been achieved and has impacted interstate commerce and the Relevant Market.

212. j2's share of the Relevant Market has grown from 40% at the end of 2002 and now exceeds 90%.

213. j2 and Catch Curve, alone and together, have the power to control prices or exclude competition.

214. j2 and Catch Curve possess monopoly power in the relevant market and willfully acquired and maintained that power by the anticompetitive means described herein, and not by growth or development as a consequence of a superior product, business acumen, or historic accident.

215. j2 and Catch Curve have created artificial barriers to entry into the relevant market by baselessly asserting that their patents covering fax-to-fax technology also cover fax to email technology.

216. j2 and Catch Curve's targeting of MTI has created an environment of fear in the marketplace whereby potential resellers may be reluctant to deal with IGC due to fears of being targeted by Catch Curve.

217. j2 and Catch Curve have also tarnished IGC's reputation in the marketplace by branding IGC as a patent infringer.

218. j2 and Catch Curve's litigation and licensing scheme has also caused a significant disruption to IGC's operations by distracting IGC management from its normal operations. IGC has only approximately 6 employees. j2 and Catch Curve knew that IGC is a smaller rival and that the threats of litigation coupled with onerous licensing terms on inapplicable and fraudulent patents would help to disrupt IGC's business operations and allow j2 to attempt to siphon off IGC's customers.

219. In addition to the distraction caused by the objectively baseless litigation, j2 and Catch Curve have also caused significant distraction in IGC's operations, and diverted scarce resources away from its internet facsimile business.

## COUNT V

**Sherman Act § 2**
**(Attempt to Monopolize by j2 and Catch Curve)**

220. IGC incorporates the allegations contained in Paragraphs 1- 202 and Paragraphs 210 through 219 [Count IV] above as Paragraph 220 of this Count V.

221. j2 and Catch Curve, individually and collectively, have attempted to acquire a monopoly in j2 in the Relevant Markets.

222. j2 and Catch Curve, individually and collectively, have illegally acquired or maintained a monopoly by, among other things, the following illegal and anticompetitive acts:

- Perpetrating fraud on the USPTO in order to obtain the AudioFAX Patents;
- Threatening and instituting objectively baseless infringement actions against IGC and other competitors of j2 in the Relevant Markets, with full knowledge that the patents-in-suit were invalid, unenforceable, obtained by fraud, and not infringed by IGC's or other competitors'

services, for the purpose of and thereby subjecting the targets of this scheme to foreclosure from the Relevant Markets and to unnecessary license fees and litigation expenses, and raising their costs while lowering j2's costs;

- Using the threat of baseless litigation to intimidate competitors and force them to sell their business to j2 or leave the market; and
- Acting to interfere with IGC's and other of j2's competitors' business expectancies.

223. There is a dangerous probability that j2 will successfully acquire monopoly power in the Relevant Markets.

224. These actions of j2 and Catch Curve, individually and collectively, have caused harm to competition and consumers and have caused a loss of revenue by Counterclaim Plaintiff.

## <u>COUNT VI</u>

**Sherman Act § 2**
**(Attempt to Monopolize by AudioFAX and AudioFAX IP)**

225. IGC incorporates the allegations contained in Paragraphs 2(a), 2(b), 3-19, 22-27, 42-45, 53-54, 56-69, 72-73, 101-102, and 127-202 above as Paragraph 225 of this Count VI.

226. AudioFAX and AudioFAX IP, individually and collectively, have attempted to acquire a monopoly for themselves or j2 in the Relevant Markets.

227. AudioFAX and AudioFAX IP had a dangerous probability of successfully acquiring monopoly power, and would have acquired such monopoly power had it not sold its patents to Catch Curve.

228. AudioFAX and AudioFAX IP, individually and collectively, have illegally acquired or maintained a monopoly for themselves or j2 by, among other things, the following illegal and anticompetitive acts:

- Perpetrating fraud on the USPTO in order to obtain the AudioFAX Patents;
- Threatening and instituting objectively baseless infringement actions in the Relevant Markets, with full knowledge that the patents-in-suit were invalid, unenforceable, obtained by fraud, and not infringed by IGC's or other competitors' services, for the purpose of and thereby subjecting the targets of this scheme to foreclosure from the Relevant Markets and to unnecessary license fees and litigation expenses, and raising their costs; and
- Acting to interfere with IGC's and other of j2's competitors' business expectancies.

229. These actions of AudioFAX and AudioFAX IP, individually and collectively, have caused harm to competition and consumers and have caused a loss of revenue by Counterclaim Plaintiff.

## COUNT VII

### Breach of Contract by j2

230. In 2000, Counterclaim Defendant j2's predecessor jFax sought to acquire a competitor at that time known as eFax.com.

231. eFax.com (*"eFax"*) had previously entered into a co-location agreement with IGC, whereby IGC would perform many of the "backroom operations" for eFax.

232. eFax provided Internet facsimile services under the eFax brand, and IGC, in accordance with its contract with eFax, would receive facsimiles from eFax customers and, using its own technology, would convert them to data files, which would be thereafter transmitted to the e-mail addresses of the eFax customers as an attachment.

233. jFax was desirous of terminating the co-location agreement between IGC and eFax after its acquisition of eFax. In addition, jFax wanted to accomplish a smooth transition of the eFax customer base and the services being provided by IGC in the year 2000 and before.

234. Therefore, jFax negotiated with IGC and entered into an agreement to transfer the service capabilities and further fulfill all of the obligations of the agreements that eFax owed to IGC.

235. However, IGC wanted to be protected from charges of infringement of any patents, so it negotiated a warranty of non-infringement from jFax.

236. As a result of these negotiations, jFax entered into a Software License Agreement (*"Software License"*) with IGC on June 30, 2000.

237. jFAX warranted to IGC that none of the systems and software being used by IGC infringed any patents of which jFax was aware.

238. At the time the Agreement was executed, jFax was a defendant in a lawsuit alleging infringement of the AudioFAX Patents.

239. jFAX was well aware both of the existence of those patents and that a lawsuit would be brought against IGC.

240. Therefore, the negotiations resulted in j2's predecessor jFax providing IGC an on-going warranty, which j2 has assumed, that IGC's activities did not and do not infringe the AudioFAX Patents.

241. By causing Catch Curve to file a patent lawsuit alleging that IGC infringes the AudioFAX Patents, j2 breached the Software License when the Complaint in this case was filed in 2005.

242. At the time j2 executed the Software License, it was aware of the AudioFAX Patents.

243. j2 has breached its Software License warranty by the filing of the Complaint and other actions prior to the expiration of any applicable statute of limitations on the AudioFAX patents and its warranty.

244. By reason of the foregoing breach of warranty, IGC has been damaged in its business and property.

**WHEREFORE**, Counterclaim Plaintiff IGC respectfully requests that:

A. This Court find that each of the patents in suit is invalid;

B. This Court find that each of the patents in suit is unenforceable;

C. This Court find that none of the claims of the patents in suit is infringed by any of the IGC and MTI products, services, and methods;

D. This Court enjoin j2's current antitrust activities;

E. This Court award such further equitable relief as it deems just and proper, such as breaking up j2's monopoly and requiring the divestiture of the companies and assets acquired during the creation of its monopoly;

F. This Court order j2 to pay IGC $5 million for its breach of contract;

G. This Court dismiss Catch Curve's current claims against IGC and MTI with prejudice;

H. IGC be awarded treble damages under the antitrust laws in an amount to be determined at trial;

I. IGC be awarded punitive damages in an amount to be determined at trial;

J. IGC be awarded its reasonable attorneys' fees and costs pursuant to all available federal and state statutes or rules, including but not limited to the antitrust and patent laws;

K. Find this case an exceptional case and award IGC and MTI their reasonable attorneys' fees, expenses and costs in this action pursuant to 35 USC § 285; and

L. The Court grant such other relief as it deems just and proper, pursuant to, among other things, 28 U.S.C. § 2202.

## JURY TRIAL

Defendants and Counterclaim Plaintiff respectfully demand a trial by jury on all counts of the Complaint and on all issues so triable.

Dated: May 13, 2008

Respectfully submitted,

/s/ Damany F. Ransom
Michael J. Powell, Ga Bar No. 586275
Damany F. Ransom, Ga Bar No. 594774

BAKER, DONELSON, BEARMAN
CALDWELL & BERKOWITZ, P.C.
Six Concourse Parkway, Suite 3100
Atlanta, Georgia 30328-5353
(678) 406-8700 - Telephone
(678) 406-8701 –Facsimile

Robert J. Schneider, IL ARDC #2499223
John R. Crossan, IL ARDC #0548367
James P. Sullivan, IL ARDC #6256746
James Heiser, IL ARDC #6280191
CHAPMAN AND CUTLER LLP
111 West Monroe Street, #1700
Chicago, Illinois 60603-4080
(312) 845-3919 - Telephone
(312) 701-2361 – Facsimile

Of Counsel:

Phillip Zane
DC Bar No. 452939
Illinois Bar No. 6208254

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
555 Eleventh Street, N.W. 6th Floor
Washington, DC 20004
(202) 508-3400 - Telephone
(202) 508-3402 - Facsimile

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies the foregoing document has been prepared with one of the font and point selections (Times New Roman, 14 point) approved by the Court in Local Rules 5.1 (C) and 7.1 (D).

This 13th day of May, 2008.

/s/Damany F. Ransom
Damany F. Ransom

**CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2008, I electronically filed the foregoing Defendants' First Amended Answer and Affirmative Defenses, and Defendant IGC's First Amended Counterclaims for Patent Invalidity, Non-Infringement, Unenforceability, and for Antitrust and Other Violations with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following:

Scott A. Horstemeyer
Dan R. Gresham
Melissa Rhoden
dan.gresham@tkhr.com
THOMAS, KAYDEN, HORSTEMEYER & RISLEY, LLP
600 Galleria Parkway, Suite 1500
Atlanta, Georgia 30339

Robert A. Sacks
sacksr@sullcrom.com
Brian R. England
Edward E. Johnson
SULLIVAN & CROMWELL, LLP

1888 Century Park East, Suite 2100
Los Angeles, California 90067

*Attorneys for Plaintiff / Counterclaim Defendant Catch Curve, Inc. and Added Counterclaim Defendant j2 Global Communications, Inc., and Richard Ressler, Michael William McLaughlin, IP Investments Group, Ryan Strong, Nehemia Zucker, and R. Scott Turicchi*

Stephen David Libowsky
libowskys@howrey.com
HOWREY, SIMON, ARNOLD & WHITE
321 North Clark Street, Suite 3400
Chicago, Illinois 60610

*Attorneys for FTI Consulting, Inc. and Kevin Shultz*

Jennifer Moore
moorej@gtlaw.com
Mark Trigg
Triggm@gtlaw.com
GREENBERG TRAURIG, LLP
3290 Northside Parkway
Atlanta, GA 30327
*Attorneys for IPAC, LLC*

/s/Damany F. Ransom
Damany F. Ransom