# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| CATCH CURVE, INC.,     ) | |
|     Plaintiff and Counterclaim Defendant,   ) | Civil Action File No. |
| v.   ) | 1:06-CV-2199-CC |
| INTEGRATED GLOBAL CONCEPTS, INC.,   ) | |
|     Defendant and Counterclaim Plaintiff,   ) | |
|     and   ) | |
| MEIXLER TECHNOLOGIES, INC.,   ) | |
|     Defendant.   ) | |

| | |
|---|---|
| INTEGRATED GLOBAL CONCEPTS, INC.,   ) | |
|     Counterclaim Plaintiff,   ) | |
| v.   ) | |
| J2 GLOBAL COMMUNICATIONS, INC., AUDIOFAX, INC. and AUDIOFAX IP LLC,   ) | |
|     Additional Counterclaim Defendants.   ) | |

## COUNTERCLAIM DEFENDANTS CATCH CURVE, INC. AND J2 GLOBAL COMMUNICATIONS, INC.'S BRIEF IN SUPPORT OF THEIR RENEWED MOTION TO DISMISS DEFENDANT IGC'S FIRST <u>AMENDED COUNTERCLAIMS</u>

Plaintiff and Counterclaim Defendant Catch Curve, Inc. ("Catch Curve") and Additional Counterclaim Defendant j2 Global Communications, Inc. ("j2") hereby move pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Counts IV, V and VII of the First Amended Counterclaims ("FAC") asserted by Defendant Integrated Global Concepts, Inc. ("IGC") for failure to state a claim. In support of their motion, movants show the Court as follows:

## INTRODUCTION

Catch Curve's Complaint alleges patent infringement by IGC of five U.S. patents (the "AudioFax Patents"). IGC has filed antitrust counterclaims against Catch Curve and j2 (Counts IV and V) and a breach of contract counterclaim against j2 (Count VII).[1] The Court previously dismissed IGC's original counterclaims as an impermissible "shotgun pleading," only for IGC to file a FAC that is 63 pages and 244 paragraphs long (compared to 211 paragraphs before), with the antitrust claims incorporating by reference *over 200 paragraphs each*. The FAC should be dismissed on this basis alone.

Even if the FAC is deemed permissible despite its "shotgun pleading" format, it must be dismissed. Judge Dean D. Pregerson of the U.S. District Court

---

[1]  j2 is not moving to dismiss the remaining counts. Counts I – III seek declaratory relief and Count VI is directed to AudioFax, Inc. and AudioFax IP LLC.

of the Central District of California has already considered claims that are, as IGC itself has admitted, substantially identical to IGC's claims here, and found them to be without merit.  In <u>Catch Curve, Inc.</u> v. <u>Venali, Inc.</u>, No. 05-4820 DDP (C.D. Cal.) ("the Venali Action"), Catch Curve asserted that Venali, which like IGC is an Internet fax company, infringed the same patents at issue here.  As in this case, Venali brought monopolization and attempted monopolization counterclaims under Section 2 of the Sherman Act based on Catch Curve and j2 supposedly pursuing sham litigation based on the same patents.  If there were any doubt about the similarity of the cases, IGC dispelled it in the very first sentence of its opposition brief to j2's Motion to Dismiss IGC's Counterclaims ("IGC's 2008 Response"), in which it described the Venali Action as "a very similar case."  (Docket No. 94.) IGC went on to implore the Court to "follow Judge Pregerson's well-reasoned rulings" (<u>id.</u>), referring to Judge Pregerson's <u>Markman</u> ruling and his ruling on j2's Rule 12(b)(6) motion, both of which were attached as exhibits to the FAC.

Just months later, Judge Pregerson granted summary judgment to j2, dismissing Venali's antitrust counterclaims under the <u>Noerr-Pennington</u> doctrine. (*See* Exhibit A.)  Judge Pregerson concluded "as a matter of law that [] Catch Curve's patent infringement suit against Venali was not baseless" and that there

was no evidence of a pattern of sham litigation in Catch Curve's history.[2]  Judge

Pregerson's decision—based upon his claim construction order and on a record

developed in over three years of litigation—should be the end of IGC's claims as

well.

Even passing Judge Pregerson's well-reasoned and unappealed ruling, IGC's

Sherman Act claims also fail to allege a viable antitrust injury.  The only injury

IGC identifies is the cost of defending this lawsuit.  IGC does not allege any facts

that would suggest that its payment of legal fees to defend this action have

somehow harmed competition.  Nor does IGC allege any facts that, even if proven,

could demonstrate that the payment of attorneys' fees by anyone else to defend

litigation brought by Catch Curve has had any impact on competition.  IGC does

not allege any facts with respect to the magnitude of any costs allegedly imposed

upon anyone else, or identify how the costs may have had an adverse effect on

competition, such as how they have affected prices, the ability of companies to

compete, or the number and strength of competitors in the market.  The few facts

alleged by ICG demonstrate to the contrary: there are numerous companies

competing in the alleged market, and many of those competitors had licenses to the

AudioFax Patents long before Catch Curve ever acquired them.  Indeed, Catch

---

[2]   Venali did not appeal the dismissal of its antitrust counterclaims.

Curve's parent j2 was among those who defended litigation brought by AudioFax and paid for a license under the AudioFax Patents long before Catch Curve acquired them, with no apparent adverse effect on its ability to compete.  Because IGC has failed to allege facts tying Catch Curve's litigation to any injury to competition, its assertions that Catch Curve's claims lack merit do not implicate the antitrust laws.

Finally, IGC's breach of contract claim (Count VII) rests on a misstatement of the relevant contractual provision, which by its terms does not provide any warranty of the type on which IGC's claim is founded.   IGC's claim also depends upon the temporally-impossible assertion that j2 already planned to sue IGC for infringement of the AudioFax Patents in 2000 (five years before j2 acquired the patents)—an assertion that has no facts in the FAC to support it.  And in any event, IGC's breach of contract claim is time-barred.

Accordingly, Counts IV, V and VII should be dismissed.

## BACKGROUND

## I.    The AudioFax Patents.

The AudioFax Patents cover technologies related to the transmission and remote storage of facsimile messages.  U.S. Patent No. 4,994,926 ("the '926

Patent") was the first to be issued, in 1991.  (FAC ¶ 12.)[3]  The remaining Patents

are continuations or continuations-in-part of the '926 Patent.  (Id. ¶¶ 12, 57.)

Catch Curve, formed in 2005, and its parent j2 had no role in prosecuting the

patent applications that led to the issuance of the AudioFax Patents and did not

acquire the AudioFax Patents until 2005, after they had been widely licensed to

many companies by AudioFax over the past decade.  (FAC ¶ 23.)  Before 2005, the

AudioFax Patents were owned and enforced by Counterclaim Defendants

AudioFax, Inc. and AudioFax IP LLC (collectively, "AudioFax").  (Id. ¶¶ 56, 57,

61, 62.)  Although IGC asserts an attempted monopolization claim against

AudioFax (id. ¶¶ 225-29), there is no allegation that AudioFax ever offered

Internet fax services or competed against j2 or IGC.

j2 (then known as JFAX.COM, Inc.) had no affiliation with AudioFax or

anyone allegedly involved in procuring or licensing the AudioFax Patents.  To the

contrary, j2 was among those who AudioFax IP accused of infringing the

AudioFax Patents in an action brought in 1999.  (Id. ¶ 17.)  The case was litigated

for a short time, then stayed pending reexamination of the '926 Patent.  In 2001,

---

[3]   Because the allegations of the counterclaims generally are taken as true on a
      motion to dismiss under FED. R. CIV. P. 12(b)(6), see, e.g., Financial Sec.
      Assur., Inc. v. Stephens, Inc., 500 F.3d 1276, 1282 (11th Cir. 2007), movants
      rely on IGC's allegations for purposes of this motion.  This reliance does not
      constitute an admission in any sense.

shortly after the '926 Patent successfully emerged from reexamination, j2 settled the litigation and obtained a non-exclusive license to the AudioFAX Patents, paying a substantial sum to AudioFax.  (Id. ¶ 22.)

Four years later, in 2005, j2 acquired the AudioFax Patents through its subsidiary Catch Curve.  (Id. ¶ 23.)  All of the patents asserted by Catch Curve in this suit issued prior to the acquisition (id. ¶ 12); as such, neither j2 nor Catch Curve could have played any role in the alleged fraud on the U.S. Patent & Trademark Office ("PTO") imagined by IGC.[4]  (Id. ¶¶ 131-201.)  There is also no allegation that j2 or Catch Curve directed, participated in or had anything to do with the patent infringement claims made by AudioFax before j2 and Catch Curve acquired the patents in 2005.

## II.    **j2's Business and the Alleged Monopoly.**

### A.    **The Alleged Relevant Market.**

j2 is a Los Angeles-based company that principally provides messaging and communications services to individuals and businesses.  Among other services, j2 provides Internet facsimile services, i.e., it allows for the delivery of facsimile

---

[4]   IGC also alleges in passing that j2 committed fraud on the PTO in obtaining U.S. Patent numbers 6,208,638 and 6,597,688.  (FAC ¶¶ 74-88.)  IGC has failed to produce any evidence supporting this allegation.  More to the point, there is no allegation that j2 ever asserted those patents against IGC.  Accordingly, they have no conceivable relevance to this action.

messages to a computer in the form of an email attachment, or from a computer to a facsimile machine.  (<u>Id.</u> ¶ 7.)

IGC alleges that the relevant market for purposes of its antitrust claims is "Internet facsimile services that deliver fax messages via the Internet to home offices and small offices" in the United States (the "Relevant Market").  (<u>Id.</u> ¶¶ 32, 33.)  IGC claims that j2 has 90% of that supposed Market, but does not allege how j2 acquired that alleged market share, and does not allege any facts to connect j2's alleged market share with its acquisition and ownership of the AudioFax Patents since 2005.  (<u>Id.</u> ¶ 29.)  IGC claims that it competes with j2 in the Relevant Market. (<u>Id.</u> ¶ 33.)  Although j2 is allegedly the largest provider of services to the Relevant Market, IGC makes clear that there are "numerous" other competitors.  (<u>Id.</u> ¶ 51.)

The purported basis for IGC's antitrust claim is that (i) j2 perpetrated fraud on the PTO in order to obtain the AudioFax Patents; (ii) j2 and Catch Curve have initiated allegedly baseless litigation under the AudioFax Patents, (iii) j2 has used the threat of baseless litigation to intimidate competitors, and (iv) j2 has acted to interfere with IGC's and other unspecified competitors' businesses.  (<u>Id.</u> ¶ 210.) No facts are alleged to support any of these ultimate assertions.  To the contrary, as to fraud on the PTO, IGC does not allege that j2 and Catch Curve prosecuted the AudioFax Patents before the PTO and acknowledges that they did not even acquire

those Patents until 2005. (Id. ¶ 23.)  IGC further alleges that the AudioFax Patents

were widely enforced—through litigation and licenses—by AudioFax for many

years prior to their acquisition by j2 and Catch Curve in 2005.  Indeed, IGC alleges

that j2 itself was sued by AudioFax and took a license from AudioFax.  (Id. ¶¶ 17,

18, 22.)  The FAC does not contain any facts with respect to any alleged

interference by j2 against IGC or anyone else.  And the FAC does not allege any

facts that could establish a nexus between any asserted baseless litigation or

interference and competition in the alleged market.

### B.    j2's Previous Dealings With IGC.

In 2000, j2 (then known as JFAX) acquired a company called eFax.  (Id. ¶

230.)  eFax had an agreement with IGC under which IGC performed certain

services related to eFax's "backroom operations."  (Id. ¶ 231.)  j2 wished to

discontinue using IGC's services after the acquisition, but required those services

to continue during the transition period away from IGC.  (Id. ¶ 233.)  Therefore, j2

entered into a license agreement (the "Software License" or "License") under

which it purchased the right to use IGC's software for an interim period and a

warranty from IGC that the software did not infringe any intellectual property

rights.[5]  Also in the License Agreement, j2 warranted that it was not aware, at the time the agreement was executed, of any prior assertion of intellectual property rights concerning the use by eFax of IGC's software.  (License § 6.1.)  Again, this was five years before j2 acquired the AudioFax Patents.

## III.   Procedural History.

Catch Curve filed this action for patent infringement against IGC on September 15, 2006.[6]  On November 3, 2006, IGC moved to dismiss for lack of personal jurisdiction, or in the alternative to transfer the case to the Northern District of Illinois.[7]  By Order dated September 20, 2007, this Court denied IGC's motion in its entirety and ordered the case to proceed.

---

[5]   A true and correct copy of the Software License is attached hereto as Exhibit B. Because IGC referred to the License in its Counterclaim and alleges a breach of contract claim based on the License, "the Court may consider the [Software License] part of the pleadings for purposes of Rule 12(b)(6) dismissal," without converting the motion into a motion for summary judgment.  Brooks v. Blue Cross and Blue Shield of Florida, Inc., 116 F.3d 1364, 1369 (11th Cir. 1997).

[6]   Catch Curve also named Meixler Technologies as a defendant.  In light of the claim construction affirmed by the Federal Circuit, Catch Curve intends to dismiss its claims against Meixler, and is currently working out a stipulation with Meixler to effect the dismissal.

[7]   Underscoring the harassing nature of IGC's counterclaims, while IGC's motion to dismiss or transfer this action was pending before this Court, IGC brought a lawsuit in the Northern District of Illinois substantially identical to its counterclaims here.  See Integrated Global Concepts, Inc. v. j2 Global Commn's, Inc., et al., Case No. 07-cv-3494 (N.D. Ill.).  After forcing

IGC then filed counterclaims against 16 parties, many of them with no reasonable connection to this dispute, as part of an attempt to apply pressure against Catch Curve.  The counterclaims contained 211 paragraphs of conclusory, repetitive, and often inconsistent or contradictory allegations, many of them copied from pleadings in other cases to which IGC is not a party, and many of which had no applicability to any claim that IGC has standing to bring or any harm that IGC could reasonably claim to have suffered.

On April 23, 2008, this Court dismissed IGC's counterclaims without prejudice as an impermissible shotgun pleading.  IGC then filed its FAC.  Although the FAC drops many of the extraneous parties and some of the more outlandish causes of action, IGC has failed to fix the fundamental problems with its original pleading.  The FAC is 244 paragraphs (even more than the previous pleading) and the allegations remain repetitive, disorganized, and often irrelevant.

Catch Curve moved to dismiss the FAC.  While that Motion was pending, the Court granted Catch Curve's motion to stay this case pending the conclusion of Catch Curve's appeal to the Federal Circuit in the Venali Action.  (Docket No. 106.)  The Federal Circuit ultimately affirmed Judge Pregerson's claim

_____

defendants to collectively file nine motions to dismiss and/or to stay, IGC finally conceded that the Illinois action was duplicative, and agreed to stipulate to a stay of that action pending the outcome of this action.

construction ruling and grant of summary judgment of non-infringement.  In light of the Federal Circuit's ruling, Catch Curve no longer intends to assert infringement by IGC's fax-to-email service; instead, the infringement case will be limited to IGC's fax-to-fax service.

In June 2010, following the Federal Circuit's ruling, the Court granted j2 and Catch Curve's motion to lift the stay, and j2 and Catch Curve were given leave to renew their Motion to Dismiss.  (Docket No. 109.)

<u>**ARGUMENT AND CITATION OF AUTHORITIES**</u>

**I.      <u>Legal Standard Under Fed. R. Civ. P. 12(b)(6).</u>**

To state a claim, a complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2). Although factual allegations are accepted as true, in antitrust cases "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quotes omitted) ("<u>Twombly</u>").  As explicitly stated in <u>Twombly</u>, a plaintiff must plead facts to support an antitrust claim.

In <u>Twombly</u>, the Supreme Court rejected the familiar language of <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957), under which dismissal is appropriate only if "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." See Twombly, 550 U.S. at 561. Instead, the Court recognized that "'[t]he costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint.'" Id. at 559 (quoting Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984)). Accordingly, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and the Complaint must cross the line "between possibility and plausibility." Id. at 555, 557.

## II.     **The FAC Should Be Dismissed as an Improper Shotgun Pleading.**

The Eleventh Circuit has repeatedly emphasized that complaints should set forth the basis for relief clearly and concisely, so that the Court is not required to "sift through the facts presented and decide for [itself] which were material to the particular cause of action asserted, a difficult and laborious task indeed." Pelletier v. Zweifel, 921 F.2d 1465, 1518 (11th Cir. 1991); see also, e.g., Watts v. Florida Int'l Univ., 495 F.3d 1289, 1299 (11th Cir. 2007) ("We have constantly preached to attorneys that they should avoid repetitive allegations and averments in complaints, warning against the reviled 'shotgun pleadings' style."); Strategic

Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293, 1296 (11th Cir. 2002) (affirming dismissal of third amended complaint that "contain[ed] 127 paragraphs (six more than the second amended complaint) and nine counts, with each count incorporating by reference every paragraph that precede[d] it").

With its FAC, IGC has again ignored this Circuit's pleading standards. The FAC is 63 pages long and contains 244 paragraphs. Moreover, each cause of action incorporates many, or most, of those paragraphs, making it impossible to tell the basis for the claim. For instance, IGC's Count V (Attempt to Monopolize) incorporates by reference over 200 paragraphs – paragraphs 1-202 and 210-219. The allegations in the FAC are repetitive and there is no discernable method to their organization. In short, the FAC, like IGC's prior pleading, fails to comply with the Eleventh Circuit's pleading standards and should be dismissed.

## III.   IGC's Sherman Act Claims Should Be Dismissed Under the Noerr-Pennington Doctrine.

Because IGC's claims are predicated on Catch Curve's patent infringement claims against IGC and others, they are foreclosed by the Noerr-Pennington doctrine. See Prof'l Real Estate Inv., Inc. v. Columbia Pictures, Inc., 508 U.S. 49, 60-61 (1993) (hereinafter "PRE"). Noerr-Pennington immunity protects the First Amendment right to petition the government, and is pierced only "with great reluctance." White v. Lee, 227 F.3d 1214, 1232 (9th Cir. 2000). A patent

13

infringement suit can give rise to an antitrust violation only if there is clear and convincing evidence that the patent was granted as a result of intentional deceit by the patent owner, Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1071 (Fed. Cir. 1998) , or that the patent owner pursued litigation of the patent that was both (i) objectively baseless and (ii) brought in bad faith.  PRE at 60-61; Handgards, Inc. v. Ethicon, Inc., 601 F.2d 986, 996 (9th Cir. 1979).  Litigation is objectively baseless only where "no reasonable litigant could reasonably expect success on the merits."  PRE, 508 U.S. at 60.

Judge Pregerson has already held—as a matter of law—that the Venali Action was not objectively baseless.  (Exhibit A at 10.)  IGC's counterclaims should likewise be dismissed.  In IGC's 2008 Response to j2 and Catch Curve's previous Motion to Dismiss, IGC represented to the Court that this action is substantially similar to the Venali Action for these purposes, and relied heavily on Judge Pregerson's decisions in the Venali Action.  Specifically, IGC stated, in reference to Judge Pregerson's ruling on Catch Curve and j2's Motion to Dismiss:

> That Court also ruled, in a separate opinion, that the conduct of the j2 Defendants gave rise to a claim under the antitrust laws based on the same Walker Process [Equip., Inc. v. Food Mach. Corp., 382 U.S. 172 (1965)] and Hangards[, Inc. v. Ethicon, Inc., 601 F.2d 986 (9th Cir. 1979), *cert denied,* 444 U.S. 1025 (1980)] theories presented here. Catch Curve v. Venali, Inc., 519 F. Supp. 2d 1028 (C.D. Cal. 2007) (attached hereto as Exhibit 2).

14

> Yet, in this case, the j2 Defendants continue to maintain baseless allegations that IGC's fax-to-email service infringes the AudioFAX Patents.  <u>This Court should follow Judge Pregerson's well-reasoned rulings</u> and deny the present motion to dismiss.

(IGC's 2008 Response at 2, emphasis added.)  Further, IGC repeatedly drew similarities between this case and the Venali Action pending before Judge Pregerson, emphasizing the similarities between IGC and Venali, analogizing the two cases, and attaching two rulings in the Venali Action as exhibits to both its 2008 Response and to the FAC.  (<u>See</u> IGC's 2008 Response at 2.)

Roughly four months after IGC's 2008 Response was filed, Judge Pregerson granted j2's Motion for Summary Judgment, dismissing Venali's antitrust claims.[8] Judge Pregerson found that Catch Curve was protected by <u>Noerr-Pennington</u> immunity because its claims against Venali, although unsuccessful, were not "objectively baseless" as a matter of law.  (Exhibit A at 10.)  Specifically, he held that

> The Court has reviewed its Claim Construction Order in conjunction with this motion.  Without restating the Order in its entirety here, the Court notes that construction of the claim terms required intricate

---

[8]  For the Court's reference, j2's Motion for Summary Judgment and Reply are attached hereto as Exhibits C and D.  (Venali's Opposition brief was filed under seal and no public redacted version was filed.)  These documents are available on PACER and therefore are properly the subject of judicial notice.  *See* Fed. R. Evid. 201 (permitting courts to take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

analysis.  While the Court believes its constructions properly resolve the disputes over the claim terms, <u>the Court did not consider Catch Curve's contrary constructions to be frivolous when it issued the Claim Construction Order, nor does it consider them to be objectively baseless now</u>.  During the claim construction process, Catch Curve offered reasonable arguments in support of its proposed constructions that were based on intrinsic evidence, claim construction principles, and expert testimony.

(<u>Id.</u>; emphasis added, internal citations and footnote omitted.)  Judge Pregerson further held that Catch Curve's prior license agreements with other companies reflected "litigation success."  (<u>Id.</u> at 18.)  He concluded that, in light of this, Venali could not show that Catch Curve was filing lawsuits "without regard to the merits" as part of a pattern of "baseless, repetitive claims."  (<u>Id.</u> at 20, citing <u>USS-POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council</u>, 31 F.3d 800, 811 (9th Cir. 1994)).  Accordingly, he granted summary judgment to Catch Curve.  Venali did not appeal.

IGC should not be permitted to run from its assertions regarding the similarities of these two cases or its admonition that "[t]his Court should follow Judge Pregerson's well-reasoned rulings."  (IGC's 2008 Response at 2.)  As IGC itself has acknowledged in filings with this Court, the issues in this case mirror those raised in the Venali Action.  j2 and Catch Curve's litigation is not "objectively baseless" and therefore cannot violate the antitrust laws.

16

**IV.   IGC's Sherman Act Claims Should Be Dismissed Because IGC Has Not Alleged Antitrust Injury.**

The antitrust laws are concerned with "the protection of <u>competition</u>, not <u>competitors</u>." <u>Brown Shoe Co. v. U.S.</u>, 370 U.S. 294, 320 (1962).  They are intended not to federalize business tort law, but to guarantee the beneficial effects of a competitive market—higher output and quality and lower prices—to the public as a whole.  <u>See</u> <u>Car Carriers</u>, 745 F.2d at 1107-08.  IGC's Sherman Act claims allege, at most, nothing more than a minor injury (the litigation costs stemming from a patent infringement lawsuit) inflicted on one competitor by another.  Therefore, IGC's claims fail to plead antitrust injury and must be dismissed.

To state a claim under the antitrust laws, a plaintiff "must prove <u>antitrust injury</u>, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." <u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 489 (1977).  In other words, "a plaintiff can recover only if [its] loss stems from a competition-<u>reducing</u> aspect or effect of the defendants' behavior." <u>Atl. Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 344 (1990).

IGC has failed to plead an injury caused by a competition-reducing aspect of j2 and Catch Curve's conduct.  IGC alleges that it has been injured by the expenses

17

incurred in defending this lawsuit, but, setting aside conclusory allegations of the sort <u>Twombly</u> rejected, it pleads nothing to suggest that its litigation expenses are, or could be, connected to any injury to the market.  Absent such a connection, there is no antitrust injury.  <u>Atl. Richfield Co</u>., 495 U.S. at 344.

### A.   <u>The Only Injury IGC Alleges Is the Expense of Defending This Lawsuit.</u>

The first step in pleading antitrust injury is to identify an injury-in-fact.  <u>See</u> 15 U.S.C. § 15 (requiring injury to "business or property").  IGC does not identify any injury that it has suffered other than its attorneys' fees in this action, as well as related injuries that accompany any litigation (<u>e.g.</u>, disruption to the business and harm to reputation).  (FAC ¶¶ 106, 109, 111, 217, 218, 219.)

IGC cannot establish antitrust injury with its allegations that j2 "has obtained a 90% share of the market" and, as a result, charges "artificially high prices for its services (which were recently increased by another $4 per month for individuals)" to meet the injury-in-fact requirement.  (FAC ¶¶ 46, 52.)  If true, those allegations demonstrate a benefit, not injury, to IGC, which could raise its own prices and still compete with j2.  <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 583 (1986) ("as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market price").

Nor can IGC establish antitrust injury with its allegation that Catch Curve sued Meixler, a reseller of IGC's services, "in an attempt to cause [Meixler] to cease dealing with IGC and further erode IGC's customer base."  (FAC ¶ 113.) There is no allegation that Meixler <u>has</u> stopped dealing with IGC, and therefore the Meixler suit cannot have caused injury-in-fact to IGC.

In short, the only possible basis for an antitrust injury to IGC is the legal fees and related costs stemming from this lawsuit.[9]

**B.    <u>The Complaint Does Not Adequately Plead a Connection Between IGC's Alleged Litigation Expenses and Any Harm to Competition</u>.**

Although IGC tries to dress it up as an antitrust claim, the FAC actually describes nothing more than a garden-variety claim for sanctions or malicious prosecution, which is premature here because the underlying claims have not yet been adjudicated.  The legal fees IGC has incurred in defending this suit do not constitute antitrust injury, for two reasons.

---

[9]   IGC's fees and costs related to this suit are presumably very limited given that the case has not yet entered discovery.  And any legal fees that IGC incurs going forward are of its own making.  Following the Federal Circuit's decision, Catch Curve offered to dismiss its infringement claims with prejudice because, under the claim construction affirmed by the Federal Circuit, only IGC's fax-to-fax service (as opposed to its larger fax-to-email service) infringes, limiting the damages Catch Curve can recover.  IGC refused to stipulate to the dismissal.

First, IGC fails to set forth any connection between its alleged injury and reduced competition.  Without factual allegations that give rise to a plausible inference that the alleged sham litigation reduced competition, IGC has not adequately pleaded antitrust injury.  See Atl. Richfield Co., 495 U.S. at 344 ("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.").

IGC alleges no facts—as distinct from bare conclusions—to suggest the allegedly sham lawsuit against IGC (or any other supposed sham lawsuit) has affected the market.  IGC does not allege that it was forced to raise prices due to the litigation, or identify any other competitor of j2 who raised prices as a result of litigation, or even state that market prices, as a whole, have gone up.  Nor does IGC identify any potential competitor whose entry into the market was deterred by fear of sham litigation.  With one exception,[10] IGC also fails to identify any competitors that have exited the market as a result of sham litigation, or to allege

---

[10]   IGC claims that a company called Vera Cruz Marketing, which "provided its services through the website InternetFaxProvider.com," "is in the process of shutting down its Fax to email business because it is impossible for it to operate within the constraints of the onerous terms imposed on it by j2 and Catch Curve."  (FAC ¶¶ 118, 120.)  But IGC does not allege any facts to demonstrate any connection between action taken by Vera Cruz Marketing and allegedly sham litigation by j2 or Catch Curve.  Nor does it allege facts relating to what market share Vera Cruz Marketing has or had and how, if at all, its purported decision to shut down its business affects competition.

that the quantity or quality of available fax-to-email services has decreased.  Post-

Twombly, these omissions compel the inference that the alleged relevant market

has not been affected by any alleged sham litigation.  See Perry v. Rado, 504 F.

Supp. 2d 1043, 1047 (E.D. Wash. 2007) (dismissing antitrust claim because "it is

unreasonable to infer" injury to competition absent allegations of a rise in market

prices above a competitive level or a decrease in supply or quality of services).

Several courts have held that allegations of litigation expenses, without

additional factual allegations that would enable the court to plausibly infer harm to

competition, are not sufficient to plead antitrust injury.  For example, in Brotech

Corp. v. White Eagle Int'l Tech. Group, Inc., No. 03-232, 2004 WL 1427136, at *7

(E.D. Pa. June 21, 2004), the Court held that:

> [a]n antitrust plaintiff must show that the allegedly anticompetitive
> conduct harmed "the competitive landscape."  While the Amended
> Counterclaim alleges that [Defendant's] payment of defense costs in
> this litigation flows from Plaintiffs' allegedly anticompetitive conduct,
> there is no allegation that said payment had any effect on competition,
> on the price, quantity or quality of [Defendant's]  products, or
> prevented [Defendant] from pursuing its entry into the market.

(citations omitted); see also AMA v. United Healthcare Corp., No. 00-2800, 2007

WL 683974, at *5 n.3 (S.D.N.Y. March 5, 2007) ("litigation costs alone do not

constitute antitrust injury"); Chip-Mender, Inc. v. Sherwin-Williams Co., No. C05-

3465 PJH, 2006 WL 13058, at *5 (N.D. Cal. Jan 3, 2006) (litigation expense is not

"the type of injury that the antitrust laws were designed to protect against, but is rather a purely individual economic injury to [the antitrust plaintiff] that has no effect on competition in the relevant market").

Similarly, IGC failed to allege facts showing that its litigation costs had any effect on competition.  The FAC, like IGC's prior counterclaims, confirms that IGC's allegation is nothing more than that the litigation "enable[s] j2 to lower its costs of participating in the Relevant Markets at the expense of smaller rivals' businesses while raising their costs of competing with j2."  (FAC ¶ 112.)  To plead an antitrust injury, more is needed than an allegation of a transfer of money from one competitor to another.  See Brown Shoe Co., 370 U.S. at 320.

Second, the FAC does not attempt to allege facts that could explain how relatively insignificant litigation costs could deter entry to, or force exit from, the relevant market.  IGC does not even allege the magnitude of costs allegedly incurred by itself or anyone else.

Indeed, the implication that such unspecified costs could affect market entry or exit decisions contradicts IGC's monopoly and market power allegations: only in a market with paper-thin profit margins could that be the case, and such small margins imply that the market is highly competitive, not monopolistic.  IGC's claim that j2 has built a monopoly by extracting small license fees is further

contradicted by its allegation that j2 has "numerous" competitors in the Relevant Market (FAC ¶ 51).  Indeed, IGC identifies by name some twenty-five competitors against whom Defendants allegedly brought patent enforcement suits.  (<u>Id.</u> ¶ 101.) Most of the lawsuits were allegedly settled by purchasing "a lump sum, fully paid-up license."  (<u>Id.</u> ¶ 98.)  It is hard to imagine how one company could exercise market dominance in a market with "numerous" competitors, at least two dozen of which <u>already</u> purchased a fully paid-up license to the AudioFax patents, and therefore are not currently being harmed, and cannot be harmed in the future, by any lawsuit enforcing those patents.

IGC's claims are further contradicted and/or undermined by several other facts.  IGC claims that j2 has an advantage over its competitors because they have been forced to defend against infringement litigation related to the AudioFax patents.  However, j2 itself defended a lawsuit from AudioFax, then paid for a license under the Patents.  (FAC ¶¶ 17, 22.)  Moreover, most of the lawsuits referenced by IGC occurred before the time j2 and Catch Curve acquired the AudioFax Patents in 2005.  Accordingly, these prior lawsuits cannot be the basis for any claim against j2 and Catch Curve.

IGC's allegations concerning barriers to entry are similarly contradictory. IGC alleges that the AudioFax Patents are inapplicable to services in the alleged

23

relevant market, but also that they are a barrier to entry.  (FAC ¶¶ 15, 128.)  IGC

cannot have it both ways.  If the AudioFax Patents are obviously invalid or not

infringed by internet fax services, then IGC has disproved its own allegation that

the market has material barriers to entry.  Without barriers to entry, IGC cannot

allege that j2 has market power sufficient to injure competition.  See Bailey v.

Allgas, Inc., 284 F.3d 1237, 1256 (11th Cir. 2002) ("Where a market has low

barriers to entry, sellers charging supracompetitive prices will soon attract new

competitors.").  On the other hand, if the AudioFax Patents are valid and infringed

by internet fax services, then IGC's allegations of sham litigation necessarily fail.

In short, if Catch Curve's lawsuit were without merit, IGC would have

remedies to recover the expenses incurred in defending against the lawsuit, such as

FED. R. CIV. P. 11, or seeking to have the Court determine this case to be

exceptional.[11]  But IGC's allegations here do not remotely implicate the antitrust

laws.  IGC has not alleged harm to competition in the Relevant Market as a result

of the alleged anticompetitive conduct; nor has it provided a plausible explanation

of how the cost of defending a lawsuit could give rise to a monopoly.  As such,

---

[11]  In addition to dismissing Venali's antitrust claims on summary judgment, Judge
Pregerson held that the case was not exceptional and accordingly denied
Venali's request for fees.  (Exhibit E.)

IGC has not adequately pleaded antitrust injury, and its antitrust claims therefore fail.

**V.    IGC Has Not Adequately Alleged a Breach of Contract.**

In Count VII, IGC alleges that j2 (then known as JFAX.COM) breached its Software License with IGC.[12]   Pursuant to that License, j2 obtained a nonexclusive software license from IGC.  Although the FAC asserts that j2 "warranted to IGC that none of the systems and software being used by IGC infringed any patents of which jFax was aware," (FAC ¶ 237), that is not what the License says at all.  Nor would it make any sense, because IGC was the licensor and j2 was the licensee. While it is common for a licensee to receive a warranty protecting it from patent infringement liability based on its use of the licensed software, it is bizarre for a licensor like IGC to claim that the <u>licensee</u> somehow warranted the <u>licensor's</u> software and, even further, that the licensee warranted the licensor's own software in connection with uses unrelated to the license agreement.

The warranty on which IGC relies is actually a warranty that IGC gave to j2. It provides that "IGC represents and warrants to eFax and JFAX that . . . (c) neither the Licensed Software nor any other Intellectual Property Right infringes or will

---

[12]   As noted above, <u>see</u> n.5 <u>supra,</u> the Software License is attached hereto as Exhibit B and can properly be considered on this motion as part of the pleadings.

infringe the intellectual property rights of any third party." (License § 6.1.) All that the License says about j2 is that "neither eFax nor JFAX to [the] best of its knowledge is aware of any claim that the Licensed Software infringes the intellectual property rights of any third party." (Id.)

IGC contends that j2 breached the warranty provision, because at the time it executed the License, it "was well aware both of the existence of those patents and that a lawsuit would be brought against IGC." (FAC ¶ 239.) IGC's claim fails to state a claim for at least four independent reasons.

First, IGC does not allege that, as of the date of the Software License, j2 was aware of any "claim" that the Licensed Software infringed a third party's intellectual property. There are no facts in the FAC to support such a claim, which is counter to every fact that is alleged. Indeed, IGC does not even allege that in November 2000, when the Software License was executed, anyone had asserted any claim against IGC based upon the AudioFax Patents. To the contrary, IGC itself warranted that it had received no claims of infringement as of November 2000, and the only claim identified in the complaint is the one that Catch Curve asserted in this case *in 2005*. IGC itself alleges that in 2000, j2 (and Catch Curve, which did not even exist) had no interest in the AudioFax Patents but was actually being sued by AudioFax on its own service. IGC does not identify anyone at j2

who it alleges had considered (or would have had any reason to consider) in

November 2000 whether the AudioFax Patents, which j2 did not own or have any

interest in at that time, had any applicability to the IGC software being licensed to

j2.  And IGC certainly does not allege that as of November 2000, someone at j2

had analyzed IGC's software and determined that there existed a possible claim

against IGC under patents that j2 did not own.

Second, by its terms, the warranty applies only to the software actually used

by or for j2—not to software being used by IGC for unrelated activity.  Licensed

Software is defined in Schedule A of the License as "all of the software . . . that

eFax and/or IGC uses as of the date of the Agreement in connection with the

services performed by eFax and/or IGC for eFax's customers or in connection with

any related billing, credit card processing, customer sign-up/provisioning,

reseller/branding support, API, user data base and web site hosting functions, or

otherwise relating to the eFax services and their use by eFax and its customers. . .

."  (License at 8, emphasis added.)  In other words, a claim would potentially fall

within the warranty only if it were based on eFax's use of IGC's software.  The

patent infringement claims asserted by Catch Curve against IGC in this case have

nothing to do with eFax's use of IGC's software.  To the contrary, Catch Curve's

claims are based upon IGC's own messaging services that infringe the AudioFax Patents.

Third, it is unclear (and nowhere alleged in the FAC) how j2 could have known in 2000 about some plan to assert a claim against IGC under the AudioFax Patents, given that j2 did not acquire those Patents and Catch Curve was not formed until 2005, almost five years later.  (FAC ¶ 23.)  The notion that j2 was already plotting, in 2000, to sue IGC for infringement of patents it did not own until five years later is absurd and, in any event, is nowhere supported by any facts alleged in the FAC.

Fourth, IGC's breach of contract claim is in all events barred by the applicable statute of limitations, GA. CODE ANN. § 11-2-725.[13]  Under the Software License, IGC provided the source code for the software on CD-ROMs (License § 2.1), accompanied by only minimal services ("reasonable instruction" in using the software).  (License § 3.2.)  Therefore, the sale of the license was a sale of goods governed by the UCC.  See Richard Haney Ford, Inc. v. Ford Dealer Computer Servs., 461 S.E.2d 282, 283 (Ga. Ct. App. 1995); Dealer Mgmt. Sys.,

---

[13]   Although the Software License provides that it is governed by California law (License § 8.4), the statute of limitations is nevertheless a matter of Georgia law.  See Lloyd v. Prudential Sec., Inc., 438 S.E.2d 703, 704 (Ga. App. 1993) (statute of limitations is procedural, and therefore is governed by Georgia law, regardless of choice of law provision in contract).

Inc. v. Design Auto. Group, Inc., 822 N.E.2d 556, 560 (Ill. App. Ct. 2005);

Advent Sys. Ltd. v. Unisys Corp., 925 F.2d 670, 675-76 (3d Cir. 1991) (holding

that software is a good within the definition of the UCC); Newcourt Fin. USA, Inc.

v. FT Mortgage Cos., Inc., 161 F. Supp. 2d 894, 897 (N.D. Ill. 2001).

The statute of limitations governing the sale of goods, GA. CODE ANN. § 11-

2-725, provides that "[a]n action for breach of any contract for sale must be

commenced within 4 years after the cause of action has accrued. . . ."  It further

provides that, as a matter of law – and contrary to IGC's allegation that the breach

of warranty occurred when Catch Curve brought this suit (FAC ¶¶ 241, 243) – "[a]

cause of action accrues when the breach occurs, regardless of the aggrieved party's

lack of knowledge of the breach.  A breach of warranty occurs when tender of

delivery is made . . . ."  (Id.)  Here, the tender of delivery (and hence any breach of

warranty) occurred on November 22, 2000, the date of the License.  Thus,

regardless of when IGC discovered the alleged breach or when Catch Curve

brought suit, the four year statute of limitations ran nearly three years before IGC

brought its original counterclaims in October 2007, and the breach of contract

claim should be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, Catch Curve and j2 respectfully request that

Counts IV, V and VII of IGC's First Amended Counterclaims be dismissed.

Respectfully submitted, this 16th day of July, 2010.

/s/ Robert A. Sacks
Robert A. Sacks
California Bar No. 150146
Brian R. England
California Bar No. 211335
Edward E. Johnson
California Bar No. 241065
**SULLIVAN & CROMWELL, LLP**
1888 Century Park East, Suite 2100
Los Angeles, California 90067
(310) 712-6600
(310) 712-8800 Fax

Scott A. Horstemeyer
Georgia Bar No. 367836
Dan R. Gresham
Georgia Bar No. 310280
Melissa Rhoden
Georgia Bar No. 143160
**THOMAS, KAYDEN, HORSTEMEYER
& RISLEY, LLP**
600 Galleria Parkway, Suite 1500
Atlanta, Georgia 30339
Telephone: (770) 933-9500
Facsimile:  (770) 951-0933

Attorneys for Plaintiff / Counterclaim
Defendant Catch Curve, Inc. and
Additional Counterclaim Defendant j2
Global Communications, Inc.

## **CERTIFICATE OF COMPLIANCE**

The undersigned counsel certifies the foregoing document has been prepared with one of the font and point selections (Times New Roman, 14 point) approved by the Court in Local Rule 5.1 (C) and 7.1 (D).

This 16th day of July, 2010.

*/s/ Dan R. Gresham*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 16, 2010, the foregoing **"COUNTERCLAIM DEFENDANTS CATCH CURVE, INC. AND J2 GLOBAL COMMUNICATIONS, INC.'S BRIEF IN SUPPORT OF THEIR RENEWED MOTION TO DISMISS DEFENDANT IGC'S FIRST AMENDED COUNTERCLAIMS"** was filed electronically with the ND Ga. Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

*/s/ Dan R. Gresham*