## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| CATCH CURVE, INC., | ) |
| | ) |
| Plaintiff and Counterclaim Defendant, | ) |
| | ) |
| | ) No. 1:06-CV-02199 |
| v. | ) Judge Clarence Cooper |
| | ) |
| INTEGRATED GLOBAL CONCEPTS, INC., | ) |
| | ) |
| Defendant and Counterclaim Plaintiff, | ) |
| and | ) Jury Trial Demanded |
| | ) |
| MEIXLER TECHNOLOGIES, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |
| INTEGRATED GLOBAL CONCEPTS, INC., | ) |
| | ) |
| Counterclaim Plaintiff, | ) |
| | ) |
| v. | ) |
| J2 GLOBAL COMMUNICATIONS, INC., | ) |
| AUDIOFAX, INC., AND AUDIOFAX IP LLC | ) |
| | ) |
| Added Counterclaim Defendants. | ) |

### RESPONSE OF INTEGRATED GLOBAL CONCEPTS, INC. TO THE J2 DEFENDANTS' RENEWED MOTION TO DISMISS

2848322.01.17.doc

TABLE OF CONTENTS

SECTION                                    HEADING                                    PAGE

SUMMARY OF THE ARGUMENTS ................................................................1

OVERVIEW OF THE PATENTS AND THE FEDERAL CIRCUIT DECISION .........................4

I.   The j2 Defendants' Motion Must Be Denied Because It Is
     Premised Entirely on Improper Submissions
     From Outside the Pleadings ...................................................8

     A.   The Court Cannot Consider the Findings In the *Venali*
          Case or the j2 Defendants' Briefing in That Case
          Because They Are Not Subject to Judicial Notice
          and Are Hearsay ..........................................................9

     B.   The License Agreement Also Cannot Be Considered
          Because It Is Not Authenticated ........................................11

     C.   This Court Should Deny the Motion Rather Than
          Convert It to a Motion for Summary Judgment .................12

II.  IGC's Sham Litigation Claims Are Easily Plausible and
     Therefore Satisfy the *Twombly* Standard ...........................13

III. IGC Properly Alleges an Antitrust Injury ................................19

     A.   The j2 Defendants' Attempts to Extract Bogus
          Royalties and Eliminate IGC as a Competitor
          Independently  Provides Sufficient Injury and
          Satisfies the *Twombly* Standard..........................................19

     B.   Being Named in a Suit Involving *Walker Process*
          Fraud Is a Sufficient Antitrust Injury ..............................20

     C.   The Targeting of IGC's Reseller Satisfies the Injury
          Requirement ...................................................................21

     D.   Litigation Costs Alone Are Sufficient to State an
          Antitrust Claim in *Walker Process* and Sham
          Litigation Cases ................................................................23

     E.   IGC Has Alleged Numerous Other Instances of
          Misconduct That Establish a Nexus Between the
          j2 Defendants' Sham Litigation and Patent Fraud
          and a Harm to Competition .............................................27

IV.  The j2 Defendants Have Failed to Show That IGC's Breach of
     Contract Claims Should Be Dismissed ...............................30

V.   The j2 Defendants' "Shotgun Pleading" Argument Is
     Misplaced ........................................................................33

CONCLUSION .................................................................................35

## TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories vs. Teva Pharmaceuticals, USA Inc.,* 432 F.Supp.2d 408 (D.Del. 2006) .................................................................................20

*AMA v. United Healthcare Corp.*, 2007 WL 683974 (S.D.N.Y. March 5, 2005) ...................................................................................................25

*Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.*, 2007 WL 4465195, at *10 (D. Minn. Dec. 18, 2007) ....................................19, 20

*Ashcroft v. Iqbal,* 129 S. Ct. 1937 (2009)..................................................14

*Atlantic Richfield Co. v. U.S.A. Petroleum Co.*, 495 U.S. 328 (1990) ..............19, 27

*Bourns, Inc. v. Raychem Corp.,* 331 F.3d 704 (9th Cir. 2003)................................21

*Brotech Corp v. White Eagle Int'l Tech. Group, Inc.*, 2004 WL 1427136 (E.D. Pa. June 21, 2004) .................................................................24

*Buehler AG v. Ocrim, S.p.A.,* 836 F. Supp. 1291 (N.D. Tex. 1992).......................21

*Catch Curve, Inc. v. Venali, Inc.*, 363 Fed.Appx.19, 2010 WL 270889 (Fed. Cir. January 22, 2010)...................................................................2

*Chip-Mender, Inc. v. Sherwin Williams Co.*, 2006 WL 13058 (N.D. Cal. Jan. 3, 2006) ...................................................................................25

*D.A. Rickards, M.A. v. Canine Eye Registration Foundation, Inc.*, 783 F.2d 1329 (9th Cir. 1986)...................................................................24

*Dewey v. University of New Hampshire*, 694 F.2d 1, 3 (1st Cir. 1982) ................14

*Doss v. Clearwater Title Co.*, 551 F.3d 634 (7th Cir. 2008).............................9

*Emory Univ. v. Nova Biogenetics, Inc.* 2006 WL 2708635, *3 (N.D. Ga. Sept. 20, 2006) .............................................................................12

*Erickson v. Pardus*, 551 U.S. 89 (2007)......................................15, 22, 28

*Gibb v. Scott*, 958 F.2d 814 (8th Cir. 1992) ...............................................8

*Global Network Communications, Inc. v. City of New York*, 458 F.3d 150 (2d Cir. 2006).............................................................................13

*Gomez v. Toledo*, 446 U.S. 635 (1980) .......................................................30

*Handgards, Inc. v. Ethicon, Inc.*, 743 F. 2d 1282 (9th Cir. 1984)....................26, 27

*Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987) ........................................13

*Hospital Bldg. Co. v. Trustees of Rex Hospital*, 425 U.S. 738 (1976) ...................14

*Hydril Co. LP v. Grant Prideco LP*, 474 F.3d 1344 (Fed. Cir. 2007)...............22, 23

*In re Netflix*, 506 F. Supp. 2d 308 (N.D. Cal. 2007) .......................................21

*In re TJX Companies Retail Security Breach Litigation*, 524 F. Supp. 2d 83 (D. Mass. 2007)............................................................................14

*International Star Class Yacht Racing Assoc. v. Tommy Hilfiger U.S.A., Inc.,* 146 F.3d 66 (2d Cir. 1998)...............................................................10

*Jarrow Formulas, Inc. v. Int'l Nutrition Co.*, 175 F. Supp. 2d 296 (D. Conn. 2001) .......................................................................................15

*Jones v. Automobile Ins. Co. of Hartford Conn.*, 927 F.2d 1528, (11th Cir. 1990) .......................................................................................13

*Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.*, 562 F.2d 365 (6th Cir. 1977) ..................................................................................18, 27

*Kobe, Inc. v. Dempsey Pump, Inc.*, 198 F. 2d 416 (10th Cir. 1952).......................27

*Lynch v. Magnavox, Co.*, 94 F. 2d 883 (9th Cir. 1938).........................................27

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...................................................................................................25

*McKeever v. State of Ga.*, 1896 Ga. App. 445 (Ga. Ct. App. 1988) ......................33

*Molecular Diagnostics Laboratories v. Hoffmann-La Roche Inc.*, 402 F.Supp.2d 276 (D.D.C. 2005) .....................................................................21

*Moore U.S.A., Inc. v. Standard Register Co.*, 139 F.Supp.2d 348 (W.D.N.Y. 2001) ...................................................................................................15

*Netflix, Inc. v. Blockbuster, Inc.*, 2006 WL 2458717, *7-8 (N.D. Cal. Aug. 22, 2006) ..............................................................................................28

*New Morn Foods, Inc. v. B&B Egg Co.*, 286 Ga. App. 29 (Ga. Ct.App. 2007) ...................................................................................................32

*Quality Foods de Centro America, S.A. v. Latin American Agribusiness Development Corp., S.A.*, 711 F.2d 989 (11th Cir. 1983)...................................19

*Royale Green Condominium Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 2008 WL 540742 * 5 (S.D. Fla. Feb. 25, 2008)...........................................................34

*Tarleton v. Meharry Medical College*, 717 F.2d 1523 (6th Cir. 1983)..................14

*Taylor v. Sturgell*, 128 S.Ct. 2161 (2008) ..............................................................9

*Tierney v. Vahle*, 304 F.3d 734 (7th Cir. 2002).................................................11, 12

*United States v. Jones*, 29 F.3d 1549 (11th Cir. 1994)..........................................10

*Wall v. Citizens & Southern Bank of Houston County*, 153 Ga. App. 29 (Ga.Ct.App. 1980)..............................................................................19, 20, 32

*White Mule Co. v. ATC Leasing Co. LLC*, 540 F. Supp. 2d 869 (N.D. Ohio 2008) ...................................................................................................27

**Statutes**

15 U.S.C.A. §15 .......................................................................................................24

**Other Authorities**

5 ANNOTATED PATENT DIGEST §34:47 (2008) ........................................................24

FEDERAL PRACTICE & PROCEDURE § 1366 ...............................................................8

Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 348a (Supp. Ed. 2009)..............................................................................................19

**Rules**

FED. R. CIV. P. 12(b) ...........................................................................................1, 12

Integrated Global Concepts, Inc. (*"IGC"*), by and through its attorneys, for its Response to the Renewed Motion of Plaintiff/Counterclaim Defendant Catch Curve, Inc. (*"Catch Curve"*) and Third Party Defendant j2 Global Communications, Inc. (*"j2"*) (collectively, the *"j2 Defendants"*) to dismiss Counts IV, V and VII of IGC's First Amended Counterclaims pursuant to FED. R. CIV. P. 12(b)(6) (the *"Motion"*) respectfully states as follows:

### SUMMARY OF THE ARGUMENTS

The j2 Defendants' Motion is premised entirely on unverified documents from outside of the pleadings, of which they ask the Court to take "judicial notice." However, in the case of the License Agreement, the j2 Defendants have failed to even authenticate their submission, and for their other submissions, they have seriously misapplied the doctrine of judicial notice. This Court cannot consider any of these documents, particularly the j2 Defendants' self-serving summary judgment briefs and the findings made in the *Venali* opinion, in the context of a motion to dismiss. It would be grossly unfair to IGC to consider the substance of the j2 Defendants' extra-pleading submissions, such as their summary judgment briefs (which themselves reference submissions from outside the pleadings) when IGC has not had any opportunity to present its claims or rebut the irrelevant factual

2848322.01.17.doc

arguments in these improper submissions.[1]

Since this case was stayed over IGC's objection, the Federal Circuit has ruled on the patents at issue and issues affecting claim construction in this case, and adopted the position advocated by IGC. *See, Catch Curve, Inc. v. Venali, Inc.*, 363 Fed.Appx.19, 2010 WL 270889 (Fed. Cir. January 22, 2010). As noted by this Court in its Order staying this case, "[t]he Federal Circuit Court of Appeals issues binding precedent with respect to patent disputes and issues of claim construction" and "the Federal Circuit's construction of the patents will also be relevant to and provide guidance for this Court's disposition of the counterclaims that have been asserted." *See* Docket No. 106. Despite receiving this ruling from the Federal Circuit that their proposed claim construction lacked merit, the j2 Defendants have ignored key aspects of the Federal Circuit's claim construction, and are forging ahead with their infringement claims against IGC in violation of this ruling. As such, whatever basis for Catch Curve's claims that Judge Pregerson might have found in 2007, which itself cannot be considered in the context of a motion to dismiss, has been erased by their subsequent conduct. Additionally, IGC has properly alleged that the j2 Defendants asserted patents that they know were

---

[1]   With the improper submission of their summary judgment briefs in the *Venali* case, the j2 Defendants have now improperly submitted almost <u>90</u> pages of briefing, in clear violation of the 30 page limitation imposed by this Court's July 7, 2010 scheduling order.

procured by fraud on the patent office against IGC.  This critical allegation, which was not even before Judge Pregerson, illustrates why the Court cannot grant the Motion based on the factual record from that case; there simply cannot be any objective or subjective basis for infringement claims based on fraudulently procured patents.  While IGC believes that the evidence will show that the suit lacks an objective and subjective basis without reference to its *Walker Process* claims, the j2 Defendants' *Noerr-Pennington* immunity claims based on the *Venali* ruling are premature and flawed.

As shown below, the Motion should be denied because:  (i) the Motion is premised almost entirely on matters outside the pleadings, which cannot be considered, many of which have not even been authenticated, (ii) the Motion ignores critical facts supporting injury to IGC and to competition in the Counterclaims, such as the j2 Defendants' attempts to extract bogus licensing fees and the targeting of IGC's reseller, Meixler Technologies, Inc. (*"MTI"*), with sham infringement litigation to destroy IGC's customer base, which has created an environment of fear in the marketplace to deal with IGC and risk being subjected to litigation by the j2 Defendants, (iii) IGC has properly alleged a marketwide pattern of objectively and subjectively baseless litigation to monopolize the small office/home office (*"SOHO"*) internet facsimile market, (iv) IGC has properly

alleged that the j2 Defendants knew the AudioFAX Patents were procured by fraud on the USPTO, removing any subjective or objective basis for accusing IGC of infringement, (v) IGC's breach of contract claims are well-pled, and (vi) IGC's Counterclaims are not "shotgun pleadings."

OVERVIEW OF THE PATENTS AND THE FEDERAL CIRCUIT DECISION

At issue in this case are a group of patents, the *"AudioFAX Patents,"* now owned by Catch Curve. The patents are directed to certain older technology, including fax-machine-to-fax-machine transmission of document facsimiles by telephone line. However, IGC's systems do not communicate over telephone lines from end to end, but rather use internet protocol to facilitate the transmission of data. As this Court is aware, the Federal Circuit's opinion held that these technologies, used by fax-to-email providers like IGC, do not infringe these patents. Additionally, the Federal Circuit held that a critical limitation on the claims under the AudioFAX Patents is that the accused infringer's systems must use the telephone network. As such, even "fax-to-fax" services do not infringe these patents unless the accused infringer's systems communicate with each other like a classic fax machine, *i.e.,* over a telephone line.

Despite this clear limitation, the j2 Defendants assert that IGC has a telephonic component to its systems. While this assertion is false, the j2

Defendants apparently intend to argue that this provides them with a colorable basis to continue litigation against IGC, while hopefully allowing them to manufacture a *post-hoc* "objective basis" for suing IGC (*i.e.,* a purported "fax-to-fax" component in IGC's systems), so that they can attempt to avoid antitrust liability under the *Noerr-Pennington* doctrine.  Critically, however, in the year 2000, j2 executed a License Agreement whereby j2 actually licensed the very software which it now claims contains a "fax-to-fax" component from IGC.  The j2 Defendants have improperly made various arguments about IGC's breach of warranty claim in the Motion, but regardless of the outcome on this claim, what is of paramount importance is that j2 has known since 2000 precisely how IGC's system operates, that the system uses only internet protocol, not the telephone network, and that there is no "fax-to-fax" infringement under these patents, as construed by the Federal Circuit.

To divert attention from these critical facts and others that are alleged in the Counterclaims, the j2 Defendants resort to introducing settlement communications in support of their Motion in an attempt to negatively portray IGC as the "aggressor" in this matter, and suggest that IGC is somehow "needlessly" prolonging litigation.  But why would or should IGC give up its meritorious antitrust claims for nothing, after having spent significant sums defending itself

against these frivolous claims, and having received a favorable ruling at the Federal Circuit?  IGC is a small business, with six employees, operating out of the ground floor of a house on Chicago's north side, who was sued by Catch Curve in a distant forum.   j2 is a publicly traded company headquartered in Hollywood, California, who has sued and/or extracted bogus license fees from untold numbers of small businesses, which they never would have been entitled to receive under the Federal Circuit's ruling.  For the j2 Defendants to somehow suggest that IGC is the aggressor in this case for wanting its "day in court" after enduring 5 years of sham patent litigation, or that IGC is somehow harassing j2, is beyond the pale.[2]

Inexplicably, the j2 Defendants ask this Court to grant their Motion based on the factual record from a summary judgment motion in another case.  For example, they ask the Court to take judicial notice of the *contents* of the briefs they submitted in the *Venali* case because they "are available on PACER."  *Motion* at FN8.  In other words, the j2 Defendants assert that just because a document has been uploaded by someone to the PACER system, its contents become subject to judicial notice.  As described below, it is hornbook law that this Court cannot take "judicial notice" of facts before other tribunals and cannot consider matters outside

---

[2]   Regardless, the fact that Catch Curve admits that it readily "offered to dismiss its infringement claims *with prejudice*" calls into question whether there is any real "basis" for these impending "fax-to-fax" infringement claims.

the pleadings of this nature in considering a motion to dismiss.  The j2 Defendants have submitted over 90 pages of briefing dealing with expert testimony, depositions, and other arguments from the *Venali* case, none of which are relevant to the Motion, and should not have been put before the Court.[3]

Putting aside these defects, the j2 Defendants' argument is also nonsensical. How can this Court find that there is an objective or subjective basis for a claim construction which has not even been determined?  Moreover, how can the j2 Defendants have an objective or subjective basis for asserting patents against IGC that they know were procured by fraud?  In his summary judgment ruling, Judge Pregerson merely found that Venali had not established that Catch Curve's 2007 *claim construction* was "frivolous."  While hardly a ringing endorsement of Catch Curve's conduct, until Catch Curve actually advances its claim construction in this case, there can be no determination as to whether it has sufficient basis to qualify for immunity under the *Noerr-Pennington* doctrine.

---

[3]   Underscoring the outlandish nature of the Motion, the j2 Defendants suggest that the Court can consider all of their summary judgment submissions, but need not even consider Venali's arguments (which would be favorable to IGC) because they were filed under seal and therefore not "on PACER."  These outlandish statements suggest that the j2 Defendants are simply trying to gain a tactical advantage in this litigation by "loading up" their Motion with extraneous materials in the hope that the Court will form a negative opinion of IGC's claims.

All that is known now is that Catch Curve appears to intend to charge IGC with infringement based on a "fax-to-fax" theory, which is itself a different theory than what was before Judge Pregerson.  Based on the fact that j2 licensed IGC's software in 2000, and other reasons, IGC believes that the evidence will show that such a contention is baseless as confirmed by the Federal Circuit's ruling.  To say the least, that determination cannot be made based on the factual record before another judge, in another case, on different claims, because IGC once asked this Court to follow that judge's ruling on another type of motion.[4]

ARGUMENT

**I.    The j2 Defendants' Motion Must Be Denied Because It Is Premised Entirely on Improper Submissions From Outside the Pleadings**

Matters outside the pleadings include "any written or oral evidence" submitted in opposition to a pleading.  *Gibb v. Scott*, 958 F.2d 814, 816 (8th Cir. 1992) (contract was outside of pleadings and should not be considered) (quoting FEDERAL PRACTICE & PROCEDURE § 1366).  In considering whether the plaintiffs have pled their case adequately to withstand the motion to dismiss, the Court may only consider evidence outside the pleadings that is undisputedly authentic and on

---

4    To be clear, IGC is not "running" from its prior position, and it continues to believe that Judge Pregerson correctly denied the j2 Defendants' Motion to Dismiss Venali's sham litigation claims.  IGC's prior argument was simply that another court had found similar sham litigation claims to be well pled. IGC never asserted that Judge Pregerson's rulings should be formally binding on the j2 Defendants, like they now attempt to do to IGC.

which the plaintiffs have specifically relied in their complaint.  *See, e.g., Doss v. Clearwater Title Co.*, 551 F.3d 634, 639-640 (7th Cir. 2008).  The j2 Defendants advance two primary reasons why this Court can consider their extra-pleading submissions:   (i) they are available on PACER, and therefore the contents are subject to judicial notice; and (ii) IGC purportedly relied on the *Venali* ruling in its response to the j2 Defendants' prior motion to dismiss and, therefore, all of the facts of the *Venali* case can be considered.  Neither of these arguments has merit.

> **A.    The Court Cannot Consider the Findings In the *Venali* Case or the j2 Defendants' Briefing in That Case Because They Are Not Subject to Judicial Notice and Are Hearsay**

With good reason, the j2 Defendants do not assert that the *Venali* ruling is *res judicata* regarding IGC's claims.  *See, Taylor v. Sturgell*, 128 S.Ct. 2161, 2171 (2008) (noting that a non-party "has not had a 'full and fair opportunity to litigate'" and that the "application of claim and issue preclusion to nonparties" is inappropriate).  Rather, they make a type of misplaced "estoppel" argument that IGC should be bound by the *Venali* court's factual finding, on summary judgment, that Catch Curve's conduct in the *Venali* case was not "objectively baseless," and therefore qualified for immunity under the *Noerr-Pennington* doctrine.

However, it would violate FED. R. EVID. 201 for the Court to take judicial notice or otherwise consider the contents of the *Venali* ruling in adjudicating this

Motion.  The Federal Rules of Evidence permit a Court to take judicial notice only of facts "not subject to reasonable dispute." FED. R. EVID. 201(b).   However, "[f]acts adjudicated in a prior case do not meet either test of indisputability contained in Rule 201(b): they are not usually common knowledge, nor are they derived from an unimpeachable source." *International Star Class Yacht Racing Assoc. v. Tommy Hilfiger U.S.A., Inc.,* 146 F.3d 66, 70 (2d Cir. 1998)(*citing United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (holding that findings of fact concerning defendant's work habits made by another district court in separate litigation were not sufficiently indisputable to be judicially noticed)).  Rather, a court "may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Id.*[5]

Here, the j2 Defendants have improperly introduced the *Venali* ruling in order to demonstrate the truth of the contents therein, namely that its claim construction in that case was not baseless.  These improper submissions to prove the substantive issues before the Court are inappropriate on a motion to dismiss.

---

[5]   Judge Pregerson's findings (as well as the factual arguments in j2 Defendants summary judgment briefs) are also inadmissible hearsay and cannot be considered on this basis as well.  *See, Jones*, 29 F.3d at 1554.

**B.**     **The License Agreement Also Cannot Be Considered Because It Is Not Authenticated**

In considering a motion, the Court can only consider admissible evidence; any evidence considered must be properly authenticated *by the proponent* and proper foundation must be laid. *See, Tierney v. Vahle,* 304 F.3d 734, 739 (7th Cir. 2002) ("What would not be cricket would be for the defendant to submit a document in support of his Rule 12(b)(6) motion that required discovery to authenticate or disambiguate; in such a case the judge would be required to convert the defendant's motion to a Rule 56 motion if he were minded to consider the document in deciding whether to grant the motion.") (Posner, J).

Here, the j2 Defendants have neither authenticated the License Agreement nor laid proper foundation.  The Motion asserts that the document attached as Exhibit B is a "true and correct copy," but there is no affidavit or verification in the Motion of anyone affirming this statement.  To the extent that this statement could be read to indicate that counsel for the j2 Defendants is declaring that it is a true and correct copy, there is nothing in the Motion or elsewhere that establishes that counsel is competent to testify to the authenticity of the document, or that any conceivable hearsay exception applies.  The j2 Defendants point to a case where a court considered a contract as part of the pleadings on a motion to dismiss, but even if the Court found that the License Agreement was properly part of the

pleadings, this would only arguably obviate the need to convert the Motion into one for summary judgment pursuant to Rule 12(d) to adjudicate IGC's contract claims. It does not relieve the j2 Defendants of their burden of laying proper foundation for what is attached to the Motion. *See, Tierney*, 304 F.3d at 739. As such, the License Agreement must be excluded, and Count VII regarding breach of contract cannot be dismissed.

### C. This Court Should Deny the Motion Rather Than Convert It to a Motion for Summary Judgment

Rather than sift through the j2 Defendants' submissions to weed out the premature and/or improper submissions, the Court should simply deny the Motion. The j2 Defendants will have ample opportunity to substantiate their arguments upon a full record at the summary judgment stage or at trial. Matters outside the pleadings must be excluded from consideration by the Court in connection with a motion to dismiss. *See* FED. R. CIV. P. 12(d); *Emory Univ. v. Nova Biogenetics, Inc.* 2006 WL 2708635, *3 (N.D. Ga. Sept. 20, 2006) (declining to consider documents attached to motion to dismiss or to convert to motion for summary judgment "at this early stage of the litigation before there has been any discovery").

As a general rule, a court cannot consider matters outside the pleadings without converting it to a motion for summary judgment and giving the parties ten

days notice and an opportunity to present evidence. *Jones v. Automobile Ins. Co. of Hartford Conn.*, 927 F.2d 1528, 1532-33 (11th Cir. 1990) (noting "bright line" nature of the rule); *Holloway v. Lockhart,* 813 F.2d 874, 879 (8th Cir. 1987) (declining to allow judicial notice of finding in a related litigation that use of tear gas against a group of inmates was reasonable and necessary because that fact could only be ascertained by independent examination and evaluation of witnesses). Conversion is "strictly enforced" and "mandatory" when matters outside the pleadings are considered. *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (noting that summary judgment is the "proper procedural device to consider matters outside the pleadings.") IGC respectfully submits that if the submission of so many documents and contested facts is necessary, this is not the type of case that can be resolved on a motion to dismiss.[6]

## II. IGC's Sham Litigation Claims Are Easily Plausible and Therefore Satisfy the *Twombly* Standard

Even if some "plausibility" argument could be parsed out of the Motion that did not involve consideration of the j2 Defendants' improper and irrelevant

---

[6]  Conversion would also be inappropriate in this case because IGC has not had any access to discovery and would be entitled to relief under Rule 56(f). It would also be a waste of resources to convert the Motion when, as here, it would not fully resolve the case. The proper course is to deny the Motion and allow the parties to proceed with claim construction briefing so that the basis of the j2 Defendants' claims can be determined.

submissions, the Motion must still be denied. A complaint "stat[ing] a claim to relief that is plausible on its face" such that it contains "factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" should survive a motion to dismiss. *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Plausible grounds . . . simply calls for enough fact to raise *a reasonable expectation that discovery will reveal evidence*" supporting the claims at issue. *Twombly*, 550 U.S. at 556 (emphasis added). This means that the complaint must only contain "the allegation of a minimal factual setting." *In re TJX Companies Retail Security Breach Litigation*, 524 F. Supp. 2d 83, 87 (D. Mass. 2007) (quoting *Dewey v. University of New Hampshire*, 694 F.2d 1, 3 (1st Cir. 1982)).

In antitrust cases, "where the proof is largely in the hands of the alleged conspirators," dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly. *Tarleton v. Meharry Medical College,* 717 F.2d 1523, 1529 (6th Cir. 1983) (citing *Hospital Bldg. Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746 (1976)). Regarding sham litigation claims, all that is required is that the claimant allege facts that, if proved, show that the defendant is engaging in sham litigation. *Jarrow Formulas, Inc. v. Int'l Nutrition Co*., 175

F. Supp. 2d 296, 310-11 (D. Conn. 2001) (allegation that patent infringement action was sham precluded dismissal of action under *Noerr-Pennington* doctrine) (*citing Moore U.S.A., Inc. v. Standard Register Co.*, 139 F.Supp.2d 348, 358-59 (W.D.N.Y. 2001) (concluding that the defendant's antitrust counterclaims would not be dismissed because the defendant "made numerous allegations that could support a finding that [the plaintiff,] and its alleged co-conspirators, have engaged in and are engaging in sham litigation through the present lawsuit" and "reject[ing] [the plaintiff's] attempt to interject evidence and arguments of fact into this Rule 12(b)(6) motion")).   Under *Twombly*, detailed factual allegations are not required; rather, the complaint need only give the defendant fair notice of what the claim is and the grounds on which the claim rests, and all factual disputes must be resolved in Plaintiff's favor on a motion to dismiss.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.").   Therefore, to survive a motion to dismiss the complaint, a plaintiff need only raise a right to relief above the speculative level.  *Twombly*, 127 S.Ct. at 1965.

It cannot be said that IGC's sham litigation claims are mere speculation. IGC has alleged a wide-ranging pattern of subjectively and objectively baseless litigation directed at numerous competitors.  (¶¶ 26-31, 106-120, 210, 222-224.)

As IGC has alleged, j2 holds patents directly on its own and indirectly through several subsidiaries, such as Catch Curve and Dynamic Depth. (¶ 40.) The monopolization scheme employed by the j2 Defendants has succeeded by dividing up the patents among the several subsidiaries and then filing suits in several waves. After a competitor survives the "first round" of sham litigation on the AudioFAX Patents (or, as most have done, takes an unnecessary and onerous license), it faces a "second round" regarding the '638 and '688 patents, to be followed by successive rounds on the Bobo Patents or with another one of j2's patent-holding companies, called Dynamic Depth. (¶¶ 74-90.) However, as alleged in the Counterclaims and as will be proven, no company has been able to go more than "two rounds" with j2 without selling out to j2 or moving under j2's license umbrella. (¶¶ 27-29, 39-42.)

In fact, subsequent to the filing of the Counterclaims, j2 recently announced that it had *acquired Venali*, after over six years of litigation. Despite its victory at the Federal Circuit on the AudioFAX Patents, Venali had also been sued by j2 on the '638 and '688 patents in 2004 (which was set for trial in 2011), and had been involved in various other costly litigation with j2 since 2004. It is not only plausible, but likely, that small and mid-sized businesses like Vera Cruz, Venali, and others must close down, pay for a worthless license, or sell out to j2 when

faced with baseless patent infringement claims. (¶¶ 117-120, 210, 221, 228.) Businesses of this size either cannot justify or simply cannot afford the tremendous cost of defending themselves in baseless litigation. (*Id*.; ¶ 218.) But each license taken, case settlement, or competitor acquisition occurs in a quiet, "one off" fashion, without any real scrutiny from any court. Yet any time a competitor attempts to scrutinize this conduct under the antitrust laws, j2 asserts that it is only an "individualized injury" of that competitor, despite its acquisition of a 90% market share through this monopolization strategy. (¶¶ 29, 36, 46, 212.)[7]

Also, competitors are forced to either sell out to j2 or license the inapplicable patents to avoid successive rounds of litigation from j2, Catch Curve and Dynamic Depth, which also has the effect of driving up costs to consumers and destroying competition in the SOHO market. (¶¶ 28, 29, 37, 46, 52, 98, 224.) In fact, it has long been recognized that, as here, within the context of a *Walker Process* claim, a competitor is faced with limited choices, either ceasing competition, entering into a deal with the enforcing party, or facing an infringement suit. *See, e.g., Kearney & Trecker Corp. v. Cincinnati Milacron,*

---

[7] It is also noteworthy that the j2 Defendants have extracted tens of millions of dollars in unnecessary licensing fees from fax-to-email providers which, under the Federal Circuit's ruling, they would never have been entitled to receive. But this is only the tip of the iceberg, as numerous fax-to-email providers either sold their businesses to j2 or simply closed down rather than face the prospect of litigation on the AudioFAX Patents.

*Inc.*, 562 F.2d 365, 373-374 (6th Cir. 1977).  Here, IGC's claims are plausible.

A good example of this is j2's history of fraud in obtaining the '638 and '688 patents.  (¶¶ 74-90.)  The misuse of these patents, as well as the Bobo Patents, provide an example of how the j2 Defendants leverage their patent portfolio in serial infringement cases to inflict the most damage on their competitors and thus achieve their monopoly.  (¶¶ 38-40; ¶¶ 74-88.)

In their Motion, the j2 Defendants strangely assert that these allegations should be disregarded because IGC has "failed to produce any evidence" of fraud in the prosecution of the '638 and '688 patents.  (*j2 Mem.* at FN4.)  Obviously, this is not an appropriate argument for a motion to dismiss, and IGC believes that the evidence will substantiate this allegation.[8]

The Eleventh Circuit has cautioned that motions to dismiss are "typically inappropriate" in fact-intensive antitrust cases.  *See, Quality Foods de Centro America, S.A. v. Latin American Agribusiness Development Corp., S.A.*, 711 F.2d

---

[8]  More outrageous is the assertion that there is "no allegation that j2 ever asserted those patents against IGC." (*j2 Mem.* at FN4.)  The j2 Defendants questionably fail to inform the Court that on November 13, 2009, their licensing agent Ryan Strong sent IGC, MTI and another business partner of IGC a letter claiming infringement of the '638, '688, '066 and '132 patents. These Counterclaims had already been filed on May 13, 2008.  Therefore, while not a basis for granting the Motion in any event, it is disingenuous for the j2 Defendants to suggest this allegation is missing while not informing the Court of the fact that they asserted these patents subsequent to the filing of the Counterclaims.

989, 994-95 (11th Cir. 1983).  Given the improper submissions and the detailed

allegations in the Counterclaims, IGC's claims clearly rise above the level of

speculation and the Motion should be denied.

### III.   IGC Properly Alleges an Antitrust Injury

#### A.   The j2 Defendants' Attempts to Extract Bogus Royalties and Eliminate IGC as a Competitor Independently  Provides Sufficient Injury and Satisfies the *Twombly* Standard

"[A] rival clearly has standing to challenge the conduct of rival(s) that is

illegal precisely because it tends to exclude rivals from the market."  Phillip E.

Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 348a (Supp. Ed. 2009).  Courts

applying *Twombly* have held that an attempt to extract royalties or eliminate

competitors sufficiently states an antitrust injury in cases such as these:

> Since Rockwood has asserted that it has been injured by Anchor's
> enforcement of its patents which, assertedly, were fraudulently
> procured, so as to extract royalties, or eliminate competitors, such
> as Rockwood, we find that Rockwood has asserted a sufficient
> claim of antitrust injury, since it has pled "enough facts to state a
> claim to relief that is plausible on its face," *Bell Atlantic Corp. v.
> Twombly*, *supra* at 1974, which, at the threshold of litigation,
> properly survives a Motion to Dismiss.    Accordingly, we
> recommend that Anchor's Motion to Dismiss the Antitrust
> Counterclaim be denied.

*Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc*., 2007 WL 4465195,

at *10 (D. Minn. Dec. 18, 2007).  Here, IGC has properly alleged that the j2

Defendants have attempted to extract bogus royalty payments from IGC and

otherwise eliminate it as a competitor in the small office-home office internet facsimile market.  (*See, e.g.,* ¶¶ 24, 50, 99, 222.)

The j2 Defendants erroneously assert that *Walker Process* liability requires the defendants to have prosecuted the patents themselves, but this is not an element of the claim.  *Abbott Laboratories vs. Teva Pharmaceuticals, USA Inc.,* 432 F.Supp.2d 408, 432 (D.Del. 2006)  ("A *Walker Process* claim may be made against a party that knowingly enforces a patent procured by fraud on the PTO, even if that party did not itself prosecute the patent").  Regardless, IGC has alleged not only that Catch Curve knew about the past fraud but that Catch Curve committed its own acts of fraud in refusing to cite material prior art during reexamination, in order to extract bogus royalty payments from IGC and eliminate it as a competitor. (¶¶ 68-73, ¶ 222.)  Under these circumstances, IGC's allegations are sufficient.[9]

### B. Being Named in a Suit Involving *Walker Process* Fraud Is a Sufficient Antitrust Injury

A competitor suffers antitrust injury merely by being named in a *Walker Process* infringement suit itself.  *Anchor Wall Systems, Inc.*, 2007 WL 4465195 at *10 ("as to the threshold issue of whether Rockwood, as a competitor, has standing

---

[9]   The interpretation of the injury requirement advanced by the j2 Defendants would lead to the unacceptable result that a party could escape *Walker Process* liability by simply assigning the fraudulently procured patents to a new entity to enforce them, which is essentially what occurred in this case. (¶ 24-28.)

to allege an antitrust injury, a number of decisions have held that, in the context of *Walker Process* claims, competitors have such standing, when they are named in a patent infringement suit.") (*citing Molecular Diagnostics Laboratories v. Hoffmann-La Roche Inc.*, 402 F.Supp.2d 276, 281 (D.D.C. 2005)). Even *potential* competitors suffer the minimal injury. *See e.g., In re Netflix,* 506 F. Supp. 2d 308 (N.D. Cal. 2007) (recognizing that even "those potential competitors who are ready to enter into the market may have standing to bring *Walker Process* claims") (citing *Bourns, Inc. v. Raychem Corp.,* 331 F.3d 704, 711-12 (9th Cir. 2003)). Here, the j2 Defendants have not only directed threats but engaged in five years of litigation on their fraudulently obtained patents.

Also, the lost sales that IGC would suffer if it is found to have infringed patents obtained by fraud are sufficient injury. *Buehler AG v. Ocrim, S.p.A.,* 836 F. Supp. 1291, 1304 (N.D. Tex. 1992) (denying summary judgment because a *Walker Process* antitrust plaintiff has an antitrust injury where it would "suffer direct injury in lost" sales if it lost the pending infringement action against it).

### C.  The Targeting of IGC's Reseller Satisfies the Injury Requirement

The Federal Circuit recently clarified that even *threats* of litigation against a competitor's resellers and customers using fraudulently obtained patents (like the j2 Defendants did to MTI in this case), causes antitrust injury to the competitor:

> . . . [A] valid *Walker Process* claim may be based upon
> enforcement activity directed against the plaintiff's customers.
> Threats of patent litigation against customers, based on a
> fraudulently-procured patent, with a reasonable likelihood that
> such threats will cause the customers to cease dealing with their
> supplier, is the kind of economic coercion that the antitrust laws
> are intended to prevent.  A supplier may be equally injured if it
> loses its share of the market because its customers stop dealing
> with it than if its competitor directs its monopolistic endeavors
> against the supplier itself.  Without customers, a supplier has no
> business.

*Hydril Co. LP v. Grant Prideco LP*, 474 F.3d 1344, 1350 (Fed. Cir. 2007).

Because the j2 Defendants sued IGC's customer MTI, IGC has properly pled an

antitrust injury.

The j2 Defendants offer only a single sentence addressing this fundamental

injury.  In that sentence, they assert that because IGC has not alleged that MTI has

stopped dealing with IGC, that IGC suffers no injury.  (*j2 Mem.* at 19.)  However,

under *Hydril*, all that is required to meet the injury requirement is a *threat* of

litigation on fraudulently procured patents.  *Hydril*, 474 F.3d at 1350.  Here, the j2

Defendants actually carried out that threat and dragged MTI into five years of

costly litigation before they finally agreed to dismiss MTI from the case.  Further,

the impact of the litigation on the MTI/IGC relationship is a question of fact, and

the inferences therefrom must be drawn in IGC's favor.  *See, Erickson,* 551 U.S. at

94.  Like the conduct of the j2 Defendants alleged here, the court in *Hydril* further

noted that the fraud alleged in that case was based upon the defendant's failure to

disclose prior art to the patent office.  *Hydril,* 474 F.3d  at 1349.  Also, in addition to the risk that MTI itself could have gone out of business, IGC could have been forced to indemnify MTI, causing IGC injury as well.[10]

Here, as in *Hydril*, the j2 Defendants used sham litigation and enforcement of invalid and noninfringed patents to cause MTI, one of IGC's resellers, to cease dealing with IGC and thus to erode IGC's customer base. (¶¶ 2,  47-48, 113.)  The j2 Defendants have also used a combination of a bogus licensing scheme, patent fraud, and sham litigation to distract IGC management, to disrupt IGC's operations, and to divert scarce resources and employee focus from IGC's internet facsimile business, so that they can siphon off IGC's customers.  (¶ 218.)  These suits have created an environment of fear in the marketplace, whereby potential resellers are reluctant to deal with IGC, lest they be subjected to the risk of being targeted by Catch Curve in costly and baseless litigation.  (¶¶ 37, 216.)  As such, the minimal injury requirement is met.

### D.    Litigation Costs Alone Are Sufficient to State an Antitrust Claim in *Walker Process* and Sham Litigation Cases

While the j2 Defendants cite some unreported cases suggesting that

---

10   While the j2 Defendants recently dismissed MTI from the case, nothing in *Hydril* or elsewhere suggests that a party can avoid liability by simply dropping the suit.  If this were the case, a plaintiff  could file sham suits but later drop the claims against those who fought back.  In any case, under *Hydril*, a mere threat is sufficient, and ends the inquiry.  *Hydril*, 474 F.3d at 1350.

litigation costs are insufficient antitrust injury in limited circumstances, it is clear

that in the *Walker Process* and sham litigation context, such as this one, IGC has

pled sufficient injury.  For example, according to a recent treatise:

> When the alleged antitrust violation is the bringing of an
> infringement lawsuit based on a patent that is unenforceable for
> *Walker Process* type fraud, the infringement action is a sham, or
> there was a threat to institute a sham infringement lawsuit that
> caused the antitrust plaintiff to bring a declaratory judgment
> action, an accused infringer can generally assert the attorneys'
> fees and costs associated with defending itself from the charges
> of infringement as the predicate antitrust injury.  Moreover, these
> fees and expenses may, in proper circumstances, be trebled under
> 15 U.S.C.A. §15.

5 ANNOTATED PATENT DIGEST §34:47 (2010).  Moreover, litigation costs incurred

in defending frivolous suits have been held to be sufficient under the standard of

*Brunswick Corp*., the case relied on by the j2 Defendants.  (*j2 Mem.* at 17.)  *See,*

*e.g., D.A. Rickards, M.A. v. Canine Eye Registration Foundation, Inc*., 783 F.2d

1329, 1334-35 (9th Cir. 1986)  ("We have held that the costs incurred in the

defense of a suit filed in violation of the antitrust laws constitute antitrust injury as

defined in *Brunswick*").

The j2 Defendants do cite three unreported cases where litigation costs were

held insufficient when the plaintiff failed to plead a harm to the market generally.

*See Brotech Corp v. White Eagle Int'l Tech. Group, Inc*., 2004 WL 1427136 (E.D.

Pa. June 21, 2004) (counterclaim did not allege that litigation costs had any effect

on competition).  The j2 Defendants also cite to *AMA v. United Healthcare Corp*., 2007 WL 683974 (S.D.N.Y. March 5, 2007), but that claim failed because there was "no allegation that the adverse effect is experienced by anyone other than Counterclaim Plaintiffs."  *Id*.  Similarly, the j2 Defendants also cite a third case - *Chip-Mender, Inc. v. Sherwin Williams Co*., 2006 WL 13058 (N.D. Cal. Jan. 3, 2006) for the same proposition.  Here, IGC has made numerous specific factual allegations that the j2 Defendants' conduct has adversely impacted competition and harmed the market generally.  (¶¶ 37, 41, 46, 50, 52, 98, 125, 213, 215. 218, 224.)

For example, IGC has without limitation alleged that j2 Defendants brought suits against dozens of competitors and that as a result of its bogus licenses, sham litigation and patent fraud, j2 has obtained a 90% market share.  (¶ 46, ¶ 101.)  The real deficiency described in these cases is when a competitor attempts to transform a single, random lawsuit into an antitrust claim.  Throughout its Counterclaims, IGC alleges harm to competitors and stifled competition throughout the market as a result of a market-wide scheme of sham litigation and fraudulent patent enforcement.  (*See, e.g.,* ¶¶ 44-46, 50-52.)

The fact that litigation costs are incurred by IGC in defending itself also demonstrates the flaw in j2 Defendants' argument, j2 *Mem.* at 18, based on *Matsushita Electric Industrial Co. v. Zenith Radio Corp*., 475 U.S. 574 (1986),

another inapposite predatory pricing case not in the context of a motion to dismiss, that IGC could raise its prices and so obtain benefits from the j2 Defendants' conduct.  The j2 Defendants cite no authority for the proposition that *Matsushita* is relevant when a competitor is attempting to exclude another from the market entirely through sham patent litigation and patent fraud, and courts have held defendants liable when invalid patents were used to monopolize.  *See, e.g., Handgards, Inc. v. Ethicon, Inc.*, 743 F. 2d 1282, 1294 (9th Cir. 1984) (no facts warranted reversal of jury's findings that until patent was declared invalid, defendants enforcement of the patent allowed it control of 90% of relevant market).  Also, IGC cannot obtain such net gains from j2's price fixing because the costs of Catch Curve's litigation and its onerous licensing demands exceed any increased profits from increased prices, assuming that the market would permit a price increase, which is yet another question of fact.  Additionally, the *in terrorem* effect on IGC's customers, such as MTI, of being subjected to baseless and costly infringement litigation effectively prevents such competitive providers from entering the marketplace, or at least makes such competitors pay for unnecessary licenses, which drives up their costs and forces them under j2's licensee umbrella, resulting further in increases in costs to consumers.  (¶¶ 37, 45, 96, 98, 106, 216.) [11]

---

[11]   The j2 Defendants also erroneously state that if the patents are invalid then

**E.    IGC Has Alleged Numerous Other Instances of Misconduct That Establish a Nexus Between the j2 Defendants' Sham Litigation and Patent Fraud and a Harm to Competition**

Finally, the j2 Defendants cite no case that arose in the context of *Walker Process* and sham litigation claims suggesting that there must be a special nexus between the litigation costs and harm to the market.  Rather, the one case they cite, *Atlantic Richfield Co. v. U.S.A. Petroleum Co.*, 495 U.S. 328, 344 (1990), is another inapposite predatory pricing case decided on summary judgment. However, where a competitor like IGC chooses to defend against the infringement action and can prove the requisite *Walker Process* fraud, "[t]his, in itself, [meets] the requirement that there be a causal connection between the infringement suit and the antitrust activities."  *Kearney & Trecker Corp.,* 562 F.2d at 374; *see also White Mule Co. v. ATC Leasing Co. LLC*, 540 F. Supp. 2d 869, 891 (N.D. Ohio 2008) (competitor's "loss of sales"  due to the enforcement of fraudulently

---

there can be no barriers to entry, suggesting that IGC cannot "have it both ways."  The j2 Defendants cite no authority for this proposition, and it defies logic -- just because a product is not properly patented does not suggest that it cannot be a barrier to competitors entering the market if the existing competitors are being targeted with sham litigation.  Rather, the authority is to the contrary.  *See Handgards*, 743 F.2d at 1294 (bringing a lawsuit to enforce a patent with the knowledge it is likely invalid for anti-competitive purposes can support a claim under § 2 of the Sherman Act); *Kobe, Inc. v. Dempsey Pump, Inc.*, 198 F. 2d 416 (10th Cir. 1952) (patentee engaged in planned monopolization by acquiring all patents in field, obtaining covenants not to compete from sellers of patents, bringing and publishing infringements suits, and intimidating rest of industry with lawsuits); *Lynch v. Magnavox, Co.*, 94 F. 2d 883, 889-90 (9th Cir. 1938) (pooling of patents to intimidate and bring infringement actions to control a market is anticompetitive).

obtained patents and "significant attorney's fees and litigation costs in defending against" an infringement action both "flow directly from the alleged *Walker Process* antitrust violation.")  Since a  patent allows the holder to lawfully exclude competition, the wrongful or improper assertion of patent rights interferes with the ability of IGC and other targets to offer its services in that market, and so such a nexus does exist in this case.  *See, e.g., Netflix, Inc. v. Blockbuster, Inc.*, 2006 WL 2458717, *7-8 (N.D. Cal. Aug. 22, 2006) (finding that the sham litigation exception was adequately pled where, if the plaintiff's "allegations about omitted prior-art references, flooding, and withholding prior art from the PTO examiner are proven, plaintiff may demonstrate the requisite abuse of process to succeed on a sham-litigation claim").[12]

Additionally, the j2 Defendants have also timed the filings of their litigation and the making of their patent enforcement demands to preclude various third party business mergers and to disrupt others' attempts to better compete with the j2 Defendants.  (¶28, 102, 115, 116.)  The j2 Defendants have accomplished this by timing the filing of their patent infringement actions for just days before rival firms were to merge, and thus have stopped more effective competition with the j2

---

12   Also, any required factual "nexus" is inappropriate for consideration in a motion to dismiss.  *See Erickson,* 551 U.S. at 94.

Defendants by attacking the principal assets of competitors in the market. *Id*. IGC also alleges that as part of this pattern of sham litigation and bogus patent enforcement, the j2 Defendants have been able to acquire or to force out of business competitors who did not capitulate to its demands. (¶¶ 117-120, 126, 127, 130.)[13]

IGC further provides specific examples of patent fraud and sham litigation, targeting IGC and others, which have had a chilling effect on competition in the internet facsimile market (¶¶ 101-102, 127, 130-201), and that have driven competitors out of business. (¶¶ 117-120.)  Also, the terms of virtually all of j2's sham settlements have been kept confidential, allowing the j2 Defendants to conceal the true impact on the market and preventing IGC from alleging the totality of the scheme.  Therefore, the adverse impact on the competitive landscape is likely much more severe than is alleged in the Complaint, and subsequent to the filing of the Complaint, there have been further examples of competitors who have been driven out of the market or driven under the j2 license umbrella.[14]

---

13   In addition to identifying dozens of sham suits against competitors (¶ 101), IGC has also offered Vera Cruz Marketing as an example of how the j2 Defendants' scheme to monopolize the relevant market operates.  Vera Cruz was targeted by the j2 Defendants in a sham suit and was forced to take an onerous license that forced it out of business.  (¶¶ 117-120.)

14   The j2 Defendants' arguments regarding potential Rule 11 remedies are similarly misplaced.  While the j2 Defendants correctly point out that, like any

## IV.   The j2 Defendants Have Failed to Show That IGC's Breach of Contract Claims Should Be Dismissed

As set forth in Section I above, it is not proper for this Court to consider the License Agreement because it is not authenticated and foundation has not been properly established.   The j2 Defendants also devote a significant portion of this argument to a recitation of their version of the facts.   As set forth above, this Court must take IGC's allegations as true for the purposes of a motion to dismiss.   IGC alleges that the breach arose not out of any defect in the "goods," but rather from breach of j2's unique warranty agreement when the first Complaint in this case was filed in 2005.   (¶¶ 235, 237, 241, 243.)   Additionally, the existence of an affirmative defense does not undercut the adequacy of a pleading.   *See generally, Gomez v. Toledo*, 446 U.S. 635, 639-41 (1980) (noting that burden of proof on affirmative defense rests with party asserting the defense).

As alleged in the Complaint, the warranty contained in the license was a separate, negotiated, and unique warranty that IGC negotiated from j2.   (¶¶ 235-237.)   The reason for this was that IGC knew that patent lawsuits filed by patent trolls and patent holding companies, like Counterclaim Defendants AudioFAX

---

litigant, their conduct may be scrutinized under Rule 11, the existence of this additional remedy does not change the fact that IGC's *Walker Process* and sham litigation claims are well-pled and are viable theories under the antitrust laws.

IP LLC and Catch Curve, had been increasing sharply:   IGC wanted to be protected from them and, through hard bargaining, it obtained such a warranty.   *Id*.

At most, the j2 Defendants' premature and misplaced contractual interpretation arguments suggest that the contract is ambiguous, and that the Court will have to take parol evidence.   O.C.G.A. 24-6-3(b) ("Parol evidence shall be admissible to explain all ambiguities, both latent and patent.")   In fact, the j2 Defendants seemingly offer various pieces of "parol evidence," often about the use of the IGC software, j2's state of mind in 2000, and other matters, as "evidence" of their interpretation.   (*j2 Mem*. at 25-29.)   Right or wrong, these assertions cannot be considered in the context of a motion to dismiss.

j2 was, in fact, a defendant in 2000 in a proceeding similar to this one. (¶ 238.)   That is why IGC logically alleges that j2 was aware of the claims that could be asserted against IGC and why IGC sought the warranty back then. (*See* ¶ 235.)   IGC's claims are not premised on any kind of "secret plan" of j2 to sue IGC in the future but rather on the terms of the contract, in which it negotiated a broad warranty.

Finally, the j2 Defendants' attempt to recharacterize the Software License as a "sale of goods" -- *i.e.,* off-the-shelf computer software -- to try to bring the agreement within the UCC limitations period, is misplaced.   Additionally, under

Georgia law, the statute of limitations in a contract dispute begins to run on the date when suit on the claim can first be brought. *See New Morn Foods, Inc. v. B&B Egg Co.,* 286 Ga. App. 29 (Ga. Ct.App. 2007). Here, IGC had no claim until Catch Curve filed its first suit against IGC in 2005.[15]

Moreover, the warranty at issue here is a separate ongoing warranty of non-infringement. (¶ 240.) IGC's breach of contract count does not arise out of any defect in the software used, but out of j2's separate agreement to protect IGC from charges of patent infringement. (¶¶ 235, 241, 243.)[16]

In any case, IGC alleges that the breach of the Software License warranty did not occur until the first Catch Curve Complaint was filed. (¶ 241.) Whether or not "tender of delivery" occurred on November 22, 2000, as the j2 Defendants assert, or some other date, as IGC asserts, is a disputed issue of fact precluding a grant of the Motion. *See, e.g., Wall v. Citizens & Southern Bank of Houston County*, 153 Ga. App. 29 (Ga.Ct.App. 1980) (whether note was accelerated more

---

15  In addition to the filing of this lawsuit, IGC has also alleged that j2 breached the license through "other actions prior to the expiration of any applicable statute of limitations on the AudioFAX patents and its warranty." (¶ 243.)

16  Under Georgia law, where a contract is divisible, the statute will run separately as to each aspect of performance when it becomes due. *New Morn Food,* 286 Ga. App. 29, at 30-31. Up until 2005, j2 had been properly performing on the terms of the warranty, and IGC had, up until then, not been sued for infringement. Thus, the proper date at which the statute of limitations began to run is in 2005, when j2's subsidiary Catch Curve filed the first lawsuit against IGC, and not some earlier date.

than six years prior to initiation of lawsuit was question of fact precluding a directed verdict); *overruled on other grounds by McKeever v. State of Ga.*, 1896 Ga. App. 445 (Ga. Ct. App. 1988).

j2 is a highly sophisticated party that necessarily understood, when granting the warranty to IGC, that IGC could be exposed to liability for patent infringement at any time, for many years into the future.  (¶ 240.)  Yet, in order to obtain the benefits of the transferring of the eFax customer base and IGC's highly valuable transition services, they gave such a warranty.  (¶ 230-236.)  The breach of contract claim must go forward.

## V.    The j2 Defendants' "Shotgun Pleading" Argument Is Misplaced

Finally, the j2 Defendants make a renewed "shotgun pleading" argument based primarily on the assertion that IGC's antitrust Counterclaims are too long and complicated.  (*j2 Mem*. at 12-13.)  However, a careful examination of the prior draft against the amended counterclaims would reveal that IGC carefully followed this Court's instruction, and has dropped all but the j2 and AudioFAX defendants (who never appeared), and removed many counts. IGC also broke up numerous larger paragraphs into more concise, shorter allegations so that they would be easier to admit or deny (although this did increase the overall number of paragraphs and the page count).   The j2 Defendants attempt to portray the

Counterclaims as being deficient or abusive simply because there are more paragraphs, but they ignore that the volume of the counts, defendants and allegations is all significantly lower.   In any case, the Counterclaims, as drafted, are not a shotgun pleading:

> "True 'shotgun pleadings' involve the situation where the pleadings are replete with factual allegations that could not possibly be material to any of the causes of action they assert.  This is not the case here.  Although Plaintiff [h]as adopted and incorporated all of the factual allegations into both counts of the Amended Complaint, Count II (bad faith), as discussed, *supra*, is necessarily reliant on the factual allegations supporting Count I (breach of contract).  Simply put, here the facts necessary to support a claim of breach of contract will also be necessary to support a claim of bad faith, if it is determined that a breach occurred."

*See Royale Green Condominium Ass'n, Inc. v. Aspen Specialty Ins. Co.,* 2008 WL 540742, * 5 (S.D. Fla. Feb. 25, 2008) (denying motion to dismiss based on "shotgun pleading" argument) (citations omitted).   As set forth above, IGC's *Walker Process* and sham litigation claims, while different legal theories, are based on similar facts and are properly incorporated by reference within each count.  As noted above, there can be no objective basis for infringement litigation on fraudulently obtained patents.  Thus, there is enough overlap in the allegations to remove any "shotgun" pleading considerations.

Notably, Catch Curve's Complaint uses the same "shotgun" pleading format against IGC, yet IGC was able to answer.  Also, the j2 Defendants, who are a

parent and wholly owned subsidiary, vigorously argued that they are a "single source of economic power" through this case. *See, e.g., December 7, 2007 Motion to Dismiss* at 25. They cannot now reasonably argue that IGC's claims should be dismissed because they fail to draw a distinction between two defendants where no meaningful one exists. The j2 Defendants fail to offer any credible argument that they are unable to understand and answer the Counterclaims. Rather, this argument represents another misplaced attempt to impose further delay and distract the court from the merits of IGC's counterclaims. Thus, this unreasonable argument should be rejected.

## CONCLUSION

For the foregoing reasons, IGC has properly alleged that the j2 Defendants are participants in a marketwide scheme to monopolize the small office/home office internet facsimile market. The Motion to Dismiss should be denied.

Dated:  September 14, 2010

Respectfully submitted,

BAKER, DONELSON, BEARMAN
CALDWELL & BERKOWITZ, P.C.

/s/ Michael J. Powell

_____
Michael J. Powell
Georgia Bar No. 586275

BAKER, DONELSON, BEARMAN
CALDWELL & BERKOWITZ, P.C.
Monarch Plaza, Suite 1600
3414 Peachtree Road, NE
Atlanta, Georgia 30326
(678) 406-8700 - Telephone
(678) 406-8701 - Facsimile

Of Counsel:
Robert J. Schneider, IL ARDC #2499223
James Heiser, IL ARDC #6280191
CHAPMAN AND CUTLER LLP
111 West Monroe Street, #1700
Chicago, Illinois  60603-4080
(312) 845-3919 - Telephone
(312) 701-2361 - Facsimile

## <u>CERTIFICATE OF COMPLIANCE</u>

Undersigned counsel certifies the foregoing document has been prepared with one of the font and point selections (Times New Roman, 14 point) approved by the Court in local rule 5.1 (C) and 7.1 (D).

This 14th day of September, 2010.


/s/ Michael J. Powell
_____
MICHAEL J. POWELL

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 14, 2010, I electronically filed the foregoing notice with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record.

/s/ Michael J.  Powell
_____
MICHAEL J. POWELL