IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CATCH CURVE, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| INTEGRATED GLOBAL CONCEPTS, INC., | : | CIVIL ACTION NO. 1:06-CV-2199-AT |
| | : | |
| Defendant/Counter Claimant, | : | |
| | : | |
| v. | : | |
| | : | |
| CATCH CURVE, INC.; J2 GLOBAL COMMUNICATIONS, INC.; AUDIOFAX, INC.; AUDIOFAX IP LLC, | : : : : | |
| | : | |
| Counter Defendants. | : | |

## <u>O R D E R</u>

This matter arises from the contested enforcement of certain patents related to fax-based technology.   In response to Plaintiff Catch Curve, Inc.'s complaint asserting claims for patent infringement, Defendant Integrated Global Concepts, Inc. ("IGC") filed counterclaims, in which it asserted claims for declaratory judgments of invalidity, unenforceability, and non-infringement of the patents-in-suit; antitrust; and breach of contract.

Presently before the Court is a partial motion to dismiss filed by Counter Defendants Catch Curve and j2 Global Communications, Inc.   They seek to dismiss IGC's antitrust and breach of contract counterclaims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure [Doc. 121].   For the reasons discussed below, the motion is **GRANTED in part** and **DENIED in part**.

## I.   Background

Keeping in mind that when deciding a motion to dismiss, the Court must accept the factual allegations in the Complaint as true and construe them in the light most favorable to the nonmoving party, the Court provides the following statement of facts.  *See Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir. 2007).   Thus, the factual statements contained in this Order do not represent actual findings of fact.   Instead, the Court provides the statements simply to place its legal analysis in the context of the allegations asserted in this matter.

### A.    The Parties and the Patents-in-Suit

J2 is Catch Curve's parent company.  First Am. Countercl. ("FAC") ¶¶ 23, 73, ECF No. 85.  Catch Curve owns the patents-in-suit by assignment, and its only business is licensing and litigating them.  Compl. ¶ 5, ECF No. 1; FAC ¶¶ 23, 50, 73.  IGC and j2 are competitors that market Internet facsimile services to home offices and small offices in the United States.  FAC ¶¶ 7, 32, 33.  In return for a fee, they provide individuals and small businesses with a dedicated phone

number that allows users to receive faxed messages directly on their computers in the form of attachments to e-mail. *Id.* ¶¶ 16, 32. IGC provides fax-to-email services that Catch Curve now claims infringe the patents-in-suit under 35 U.S.C. § 271. Compl. ¶¶ 8, 13-18; FAC ¶ 16.

AudioFAX previously owned the patents-in-suit. FAC ¶ 8. An AudioFAX principal worked with an intellectual property consultant to develop them. *Id.* ¶¶ 17, 57-58. Development started in or around 1987, when AudioFAX bought some patents relating to fax-to-fax technology. *Id.* ¶ 56. The AudioFAX principal and the consultant attempted to augment those patents by filing continuing patent applications, with the goal of expanding the fax-to-fax patents to cover fax-to-email technology. *Id.* ¶¶ 57-58. Despite their knowledge that the patents did not in fact cover fax-to-email technology, "they conceived a scheme to file and prosecute fraudulent patent applications with the intent to deceive the USPTO [United States Patent and Trademark Office]" and failed to disclose prior art in their applications. *Id.* ¶¶ 58, 131-200. The resulting patent portfolio consists of the patents that are the subject of this lawsuit. *Id.* ¶ 60. The patents-in-suit are U.S. Patent Nos. 4,994,926; 5,291,302; 5,459,584; 6,643,034; and 6,785,021 ("the Patents"), and are all entitled "Facsimile Telecommunications System and Method." *Id.* ¶¶ 11-13, 15.

During the time that it owned the Patents, AudioFAX set up AudioFAX IP to implement a licensing program in the fax-to-email industry. *Id.* ¶ 62.

AudioFAX and AudioFAX IP would first attempt to convince fax-to-email competitors to license the Patents through the licensing program. *Id.* ¶ 61. When they refused to participate, AudioFAX and AudioFAX IP would then sue them for patent infringement. *Id.* ¶ 61.

In 1999, AudioFAX IP sued jFax.com, Inc. ('jFax") on the Patents. *Id.* ¶ 17. jFax was j2's predecessor. *Id.* ¶ 17. AudioFAX IP claimed that jFax's fax-to-email service infringed the Patents. *Id.* JFax counterclaimed, alleging that the Patents were limited to fax-to-fax systems and therefore were invalid, unenforceable, and not infringed by its fax-to-email service. *Id.* ¶¶ 19-20. The parties settled the litigation. *Id.* ¶ 22. Later, in early 2005, j2 acquired control over the Patents through Catch Curve. *Id.* ¶¶ 23, 73.

Catch Curve and j2 have continued the AudioFAX licensing scheme. *Id.* ¶¶ 95-97. Prior to the instant lawsuit, AudioFAX and AudioFAX IP, and later, Catch Curve, had licensed the Patents to a number of companies that offered fax-to-email services. *Id.* ¶¶ 18, 44-45, 62. They obtained some of the licenses under threat of litigation; in other cases, they brought patent infringement lawsuits and obtained the licenses in settlement. *Id.* ¶¶ 17, 23-26, 44-45, 61.

In December 2005, j2 contacted IGC and suggested that j2 was interested in purchasing IGC. *Id.* ¶ 121. J2 then made a below-market offer for IGC that IGC rejected. *Id.* ¶¶ 122-24. J2 then directed Catch Curve to sue IGC for infringement of the Patents. *Id.* ¶ 124. At the time Catch Curve brought its

infringement claims against IGC, none of the other infringement lawsuits involving the Patents had reached claim construction.  *Id.* ¶¶ 53-54.

### B.   Contractual Relations

In 2000, while the suit between AudioFAX IP and jFax (j2's predecessor) was pending, jFax and IGC entered into a Software License Agreement ("License Agreement") under which IGC licensed fax-to-email software to jFax.  *Id.* ¶¶ 230-34, 236, 238.  IGC contends that in the Licensing Agreement, jFax granted it "a warranty of non-infringement" under which this lawsuit constitutes a breach of contract.  *Id.* ¶ 235-41.

### C.   Procedural History

On September 15, 2006, Catch Curve brought this suit against IGC, alleging patent infringement.[3]   Compl. ¶¶ 13-18.   Since then, the case has progressed in fits and starts.  After an extension of time, on November 3, 2006, IGC moved to dismiss the complaint or transfer the case.  ECF No. 5.  After several more extensions of time, the Court denied IGC's motion to dismiss or transfer.  Ord., Sept. 20, 2007, ECF No. 22.  On October 11, 2007, IGC filed an answer; counterclaims against Catch Curve, the AudioFAX companies and j2; and a third-party complaint.[4]   ECF No. 27.  After more extensions of time, the

---

[3] Catch Curve also named Meixler Technologies, Inc., as a defendant, but later stipulated to its dismissal from the case.  Stip. Dismissal, Jul. 21, 2010, ECF No. 122.

[4] The third-party defendants have since been terminated from the case.

Court held a hearing on multiple motions to dismiss the counterclaims and third-party complaint. Min. Entry, Apr. 23, 2008, ECF No. 81. With the Court's permission, IGC filed its amended answer and counterclaims on May 13, 2008. ECF No. 85. After another extension of time, on June 13, 2008, Catch Curve and j2 filed a partial motion to dismiss the first amended counterclaims. ECF No. 92.

Meanwhile, in a related case, the District Court for the Central District of California construed the Patents.[5] *See Catch Curve, Inc. v. Venali, Inc.*, No. CV 05-04820 DDP (AJWx), 2007 WL 3308101 (C.D. Cal. May 11, 2007). It found that the Patents were limited to traditional fax-to-fax services and are not infringed by firms using Internet-based systems to deliver fax files to recipients' e-mail accounts. *Id.* at *6-8. Like IGC in the instant case, the California defendant, Venali, also brought antitrust counterclaims against Catch Curve and j2. FAC ¶ 104. The California court had denied Catch Curve and j2's motion to dismiss the antitrust counterclaims, but after construing the patent claims, it granted their motion for summary judgment on the antitrust claims. *See Catch Curve*, 519 F. Supp. 2d 1028, 1038 (C.D. Cal. 2007) (denying motion to dismiss); *Catch Curve, Inc. v. Venali*, No. 05-4820-DDP, at *11 (C.D. Cal. Nov. 3, 2008) (granting motion for partial summary judgment). The Court then stayed this case while the Federal Circuit considered Catch Curve's claim construction appeal

---

[5] About a year before it brought the instant suit against IGC, Catch Curve had sued another competitor for infringement of the Patents in *Catch Curve v. Venali, Inc.* FAC ¶ 53; *compare* Compl. ¶ 5 *with Catch Curve v. Venali, Inc.*, No. 05-4820-DDP (C.D. Cal., Jul. 1, 2005), First Am. Compl. ¶¶ 5, 7, 9, 11, 13.

in the *Venali* suit.  Ord., Feb. 18, 2009, ECF No. 106 (also denying the partial motion to dismiss the counterclaims with leave to re-file).  On January 22, 2010, the Federal Circuit affirmed the California district court's claim construction ruling.  *Catch Curve, Inc. v. Venali, Inc.*, 363 Fed. App'x 19, 25.

On June 7, 2010, the Court reopened the instant case, Ord., ECF No. 109, and on July 16, 2010, Catch Curve and j2 re-filed their partial motion to dismiss IGC's counterclaims, ECF No. 121.  Catch Curve and j2 ("Movants") seek the dismissal of Counts IV, V, and VII.  Mot. Dismiss 2.  In Counts IV and V, IGC claims that Catch Curve and j2's enforcement of the Patents violates § 2 of the Sherman Act.[6]  FAC ¶¶ 209-24.  In Count VII, IGC claims that by bringing this suit, Catch Curve and j2 breached the 2000 License Agreement between jFax and IGC.  *Id.* ¶¶ 230-44.  Movants contend that the counts fail to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Mot. Dismiss 2.

On February 15, 2011, the judge then assigned to this matter held a hearing on the motion to dismiss.  Min. Entry, ECF No. 131.  On March 7, with the motion still pending, the Clerk reassigned the case to the undersigned judge.  The Court held a status conference on June 30 and now addresses the motion to dismiss.

---

[6] Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States . . . shall be deemed guilty of a felony . . . ." 15 U.S.C. § 2.

## II.    Legal Standard

The purpose of a Rule 12(b)(6) motion is to determine whether the complaint states a claim for relief.  An antitrust plaintiff "must allege facts in support of each element of an antitrust violation."  *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1077 (11th Cir. 2004).  In considering a motion to dismiss, the Court must accept the allegations in the complaint as true and construe them in the light most favorable to the nonmoving party.  *Ambrosia Coal & Constr. Co.*, 482 F.3d at 1316; *Powell v. United States*, 945 F.2d 374, 375 (11th Cir. 1991).  To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must contain sufficient factual allegations to suggest the required elements of a cause of action.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295-96 (11th Cir. 2007).  "[A] formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Nor will mere labels and legal conclusions withstand a 12(b)(6) motion to dismiss.  *Id.*  Ultimately, the complaint is required to contain "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.

## III.   Discussion and Analysis

As an initial matter, the Court addresses Movants' argument that the Court should dismiss the First Amended Counterclaim as an impermissible shotgun pleading.  *See* Br. Supp. Mot. Dismiss 1, Jul. 16, 2010. ECF No. 121-1.  The Court

has reviewed the pleadings, and although they are unwieldy, they are generally understandable, at least arguably relevant, and not unreasonably duplicative. *See Watts*, 495 F.3d at 1299 (listing the features typical of shotgun pleadings). More importantly, given the long pendency of this case, the tangled history of the parties, and the factual complexity necessary in pleading antitrust claims under the *Twombly* standard, the Court sees little to be gained by requiring IGC to once again re-plead its counterclaims prior to considering the merits of the motion to dismiss. The Court therefore declines to dismiss the amended counterclaims on this ground.

### A.    Antitrust Claims

In Counts IV and V, IGC alleges that Catch Curve and j2 have engaged in anticompetitive conduct that forms the basis for claims of monopolization and attempt to monopolize under § 2 of the Sherman Act. FAC ¶¶ 209-24. It seeks relief from Catch Curve and j2 "under *Walker-Process* and *Handgards* theories, as well as relief from j2's monopolization of the internet facsimile market based on its predatory acquisition of competitors and anticompetitive behavior." *Id.* ¶ 1. The Court considers the allegations under each theory in turn.

#### 1.    *Walker Process* Allegations

The *Walker Process* theory is an antitrust theory upon which a defendant accused of patent infringement may sue a plaintiff patent owner for asserting a patent procured by fraud on the patent office. *See Walker Process Equip., Inc. v.*

*Food Mach. & Chem. Corp.*, 382 U.S. 172, 174 (1965).  A successful *Walker Process* claim requires proof of "(1) a false representation or deliberate omission of a fact material to patentability, (2) made with the intent to deceive the patent examiner, (3) on which the examiner justifiably relied in granting the patent, and (4) but for which misrepresentation or deliberate omission the patent would not have been granted."  *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1364 (Fed. Cir. 1998).

Although IGC alleges that Catch Curve and j2 are subject to *Walker Process* antitrust liability because the Patents "were procured by fraud on the United States Patent and Trademark Office," it admits that it was AudioFAX IP's principal—not Catch Curve or j2—who procured the Patents.  FAC ¶¶ 12, 23, 44, 56-60, 210, 222.  An assignee may nevertheless be liable under the *Walker Process* theory if it "maintains and enforces the patent with knowledge of the patent's infirmity."  *Walker Process*, 382 U.S. at 177 n.5.  IGC makes the bare allegation that Catch Curve and j2 possessed such knowledge.  *See* FAC ¶¶ 210, 222.  It does not, however, allege any *facts* that would "raise a reasonable expectation that discovery will reveal evidence" that Catch Curve or j2 was involved in the procurement of the Patents or that either company knew that the Patents had been procured by fraud on the patent office.  *See Twombly*, 550 U.S.

at 556.   Accordingly, the antitrust claims that are predicated on the *Walker Process* theory are due to be dismissed.[7]

### 2.   *Handgards* Allegations

The *Handgards* theory is a somewhat broader antitrust theory upon which an infringement defendant may sue a plaintiff patent owner for pursuing the patent suit "in bad faith."   *See Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1288, 1295 n.18 (9th Cir. 1984).   Catch Curve and j2 argue that IGC's *Handgards* counterclaims are very similar to those the infringement defendant asserted against them in *Venali* in the District Court for the Central District of California. Br. Supp. Mot. Dismiss 14 (referring to *Catch Curve, Inc. v. Venali, Inc.*, No. CV 05-04820 DDP (AJWx)).   They therefore contend that because the California district court granted summary judgment on the antitrust counterclaims under the *Noerr-Pennington* doctrine, that "decision . . . should be the end of IGC's claims as well."   *See id.* at 2-3 (citing Ord., *Catch Curve, Inc. v. Venali, Inc.*, No. CV 05-04820 DDP (AJWx) (C.D. Cal. Nov. 3, 2008), ECF No. 187) (referring to the antitrust immunity doctrine established in *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965)).

---

[7] The Court recognizes IGC's argument that Catch Curve and j2 obtained U.S. Patents Nos. 6,208,638 and 6,597,688 by fraud on the patent office.   *See* FAC ¶¶ 74-89; Resp. Mot. Dismiss 18, Sept. 14, 2010, ECF No. 124.   IGC does not state in its Counterclaim, however, that Catch Curve or j2 has asserted those patents against it.   Consequently, that alleged fraudulent procurement may not serve as the basis for IGC's *Walker Process* claim.   *See Walker Process*, 382 U.S. at 174.

The California court's decision, as Movants admit, is not binding on this Court.  *See* Reply Supp. Mot. Dismiss 3-4, Oct. 8, 2010, ECF No. 127 (noting that Movants did not submit the *Venali* rulings "for the truth of the assertions within them").  Nor are that court's findings binding on IGC.  *See Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (noting that because a non-party "generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit'" it may not be bound by the suit's results).  Therefore, it is improper for the Court to consider the California court's factual determinations without converting the instant motion to dismiss to a motion for summary judgment.  The Court declines to convert the motion, and thus, it must conduct its own analysis based on IGC's pleadings.

The Court will first consider whether IGC's counterclaim adequately pleads the monopolization claim or the attempt to monopolize claim under the *Handgards* theory.  If the Court finds that the counterclaim adequately alleges an antitrust claim, it will then determine whether it also pleads facts sufficient to overcome the presumption of *Noerr-Pennington* immunity for acts of petitioning the government.

Unlawful monopolization involves two elements: (1) "the possession of monopoly power in the relevant market," and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).   A private claimant seeking damages must also show that the monopolization caused it to suffer an "antitrust injury." *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1571-72 (11th Cir. 1991).   Attempted monopolization requires a showing of: (1) "predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power" in the relevant market.   *Spanish Broad. Sys. of Fla., Inc.*, 376 F.3d at 1074 (punctuation and citation omitted).   Because the elements of the monopolization claim and the attempt to monopolize claim overlap so extensively, the Court will evaluate them together.

### a.   Relevant Market

Claims under § 2 of the Sherman Act "require harm to competition that must occur within a 'relevant', that is, a distinct market, with a specific set of geographical boundaries and a narrow delineation of the products at issue."   *Id.* (citation omitted).   IGC defines the relevant geographic market as the fifty states, plus the District of Columbia and Puerto Rico.   FAC ¶ 33.   It defines the relevant product market as "Internet facsimile services provided to home offices and small companies and offices."   *Id.* ¶ 32.   It states that competitors in the relevant market are those companies that "provide individuals and small businesses, for a fee, with a dedicated phone number that allow [sic] users to receive fax messages directly on their computers in the form of attachments to e-mails."   *Id.*   For the

purpose of evaluating the motion to dismiss, the Court evaluates IGC's *Handgards* antitrust claims in relation to this defined market.

### b.    Intent

"In order to fall within § 2, the monopolist must have . . . the intent to monopolize." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603 n.28 (1985) (citation omitted).  IGC alleges that Catch Curve and j2 intended to gain monopoly power by threatening and engaging in baseless patent infringement litigation.  FAC ¶¶ 210, 214-19, 221.  It contends that Catch Curve and j2 knew that the Patents are "obviously inapplicable to fax-to-email technology" but brought infringement claims against fax-to-email providers anyway as part of a scheme to extract bogus licensing fees, wrongfully gain leverage to purchase competitors, and disrupt competitors' businesses, often at key moments.  *See, e.g., id.* ¶¶ 28, 38, 44-48, 102, 113, 216.

According to IGC, Catch Curve and j2 knew that the Patents did not cover fax-to-email technology because when AudioFAX sued j2 (then jFax) on the Patents in 1999, j2 investigated the Patents and asserted that they covered only fax-to-fax technology.  FAC ¶¶ 20-21.  It also notes that despite the 2007 claim construction ruling finding that the Patents are limited to fax-to-fax technology, Catch Curve and j2 have persisted in this suit.   *Id.* ¶¶ 53-55.  Finally, it avers that j2 hid its activities and relationship with Catch Curve from securities analysts and regulators, which further suggests bad intent.   *Id.* ¶¶ 99-100.  Based on these

specific factual allegations, the Court finds that IGC has sufficiently alleged Catch Curve and j2's specific intent to gain monopoly power by anticompetitive means.

### c.    Monopoly Power

The accused monopolist must possess enough power or potential power in the relevant market that it could harm competition. *Spanish Broad. Sys. of Fla., Inc.*, 376 F.3d at 1074 (punctuation and citation omitted). Market share is a typical indicator of monopoly power. *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 999 (11th Cir. 1993) ("The principal measure of actual monopoly power is market share . . . .").

IGC contends that, as a result of its anti-competitive activities, j2's share of the relevant market now exceeds ninety percent. FAC ¶¶ 29, 36, 46, 212, 214. It also contends that Catch Curve and j2's allegedly wrongful enforcement of the Patents presents a substantial barrier to entry into the relevant market and that there are no adequate substitute products or services. *Id.* ¶¶ 128-29, 215. The Supreme Court of the United States, among other courts, has found comparable market shares to be indicative of monopoly power. *See, e.g., Grinnell Corp.*, 384 U.S. at 571 (finding that an eighty-seven percent share of the relevant market was sufficient to establish monopoly power); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) (finding that "over two-thirds of the entire domestic field of cigarettes, and . . . over 80% of the field of comparable cigarettes" amounted to "a

substantial monopoly"); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945) (finding a market share of ninety percent sufficient to establish monopoly power). The Counterclaim therefore contains sufficient facts to render plausible its allegations that Catch Curve and j2 have established a monopoly in the relevant market or present a dangerous probability of creating one.

### d.    Antitrust Injury

To assert a claim under Sherman Act, the complainant must have suffered an "injury of the type the antitrust laws were intended to prevent" that was caused by the anticompetitive activity. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The purpose of antitrust laws is to "protect[] . . . *competition*, not *competitors*." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

IGC avers that Catch Curve and j2 have wrongfully pursued a scheme to obtain licensing fees from fax-to-email providers—including IGC—on patents they know cover only fax-to-fax technology. FAC ¶¶ 18-21, 23-29. IGC contends that even though the Patents are clearly inapplicable to fax-to-email services, the competitors Catch Curve and j2 target are nevertheless "forced to license the inapplicable patents or sell their business to j2" because they are generally small businesses that cannot "endure the expense of litigation and disruption of their businesses that litigation entails" and because j2 exerts additional pressure on

them by targeting their customers and resellers with sham litigation as well. *Id.* ¶¶ 28, 44, 47-48, 51, 114-15. It also claims that because of the anticompetitive behavior, IGC and other fax-to-email providers "have been delayed, prevented, and hindered in competing" against Catch Curve and j2 and have been prevented from "offering better, more innovative services." *Id.* ¶¶ 30-31. Finally, it contends that Catch Curve and j2's wrongful activities have harmed their rivals' ability to compete by raising their costs of doing business, either by exacting bogus licensing fees, or, as in IGC's case, requiring the expenditure of legal fees in defense of a sham lawsuit. *Id.* ¶¶ 112, 210, 222. Viewed in the light most favorable to IGC, these facts sufficiently support its allegation that it suffered an antitrust injury.

### e.      Anticompetitive Conduct and *Noerr-Pennington* Immunity

To successfully state the antitrust counts, IGC must also allege facts that plausibly suggest that Catch Curve and j2 engaged in predatory, exclusionary, or anticompetitive conduct in the pursuit of monopoly power. *See Aspen Skiing Co.*, 472 U.S. at 605; *Spanish Broad. Sys. of Fla., Inc.*, 376 F.3d at 1074. Whether Catch Curve and j2's conduct may be characterized as anticompetitive depends on the conduct's impact on consumers, smaller rivals, and the companies themselves. *See Aspen Skiing Co.*, 472 U.S. at 605. "If a firm has been

'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory." *Id.*

IGC alleges that Catch Curve and j2 have engaged in a course of conduct aimed at damaging competition in the relevant market.  It alleges that the anticompetitive course of conduct includes patterns of (1) predatory acquisition of competitors, FAC ¶¶ 25, 44, 45, 94; (2) bringing and maintaining baseless, vexatious lawsuits, *id.* ¶¶ 26-27, 55, 98; (3) threatening to bring litigation in order to coerce competitors to purchase bogus licenses, *id.* ¶¶ 18, 24, 44-45, 96, 111-12, 115-16; (4) timing the infringement actions so that they prevent competitors from consummating major contracts with customers, making acquisitions, or making stock offerings, *id.* ¶¶ 28, 102; and (5) targeting competitors' customers and resellers with sham litigation in an attempt to dissuade them from doing business with the competitor, *id.* ¶¶ 47-48, 113-14.  IGC also avers that "as a result of its illegally acquired and maintained market dominance, j2 has been able to charge artificially high prices for its services," while at the same time "reducing competition in these markets and precluding new competitive offerings to consumers." *Id.* ¶ 52.  It also contends that the activity has driven competitors out of business. *Id.* ¶¶ 117, 120.  The Court therefore finds that IGC has adequately pled anticompetitive conduct.

Nevertheless, Catch Curve and j2 argue that these allegations fail to state a viable antitrust claim because, at their root, they are all based on litigation and

litigation-related activity, which they contend is protected from antitrust prosecution under the *Noerr-Pennington* doctrine.  Br. Supp. Mot. Dismiss 13.  They also point to the *Venali* court's finding that the patent enforcement action in that case—enforcement that is substantially similar to the enforcement action in the case at hand—was not objectively baseless.  *Id.* at 14.  IGC, in turn, contends that the patent infringement litigation is a sham and therefore not subject to *Noerr-Pennington* protection.  Resp. Mot. Dismiss 4-5.  It argues that no reasonable litigant could expect to succeed in asserting what are obviously fax-to-fax patents in suits against companies offering fax-to-email services.[8]  *Id.*

The *Noerr-Pennington* doctrine protects parties from antitrust liability predicated on acts of petitioning the government.  *See Pennington*, 381 U.S. at 670; *Noerr Motor Freight, Inc.*, 365 U.S. at 135.  The protected activities include petitioning for relief in court.  *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993).  Such activities are not protected, however, if they are "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor."  *Noerr*, 365 U.S. at 144; *accord Prof'l Real Estate Investors,* 508 U.S. at 51.  *Noerr-Pennington* immunity will not apply if the antitrust claimant shows that

---

[8] It also argues that the patent infringement litigation was a sham because Catch Curve and j2 knew that the Patents had been procured by fraud on the patent office.  Resp. Mot. Dismiss 3.  Because the Court found that IGC has not averred facts sufficient to support its allegation that Catch Curve and j2 knew of any fraudulent procurement, the argument fails.  *See* discussion *supra* § III.A.1.

the underlying litigation "is objectively baseless" and brought in bad faith. *Prof'l Real Estate Investors,* 508 U.S. at 60-61.   In other words, to overcome the presumption that *Noerr-Pennington* immunity applies, the antitrust claimant must prove that "the defendant lacked probable cause" to institute the infringement suit and that "the defendant pressed the action for an improper, malicious purpose." *Id.* at 62 (noting that "[p]robable cause to institute civil proceedings requires no more than a "reasonable belief that there is a chance that a claim may be held valid upon adjudication") (citation and punctuation omitted).

The question of whether a lawsuit is a sham, in the context of the sham exception to *Noerr-Pennington* immunity, is generally a question of fact. *See, e.g., Indep. Taxicab Drivers' Emps. v. Greater Houston Transp. Co.*, 760 F.2d 607, 612 n.9 (5th Cir. 1985); *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1253 (9th Cir. 1982); *In re Flonase Antitrust Litig.*, ___F. Supp. 2d ___, 2011 WL 2162898, at *8 (E.D. Pa. Jun. 2, 2011); *Scooter Store, Inc. v. SpinLife.com, LLC*, ___ F. Supp. 2d ___, 2011 WL 1460438, at * 8 (S.D. Ohio Apr. 18, 2011).   IGC has alleged that it is obvious that the Patents do not cover the fax-to-email services it sells, and thus Catch Curve's patent infringement suit is a sham.  FAC ¶ 26.  Conversely, Movants contend that the *Venali* claim construction and the subsequent grant of summary judgment on the antitrust claims in that case on *Noerr-Pennington* grounds lead to the inevitable

conclusion that *Noerr-Pennington* immunity also applies here.  *See* Reply Supp. Mot. Dismiss 7.

Although the *Venali* court found that Catch Curve and j2's claim construction in that case was not unreasonable and that therefore the patent infringement suit against Venali was not a sham, it would be premature for this Court to consider those factual findings on a motion to dismiss in this case.  *Cf. Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (discussing the limited circumstances within which a court may consider evidence on a motion to dismiss).  This Court is not bound by the findings of the other district court.  *See McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004) ("The general rule is that a district judge's decision neither binds another district judge nor binds him . . . .").  Moreover, IGC, who was not a party to the *Venali* suit, is entitled to present its own evidence and arguments in its own case.  *See Taylor*, 553 U.S. at 892 (explaining that a non-party generally may not be bound because it "has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit'").  No infringement contentions have yet been advanced in the instant matter, so at present, the scope and grounds for the claims are undefined and cannot be precisely compared to the allegations asserted in *Venali*.  *See* Rev. Sched. Ord. ¶ 5, Jul. 7, 2010, ECF No. 120 (providing that Catch Curve shall serve its infringement contentions within forty-five days after Catch Curve and j2 file an answer to IGC's counterclaims).  Finally, it is possible that IGC will present

relevant evidence not considered in *Venali*.  Thus, the Court cannot, at this time, rule out the possibility that IGC may show that Catch Curve's claims are objectively baseless and brought in bad faith.  *See Hoffman-La Roche, Inc. v. Genpharm, Inc.*, 50 F. Supp. 2d 367, 380 (D.N.J. 1999) (declining to find *Noerr-Pennington* immunity on a motion to dismiss because "reasonableness is a question of fact").  Consequently, the Court finds that IGC's *Handgards* antitrust claims are pled sufficiently to survive Catch Curve and j2's motion to dismiss on *Noerr-Pennington* grounds.

**B.    Contract Claim**

In Count VII, IGC counterclaims against j2 for breach of contract.  FAC ¶¶ 230-44.  It asserts that the claim "aris[es] out of a unique warranty which j2 [then known as jFax] gave to IGC in which it warranted that IGC's software did not infringe any patents."  *Id.* ¶ 1.  It asserts that j2 granted it a "warranty of non-infringement" in a software license agreement ("License Agreement") that jFax and IGC executed on June 30, 2000.  *Id.* ¶¶ 235-36.  It contends that by filing the instant infringement suit, Catch Curve breached the warranty.  *Id.* ¶ 241.  Movants contend that IGC misinterprets and overextends the warranty.  Br. Supp. Mot. Dismiss 25.

IGC did not attach the License Agreement as an exhibit to its Counterclaim, and in response to Movants' submission of the Agreement to the Court, IGC argues that the Court may not consider the Agreement without converting the

motion to dismiss into a motion for summary judgment and allowing for additional briefing.  Resp. Mot. Dismiss 30; Stip. IGC, Attachment 1, Jul. 8, 2011, ECF No. 134-1 at 1.  Thus, IGC contends that the Court must look only to the face of the Counterclaim to determine whether its contract count is sufficiently pled.  Resp. Mot. Dismiss 30.  This is incorrect.

A document outside the four corners of a complaint may be considered on a motion to dismiss, even if it is not attached to the complaint, "if it is central to the plaintiff's claims and is undisputed in terms of authenticity."  *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 n.3 (11th Cir. 2005); *accord Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010) ("In ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged.") (citation omitted).  On July 8, 2011, in response to an Order of this Court, IGC filed a clean copy of the License Agreement and stipulated to its authenticity.  Stip. IGC 2, ECF No. 134.  It also introduced a copy of an Agreement of Understanding and stipulated to its authenticity.  *Id.*  It further affirms that the License Agreement and Agreement of Understanding, "together with several other agreements between j2 and IGC, form the basis for IGC's breach of contract claims."  Stip. IGC, Attachment 1 at 1.  Consequently, the Court may consider the documents as part

of the pleadings on the motion to dismiss and need not convert the motion to a motion for summary judgment.[9]

Again applying the *Twombly* standard, the Court looks to the pleadings—and in this case, the authenticated License Agreement and Agreement of Understanding—for factual assertions sufficient to render IGC's breach of contract claim plausible. *See Twombly*, 550 U.S. at 570. IGC argues that in the Agreement of Understanding, j2 gave it a "general and unqualified" release from "all claims," whether "presently known, anticipated or disclosed," or not, and promised "never to institute or maintain" an action against IGC regarding its services or equipment. Stip. IGC, Attachment 1 at 2 (citing Stip. IGC, Ex. 2, §§ 5(a), 6 & 7).

The License Agreement provides that it is governed by California law. Stip. IGC, Ex. 1, § 8.4. Under California law, contract interpretation is a question of law for the court. *Travelers Cas. & Sur. Co. v. Am. Int'l Surplus Lines Ins. Co.*, 465 F. Supp. 2d 1005, 1012 (S.D. Cal. 2006). The goal is to find and give effect to the true intent of the contracting parties. *Starlight Ridge S. Homeowners Ass'n*

---

[9] Movants request that the Court strike the Agreement of Understanding because IGC did not rely on it on the face of its contract counterclaim and because IGC newly presents it more than nine months after the completion of briefing on the motion to dismiss. Resp. Stip. 2-3, Jul. 14, 2011, ECF No. 135. Although propriety of accepting this late submission would be questionable, particularly if IGC were the moving party, the Court has considered it for the purposes of viewing the pleadings in the light most favorable to the non-moving party on the motion to dismiss, and it therefore denies the request to strike. *See* Stip. IGC, Ex. 1, § 8.10, Jul. 8, 2011, ECF No. 134-2 (expressly integrating the Agreement of Understanding into the License Agreement).

*v. Hunter-Bloor*, 99 Cal. Rptr. 3d 20, 25 (Cal. Ct. App. 2009).  Where contract terms are clear and unambiguous, courts will look to them alone to determine the parties' true intent.  *Travelers Cas. & Sur. Co.*, 465 F. Supp. 2d at 1012.  The same standards would apply under Georgia law.  *See S. Fed. Sav. & Loan Assoc. of Atlanta v. Lyle*, 290 S.E.2d 455, 458 (Ga. 1982).

The Agreement of Understanding upon which IGC relies contains an introductory section entitled "Recitals."  Stip. IGC, Ex. 2 at 2, ECF No. 134-3.  The introductory section explains that at the time the parties entered into the contract, jFax and a company called eFax were preparing to merge.  *Id.*  It further notes that eFax and IGC were engaged in payment and licensing disputes over software IGC had developed for eFax and that eFax, jFax, and IGC "desire[d] to fully and completely settle all issues and outstanding claims between eFax and IGC prior to the Merger."  *Id.*  It is against this background that j2 (then jFax) allegedly pledged never to sue IGC.

The plain language of the Agreement of Understanding does not support IGC's interpretation, however.  IGC claims that in § 7 of the Agreement of Understanding, "j2 gave IGC a 'Covenant Not to Sue' wherein it agreed '**never** to institute or maintain against' IGC any action or proceeding relating to IGC's services or equipment."  Stip. IGC, Attachment 1 at 2 (citing Stip. IGC, Ex. 2, § 7) (bold type in IGC's argument, but not the cited contract).  When one compares this excerpt to the full text of the section as it relates to jFax's covenants, it is

clear that IGC omitted language that is critical to understanding that the covenant not to sue applies only to a subset of claims called the "Merger Party Claims": "JFAX . . . hereby covenants and agrees never to institute or maintain against . . . the IGC Parties . . . any action or proceeding *based in whole or in part upon the matters with respect to which . . . the Merger Party Claims apply.*" Stip. IGC, Ex. 2, § 7 (emphasis added).

IGC similarly claims that in § 5(a) of the Agreement of Understanding, "j2 released and fully discharged IGC from all claims 'known or unknown' arising from IGC's services or equipment." Stip. IGC, Attachment 1 at 2 (citing Stip. IGC, Ex. 2, § 5). Again, this excerpt suffers from critical omissions. The relevant part of § 5(a) states, in fact, that upon certain conditions precedent,

> JFAX . . . will release and fully discharge each of the IGC parties, from any and all claims, demands and liabilities of whatever kind, whether presently known or unknown, suspected or alleged . . . *arising from or related to any past services, equipment, software or other assets* provided by IGC to the Merger Parties whether pursuant to the Development Agreement, the Co-Location Agreement or any other agreement or understanding, whether written or oral (the "*Merger Party Claims*").

Stip. IGC, Ex. 2, § 5(a) (emphasis added). Thus, it is clear that this release of rights also covered a subset of claims—again, the "Merger Party Claims"—arising from IGC's *past* relationship with the other parties to the contract, rather than *all* claims arising from IGC's services or equipment.

Finally, IGC argues that in § 6, "j2 and IGC agreed that these releases were 'general and unqualified' and that they 'apply not only to all claims which are presently known, anticipated or disclosed, **but also to those which are presently unknown, unanticipated or undisclosed**." Stip. IGC, Attachment 1 at 2 (citing Stip. IGC, Ex. 2, § 6) (bold type in IGC's argument, but not the cited contract). However, § 6 is entitled "Nature of Releases" and accordingly describes the nature of "[t]he releases of the IGC Claims and the Merger Party Claims" set out in the two paragraphs preceding it. *See* Stip. IGC, Ex. 2, § 6. Further, § 6 describes the releases of the IGC Claims and the Merger Party Claims outlined in §§ 4 and 5 as not simply "general and unqualified" releases, but instead as "general and unqualified releases *pursuant to the terms hereof*." *Id.* Consequently, it is clear from the plain language of the Agreement of Understanding that j2 (then jFax) did not give up all right to sue IGC at any time and on any grounds, but instead gave up only the right to pursue the bundle of claims included within the "Merger Party Claims."

IGC's Counterclaim contains no allegation indicating that the instant patent infringement suit "aris[es] from" or is "related to any past services, equipment, software or other assets provided by IGC" to jFax prior to the execution of the Agreement of Understanding, nor does it otherwise explain how

the patent infringement suit might otherwise constitute a "Merger Party Claim."[10]
*See* Stip. IGC, Ex. 2, § 5(a).  Consequently, giving IGC every benefit of the doubt
with regard to its factual allegations, the Court finds that it has failed to allege a
plausible breach of contract claim.

## IV.   Conclusion

Catch Curve and j2's motion to dismiss is **GRANTED** in part and
**DENIED** in part.   Counts IV and V, to the extent that IGC alleges them as
*Walker Process* claims, are hereby **DISMISSED**.   To the extent that IGC alleges
those Counts under the *Handgards* theory, they shall stand.   Count VII, IGC's
breach of contract counterclaim, is also **DISMISSED**.

The Court recognizes, however, that dismissals for failure to state a claim
have historically been disfavored.  *See, e.g., Spanish Broad. Sys. of Fla., Inc.*, 376
F.3d at 1070.   Therefore, should IGC believe in good faith that a sufficient factual
basis exists for its *Walker Process* antitrust claims or for its breach of contract
claim, it shall have within **FOURTEEN DAYS** after the date of the entry of this
Order to re-plead the counts in a second amended complaint.   Although the Court
declined to dismiss the First Amended Complaint as an impermissible shotgun
pleading, IGC is cautioned that the Court will not review subsequent amended

---

[10] The Court realizes that these phrases could have a connection to the Patents that
eludes its apprehension.   IGC has presented little briefing on the late-presented Agreement of
Understanding, however, and the scant briefing it did provide so misquoted the language of the
Agreement of Understanding as to be virtually useless.   Moreover, IGC failed utterly to plead the
document as a ground for its contract counterclaim.   Thus, IGC presented the Court with little
basis for finding the breach of contract counterclaim plausible.

counterclaims so leniently.  Accordingly, the Court **DIRECTS** IGC that should it decide to amend its pleadings to allege additional factual support for its *Walker Process* and breach of contract claims, it must put forth specific factual assertions and organize the pleadings so that each claim clearly incorporates by reference the precise factual support for that claim and no others.

IT IS SO ORDERED this 1st day of September, 2011.

**AMY TOTENBERG**
**UNITED STATES DISTRICT JUDGE**