IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CATCH CURVE, INC., <br><br> Plaintiff and Counterclaim Defendant, <br><br> v. <br><br> INTEGRATED GLOBAL CONCEPTS, INC., <br><br> Defendant and Counterclaim Plaintiff, <br><br> v. <br><br> j2 GLOBAL COMMUNICATIONS, INC., AUDIOFAX, INC., AND AUDIOFAX IP LLC <br><br> Added Counterclaim Defendants. | No. 1:06-CV-02199 <br> Judge Amy Totenberg <br><br> Jury Trial Demanded |

**DECLARATION OF JOHN R. NEURAUTER STATEMENT OF INTEGRATED GLOBAL CONCEPTS IN RESPONSE TO COURT ORDERED SUPPLEMENTAL BRIEFING REGARDING BASIS FOR j2 GLOBAL, INC.'S AND CATCH CURVE, INC.'S INSTITUTION OF OBJECTIVELY BASELESS LITIGATION**

Under 28 U.S.C. § 1746, I, John R. Neurauter, declare as follows:

1. I am personally knowledgeable regarding the following matters.

2. I am the Chief Executive Officer of Integrated Global Concepts, Inc.

(*"IGC"*), a small, private Illinois corporation founded in 1992.

3. IGC is a small, family-owned and operated business located on Chicago's North Side. IGC has provided an internet facsimile service, known as "MaxEmail," since 1997.

4. In September 1998, IGC was retained by a company called JetFax to develop a fax-to-email business line for JetFax's M9## line of multifunction fax machines.

5. After an intense period of development, IGC rolled out the system for JetFax in November 1998.

6. This system was designed by IGC and operated by IGC on its own servers, using its own source code and other intellectual property.

7. In February 1999, as a result of the fax-to-email system developed and offered commercially since early 1997 by IGC under the MaxEmail and FaxEmail brand names, IGC rebranded the FaxEmail service under the eFax.com brand name, JetFax became eFax.com ("eFax") and JetFax subsequently abandoned the sales of JetFax Multifunction Devices to concentrate on the eFax services.

8. The relationship between IGC and eFax was defined by a Software Development Agreement, executed on February 16, 1999 (the "Development

Agreement"), and a Co Location Agreement, executed on February 16, 1999 (the "Co Location Agreement").  A true and correct copy of the Development Agreement is attached hereto as Exhibit 1, and a true and correct copy of the Co-Location Agreement is attached hereto as Exhibit 2.

9.      During this time, I was informed that a company called JFAX.COM, now known as j2 Global, Inc., ("j2") and eFax began negotiating the terms of a merger agreement (the "Merger Agreement") pursuant to which eFax would be acquired by j2.

10.     At the time, j2 was operating a competing internet facsimile business. I was contacted by eFax and informed that j2 wanted to terminate eFax's agreements with IGC after the merger, and to transition the eFax customer base to j2's own software, equipment and systems.

11.     However, under the Development Agreement and the Co-Location Agreement, IGC had retained the rights to the source code and other intellectual property for the fax-to-email system it had originally developed for the JetFax multifunction fax machines.  The entire eFax system was operated by IGC with equipment located at IGC's facility in Des Plaines, Illinois using IGC's own software and other assets.

12. IGC also believed that the Development Agreement and the Co-Location Agreement gave IGC rights which extended for at least 5 years. These agreements provided that eFax had no rights to the source code unless IGC could not support the service. A copy of the source code was in escrow.

13. IGC had also performed services and developed software in addition to that which was required pursuant to the terms of the Development and Co-Location Agreements, which IGC believed required eFax to make additional payments to IGC pursuant to the terms of the Development and Co-Location Agreements. eFax denied that these services were additional, and instead believed that the services were encompassed within the existing agreements.

14. In order to permit the merger with eFax to proceed and to fully and completely settle all issues and potential claims between j2, IGC and eFax, j2 and eFax proposed that IGC: (1) enter into an agreement to resolve IGC's claims, (2) allow the merger to occur, and (3) provide needed services from IGC to transition the eFax customer base to j2's systems.

15. As a result, j2, eFax and IGC entered into that certain Agreement of Understanding dated June 30, 2000. A true and correct copy of the Agreement of Understanding is attached hereto as Exhibit 3.

16. The Agreement of Understanding also incorporates several other agreements between j2 and IGC, such as the Software License Agreement dated June 30, 2000, wherein j2 obtained a comprehensive license to IGC's source code and other systems.

17. The Agreement of Understanding also incorporates the Transition Services Agreement dated June 30, 2000, wherein IGC was required to teach j2 personnel how IGC's system operated and to assist in the migration of the eFax customers acquired by j2 under the Merger Agreement to a new system within j2. The successful completion of the Transition Services Agreement was confirmed in a letter from Jeffrey D. Adelman, Vice President and General Counsel of j2 Global Communications, Inc. to John R. Neurauter dated July 25, 2001.

18. j2 has been targeting IGC on the many of the patents-in-suit since at least 2002. j2 again targeted IGC and one of its resellers, Meixler Technologies, Inc., on many of the patents-in-suit again in 2009. A copy of the letter IGC received in 2002 threatening infringement from j2's licensing agent, EKMS, Inc. is attached hereto as Exhibit 4. Additionally, a copy of the letter IGC received in 2009 from IP Investments Group, Inc., is attached hereto as Exhibit 5.

19. At various times subsequent to the year 2000, it has come to my attention in the course of my duties at IGC that j2 personnel have obtained accounts with IGC's MaxEmail service.

20. For example, a high ranking j2 officer had a demo account with MaxEmail from at least June 19, 2001 through November 5, 2003. This individual appears to have used a bogus credit card in connection with the account, and his email address is on his account and that account is on a j2 IP address. I am able to provide the specific names of the j2 employees identified herein if necessary.

21. Additionally, another j2 senior officer set up a MaxEmail Plus account and used his own VISA card. This individual had a MaxEmail Plus account from at least February 21, 2003 through February 22, 2005, and his account was set up on a j2 IP address.

22. I have also been able to detect several contacts from an individual who is or was a j2 product development manager, but to date, I have not been able to determine if any accounts were set up.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

23.  In addition to the documents identified above, the documents identified on the Rider to my affidavit are true and correct copies of documents I obtained from IGC's files, documents I obtained from the PACER system, or were otherwise served upon IGC or its attorneys, except where otherwise indicated.

I hereby declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct.  Executed this 15 day of November, 2012 in Chicago, Illinois.

*/s/ John R. Neurauter*
John R. Neurauter

## RIDER

| EXHIBIT | DOCUMENT |
|---|---|
| 6 | Plaintiff's Disclosure of Infringement Contentions, filed November 14, 2011, filed in the United States District Court for the Northern District of Georgia, in Case No. 1:06-cv-2199-AT |
| 7 | May 3, 2012 Transcript of Telephone Conference Proceedings in Case No. 1:06-cv-2199-AT, in the United States District Court for the Northern District of Georgia |
| 8 | Source Code Escrow Agreement, dated February 24, 1999 |
| 9 | Confidential Memorandum dated August 18, 2000 from IGC to j2 Global Communications, Inc. |
| 10 | Transition Services Agreement, filed July 8, 2011, in the United States District Court for the Northern District of Georgia, in Case No. 1:06-cv-02199-AT.  [Dkt. No. 134-3.] |
| 11 | Order Granting Catch Curve, Inc. and j2 Global's Motion for Partial Summary Judgment, filed November 3, 2008, in the United States District Court for the Northern District of Georgia, in Case No. 1:06-cv-02199-AT.  [Dkt. No. 187.] |
| 12 | Order by Magistrate Judge Baverman, filed October 5, 2011, in the United States District Court for the Northern District of Georgia, in Case No. 1:06-cv-02199-AT.  [Dkt. No. 144.] |
| 13 | j2 2000 8-K Exhibit 10/2 (Agreement of Understanding) |
| 14 | JFAX Mandatory Disclosures - 1:99-CV-2816-RWS |
| 15 | Claim Construction Order, filed May 11, 2007, in the United States District Court for the Central District of California |
| 16 | Email from Josh Mailman to Jack Neurauter, dated November 20, 2001 |
| 17 | Chart of Dynamic Depth Patent Litigation downloaded from http://www.rfcexpress.com/lawsuits/patent-lawsuits/california-central-district-court/23622/dynamic-depth-inc-v-easylink-services-corp/related-cases/ on November 15, 2012 |
| 18 | Email from Hemi Zucker to Jack Neurauter, dated March 13, 2006 |
| 19 | Federal Circuit Opinion, Case No. 2009-1121 |