# EXHIBIT 7

```
                 UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
                       ATLANTA DIVISION


CATCH CURVE, INC.,                )
        Plaintiff and             )
        Counterclaim Defendant,   )
        -vs-                      ) Civil Action File
INTEGRATED GLOBAL CONCEPTS,       ) No. 1:06-cv-2199-AT
INC.,                            )
        Defendant and             )
        Counterclaim Plaintiff,   )

INTEGRATED GLOBAL CONCEPTS, INC., )
        Counterclaim Plaintiff,   )
        -vs-                      )
J2 GLOBAL COMMUNICATIONS, INC.,   )
ET AL.,                          )
        Counterclaim Defendants.  )



          Transcript of Telephone Conference Proceedings
              Before the Honorable Amy Totenberg
               United States District Court Judge
                     Thursday, May 3, 2012
```

APPEARANCES:

ON BEHALF OF THE PLAINTIFF/COUNTERCLAIM DEFENDANT:

    Brian R. England, Esq.
    Dan R. Gresham, Esq.

ON BEHALF OF THE DEFENDANT/COUNTERCLAIM PLAINTIFF:

    James Heiser, Esq.
    Robert J. Schneider, Esq.
    Michael J. Powell, Esq.


Elise Smith Evans, RMR, CRR
Official Court Reporter
United States District Court
Atlanta, Georgia

1           (Thursday, May 3, 2012; Atlanta, Georgia.)

2           THE COURT:  Good afternoon.  Thank you for your

3    patience.

4           Could we get everyone just to do a bit of a roll call

5    so we can understand who's on the phone?  And, then, it's been a

6    long day here, so would everyone, each time you speak, be sure to

7    identify yourselves so the court reporter can catch who's

8    speaking?

9           MR. POWELL:  Your Honor, this is Mike Powell, local

10   counsel for Integrated Global Concepts.

11          MR. GRESHAM:  This is Dan Gresham, local counsel for

12   Catch Curve and j2.

13          MR. ENGLAND:  This is Brian England from Sullivan &

14   Cromwell calling from Los Angeles on behalf of j2.

15          MR. HEISER:  This is Jim Heiser from Chapman and Cutler

16   calling from Chicago on behalf of IGC.

17          MR. SCHNEIDER:  Also in Chicago, Bob Schneider on

18   behalf of IGC.

19          THE COURT:  Okay.  Anybody else?

20          MR. ENGLAND:  Your Honor, this is Brian England from

21   Sullivan & Cromwell.

22          I have Eddie Johnson here who works with us on the

23   case, but has not appeared formally in the case.

24          THE COURT:  All right.  Very good.

25          All right.  All right.  So, it appears there are two

ELISE SMITH EVANS, RMR, CRR

1  major issues and that they really are ones connected to IGC's

2  counterclaims.  So, the first one is the scope of time.  Is that

3  right?

4          UNIDENTIFIED COUNSEL:  That's correct.

5          UNIDENTIFIED COUNSEL:  That's correct.

6          THE COURT:  I'm sorry.  Remember just to identify

7  yourself when you're talking.

8          THE COURT REPORTER:  Who was that that just spoke?

9          MR. ENGLAND:  Brian England.  And somebody else said

10 the same thing I did.

11         THE COURT:  All right.  Very good.

12         Okay.  Now, as I understand it on the -- IGC wants to

13 go past 2009 and Catch Curve says nothing past 2009 is relevant.

14 And I'm -- and part of -- as I understand it again, part of Catch

15 Curve's argument why nothing is relevant after that time is --

16 well, at least with respect to the year 2010, that after the --

17 the D.C. court, federal court, ruled that no further lawsuits

18 were brought?

19         MR. ENGLAND:  This is Brian England, Your Honor.

20         That's correct.  Following the federal circuit's ruling

21 with respect to the scope of the patents, the licensing program

22 for the -- and all efforts to enforce these patents with the

23 exception of this IGC litigation has ceased, and there have been

24 no more efforts to license those patents, certainly that I'm

25 aware of.  And, so, that's why we believe information that would

 1  be gathered by the search terms for those time frames would be

 2  outside the scope, but not relevant and very burdensome.

 3            THE COURT:  Is it correct, though, that you brought an

 4  additional claim after 2010 against IGC?

 5            MR. ENGLAND:  Well, this claim has been pending before

 6  that time.  It's been pending since I believe 2006.  This case

 7  has remained pending, but we have not filed new claims on these

 8  patents against anyone.

 9            THE COURT:  Because what I'm looking at is in the April

10  30th letter submitted by Mr. Heiser on the third paragraph it

11  says:  Notwithstanding this ruling, j2 has continued to pursue

12  IGC.  Further, in November 2011, j2 charged IGC with infringing

13  patents which are not even mentioned in its complaint.

14            MR. ENGLAND:  Well, this is Brian England again, Your

15  Honor.

16            What that's referring to, I believe, is that when we

17  provided the detailed infringement contentions, we included

18  contentions that ran on the continuation patents to this family.

19            THE COURT:  All right.

20            MR. ENGLAND:  But it has not --

21            THE COURT:  Try again --

22            MR. ENGLAND:  -- filed a new lawsuit against anyone.

23  Just this same lawsuit from 2006.

24            THE COURT:  So, you're just simply saying that these

25  were -- there were no new claims added?

ELISE SMITH EVANS, RMR, CRR

1          MR. ENGLAND:  That's the same patent claim.  It's

2   just -- it was expanding -- we were asked to provide detailed

3   infringement contentions, so we did that for the patents.  And,

4   then, we did it for the patents that were the same continuation,

5   in part -- same family of patents, so that we had given a

6   complete scope of infringement contentions.

7          THE COURT:  All right.  Let me hear from IGC about

8   that.

9          MR. HEISER:  Your Honor, this is Jim Heiser from

10  Chapman and Cutler.

11         I just want to take a step back.  This isn't a

12  situation where IGC is asking j2 to review a large number of

13  documents.  The question is that j2 won't even collect the data

14  to see whether there are a large number of hits or a large number

15  of documents that have to be reviewed.  So, we don't know whether

16  we're talking about ten documents, a thousand, 100,000.  The

17  problem is that they won't even collect that to determine what

18  the burden is.

19         And, so, you know, we would certainly accommodate if

20  there was a large number of hits -- and we've done this

21  throughout the process so far -- you know, a way to narrow that,

22  narrow the search, to focus it on whatever is relevant since

23  2009.  But I don't think it's fair, you know, to even discuss

24  with -- what the burden is until we know what the actual, you

25  know, burden would be on j2.

ELISE SMITH EVANS, RMR, CRR

1          MR. ENGLAND:  Your Honor, this is Brian England.

2          The burden is that this is a huge burden to collect

3    that data, given its very low, if not complete irrelevancy to the

4    case.

5          THE COURT:  Well, Mr. Heiser, explain to me what they

6    would be looking for.  Tell me what you had in mind, because I'm

7    having to sort of reacquaint myself with the case after we

8    attempted mediation.  So, just remind me what you think this

9    would mean that wouldn't be so burdensome at this juncture.

10         MR. HEISER:  Well, sure.  Your Honor, there's really

11   two large tracks to this case now.  The first is the patent side,

12   and that deals with from our standpoint what's called the

13   exceptional case argument.  And that goes to the -- j2's conduct

14   after the federal circuit ruled in the case.  And namely, that is

15   charging us with infringement contentions.

16         I'm not -- I don't necessarily agree with Mr. England's

17   characterization about, you know, these patents not being

18   mentioned in the case.  They have to be in the complaint in order

19   for that to have any kind of a basis for a claim against IGC.

20   And, so, I think that, you know, with respect to that issue

21   alone, you know, we have relevant ESI from after the federal

22   circuit ruled.

23         Second, you know, the infringement contentions that

24   they served deal with something called fax-to-fax.  So, they've

25   sort of changed -- sort of changed the story from where we were

1  originally and they've said that we have sort of an antiquated

2  fax-to-fax system in our operations.  And the concern there is

3  that they licensed these patents from -- they licensed our

4  technology in the year 2000.  And, so, we think that the decision

5  to change the story, to charge us with fax-to-fax infringement,

6  which happened sometime in 2010 or 2011, you know, is going to be

7  relevant to our exceptional case argument.

8          And, then, separate and apart from the patent side are

9  the Handgard claims which the Court has upheld.  And with respect

10  to those, you know, there's been a lot of acquisitions.  You

11  know, one of the key issues in our case is the market share that

12  j2 has, market power.  They've made two of the largest

13  acquisitions in the market in 2010.  Both of those were

14  defendants on these patents.  And, so, I think it goes to sort of

15  the scheme of monopolizing the market.

16          And, finally, you know, I think that there's also this

17  aspect of the counterclaim that the scheme is ongoing where the

18  patents are -- they've leveraged other patents that they own to

19  sue IGC and other competitors in the market in order to

20  monopolize.  And IGC was actually just sued, and I think that's

21  what the Court was getting at initially, that j2 filed a new

22  patent infringement lawsuit against us on some of their own

23  patents in the Central District of California.

24          And, so I think that, you know, when we look at all of

25  these -- you know, these things together, certainly it meets the

ELISE SMITH EVANS, RMR, CRR

1    relevance standard.  And, so, without any way to actually

2    evaluate j2's burden, because they won't even collect the data,

3    they haven't really articulated what the burden of that is.

4    Really, all that entails is having their IT department image a

5    hard drive and then run IGC's proposed search terms to determine

6    what that burden is.

7         So, I think that when you look at a lot of these other

8    issues -- and I'll just note finally that, you know, this is

9    really just j2's position on the merits that they, you know,

10   stopped the licensing and whathave you.  We've tried to confirm

11   that with them and I don't think that, you know, they've made any

12   representations to that effect.  And, you know, I think that

13   there's a lot of concerns there.  One I'll just note is that the

14   Comodo case, which they complain about as a search term, you

15   know, they say that they weren't -- that they never sued Comodo

16   for infringement.  But what we've been (unintelligible) is that

17   they filed a lawsuit in this court, case number 2007-cv-489

18   against Comodo.  So, I think that there's definitely some

19   concerns with the relative burden.

20        And, so, for those reasons I think that they should be

21   ordered to collect the post-2009 at least ESI.

22        THE COURT:  Well, what I'm just -- and I'm sorry.  Just

23   having walked out of a sentencing hearing, my -- I may not be

24   as -- functioning on as many wheels as I need to here.  But

25   I'm -- tell me specifically, you know, what this means.  And --

1  if I were having to do the search that you're asking for, what --

2  what is the specific items that you are looking for, what are the

3  search terms that you're asking for, and -- so that I can

4  understand the argument of burdensomeness or not.

5        MR. HEISER:  Well, that's just the thing, Your Honor,

6  is if we don't have to evaluate what the burden is because j2

7  won't tell us the number of search hits.  They won't collect the

8  data so we can make that determination.

9        MR. ENGLAND:  Your Honor, this is Brian England.  Maybe

10  it would be useful for me to jump in here for just a second.

11        THE COURT:  All right.  Go ahead.

12        MR. ENGLAND:  The first thing is just a quick point of

13  clarification.  Mr. Heiser is correct that j2 did acquire Venali

14  and Protus.  However, neither one of those companies were

15  defendants in lawsuits alleging these patents at the time of the

16  acquisitions.  In fact, the Protus case had been dismissed years

17  before.  And the Venali case is the case in which the federal

18  circuit ruled on the construction of these patents.  So, that

19  case had also been taken care of significant amount of time

20  before the acquisitions.  And that's our point about this -- this

21  having stopped.

22        Second of all, as to the burden, this is a large number

23  of custodians and they are proposing -- their search term list, I

24  believe, is approximately 200 search terms long.  So, there is

25  a -- it's not just one hard drive to get.  It's a lot of hard

1  drives.  It's very expensive to do that.  And it does impose a

2  large burden.  And, again, given the relevance of the -- the low

3  relevance that these documents would have to a scheme, as they

4  call it a quote-unquote scheme, that ended by the end of 2009.

5          THE COURT:  Why wouldn't 2010 at very minimum be a more

6  appropriate date?  When was the decision of the federal circuit?

7          MR. ENGLAND:  January 2010.  I don't have it in front

8  of me, but I believe that's the date.

9          MR. HEISER:  Your Honor, the concern there -- and,

10 again, this idea that Protus and the Venali acquisition, that's

11 just j2's position on the merits.  It doesn't have anything to do

12 with whether we should be entitled to discovery.  You know, they

13 have to articulate to the Court a specific burden, like IGC is

14 asking them to review millions of documents, but they can't do

15 that because they haven't even collected it.  You know, this idea

16 that there's a large number of custodians is important, too,

17 because, you know, we don't even -- we don't even have an

18 agreement.  We can't even get them to really articulate to us,

19 you know, a final number of custodians that we're talking about.

20          We are absolutely amenable to, you know, working with

21 them to narrow this -- this search, whether it's between time

22 periods or whathave you, but I don't think it's fair to sort of

23 cut us off from discovery just based on j2's position that the

24 Protus and the Venali, for example, acquisitions didn't have

25 anything to do with them being sued.  That's our theory of the

1    case was that they were sued on these patents and then they were

2    sued on other patents.  And that's what's happening to us right

3    now.

4              And, so, I just -- I just can't get past -- even if we

5    assume a burden on j2, it was a publicly traded company.  And IGC

6    has five employees and it's a tiny company.  Even if we assume

7    that, you know, I still don't think that changes the fact that,

8    you know, it's relevant to our theory of the case.

9              THE COURT:  Well, let's talk a little bit about the

10   other dispute which seems to be centrally connected to this,

11   which is just about the claims themselves, I guess.  Is that

12   right?  All right.

13             UNIDENTIFIED COUNSEL:  You mean --

14             THE COURT:  I'm sorry.  You're just breaking up.  Just

15   one moment.

16             What -- let me get a better understanding as to why

17   Catch Curve won't provide information as to other companies it

18   may have had contact with regarding claims of patent

19   infringement.

20             MR. ENGLAND:  Well, this is Brian England, Your Honor.

21             I'm not sure I understand your question because I don't

22   think that's what we've said.  What we've said was we objected to

23   including companies on the search terms that are not even

24   remotely involved with the fax space in any way; for example, 29

25   of those companies that are not -- not related or participating

 1  in the fax market in any way.  And, so, we think that including

 2  those in the search terms and in the expanded set of data to be

 3  collected will produce a huge number of hits and is a very

 4  burdensome thing, when there has yet to have been an articulation

 5  that I'm aware of as to how companies that are not even in this

 6  space could be relevant, which is the first step to justifying

 7  the discovery.

 8           MR. HEISER:  Your Honor, this is Jim Heiser.

 9           I mean, again, we have the same situation where we're

10  speculating about whether there's a burden for j2.  What I would

11  propose is on the search terms, which is what we've always been

12  amenable to doing, that j2 collect the data.  And, then, if what

13  Mr. England is saying plays out -- I mean, part of the issue,

14  too, is that, you know, we have to define who was in the relevant

15  market and who is not.  And that's something that we're going to

16  work with with expert witnesses and try to make a determination

17  based on the information that we get in discovery whether they

18  should be included or excluded.  We know that these are companies

19  that were acquired by j2, and we have to make a determination in

20  part because j2 might assert to us that these should be included

21  and that they changed the relevant market or changed j2's share

22  of that market.

23           So, I mean, again, we're evaluating this in a vacuum.

24  But I think that, you know, going forward with respect to search

25  terms, you know, we can always discuss that or discuss narrowing

1    those in a way -- and I should point out, Your Honor, that we've

2    basically agreed to everything that j2 has asked of us so far,

3    you know, from our standpoint.  And, you know, I just think that,

4    you know, when we talk about relative burden, you know, I feel

5    like we can get past the search terms dispute if we can just not

6    evaluate these things in a vacuum.  And -- I mean, this is my

7    first time really having to fight about search terms in this

8    manner.  You know, I feel like, you know, we -- there's just --

9    there just can't be enough of a showing of a burden until the

10   data is actually collected.

11         MR. ENGLAND:  Your Honor, this is Brian England again.

12         If I could very briefly respond, because I think it's

13   not quite wholly accurate to say that it's in a vacuum, and I'll

14   be happy to tell the Court why.  As we have made clear numerous

15   times in filings with the Court, j2 has in fact already litigated

16   these claims multiple times here in the Central District of

17   California.  So, we are well aware of what the volume of

18   documents and the burden would be.  In fact, we have been

19   prepared since right after we got the document requests -- I

20   believe there's about 90 of them approximately from IGC -- to

21   produce almost a million pages of documents that were already

22   produced in the identical litigation here.  So, we have a very

23   good sense as to what the volume was.  And of those, that's a

24   subset of the documents that were collected and reviewed.

25         So, the burden here is in fact enormous.  It is not a

1  small -- this is not just a small universe of documents.  We're

2  not talking about one custodian with one hard drive.  The

3  responsive documents in the identical litigation were

4  approximately a million pages of responsive documents.  So, it's

5  not quite clear as -- or fair to say it's in a vacuum.

6          We've presented all of that information.  We're

7  prepared to produce all of that information immediately, and

8  which would help get us a long ways down the road where we could

9  then determine whether or not there's any relevance to these

10 other documents, which again we submit there is not.

11         MR. HEISER:  Your Honor, just real briefly.  Jim

12 Heiser.

13         Again, that's the whole purpose of the protocol.  That

14 was where we started in January when we tried to broach this

15 subject was to prevent this scenario where we had a million

16 documents from another case.  We're trying to propose search

17 terms.  So, on the one hand j2 says it's too burdensome to run

18 our search terms, you know, and then on the other we get this

19 argument that there's this cache of documents that we can just

20 turn over.  I just don't think it -- I think that the thing to

21 do, the fairest -- the most fairest thing to do is to order j2 to

22 collect the 2009 data, allow the parties to confer about the

23 search terms, and, you know, see if we even have a real dispute

24 here.

25         THE COURT:  All right.  I missed something there, then.

ELISE SMITH EVANS, RMR, CRR

1   You say order -- aren't they already going to be producing the

2   2009 data?

3           MR. HEISER:  The pre -- as we understand it, the

4   pre-2009 data was collected from another case where they went

5   through this with different search terms.  So, that production,

6   it could be over-inclusive and under-inclusive because, you know,

7   their position is that, you know, it's the same case.  But it's

8   really not the same case.

9           And, you know, we have a lot of separate issues in this

10  case with respect to changes that have happened in the market

11  after 2009.  We have the fact that they basically licensed our

12  software.  I feel like, you know, that's -- that's the reason why

13  we do an ESI protocol is we come to a determination that, you

14  know -- we come to a determination that -- you know, what the

15  appropriate scope is for this case.

16          MR. ENGLAND:  Your Honor, this is Brian England.

17          Your question was correct.  Our dates include the 2009

18  dates, that's up through the end of 2009.

19          THE COURT:  So, is there -- am I -- is there a dispute

20  as to whether you're going to do a new run or not?  Are you

21  saying you won't do a new run, Mr. England?

22          MR. ENGLAND:  Well, if you -- what you mean by new run,

23  the dispute is that we believe that the data through -- up

24  through the end of 2009 is what contains all of the potentially

25  relevant stuff.  We -- what we are opposing is being forced to go

1  pull 2011 and '12 and '10 materials on the grounds that that is

2  burdensome and there's no relevance shown to that.  We have the

3  documents up to 2009, and prior to the dispute that arose about

4  whether or not that was -- was sufficient, we were prepared to

5  produce almost a million pages of documents immediately.

6          THE COURT:  Well, I just -- what I heard Mr. Heiser

7  saying was that you wanted to give him the documents or -- and

8  the -- the results of the search from another case, but you were

9  not willing to do it for their search terms, which doesn't -- I'm

10 not sure that's really what he intended to say, but that's what I

11 heard.

12         Mr. Heiser?

13         MR. HEISER:  That's correct, Your Honor.  It -- you

14 know, it could be over-inclusive and under-inclusive.  And, you

15 know, we don't want a lot of stuff that we don't think is

16 relevant to our case, but at the same time, we want to capture

17 things that are relevant to our case and that, you know, every

18 piece of litigation should be treated differently.  And we've

19 offered again to work with them on the search terms to try to

20 limit the burden, you know, of (unintelligible) going to have to

21 redo with respect to the -- the prior production.  But at the

22 same time, we think that we're entitled to a protocol for this

23 case that covers through that post-2009 series.

24         MR. ENGLAND:  Your Honor, I think -- this is Brian

25 England again.

1          I think maybe I misspoke and need to clarify.  We have

2    agreed to run their -- the new agreed-upon search terms through

3    the old database, make sure that it collects everything that it

4    would.  The -- I will represent to the Court that the document

5    requests from the two cases are almost identical and are hugely

6    overlapping, if they're not perfectly identical.  But we are

7    willing to run the new IGC search terms over our date --

8    collective database just to make sure that no potentially

9    responsive document was not previously produced.  And we remain

10   willing to do that.

11         What I'm saying is that in some ways it's not useful to

12   do that because it is already going to be a subset of what we're

13   already prepared to produce to them.  But we are willing to do

14   that and limit the production to take out documents we would have

15   otherwise produced that they now say would not be hit by their

16   search terms.  We are happy to do that.  The dispute really

17   focuses on the 2010, '11, and now '12 data.

18         THE COURT:  Well, as I understood the submissions, your

19   position was -- meaning Catch Curve's position, was that you had

20   not brought any claims against any other entities.  Why -- if

21   that's so, why would you not certify that and, I would say, not

22   just have that as to litigation, but any demand letters?

23         MR. ENGLAND:  Your Honor, I am happy to confirm with

24   them, and I'll even do a double-check to make sure.  But I am

25   unaware of any lawsuit brought after the federal court -- after

1   the federal circuit ruled on these patents, any lawsuit that was

2   brought enforcing these patents.  And I should know about it if

3   there was one, and I'm unaware of it.  But I'm happy to do

4   another confirmation of that and to provide Mr. Schneider and Mr.

5   Heiser with written confirmation of that fact.

6           MR. HEISER:  Your Honor, it's not just the filing of a

7   lawsuit, but rather targeting people with demand letters.  And I

8   just want to go back again, you know, to our theory of the case,

9   which is that it's not just the AudioFAX patents, but leveraging

10   patents such as how we've been sued in California now on a second

11   set of patents after -- like, for example, a lot of these folks

12   settled in the Georgia litigation and then they were sued again

13   in sort of this wave.  And that's what happened to Venali and

14   Protus, which is that they were sued and they either settled or

15   took a license or fought for a long time.  And, then, they get

16   out of the case in Georgia on the AudioFAX patents, which are the

17   patents-in-suit here, and then they're hit again on other patents

18   out in California or in some other venue.  And that's -- and

19   that's where I think the distinction is.

20           But specifically, you know, it's not just litigation,

21   but, you know, whether they targeted, they sent demand letters,

22   they threatened, because this litigation has all been a public

23   record.  They see what --

24           THE COURT:  Yeah.  I understand that, and I didn't --

25   and that's what precisely I said, why couldn't they verify

1    exactly who they had sent demand letters to.  Are you wanting

2    more than demand letters?

3           MR. HEISER:  Right, Your Honor, because I think that,

4    you know, again we're looking at this in a vacuum.  Without

5    knowing what the search terms -- what the number of hits are, we

6    don't know what relevant ESI is.  So, we've clearly agreed to

7    search parameters that we think are going to return putatively

8    relevant documents.  If there are a lot of those for post-2009,

9    you know, again, it's -- it just shows that there's more there

10   than what we're looking for.

11          THE COURT:  All right.  Try to be very concrete with

12   me.  Okay?  Give me an example of what you're saying here,

13   because I'm -- I'm struggling.  And I -- I understand -- and I,

14   relatively speaking, understand your theory of the case.  But I

15   just -- what I don't understand is why we -- why couldn't there

16   be just a general discovery request, independent of the ESI

17   protocol, requesting Catch Curve to identify every entity with

18   which it has made a -- to which it has made a -- any form of

19   demand in connection with any -- whatever the patents are that

20   you are concerned with that fit your theory of the case, and then

21   go from there.

22          MR. HEISER:  Well, Judge, I don't think that would

23   capture what is relevant, Your Honor.

24          THE COURT:  All right.  Well, then, that's why I'm

25   trying to get you -- I realize I'm missing something, so just

1   concretely kind of take me through that and explain to me what

2   would produce that type of information.

3           MR. HEISER:  Well, presumably, j2's management have had

4   discussions about how to formulate litigation strategy against

5   IGC.  They have licensing agents that go out and target people to

6   determine whether they're going to be acquired or whether they're

7   going to take a license with the patent.  You know, all of

8   that -- and I'm not just talking about on the AudioFAX patents,

9   but on the j2 patents and the Bobo patents, there's also what led

10  up to -- again, I don't want to lose sight of the pending

11  infringement portion of the case.  You know, we're still charged

12  with patent infringement on these cases -- on these patents.

13  And, so, we're still entitled to discovery in terms of what led

14  up to the decision to charge us with this new fax-to-fax theory

15  in 2011, you know, why we had to devote resources to patents that

16  aren't patents-in-suit.

17          All of that electronic discovery, the e-mails and other

18  evidence, you know, I think it's -- it goes to -- it goes to

19  support our exceptional case arguments and it goes to support our

20  antitrust claims.  And, so, when we talk about relevance, I

21  mean -- I mean, it's not like we have to prove our case in

22  this -- in this discovery motion.  I think it's -- you know, just

23  from what we've discussed, I mean, you can see we have a dispute

24  here.

25          THE COURT:  No, I understand --

1          MR. ENGLAND:  Your Honor, this is Brian England.  If I

2     might briefly interject.

3          THE COURT:  Yes.

4          MR. ENGLAND:  When I said I would identify everyone who

5     had been sued on the Catch Curve patents, I meant to include your

6     proviso that sued or sent the cease and desist letter of any kind

7     on the Catch Curve patents.  I will do both of those.  I did not

8     mean to inadvertently include those.  I mean, as for the rest of

9     this -- of the description that Mr. Heiser just gave you, the

10    overwhelming majority of the types of document that he has -- I

11    hypothesize might exist would all be privileged anyway and

12    wouldn't be producible or discoverable in any event.  Certainly

13    all of the discussions about j2's management and their lawyers

14    and their agents about how to license the patents.

15         Now, again -- but to be clear, there are no such

16    communications with respect to the AudioFAX patents post-2009

17    because the program terminated with the finding by the federal

18    circuit.

19         MR. HEISER:  I mean, we're still subject to litigation

20    on this, Your Honor.  I don't think you can accept their

21    representation that there's no third-party communications.  And

22    we've gone -- we're so far beyond, you know, a relevance

23    discussion.

24         THE COURT:  All right.  Well, I'm going to go offline

25    for a minute or two and look at your letter again.  So, just be

```
 1   aware that if I can -- when I go offline, I can still hear you,
 2   so don't have any private conversations --
 3              MR. HEISER:  Thank you, Your Honor.
 4              THE COURT:  -- that you wouldn't want me to hear.
 5   Okay?
 6              MR. ENGLAND:  Thank you, Your Honor.
 7              (A pause in the proceeding was had.)
 8              THE COURT:  Mr. England?
 9              MR. ENGLAND:  Yes.
10              THE COURT:  Why wouldn't it be relevant to look at
11   post-2009 conduct since j2 has filed this new patent infringement
12   lawsuit in the Central District of California?
13              MR. ENGLAND:  Well, it might be relevant, Your Honor,
14   in that case there, but the case that was just filed here in the
15   Central District of California in approximately the last two
16   weeks could not have been the basis on which IGC has been
17   asserting its monopolization claims for the past four years.  So,
18   it would not be relevant in the case in Georgia.  Now, maybe at
19   some point those cases will converge, but -- sorry.  I think
20   someone started to --
21              THE COURT:  Let me --
22              MR. HEISER:  I'm sorry.
23              THE COURT:  Go ahead, Mr. Heiser.  I was just trying to
24   explain that if -- we can't talk over each other because then no
25   one can -- no one's voice comes through, so just be careful on
```

1  that.  Go ahead, Mr. Heiser.

2           MR. HEISER:  Sorry, Brian.  Were you finished?

3           MR. ENGLAND:  I believe so.  Go ahead.

4           MR. HEISER:  Okay.  Your Honor, I would just point out

5  that, you know, that's not actually a correct statement.  We were

6  targeted on these patents in 2002, 2003, and -- but to your

7  substantive point, I mean, I think that's the issue.  If they're

8  willing to produce the -- this post-2009 information in the other

9  case, there's really no -- no net burden to j2 to produce it now.

10          MR. ENGLAND:  Your Honor, this is Brian England again.

11          Two quick things.  First, I don't -- I'm not sure what

12 they mean by targeted by these patents in 2002, but these patents

13 were -- many of them were in re-exam, the j2 patents, during that

14 time and there was no active litigation over them while they were

15 stayed pending re-exam.

16          And, second, there may or may not be relevant to these

17 documents in the -- in the j2 cases.  It depends entirely on what

18 claims IGC brings.  They have not yet responded to the complaint,

19 so any speculation on that is really just speculation at this

20 point.  We have not -- we don't know what those would be.  But as

21 it pertains to this lawsuit, that's why we believe that post --

22 all 2010 forward, post-2009 documents, are irrelevant to the

23 allegations regarding a alleged monopolization scheme that ended

24 in 2009.

25          MR. HEISER:  And, finally, Your Honor, this is just --

1    that's just -- and I don't want to repeat anything I've said

2    previously, but the j2 patents and the Bobo patents have always

3    been an issue in this case.  It's paragraph 90 -- and 89 and 90

4    in our counterclaim.  It goes back to what I said before about

5    the waves of litigation and how that is part of the scheme to

6    monopolize.  And I feel like from a discovery standpoint and a

7    relevance standpoint, you know, we may disagree on the merits,

8    and we definitely do, but from a discovery standpoint, I think

9    that that establishes that at least it's relevant.

10        THE COURT:  Okay.  What I want to do at this juncture

11   is this.  First of all, Catch Curve should verify what companies

12   they have filed any type of patent litigation against from 2009

13   forward.  And if you haven't filed any, that's fine.  If you have

14   some -- but this should not be a difficult thing.  And I don't

15   mean just filing actual lawsuits, but demand letters.  I am sure

16   that that exists.  And, so, let's understand what the universe

17   looks like here.

18        And just -- and if there's litigation as well that

19   ensued, then that should be indicated on your little -- on the

20   chart.  And that should -- counsel should submit that and

21   consider it a -- something that has been properly verified by an

22   individual in the -- in the company and represents an honest and

23   full search.

24        I'm finding the letters at this juncture, other than --

25   not sufficient to help me really make a final decision here.  So,

1    I think it would be probably helpful if I could get a -- a

2    coordinated admission that -- where IGC would state the issue.

3    Please try to provide me a little more concrete understanding of

4    your theory of why something is -- I know you think it's a done

5    deal and clear why it's relevant, but how it spins out, how it's

6    relevant, how it would -- why it's essential, and just give me a

7    few concrete examples, because I'm not living and breathing this

8    case like you all are.  And, so, some concrete examples would be

9    very helpful.  And, then, I would like, following that, the --

10   the response from Catch Curve.

11            This can be a 20 page document.  Ten pages of it can be

12   from each of you.  Do you think that you can get across what you

13   need to in that page -- amount of pages?

14            MR. ENGLAND:  I'm sorry, Your Honor.  This is Brian

15   England.  You broke up right as you said that.  I couldn't hear

16   how many pages you said.

17            THE COURT:  Twenty.  Ten pages for each side.  Do you

18   think you can get across what you need to?

19            MR. ENGLAND:  From our position, yes, we can.

20            MR. HEISER:  Certainly, Your Honor.

21            THE COURT:  Okay.  All right.  And that way I can sort

22   of have each position together and a concrete example.  And if

23   you end up needing a few more pages, let us know, but I --

24   hopefully that will do it.

25            Can the names of the companies be provided within 10

1  days?

2          MR. ENGLAND:  This is Brian England.

3          Yes, Your Honor.  Within 10 days we will provide a list

4  as you requested.

5          THE COURT:  And if that helps, once it's provided, to

6  resolve any portion of this, obviously let us know.  So, why

7  don't you -- all right.  If you could get that to us on -- on

8  Thursday the 17th, and the -- which makes the other -- the

9  listing of the companies due -- all right.  Well, let me -- then,

10  why don't you have the -- just simply let's make it then due on

11  Friday instead, Friday the 11th, and then the -- that makes a

12  more sensible schedule.

13          MR. ENGLAND:  Your Honor, this is Brian England.

14          I'm sorry.  I'm a little confused.  You want us to

15  provide the list of the names to them by the 11th?

16          THE COURT:  Right.

17          MR. ENGLAND:  And, then, they'll provide us with their

18  portion of the joint submission and then we'll respond to that?

19          THE COURT:  No.  I'm hoping that you can collaborate on

20  it so that you just start working on the joint -- that they

21  should -- you can do internally whatever schedule you want, but

22  I'm hoping to have in my hands the joint submission by the 17th.

23          MR. ENGLAND:  Okay.  We'll work with the parties to

24  make sure that that's done.

25          THE COURT:  Okay.

1          MR. ENGLAND:  That's not a problem.

2          MR. POWELL:  And, Your Honor, this is Mike Powell for

3   IGC local counsel.

4          On the 10 pages, do you want that in the form of

5   letters -- the way we've done it now is single spaced -- or do

6   you want it more in a pleading form?

7          THE COURT:  Well, I'd like you to file it on the

8   record, and I'm -- so I think that you have to have it in a

9   pleading form.  But if -- I'll give you permission, if you want

10  to use a 12 point rather than 13 point so that you don't have any

11  problems with space.

12         MR. ENGLAND:  And, Your Honor, this is Brian England.

13         I understood you to mean to say that the parties -- you

14  wanted the parties to do a joint submission where IGC would set

15  out its position and then in the same document --

16         THE COURT:  That's right.

17         MR. ENGLAND:  -- Catch Curve would do that.

18         THE COURT:  That's right.

19         MR. ENGLAND:  Okay.

20         THE COURT:  So I have both of your positions together.

21         MR. ENGLAND:  And did you mean 5 pages each for a total

22  of 10 or 10 pages each?

23         THE COURT:  No.  I meant each of you will have 10 pages

24  within a 20 page document.

25         MR. ENGLAND:  All right.  My apologies for the --

1    THE COURT:  No, that's all right.  And I realize that's

2 very rough.  And, you know -- let me put it this way, that should

3 be the objective.  If you go over a little bit, that's fine.  But

4 that should be the objective.  Okay?

5    MR. ENGLAND:  Thank you.  I don't think it will be a

6 problem.

7    THE COURT:  Because I'm trying not to drown in this,

8 but I am also trying to get a little more concrete sense of how

9 this is playing out than I could get from the submissions so far.

10 And I'll keep the submissions as well to help me understand where

11 you're at.  All right?

12    MR. ENGLAND:  Okay.

13    THE COURT:  Thank you very much.

14    (End of proceedings.)

15        *****

16

17

18

19

20

21

22

23

24

25

1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF GEORGIA

3   <u>CERTIFICATE OF REPORTER</u>

4

5

6           I do hereby certify that the foregoing pages are a true

7   and correct transcript of the proceedings taken down by me in the

8   case aforesaid.

9           This the 7th day of May, 2012.

10

11

12

13                                    _____
                                      ELISE SMITH EVANS, RMR, CRR
14                                    OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25