# EXHIBIT 11

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10

11  CATCH CURVE, INC.,              )  Case No. CV 05-04820 DDP (AJWx)
                                    )
12                  Plaintiff,      )  **ORDER GRANTING CATCH CURVE, INC.**
                                    )  **AND J2 GLOBAL'S MOTION FOR**
13       v.                         )  **PARTIAL SUMMARY JUDGMENT**
                                    )
14  VENALI, INC.,                   )  [Motion for Partial Summary
                                    )  Judgment filed on August 22,
15                  Defendant.      )  2008; Motion to Strike filed on
    _____ )  September 15, 2008]
16

17       This matter comes before the Court on Catch Curve, Inc. and j2

18  Global's Motion for Summary Judgment. Catch Curve, the patent

19  Plaintiff and antitrust counterclaim Defendant in this action,

20  moves for summary judgment on Counts Two and Three of Venali,

21  Inc.'s Second Amended Counterclaims. Counts Two and Three are the

22  final claims remaining in this case. In conjunction with its Motion

23  for Summary Judgment, Catch Curve has filed a <u>Daubert</u> motion to

24  strike or exclude testimony from Venali's expert, Dr. Richard

25  Smith.

26       After reviewing the materials submitted by the parties,

27  hearing oral argument, and considering the parties' contentions,

28  the Court grants the Motion for Partial Summary Judgment. The Court

finds that it is unnecessary to reach the Motion to Strike.

**I.     BACKGROUND**

On July 1, 2005, Plaintiff Catch Curve, Inc. ("Catch Curve") brought this suit against Defendant Venali, Inc. ("Venali") alleging patent infringement.  Catch Curve is the owner by assignment of the following patents:  U.S. Patent No. 4,994,926, U.S. Patent No. 5,291,302,  U.S. Patent No. 5,459,584, U.S. Patent No. 6,643,034, and U.S. Patent No. 6,785,021.  These patents are all entitled "Facsimile Telecommunications System and Method."

The patents disclose a fax communications system which was designed to improve security and save redial efforts by transmitting facsimile machines when the intended destination fax machine is busy or otherwise unavailable. The technology accomplishes this by providing a "store and forward facility," which receives faxes transmitted by an originating fax machine, stores them, and forwards or retransmits these messages to their intended destinations at a time when the receiving machine is available. Venali provides a fax-to-email service that Catch Curve argued infringed its patents.

Prior to this lawsuit, Catch Curve had licensed the patents-in-suit to a number of fax-to-email companies. Although Catch Curve obtained some of its licenses without litigation, others represented settlements as a result of patent infringement lawsuits. No previous lawsuits on the patents-in-suit had reached claim construction.

Venali asserted, inter alia, defenses of noninfringement and invalidity. Venali also asserted counterclaims against Catch Curve

2

1 and a third party complaint against j2 Global Communications, Catch
2 Curve's parent company. On April 30, 2007, this Court issued an
3 Order Granting in Part and Denying in Part Catch Curve's Motion to
4 Dismiss Counts Two through Six and Eight of Venali's counterclaim
5 and third party complaint.[1]  In its Order, the Court determined
6 that Venali's Sherman Act and sham litigation claims should stand
7 pending the claim construction hearing.  The Court dismissed
8 Venali's tying and § 17200 counterclaims with leave to amend.

9       On May 11, 2007, the Court issued its Claim Construction Order
10 for the patents-in-suit. <u>See</u> Docket Entry ("D.E.") 81. The Claim
11 Construction Order primarily adopted Venali's proposed construction
12 of the patents-in-suit. Most notably, the Claim Construction Order
13 found that the patents were limited to traditional fax-to-fax
14 services and did not cover fax-to-email services.

15       After the Court issued the Claim Construction Order, Catch
16 Curve served supplemental responses to interrogatories, increasing
17 the number of claims asserted and asserting infringement under the
18 doctrine of equivalents. In further supplemental responses,
19 however, Catch Curve abandoned most of those claims and narrowed
20 its allegations of infringement to a claim of literal infringement
21 of five claims of a single patent, the '021 Patent. Reserving its
22 right to appeal the Claim Construction Order, Catch Curve conceded
23 that Venali did not infringe the other four patents-in-suit in
24 light of the Claim Construction Order.

25
26
_____

27       [1]On November 30, 2007, this Court issued an Order dismissing
28 Count Eight of Venali's amended counterclaim and third party
complaint.

1      Venali moved for summary judgment of noninfringement on the

2  five claims of the '021 Patent. The Court granted summary judgment

3  of noninfringement in favor of Venali on August 12, 2008.

4      By stipulation, Venali then filed its Second Amended

5  Counterclaim and Third Party Complaint ("SACC").[2] Because of the

6  Court's August 12, 2008 Summary Judgment Order, the only remaining

7  claims in this action are Counts Two and Three of Venali's Second

8  Amended Counterclaim and Third Party Complaint. Those Counts assert

9  monopolization and attempted monopolization in violation of § 2 of

10  the Sherman Act. SACC ¶¶ 61-72. Venali alleges that Catch Curve's

11  infringement suits against its competitors, and against Venali in

12  particular, constitute sham litigation brought as a scheme of

13  willful acquisition or maintenance of monopoly power. SACC ¶¶ 62-

14  64, 68-71. Venali's antitrust claims are based solely on what it

15  claims is Catch Curve's anticompetitive litigation. Id.; Johnson

16  Decl. Ex. 1.

17      In this motion, Catch Curve and j2[3] seek summary judgment

18  against Venali on its antitrust counterclaims. Catch Curve argues,

19  first, that it is protected from liability by Noerr-Pennington

20

---

21      [2]Venali originally filed the SACC by stipulation on August 20,

22  2008. See Docket Nos. 133 & 134. Catch Curve filed this motion for
summary judgment based on the SACC on August 22, 2008. See Docket

23  No. 137. Because of a filing deficiency, the SACC was stricken on
August 27, 2008. See Docket No. 140. With leave from the Court,

24  Venali fixed this deficiency by lodging the SACC on October 3,
2008. See Docket No. 167.

25      The Court considers this Motion for Summary Judgment with
reference to that pleading. Because the parties have submitted

26  their papers on the assumption that the SACC is the operative
pleading, the Court considers this motion properly before it.

27      [3]In discussing the parties' arguments in support of the

28  current motion, the Court refers to Catch Curve and j2 collectively
as "Catch Curve."

1  immunity. Second, Catch Curve argues that, even if the Court denies

2  summary judgment on immunity, Venali does not have evidence to

3  support its substantive antitrust claims. In particular, Catch

4  Curve challenges Venali's market definition, Venali's ability to

5  meet its evidentiary burden as to the effect on competition and

6  antitrust injury, and Venali's ability to meet its evidentiary

7  burden with respect to monopoly power. Concurrently with this

8  motion, the Catch Curve also has moved to exclude the testimony of

9  Venali's expert.

10  **II.  LEGAL STANDARD AND APPLICABLE LAW**

11       A.   <u>Legal Standard for Summary Judgment</u>

12       Summary judgment is appropriate where "the pleadings, the

13  discovery and disclosure materials on file, and any affidavits show

14  that there is no genuine issue as to any material fact and that the

15  movant is entitled to a judgment as a matter of law."

16  Fed. R. Civ. P. 56(c).  All reasonable inferences from the evidence

17  must be drawn in favor of the nonmoving party.  <u>Anderson v. Liberty</u>

18  <u>Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).  A genuine issue exists if

19  "the evidence is such that a reasonable jury could return a verdict

20  for the nonmoving party"; and material facts are those "that might

21  affect the outcome of the suit under the governing law."  <u>Anderson</u>,

22  477 U.S. at 248. A party opposing summary judgment must come

23  forward with specific facts, supported by admissible evidence,

24  showing a genuine issue for trial. Fed. R. Civ. P. 56(e); <u>Brinson</u>

25  <u>v. Linda Rose Joint Venture</u>, 53 F.3d 1044, 1049 (9th Cir. 1995).

26       Summary judgment is warranted if a party "fails to make a

27  showing sufficient to establish the existence of an element

28  essential to that party's case, and on which that party will bear

5

the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). No genuine issue of fact exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

     B.  <u>Applicable Law</u>

The law of two Circuits governs the issues in Catch Curve's motion. In determining whether Catch Curve is protected from suit by <u>Noerr-Pennington</u> immunity, the Court is bound by Federal Circuit law. <u>Nobelpharma AB v. Implant Innovations, Inc.</u>, 141 F.3d 1059, 1067-68 (Fed. Cir. 1998)("[W]hether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is to be decided as a question of Federal Circuit law."). With regard "to issues involving other elements of antitrust law such as relevant market, market power, damages, etc.," however, Ninth Circuit law applies. <u>Id.</u> at 1068.

## III. <u>NOERR-PENNINGTON</u> IMMUNITY

Catch Curve first moves for summary judgment on the basis of the <u>Noer-Pennington</u> doctrine. Under <u>Noer-Pennington</u>, "[t]hose who petition the government for redress are generally immune from antitrust liability." <u>Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.</u>, 508 U.S. 49, 56 (1993)(hereinafter "PRE"); <u>see</u> <u>Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.</u>, 365 U.S. 127 (1961); <u>Mine Workers v. Pennington</u>, 381 U.S. 657 (1965). This protection, which is tied to an individual's First Amendment right to petition, extends to actions by citizens with respect to administrative agencies and courts. <u>California Motor Transport Co. v. Trucking Unlimited</u>, 404 U.S. 508, 510

1 (1972). Immunity does not extend, however to "sham" activities

2 because "'application of the Sherman Act would be justified' when

3 petitioning activity, 'ostensibly directed toward influencing

4 governmental action, is a mere sham to cover ... an attempt to

5 interfere directly with the business relationships of a

6 competitor.'" PRE, 508 U.S. at 56 (quoting Noerr, 365 U.S. at

7 144)(alteration in original).

8     A.    Immunity Under the PRE Standard

9     The Supreme Court set out a two-part definition of "sham"

10 litigation in PRE. At trial, the antitrust plaintiff has the burden

11 of proving that both steps are met. As a threshold matter, the

12 lawsuit must be "objectively baseless in the sense that no

13 reasonable litigant could realistically expect success on the

14 merits." PRE, 508 U.S. at 60. A court makes this objective

15 determination with attention to probable cause: "[t]he existence of

16 probable cause to institute legal proceedings precludes a finding

17 that an antitrust defendant has engaged in sham litigation." Id. at

18 62. Probable cause to institute civil proceedings "requires no more

19 than a reasonable belief that there is a chance that a claim may be

20 held valid upon adjudication." Id. at 62-63 (internal quotation

21 marks and alterations omitted). Although a winning lawsuit is "by

22 definition a reasonable effort at petitioning for redress and

23 therefore not a sham," the Supreme Court has cautioned courts to

24 "resist the understandable temptation to engage in post hoc

25 reasoning by concluding that an ultimately unsuccessful action must

26 have been unreasonable or without foundation." Id. at 61 n.5.

27     If the challenged litigation is objectively meritless, the

28 court may then examine the litigant's subjective motivation. Id. at

7

60. In performing its subjective analysis, the court's focus should be on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor "through the use of the government *process* –– as opposed to the *outcome* of that process –– as an anticompetitive weapon." Id. at 60-61 (quoting Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 380 (1991))(emphasis in original). A court only reaches this second step if the litigation is objectively baseless. Id. at 60.

Because it depends on a probable cause analysis, objective baselessness can be appropriate for a court to determine at summary judgment. "Where ... there is no dispute over the predicate facts of the underlying legal proceeding, a court may decide probable cause as a matter of law." PRE, 508 U.S. at 63; Thermalloy Inc. v. Aavid Eng'g, Inc., 935 F. Supp. 63, 66 (D.N.H. 1996)("Although the subjective prong necessarily requires a fact-intensive examination of the antitrust defendant's motivation, the court, once familiar with the underlying proceedings, may make a probable cause determination under the objective prong as a matter of law."). Cf. FilmTec Corp. v. Hydranautics, 67 F.3d 931, 938 (Fed. Cir. 1995)(looking to litigation history to establish facts for use in determining objective prong).[4] That is not to say, of course, that the antitrust plaintiff cannot establish a genuine issue of material fact by submitting evidence showing that there was no

---

[4]Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240, 1253 (9th Cir. 1982), decided a decade prior to PRE, is not to the contrary. The court's statement that "[w]hether something is a genuine effort to influence government action, or a mere sham, is a question of fact" referred to the immunity inquiry as a whole. Here, the Court looks only to objective baselessness, an inquiry more suited to disposition on summary judgment than the subjective prong of PRE. Cf. Thermalloy, 935 F. Supp. at 66.

1  probable cause. See <u>Breakdown Servs., Ltd. v. Now Casting, Inc.</u>,
2  550 F. Supp. 2d 1123, 1140-41 (C.D. Cal. 2007); <u>Hoffman-La Roche</u>
3  <u>Inc. v. Genpharm Inc.</u>, 50 F. Supp. 2d 367, 380 (D.N.J. 1999).

4       Although Catch Curve's patent infringement action was not
5  successful, the Supreme Court has cautioned against a post hoc
6  analysis. <u>PRE</u>, 508 U.S. at 61 n.5; <u>accord</u> <u>Breakdown Servs.</u>, 550 F.
7  Supp. 2d at 1141 ("[B]ecause the sham litigation may have a
8  chilling effect on those who in good faith seek redress in the
9  courts, [the exception] must be applied with caution."). Indeed, in
10 the patent context, this objective baselessness prong poses an
11 important hurdle. The Federal Circuit, whose law binds this Court
12 in this inquiry, has emphasized that courts should be particularly
13 careful when analyzing the objective prong in suits brought by
14 patent holders: "[n]either the bringing of an unsuccessful suit to
15 enforce patent rights, nor the effort to enforce a patent that
16 falls to invalidity, subjects the suitor to antitrust liability."
17 <u>C.R. Bard, Inc. v. M3 Systems, Inc.</u>, 157 F.3d 1340, 1369 (Fed Cir.
18 1998). Immunity concerns are especially important in light of the
19 property right granted by a patent, a right intertwined here with
20 the right to petition underlying the <u>Noerr-Pennington</u> doctrine.
21 "Since a principal purpose of the patent system is to provide
22 innovators with a property right upon which investment and other
23 commercial commitments can be made, absent the <u>PRE</u> criteria the
24 patentee must have the right of enforcement of a duly granted
25 patent, unencumbered by punitive consequences should the patent's
26 validity or infringement not survive litigation." <u>Id.</u> While these
27 principles do not undermine the rule that objectively baseless
28 litigation may not be protected by immunity, <u>see</u> <u>PRE</u>, 508 U.S. at

1    60, they do highlight the care with which the Court must approach
2    this prong.

3        The objective baselessness prong ends the <u>PRE</u> inquiry in this
4    case. While the Court's Claim Construction Order adopted Venali's
5    construction of the patent, the Court finds that the institution of
6    litigation prior to that Claim Construction was based on probable
7    cause, and therefore was not objectively baseless. Although Catch
8    Curve had filed a number of other patent infringement cases on the
9    basis of these patents, the patents-in-suit had not been construed
10   until this Court issued its Claim Construction Order.

11       The Court has reviewed its Claim Construction Order in
12   conjunction with this motion.[5] Without restating the Order in its
13   entirety here, the Court notes that construction of the claim terms
14   required an intricate analysis. <u>See</u> Claim Construction Order at 10-
15   17. While the Court believes its constructions properly resolve the
16   disputes over the claim terms, the Court did not consider Catch
17   Curve's contrary constructions to be frivolous when it issued the
18   Claim Construction Order, nor does it consider them to be
19   objectively baseless now. During the claim construction process,
20   Catch Curve offered reasonable arguments in support of its proposed
21   constructions that were based on intrinsic evidence, claim
22   construction principles, and expert testimony. It is not uncommon
23   for patent holders to aggressively assert that their patents cover
24   newer technology, such as the fax-to-email systems at issue here.

25       Moreover, the settlements and licenses that resulted from the
26   prior disputes -- including the licenses to Internet companies that

27   ─────────────
28       [5]The Claim Construction Order, issued on May 11, 2007, is
     Docket Entry 81.

10

1  AudioFax had before j2 purchased the patents -- support the Court's
2  finding that Catch Curve had at least a "reasonable belief that
3  there [was] a chance [its] claim [would] be held valid upon
4  adjudication." PRE, 508 U.S. at 62-63. Accordingly, the undisputed
5  facts show Catch Curve's patent infringement actions, though
6  unsuccessful, were not "objectively baseless." Cf. Honeywell Int'l
7  Inc. v. Universal Avionics Systems Corp., 488 F.3d 982, 1000-01
8  (Fed. Cir. 2007) (affirming District Court determination that
9  "while summary judgment of noninfringement and anticipation was
10 ultimately grounded, a reasonable litigant could have expected
11 success on the merits of Honeywell's claim for patent infringement
12 against those parties," where the District Court supported its
13 decision with other settlements, licensing, and a favorable expert
14 report on infringement)(citing 343 F. Supp. 2d 272, 326 (D. Del.
15 2004)).

16     The Court finds that this case's record, particularly those
17 documents filed in preparation for and considered during claim
18 construction, establishes as a matter of law that there was
19 probable cause. See PRE, 508 U.S. at 63. Because the Court finds as
20 a matter of law that the Catch Curve's patent infringement suit
21 against Venali was not objectively baseless, Venali cannot pierce
22 Noerr-Pennington immunity on the basis of the test set forth in
23 PRE.

24     B.   The USS-POSCO Approach

25     Catch Curve argues that the Court's inquiry should end with
26 its PRE analysis. Venali urges the Court to consider whether it has
27 raised a genuine issue of material fact as to Noerr-Pennington
28 immunity based not on PRE but rather on the approach adopted by the

11

1  Ninth Circuit in <u>USS-POSCO Industries v. Contra Costa County</u>

2  <u>Building & Construction Trades Council</u>, 31 F.3d 800 (9th Cir.

3  1994)(hereinafter "USS-POSCO").

4       In <u>USS-POSCO</u>, the Ninth Circuit considered whether, in the

5  wake of <u>PRE</u>, litigation that may not be objectively baseless can

6  still constitute sham litigation sufficient to eliminate <u>Noerr-</u>

7  <u>Pennington</u> immunity. <u>Id.</u> at 810. In particular, the Court

8  considered whether <u>PRE</u> had "effectively overrule[d]" the Supreme

9  Court's earlier decision in <u>California Motor Transport Co. v.</u>

10  <u>Trucking Unlimited</u>, 404 U.S. 508 (1972). In <u>California Motor</u>

11  <u>Transport</u>, the Supreme Court held that the allegations "that

12  petitioners 'instituted the proceedings and actions ... with or

13  without probable cause, and regardless of the merits of the

14  cases,'" <u>id.</u> at 512, were "[o]n their face ... within the 'sham'

15  exception," <u>id.</u> at 516. <u>See</u> <u>USS-POSCO</u>, 31 F.3d at 810 (describing

16  holding in <u>California Motor Transport</u>). The <u>USS-POSCO</u> court was

17  "not persuaded" that <u>PRE</u>'s two-part test overruled <u>California Motor</u>

18  <u>Transport</u>. 31 F.3d at 810. Instead, the Ninth Circuit read the

19  cases as applying to different situations: <u>PRE</u> provides a strict

20  two-step analysis to assess whether a single action constitutes

21  sham litigation; <u>California Motor Transport</u>, on the other hand,

22  "deals with the case where the defendant is accused of bringing a

23  whole series of legal proceedings." <u>Id.</u> at 811. The Court held that

24  "[w]hen dealing with a series of lawsuits, the question is not

25  whether any one of them has merit – some may turn out to – but

26  whether they are brought pursuant to a policy of starting legal

27  proceedings without regard to the merits and for the purpose of

28  injuring a market rival." <u>Id.</u>

Under the test it announced, however, the court found that the antitrust claims in <u>USS-POSCO</u> could not survive summary judgment. <u>Id.</u> Antitrust plaintiff BE & K was a merit-shop contractor that received a large contract over the protests of – and, allegedly, despite coercion from – unions who were pressuring USS-POSCO to award the general contract to a unionized contractor. <u>Id.</u> at 804. BE & K alleged that, after the contract was awarded, unions began a campaign to eliminate non-union construction in Northern California. The unions allegedly filed automatic protests, engaged in lobbying, brought lawsuits for environmental violations, and brought numerous grievances, arbitrations, and enforcement proceedings against BE & K. <u>Id.</u> BE & K alleged that the unions' conduct violated the Sherman and Clayton Antitrust Acts; the unions claimed that their conduct was protected by the <u>Noerr-Pennington</u> doctrine. <u>Id.</u>

After announcing its separate test for multiple lawsuits, the Ninth Circuit noted that the allegations in BE & K's complaint would be sufficient, if proven, to overcome the <u>Noerr-Pennington</u> defense. <u>Id.</u> at 811. The court noted, however, that the record developed "foreclose[d] any possibility that BE & K could substantiate its claim." <u>Id.</u> The court explained that although "the fact that a small number in the series of lawsuits turn out not to be frivolous will not be fatal to a claim under <u>California Motor Transport</u>," over half of the lawsuits that BE & K alleged were part of the pattern of filings "without regard to the merits" had proven successful. <u>Id.</u> "The fact that more than half of all the actions as to which we know the results turn out to have merit cannot be reconciled with the charge that the unions were filing lawsuits and

1 | other actions willy-nilly without regard to success." Id.
2 | Particularly given that BE & K had the burden in litigation, "a
3 | batting average exceeding .500 [could not] support BE & K's
4 | theory," and "BE & K therefore [could not] sustain its burden of
5 | showing that the unions' conduct [fell] within the sham exception
6 | the Noerr-Pennington." Id.

7 | Venali argues that the USS-POSCO approach is appropriate here
8 | because the SACC alleges that Catch Curve has violated the
9 | antitrust laws through its series of patent infringement lawsuits
10 | against its competitors. See SACC ¶¶ 65, 69. Venali's USS-POSCO
11 | argument relies heavily on facts and evidence that it argues gives
12 | rise to a genuine issue of material fact regarding Catch Curve's
13 | motivation for filing these various lawsuits. Opp. at 4.

14 | As noted above, Federal Circuit law governs whether Venali has
15 | pierced Noerr-Pennington immunity in this case. Nobelpharma AB, 141
16 | F.3d at 1067-68. The Federal Circuit has not addressed whether the
17 | USS-POSCO approach provides the appropriate test for pattern
18 | litigation. The parties' arguments regarding the USS-POSCO
19 | approach, as well as the Federal Circuit's silence on the matter,
20 | leave the Court with two questions to answer prior to determining
21 | whether Venali can survive summary judgment on this issue. First,
22 | to what extent is USS-POSCO different from PRE with respect to its
23 | considerations of the merit or lack of merit of the underlying
24 | cases? And second, if there is a difference, would the Federal
25 | Circuit adopt the USS-POSCO approach?

26 | Whether the lawsuits at issue are baseless is a component of
27 | the USS-POSCO approach. As the USS-POSCO court framed the test, the
28 | overarching question is whether the defendant's policy was to file

1    lawsuits "*without regard to the merits* and for the purpose of

2    injuring a market rival." 31 F.3d at 811 (emphasis added). Indeed,

3    the court in that case looked primarily to the success of the

4    lawsuits in determining that the plaintiffs could not meet their

5    burden to show that the unions' policy was to file suits without

6    regard to the merits. Id. The Ninth Circuit's description of USS-

7    POSCO in subsequent cases confirms the relevance of baselessness.

8    In Amarel v. Connell, 102 F.3d 1494, 1519 (9th Cir. 1996), the

9    Ninth Circuit explained that USS-POSCO "reflects the distinction

10   alluded to by the Supreme Court in PRE," where the Court "explained

11   that in determining whether a challenged actions falls within the

12   'sham' exception, 'a reviewing court must discern and draw the

13   difficult line separating *objectively reasonable claims* from *a*

14   *pattern of baseless, repetitive claims* ... which leads the

15   factfinder to conclude that the administrative and judicial

16   processes have been abused.'" Id. (quoting PRE, 508 U.S. at

17   58)(PRE's internal quotation marks and alterations omitted).

18   Additionally, lower courts have applied USS-POSCO with attention to

19   baselessness. See Gen-Probe, Inc. v. Amoco Corp., Inc., 926 F.

20   Supp. 948, 958-59 (S.D. Cal. 1996)(explaining that "under either

21   the PRE or the USS-POSCO test, [the plaintiff]... must demonstrate

22   objective baselessness" because the pattern of claims must be

23   "baseless as a whole"); Avery Dennison Copr. v. Acco Brands, Inc.,

24   2000 WL 986995 (C.D. Cal. 2000)(finding that the court couldn't

25   decide whether the filings were made as part of a pattern of

26   baseless claims without understanding the merits of the cases).

27        Although a court must apply the USS-POSCO test with attention

28   to the baselessness or merit of the claims, the antitrust

                                    15

1    defendant's motivation in bringing those suits is relevant to the

2    inquiry as well. As described by the USS-POSCO court, the larger

3    question to be answered focuses on whether the defendant has a

4    policy of filing claims for the purpose of injuring a market rival,

5    without regard for the merits. USS-POSCO, 31 F.3d at 811; see Gen-

6    Probe, Inc., 926 F. Supp. at 959 ("The hallmark of a California

7    Motor Transport sham claim is a pattern of baseless proceedings

8    aimed at securing, through the very process of litigation, a

9    benefit other than the prayed-for relief.").

10       Both PRE and USS-POSCO, then, have objective and subjective

11   components. The interplay between those pieces, however, is perhaps

12   slightly different: while PRE requires a determination regarding

13   objective baselessness as a threshold matter, the USS-

14   POSCO/California Motor Transport approach is not so bifurcated.

15   That said, as discussed above, a plaintiff seeking to show sham

16   litigation under USS-POSCO must still be able to prove that

17   multiple lawsuits were filed without regard to the merits. Courts

18   determine whether the antitrust plaintiff can make this showing by

19   looking to the success of that litigation, see USS-POSCO, 31 F.3d

20   at 811, with the overarching goal being to draw "the 'difficult

21   line' separating objectively reasonable claims from 'a pattern of

22   baseless, repetitive claims ... which leads the factfinder to

23   conclude that the administrative and judicial processes have been

24   abused,'" PRE, 508 U.S. at 58 (quoting California Motor Transport,

25   404 U.S. at 513); Amarel, 102 F.3d at 1519.

26       As noted in the foregoing discussion of PRE, see § III(A),

27   supra, the Federal Circuit's case law has highlighted the

28   importance of an objective baselessness requirement in situations

16

where the defendant, in its underlying litigation, seeks to protect a property right granted to it by law. See C.R. Bard, 157 F.3d at 1369; cf. 800 Adept, Inc. v. Murex Secs., Ltd., 539 F.3d 1354, 1370 (Fed. Cir. 2008)(citing to PRE and noting that "[b]ecause of the value placed on property rights, which issued patents share ..., and in light of the underlying jurisprudential basis for the bad faith standard, rooted as it is in Supreme Court cases and Constitutional principles, ... a party attempting to prove bad faith on the part of a patentee enforcing its patent rights has a heavy burden to carry"). Because the USS-POSCO approach does encompass a baselessness analysis, the approach is not necessarily in conflict with PRE. Nevertheless, at least a few district courts have doubted whether the Federal Circuit would adopt the USS-POSCO approach for allegedly sham litigation involving multiple lawsuits because the Circuit has applied PRE to cases involving multiple litigation. See, e.g., In re Terazosin Hydrochloride Antitrust Litigation, 335 F. Supp. 2d 1336 (S.D. Fla. 2004); Travelers Exp. Co., Inc. v. Am. Exp. Integrated, 80 F. Supp. 2d 1033, 1042 (D. Minn. 1999) (citing Glass Equip. Dev., Inc. v. Besten, Inc., 174 F.3d 1337, 1343-44 (Fed. Cir. 1999)); see also Organon Inc. v. Mylan Pharms., Inc., 293 F. Supp. 2d 453, 461-62 (D.N.J. 2003) (applying PRE standard to multiple patent infringement suits against multiple defendants).

Even assuming that the Federal Circuit would adopt the USS-POSCO approach for cases alleging that multiple lawsuits form the basis of an anticompetitive scheme, Venali has not raised a genuine issue of material fact as to whether Catch Curve brought its prior lawsuits without regard to the merits of those cases. The Court

1 found above that this case, though unsuccessful, was not
2 objectively baseless. Although this finding in and of itself does
3 not warrant summary judgment in favor of Catch Curve under <u>USS-</u>
4 <u>POSCO</u>, it does undermine the strength of Venali's argument.

5     Moreover, as noted above, none of Catch Curve's prior lawsuits
6 against fax-to-email companies reached claim construction; rather,
7 each of them ended in settlement -- the payment of a license for
8 the use of the services -- in Catch Curve's favor. Venali appears
9 to argue that these prior settlements do not reflect success in
10 litigation. Although these prior suits were not resolved by a court
11 or jury on the merits, settlements in favor of Catch Curve must at
12 least be considered minor successes. In litigating a patent
13 infringement suit, a patent owner will typically seek an injunction
14 excluding the defendant from continued infringement, damages or a
15 license fee for use of the invention, or both. Because Catch Curve
16 secured license fees through its settlements, these prior cases
17 reflect litigation success. <u>In re Terazosin</u>, 335 F. Supp. 2d at
18 1358 n.13 ("[T]he Court cannot agree with Plaintiffs that a
19 plaintiff who has filed suit and receives the relief sought (e.g.,
20 monetary compensation, a change in conduct, etc.) could only have
21 been deemed to have 'won' under <u>PRE</u> if it continued to litigate the
22 case and received a favorable judgment from the court."). In the
23 face of these successes, which make up the entirety of the alleged
24 pattern of sham litigation until this suit, Venali "cannot sustain
25 its burden of showing that [Catch Curve's] conduct falls within the
26 sham exception to the <u>Noerr-Pennington</u> doctrine." <u>USS-POSCO</u>, 31
27 F.3d at 811. The record of settlements "cannot be reconciled with
28

1   the charge that [Catch Curve was] filing lawsuits ... willy-nilly

2   without regard to success." <u>Id.</u>[6]

3       Venali argues that the Court should construe Catch Curve's

4   settlements as supporting its position on summary judgment. That

5   is, it argues that a jury reasonably could infer that the license

6   fees Catch Curve accepted were low compared to the prior license

7   fees and compared to the cost of litigation, and therefore that

8   Catch Curve recognized its claims were meritless. To hold as Venali

9   suggests would create a perverse incentive for patent holders: it

10   would encourage patent holders facing numerous potential infringers

11   *not* to settle their claims for low amounts regardless of the size

12   or capacity of the defendant, lest another defendant later accuse

13   the patentee of engaging in anticompetitive conduct. In addition to

14   its clear tension with the property rights held by a patent holder,

15   such a result would be contrary to the long-standing principle that

16   settlements are judicially encouraged and favored as a matter of

17   sound public policy. <u>E.g.</u>, <u>Williams v. First National Bank</u>, 216

18   U.S. 582 (1910).

19

20

21      [6]Repeated early settlements may not prevent an antitrust
plaintiff from piercing <u>Noerr-Pennington</u> immunity through the <u>USS-</u>

22   <u>POSCO</u> approach in all cases. For example, this case might be
different if Venali had presented evidence, rather than simply

23   argument, that Catch Curve had secured its licenses by
inappropriate means. Although its papers suggest anticompetitive

24   conduct in securing licenses, Venali has not supplemented its
arguments that Catch Curve repeatedly settled for less than the

25   cost of litigation with, for example, evidence that its licenses
were secured by threats aside from the pressure inevitably exerted

26   by the looming possibility of litigation expenses. Venali has
presented a complaint from the Northern District of Georgia

27   alleging that j2 decided to sue the antitrust plaintiff for patent
infringement after that plaintiff refused j2's offer for purchase.

28   O'Keefe Decl. Ex. I. Notably, however, Venali has not provided any
testimony regarding the improper nature of licensing.

In light of the outcome of its prior litigation, as well as the objective reasonableness of this suit, Venali has not raised a genuine issue of material fact as to whether Catch Curve was filing lawsuits "without regard to the merits" or as part of a pattern of "baseless, repetitive claims."[7] <u>See</u> <u>USS-POSCO</u>, 31 F.3d at 811. Accordingly, the Court finds that summary judgment is warranted in favor of Catch Curve. The Court need not reach the substantive antitrust analysis.

**IV. MOTION TO STRIKE**

Catch Curve brings a separate motion to strike or exclude testimony from Dr. Richard Smith. Because Dr. Smith's testimony is relevant only to the antitrust issues, the Court need not rule on the motion to strike.

///

///

///

---

[7]To show that these cases were filed without regard to the merits, Venali also cites to the patent claims and prosecution history, as well as what it construes as inconsistent litigation positions from when j2 was defending a suit against the prior patent owner. The Court finds the reasonable inferences flowing from these arguments insufficient, even when construed in Venali's favor, to create a genuine issue as to whether these cases were filed "without regard to the merits": the former arguments derive primarily from the Court's *resolution* of the claim construction matters, while the latter is typical in litigation, particularly at the early stages. Even drawing the inferences regarding j2's prior litigation position in favor of Venali, undisputed evidence -- that j2 paid a not insubstantial license fee and purchased the patents -- squarely points in the other direction. Venali's other evidence and arguments do not address whether litigation was filed "without regard for the merits," but rather whether it was "for the purpose of injuring a market rival." <u>See</u> 31 F.3d at 811.

**V.    CONCLUSION**

For the foregoing reasons, the Court grants summary judgment in favor of Catch Curve.

IT IS SO ORDERED.

Dated: November 3, 2008

_____
DEAN D. PREGERSON
United States District Judge