IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CATCH CURVE, INC.,

      Plaintiff and Counterclaim
                Defendant,

          v.

INTEGRATED GLOBAL CONCEPTS, INC.,

      Defendant and Counterclaim
                Plaintiff.

------------------------

INTEGRATED GLOBAL CONCEPTS, INC.,

      Counterclaim Plaintiff,

          v.

J2 GLOBAL COMMUNICATIONS, INC.,
AUDIOFAX, INC., AUDIOFAX IP LLC,

      Added Counterclaim Defendants.

No. 1:06-CV-2199-AT

## j2 GLOBAL, INC. AND CATCH CURVE, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# INTRODUCTION

IGC's counterclaims are based on Catch Curve's patent infringement claims against IGC. (Dkt. No. 85 ¶¶ 209-224.) Patent infringement claims are protected by *Noerr-Pennington* immunity, and therefore can give rise to antitrust liability only if they are objectively baseless—*i.e.*, if "no reasonable litigant could realistically expect success on the merits." *Prof'l Real Estate Inv., Inc.* v. *Columbia Pictures, Inc.*, 508 U.S. 49, 60-61 (1993) ("*PRE*"). That immunity is pierced only with "great reluctance." *White* v. *Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000).

Catch Curve's claims were not objectively baseless, and therefore summary judgment is warranted. The question before the Court now is two-fold: (i) did Catch Curve lack probable cause to bring this action in 2006 based upon a claim construction that covered fax-to-email services; and (ii) after the Federal Circuit ruled on the claim construction in 2010, were Catch Curve's narrowed infringement contentions so lacking in probable cause that no objective litigant could reasonably believe there was any chance of success on the merits?

The first question has already been answered. In 2008, the Hon. Dean D. Pregerson rejected an identical claim, asserted by Venali, Inc. in the Central District of California. There is no reason for this Court to second guess Judge Pregerson's well-reasoned opinion, and in prior briefing IGC largely abandoned

this point.

The answer to the second question is also no.  Catch Curve's infringement allegations following the Federal Circuit ruling limited its case to the fax-to-fax service that IGC advertised on its website.  Its allegations were supported by detailed, 60-page infringement contentions explaining how IGC's system met each limitation of each asserted claim, based on publicly-available marketing materials.  These contentions by themselves establish probable cause.  *See Q-Pharma, Inc.* v. *Andrew Jergens Co.*, 360 F.3d 1295, 1305 (Fed. Cir. 2004).

When the parties previously briefed these issues, IGC asked for more discovery, purportedly to show that Catch Curve had in its possession information that should have made clear to Catch Curve that IGC's website was inaccurate— *i.e.*, that IGC did not have fax-to-fax capability.  But discovery has shown the opposite:  IGC did have fax-to-fax capability, and continues to offer it to this day—and the interrogatory responses that IGC served denying that capability, which induced Catch Curve to drop its claims, were false.  Thus, not only were Catch Curve's contentions not objectively baseless, they were correct.

What's more, in 1999, IGC, which had developed and was operating an Internet fax business on behalf of eFax.com, was instructed by eFax to remove a fax-to-fax capability from the system, because its patent lawyer was concerned that

it may infringe the patents asserted in this suit. But when IGC began offering its own service in 2001, it chose to disregard this legal advice and put the fax-to-fax functionality back in. Thus, not only could a reasonable attorney have expected success on the merits, but a patent attorney—advising a potential defendant— actually did think there was a chance of success, and IGC has known that all along. j2's conduct is fully-immunized under the *Noerr-Pennington* doctrine.

## BACKGROUND AND UNDISPUTED FACTS

**I.      The Patents-in-Suit.**

Catch Curve filed this action in 2006, alleging infringement of the '926, '302, '584, '034, and '021 Patents. (Dkt. No. 1.) Generally speaking, the Patents-in-Suit claim a system or method in which a store and forward facility (SAFF) receives an incoming fax message over the public switched telephone network (PSTN), stores it, and then forwards it to the recipient. (Exs. 29-33.[1]) Certain of the claims (referred to as "storage claims") do not include the final step; *i.e.*, they claim a system or method in which the SAFF receives a fax message and stores it. (*E.g.*, Ex. 33, Claims 33, 69.) Other claims describe a system or method for receiving and storing a fax, and then forwarding the stored fax over the PSTN

---

[1] References to "Ex. __" refer to exhibits to the Declaration of Edward E. Johnson, filed herewith. References to "SUF __" refer to paragraphs in Catch Curve's Statement of Undisputed Material Facts, also filed herewith.

to another fax machine, in response to instructions entered by the user on a telephone keypad. (*Id.*, Claims 40, 63.)

## II.   j2's Dealings with IGC.

In 2000, j2 began discussions with another fax-to-email company, eFax.com, about j2 purchasing eFax. (Ex. 34 at 25:14-26:5; Ex. 35 at 18:15-19:6.) eFax had contracted with IGC to develop and maintain many aspects of eFax's service. (Ex. 22 at 16:8-14.) j2 ultimately acquired eFax in late 2000. (Ex. 36.) In connection with the acquisition, j2, eFax and IGC entered into multiple agreements to resolve outstanding payment disputes between IGC and eFax, and to set up a framework for IGC to provide "transition services" to j2 following the acquisition—essentially, IGC would assist in moving eFax's customers to j2's own technology platform, and continue maintaining eFax's platform until the transition was complete. (Exs. 37, 38.) The agreements provided for IGC to provide j2 with its source code and other documentation regarding the eFax/IGC system. (Ex. 37 ¶ 11.)

IGC provided j2 with its source code, but there is no evidence that anyone at j2 looked at the source code, other than to verify it had been provided. (Ex. 21 at 139:4-22; Ex. 39 at 196:14-21.) IGC also gave a j2 employee, Amit Kumar, a memorandum with technical details about certain aspects of the eFax

system.  (Ex. 21 132:20-133:1.)  There is no evidence that anyone at j2 ever saw the memorandum other than Mr. Kumar, who left j2 shortly thereafter and is now deceased.  (*Id.* at 133:4-21.)  The transition was completed in August 2001, and at that time any business arrangement between j2 and IGC ceased.  (SUF ¶ 1.)

## III.   The Patents' Ownership and Licensing History.

The Patents-in-Suit were originally owned by AudioFax IP LLC ("AudioFax"), which is not affiliated with j2.  (SUF ¶ 2.)  AudioFax licensed the patents extensively, including to large companies such as Sprint and AT&T.  (SUF ¶ 3.)  j2 itself paid $1 million for a license in 2001.  (SUF ¶ 4.)  In January 2005, j2 paid nearly $5 million to purchase the Patents-in-Suit, and assigned them to Catch Curve, its wholly-owned subsidiary, to continue the AudioFax licensing program. (SUF ¶¶ 5, 6.)  By the end of 2006, 53 companies had taken licenses to the Patents-in-Suit, including 27 that paid at least a million dollars.  (SUF ¶ 7.)

## IV.   The *Venali* Action.

In connection with its licensing program, Catch Curve brought lawsuits in this District and in the Central District of California.  One of the cases in California was against Venali, Inc.[2]  On May 11, 2007, Judge Pregerson issued a *Markman* ruling in the *Venali* Action construing several terms of the Patents-in-

---

[2] *Catch Curve, Inc.* v. *Venali, Inc.*, No. 05-4820-DDP (C.D. Cal.).

Suit. (Ex. 40.) The central issue addressed by Judge Pregerson was whether the term "facsimile message" should be construed to require that the accused system not only receive messages via facsimile protocol, but also retransmit messages using facsimile protocol. (*Id.*) The Court adopted Venali's position, holding that faxes must be both sent and received via facsimile protocol. (*Id.* at 12-17.)

Based on his *Markman* ruling, and the fact that Venali's system lacked the capability to forward received fax messages over the PSTN, Judge Pregerson granted Venali summary judgment. (Ex. 41.) Shortly thereafter, Catch Curve and j2 moved for summary judgment on Venali's antitrust claims, which, like IGC's claims here, alleged that j2 had monopolized the fax-to-email market using "sham" litigation. (Ex. 42.) Judge Pregerson granted summary judgment, specifically finding that Catch Curve had probable cause to assert the Patents-in-Suit based on its claim construction theory that the patents covered fax-to-email services. (Ex. 43 at 7-11.) Venali did not appeal. (Ex. 44.)

Catch Curve appealed Judge Pregerson's summary judgment and *Markman* Orders. The Federal Circuit affirmed, holding that the scope of the Patents-in-Suit is "limited to systems that are configured to forward a fax message from storage in fax protocol over a switched telephone network." (Ex. 45 at 11.) In other words, to infringe, a system must have fax-to-fax capability—the

capability to receive faxes over the telephone network and then forward those messages over the telephone network using facsimile protocol. (*Id.*)

## V.    The Procedural History of this Action.

Catch Curve served its original infringement contentions in September 2006. ( SUF ¶ 8.) Those contentions included a claim-by-claim and element-by-element analysis showing that IGC infringes the Patents-in-Suit, based upon Catch Curve's asserted claim construction at the time, which covered fax-to-email services like IGC's. (SUF ¶ 9.) The 2006 infringement contentions also asserted that IGC was infringing the Patents-in-Suit with its fax-to-fax functionality. (SUF ¶ 10.)

When Judge Pregerson granted summary judgment in the *Venali* Action, Catch Curve moved to stay this case, to avoid further litigation until the Federal Circuit ruled. (SUF ¶ 11.) The Court granted the motion over IGC's opposition. (Dkt. Nos. 101, 106.) The stay was lifted in 2010 after the Federal Circuit ruled. (Dkt. No. 109.) Because IGC's website described how a user can forward a received fax to a traditional fax machine, Catch Curve did not dismiss the case. (SUF ¶ 12.) This functionality indicated that IGC's service was infringing under the Federal Circuit ruling. (Ex. 45 at 11.) Nevertheless, Catch Curve offered to drop its claims in light of the limited damages at issue. (SUF

-7-

¶ 13.)  IGC refused.

Catch Curve served amended infringement contentions on November 14, 2011.  (SUF ¶ 14.)  Catch Curve dropped four of the five patents, leaving only the '021 Patent, and limited its assertion of the '021 Patent to claims reciting storing faxes or storing them and then forwarding them via fax protocol over the PSTN.  (SUF ¶¶ 15,16.)  Catch Curve also added two continuation patents, the '884 and '691 Patents, to provide notice of the entire scope of possible infringement claims and to provide a basis for Catch Curve to amend the complaint later if necessary.  (SUF ¶ 17.)

Ignoring the statements on its website touting fax-to-fax capability, IGC denied having that functionality.  (SUF ¶ 18.)  Catch Curve asked IGC to substantiate its denial, so that Catch Curve could dismiss the claim if IGC actually did not have that functionality notwithstanding its unambiguous public statements to the contrary.  (SUF ¶ 19.)  IGC repeatedly refused to do so; for example, IGC stated in one letter that it had no capacity to transmit a received fax message to a fax machine, but then stated in the *very same letter* that a small portion of its customers "elect to receive copies of their messages via traditional fax machines." (SUF ¶ 20.)  Eventually, IGC served interrogatory responses swearing that IGC did not have the capability to forward faxes to a fax machine.  (SUF ¶ 21.)  Catch

Curve then moved to dismiss its infringement claims with prejudice, over IGC's objection. (SUF ¶ 22.)

Importantly, discovery in this matter has now established that IGC's verified interrogatory responses were false—the MaxExmail service today has the functionality described in the infringement contentions and literally infringes the '021 Patent. (SUF ¶ 23.) Moreover, IGC has added new services that also contain the infringing technology, including an iPhone application that allows a user to append a signature to a fax message stored on IGC's server and to forward that fax message to a fax machine via facsimile protocol. (SUF ¶ 24.) As such, not only is Catch Curve's position objectively reasonable, it is *factually and legally correct*.

## ARGUMENT

### I.    Legal Standard

#### A.    Summary Judgment Standard.

Summary judgment is an integral part of the Federal Rules and their goal of securing "the just, speedy and inexpensive determination of every action." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 327 (1986); Fed. R. Civ. P. 1, 56. Summary judgment is required where "there is no genuine issue as to any material fact" and the "moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 322 (quoting Fed. R. Civ. P. 56(c)).

Rule 56(c) mandates summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *Delancy* v. *St. Paul Fire & Marine Ins. Co.*, 947 F. 2d 1536, 1544 (11th Cir. 1991).   Once the moving party has identified those portions of the record that show an absence of a genuine issue of material fact as to any necessary element, the opposing party must identify "'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). It must do so by admissible evidence, not by supposition, conjecture or evidence that will not be admissible at trial.  *See* Fed. R. Civ. P. 56(c)(2); *Celotex*, 477 U.S. 317.  This standard requires IGC to "do more than simply show that there is some metaphysical doubt as to the material facts[;] the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)) (citations omitted)).

**B.    *Noerr-Pennington* Immunity Standard.**

The standard for piercing *Noerr-Pennington* immunity, well-established under binding Supreme Court and Federal Circuit precedent, is objective and extremely difficult to meet.  Catch Curve's infringement action is

presumed to have been in good faith and protected by the *Noerr-Pennington* doctrine. *C.R. Bard, Inc.* v. *M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998). "The Plaintiffs must satisfy a heavy burden to show that the Underlying Litigation was objectively baseless." *In re Androgel Antitrust Litig.*, 888 F. Supp. 2d 1336, 1344 (N.D. Ga. 2012).

In *PRE*, the Supreme Court held that a litigant seeking to overcome *Noerr-Pennington* immunity based on allegations of "sham" litigation must first prove that the litigation was "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *PRE* at 60-61. Stated differently, to meet this high bar, one must prove that no reasonable litigant could have believed that it had probable cause to institute the litigation. Probable cause, an absolute defense, requires merely that a *reasonable* patent owner in j2's position—regardless of what j2 actually believed—"could have believed that it had some chance of winning." *PRE* at 64-65. "[E]ven in the absence of supporting authority, a litigant may reasonably offer a good faith argument for the extension, modification, or reversal of existing law without incurring sham liability." *In re Androgel Antitrust Litig.*, 888 F. Supp. 2d at 1344. "Where . . . there is no dispute over the predicate facts of the underlying legal proceeding, a court may decide probable cause as a matter of law." *PRE* at 63.

## II.   Catch Curve's Fax-to-Email Contentions Prior to the Federal Circuit Ruling Were Not Objectively Baseless.

From 2006 until after the Federal Circuit ruling, Catch Curve primarily charged IGC with infringement of the Patents-in-Suit under a fax-to-email theory.  (SUF ¶ 9.)  In the *Venali* Action, Judge Pregerson ruled that Catch Curve's fax-to-email claim construction was not objectively baseless.  (Ex. 43 at 10-11.)  Although Judge Pregerson's *Markman* order limited the AudioFax Patents to fax-to-fax technologies, he also confirmed that cases brought under Catch Curve's licensing program were brought in good faith.  (*Id.* at 17-20.)  He rejected Venali's antitrust claims, which addressed the same question at issue in this case: whether this lawsuit was objectively baseless in light of Catch Curve's claim construction position and undisputed success in licensing the Patents-in-Suit.  (*Id.* at 7-11.)

The answer is an unqualified no.  Catch Curve's licensing program resulted in approximately 53 parties purchasing licenses, including j2 itself, which paid $1 million for a license before purchasing the AudioFax Patents.  (SUF ¶¶ 3-7.)  Judge Pregerson held that "the settlements and licenses that resulted from [Catch Curve's] prior disputes—including the licenses to Internet companies that AudioFax had before j2 purchased the patents—support the Court's finding that Catch Curve had at least a "reasonable belief that there [was] a chance [its] claim

-12-

[would] be held valid upon adjudication." (Ex. 43 at 10-11.)

Judge Pregerson further held that "Catch Curve offered reasonable arguments in support of its proposed constructions that were based on intrinsic evidence, claim construction principles, and expert testimony." (*Id*. at 10.) He noted it is common for patentees to "assert that their patents cover newer technology, such as the fax-to-email systems at issue here." *Id*. Therefore, "Catch Curve's patent infringement actions, though unsuccessful, were not 'objectively baseless'" as a "matter of law." (*Id*. at 10-11.)

Judge Pregerson's analysis is equally applicable here. IGC accurately told the Court that the *Venali* Action was "a very similar case." (Dkt. No. 94 at 2.) Like IGC, Venali offered a service enabling users to receive faxes as email attachments. (Ex. 41 at 10.) Catch Curve contended that such a service infringes the Patents-in-Suit based upon the claim construction that Judge Pregerson disagreed with, but found reasonable as a matter of law. (Ex. 43 at 10-11.) IGC cannot point to any error in Judge Pregerson's analysis or anything that would compel a different result.

## III. Catch Curve's Continued Prosecution After the Federal Circuit Decision Was Not Objectively Baseless.

### A. IGC's Service Infringes the '021 Patent.

After the Federal Circuit ruling, Catch Curve narrowed its

-13-

infringement case to fax-to-fax claims in the '021 Patent. Not only was Catch Curve's assertion of the '021 Patent not objectively baseless, discovery shows that Catch Curve's contentions were both factually and legally correct, and therefore that IGC infringes.

### 1.   IGC Performs Each Step of the Patented Method.

IGC infringes the '021 Patent. Claims 33 and 40 are illustrative. (Ex. 12 at A-1 – A-6.) Claim 33 recites a method in which (i) subscribers are assigned unique telephone numbers; (ii) the system receives, at a SAFF, fax messages directed to the subscriber's phone number over the PSTN; and (iii) the system directs the messages to a unique mailbox associated with the subscriber. (*Id.* at 1-4.) MaxEmail performs each of these steps. IGC assigns unique telephone numbers to subscribers. (SUF ¶ 25 ("Users of the MaxEmail service are assigned a unique 10-digit telephone number to which others may send a facsimile message destined for the MaxEmail user.").) IGC receives calls directed to those numbers over the PSTN. (SUF ¶ 26 ("The sender's facsimile message is transmitted via facsimile protocol over the [PSTN] . . . [and] is routed through a primary rate interface (PRI) to an IGC fax/voice processor.").) And IGC directs those messages to a mailbox uniquely associated with the subscriber. (SUF ¶ 27 ("By accessing their password-protected account, MaxEmail users may view the activity log

associated with their account and open a TIFF or PDF of a facsimile message . . . .").)

Claim 40 depends on Claim 33, and adds the step of sending messages from a subscriber's mailbox to a facsimile machine in response to instructions received from the subscriber (sometimes referred to as "IVR"). (Ex. 12 at A-4 – A-6.) The individual responsible for eFax's operations testified that the eFax system developed and maintained by IGC had this capability in 1999. (SUF ¶ 28.) And IGC's witnesses uniformly, albeit begrudgingly, admitted that since 2001 an IGC subscriber has been able to use a telephone to access his or her account, and then send a previously-received fax message to a fax machine via the PSTN by entering the destination phone number. (SUF ¶ 23.) IGC's witnesses also admitted that IGC has an "auto-forward" feature which forwards incoming faxes automatically over the PSTN to a fax number designated by the subscriber. (SUF ¶ 29.)

## 2. IGC Misreads the Federal Circuit Decision.

Despite the undisputed facts set forth above, IGC claims that it does not infringe. But its argument depends not on a factual dispute, but on an erroneous reading of the Federal Circuit Decision: IGC claims the Federal Circuit held that, to infringe, the fax must "remain[] in facsimile protocol the entire time."

(Dkt. No. 195 at 3.)  Thus, the argument goes, IGC cannot infringe because it converts messages to TIF image files when they are received.  (*Id.*)  But the Federal Circuit held no such thing.  Rather, it held that the AudioFax Patents are "limited to systems that are configured to forward a fax message from storage in fax protocol over a switched telephone network."  (Ex. 45 at 11.)  It was undisputed that Venali did not have that capability, so the Federal Circuit affirmed summary judgment.  (*Id.* at 12.)  But the Federal Circuit focused on the ability to transmit a fax message—nothing in the decision says that a message can *never* be converted to digital format, and such a construction would make no sense.  The patents *require* that messages be stored in computer storage, which necessarily means that the fax must be converted to digital format.  (Ex. 33 at 3:6-10; 25:33-35.)

IGC, in contrast to Venali, *does* have the capability to forward faxes from storage over the PSTN in facsimile protocol.  As described above, a subscriber can forward a fax from computer storage to a fax machine, by accessing his or her account via telephone and then entering the fax number, or by using the iPhone app.  (SUF ¶¶ 23, 24.)  This takes IGC outside of the Federal Circuit's holding—neither Judge Pregerson nor the Federal Circuit had any occasion to consider whether a service like IGC's infringes.  But the Federal Circuit strongly

suggested it does;  in distinguishing Venali's system from the system described in

the Patent, the Federal Circuit relied on a portion of the specification that describes

exactly the IGC function that j2 accused of infringing, and that IGC now admits it

has:

> The messages received in each of the mailboxes are retained in
> a mailbox-specific queue for future retrieval by the intended
> recipients, who can "at their convenience, dial into the system
> and pick up any waiting documents." '021 patent, col. 4, ll. 1-
> 26. . . . The specification thus makes it clear that the SAFF is
> designed to deliver messages from the mailbox in fax protocol
> and over a switched telephone network, regardless of whether
> the SAFF delivers the messages to a designated destination fax
> machine or to a different fax machine as directed.

(Ex. 45 at 10-11 (emphasis added).)

IGC's witnesses attempted to manufacture an issue of disputed fact by

claiming in their depositions that IGC cannot forward a fax to a fax machine

(despite admitting that the user can receive a stored fax at a fax machine by

entering in instructions on a telephone).  (Ex. 21 at 206:25-210:14; Ex. 18 at 92:11-

96:6; Ex. 19 at 23:6-33:16.)  This is semantics—the argument rests on the notion

that the message is no longer a fax after it has been converted to a TIF image, even

if it is reconverted and sent via fax protocol.  (*Id.*)  The Federal Circuit did not so

hold, but in any event there is no factual dispute about how IGC's system works.

The only dispute is over how to interpret the Federal Circuit Decision.

Importantly, Catch Curve does not need to be right—unless no reasonable litigant could think that its interpretation "had some chance of winning," then this suit was not objectively baseless. *PRE* at 64-65.

**B.      The Fax-to-Fax Contentions Were Not Objectively Baseless.**

Summary judgment is also proper because Catch Curve's 2011 Infringement Contentions established probable cause to assert infringement based on IGC's fax-to-fax capability. These contentions span nearly 60 pages. They include detailed analysis on a claim-by-claim, limitation-by-limitation basis. (Ex. 12.) The analysis was based primarily on IGC's description of its service on its public website, which, at all times relevant to this action, unequivocally stated that IGC's service offered its customers the ability to forward fax messages from their mailboxes to "another fax number"—*i.e.*, fax-to-fax. (SUF ¶ 12.) Catch Curve's detailed claims analysis alone is sufficient to establish probable cause for its contentions. *See, e.g., 800 Adept, Inc.* v. *Murex Sec., Ltd.*, 539 F.3d 1354, 1372 (Fed. Cir. 2008).

IGC fails to identify any specific deficiencies in these contentions. But it claims that Catch Curve's contentions were objectively baseless because they relied on IGC's website, rather than information that IGC gave to Catch Curve's parent in 2000. This is wrong at every level.

*First*, it is based on the premise that IGC's website was inaccurate, and Catch Curve should have known that from looking at the information j2 received in 2000. But IGC's website *is* accurate. The webpages upon which Catch Curve relied describe how a user can call into IGC's system, and, by entering instructions on the telephone keypad, forward a previously-received fax from the user's mailbox to a traditional fax machine via the PSTN. (SUF ¶ 12.) As discussed above, IGC's system in fact enables users to do this. (SUF ¶ 23.) For this reason, IGC's rhetoric about the information provided in 2000 is a smokescreen. It makes no difference whether Catch Curve studied that information or had any duty to study it before bringing suit, because the information cannot possibly show that Catch Curve should not have relied on the website—the website is accurate.

*Second*, it is well-established that information from the defendant's website can establish probable cause to bring suit. IGC contends that it was improper for Catch Curve to rely on IGC's marketing materials. (Dkt. No. 195.) But the Federal Circuit has specifically disagreed, holding that a patentee has probable cause based on an infringer's public statements, coupled with an analysis of how those statements implicate the patent claims. *See Q-Pharma, Inc.*, 360 F.3d at 1305 ("[A] reasonable litigant could—based on [its] patent, its prosecution

-19-

history, and [the accused's] advertising and labeling statements [. . .]—expect to prevail on a claim alleging infringement.").

Here, IGC publicly advertised a fax-to-fax capability.  (SUF ¶ 12.) Catch Curve's infringement contentions carefully analyzed IGC's public statements, such as that a MaxEmail user can "Press 2 to forward a fax to another fax number," which infringes the '021 Patent.  (SUF ¶ 30.)  As in *Q-Pharma*, Catch Curve's careful analysis based on IGC's website provided probable cause to continue its case.  360 F.3d at 1305.

*Third*, there is no evidence that, as of 2011 (or even 2006), anyone at j2 had material knowledge of IGC's system.  IGC gave a Confidential Memorandum partially describing IGC's system to Amit Kumar, but there is no evidence that Mr. Kumar shared or discussed it with anyone at j2, and he left j2 shortly thereafter.  (Ex. 21 at 132:25-133:21.)  And the Confidential Memorandum does not even describe IGC's IVR functionality.  (SUF ¶ 31.)  IGC also provided j2 with its source code in 2000, but j2 had no reason to look at it, and there is no evidence that anyone ever did look at it, beyond verifying that it was received. (Ex. 21 at 139:4-22; Ex. 39 at 196:14-21.)   Nor can IGC claim that j2 had knowledge through the employees it acquired from eFax—in late 2000, IGC's President and majority owner, Jack Neurauter, wrote a letter to j2 in which he

stated that "[o]ther than a cursory overview, no one at eFax had or has any knowledge whatsoever of the inner workings of the [IGC] system." (Ex. 46 at 2.) In short, by 2006, j2 (and Catch Curve) had no special knowledge of IGC's system.

*Fourth*, the infringement contentions at issue were served *eleven years* after IGC allegedly provided the information. Even if the information from 2000 somehow contradicted IGC's website (which it did not), Catch Curve was not obligated to assume that eleven-year-old information was more accurate than IGC's current website. It is more reasonable (and certainly not objectively *un*reasonable) to conclude that the system changed. And in fact, it is undisputed that IGC's system did change. (SUF ¶ 32.) In prior briefing and argument before this Court, IGC ridiculed the possibility that IGC adopted "antiquated" fax-to-fax technology sometime after 2000. (*E.g.*, Dkt No. 195 at 1.) But its internal emails show that in 2001, IGC decided to implement additional fax-to-fax functionality (the "auto-forward feature" discussed further below) in its service. (SUF ¶ 33.) IGC has since expanded the capability to allow a subscriber to use an iPhone to forward a stored fax message to a fax machine. (SUF ¶ 24.) These changes confirm the reasonableness of Catch Curve's reliance on IGC's current website rather than obsolete information from 2000.

*Fifth*, IGC contends that the 2011 Infringement Contentions were inadequate because j2 personnel had MaxEmail accounts after 2001. But Neurauter admitted that using the service does not give a user a "detailed understanding of the technology behind how that system works." (SUF ¶ 34.) IGC has never identified information relevant to Catch Curve's infringement case that is available simply by using a MaxEmail account.

## C.   IGC Added Fax-to-Fax Functionality in 2001 Against the Advice of eFax's Patent Lawyer.

IGC claims that it does not infringe because, within IGC's system, the faxes are converted to digital images and transmitted via IP protocol to a fax server to be re-converted and sent over the PSTN. (Dkt. No. 203 at 6-8.) But there is no question that a reasonable lawyer might disagree, because it is undisputed that at least one lawyer already has, a lawyer paid to defend that system.

In 1999, eFax sought a legal opinion about whether it was infringing the AudioFax Patents, then owned by AudioFax IP (which was unaffiliated with j2). (SUF ¶¶ 2, 35) At that time eFax's system had been developed by, and was being maintained by, IGC; according to IGC it was substantially the same as the system that IGC began offering as the MaxEmail service in 2001. (Ex. 20 at 17:1-3.) In 1999, eFax offered an "auto-forward" feature. (SUF ¶ 36.) Subscribers could enter a list of destination email addresses to which incoming faxes would be

sent, but could also enter a fax number instead of an email address as the destination. (SUF ¶ 37.) An incoming fax would then be converted into a digital image, transported via IP protocol, and ultimately sent out to the destination fax number over the PSTN. (*Id.*) This is the same process that IGC uses for its IVR feature. (SUF ¶¶ 25-27, 29-30.)

      eFax's lawyer advised that, although he did not believe IGC's fax-to-email service infringed, IGC's "auto-forward" feature was in a "gray area" (*i.e.*, covered by an objectively reasonable argument) and it would be "wise" to remove it. (SUF ¶ 38.) He gave that advice to Josh Mailman, eFax's head of operations, who agreed that the feature should be removed. (SUF ¶ 39.) Mailman instructed IGC to remove the feature; at one point he emailed that the removal "MUST be completed by Jan 17th as we are having a legal opinion coming out that date." (SUF ¶ 40.) After the feature was removed, eFax's lawyer provided a non-infringement opinion, which emphasized that incoming messages "**are never transmitted to any intended receiving facsimile machines as required**" by the patent. (SUF ¶ 41.)

      When IGC began offering its own service in 2001, it disregarded the advice of eFax's patent lawyer and offered the auto-forward feature. IGC remembered that eFax had removed the feature "due to a patent issue," but

Neurauter told the others at IGC that the patent issue "won't be a big deal at all." (Ex. 25.) Therefore, IGC began offering exactly the autoforward feature that had been removed from the eFax service to avoid infringement, as eFax's head of operations testified upon being shown an IGC advertisement describing the autoforward feature:

> Q: You don't mean auto forward in the sense that eFax had auto forwarding?
>
> A: That's what [the IGC advertisement] says, "auto forward." Right there. Apply to any time a fax is auto forwarded to a fax number. You can ask MaxEmail what they meant by that. This looks to be the thing I asked to be taken out of the eFax service, but this isn't the eFax service."

(SUF ¶ 42.) IGC has offered the infringing autoforward feature continuously since 2001. (SUF ¶ 29.)

Importantly, under IGC's theory, the autoforward feature would not infringe any more than the IVR feature—in both cases, messages are converted into digital format, transmitted internally via IP protocol, and then ultimate transmitted via the PSTN through the MaxEmail send program. (SUF ¶¶ 23, 25-29.) Neurauter made clear that IGC's position is that anything using MaxEmail send—*i.e.*, both autoforward to a fax machine and IVR fax forwarding—cannot infringe, for exactly the same reason. (Ex. 20 at 169:16-170:14.) But eFax's attorney believed—like Catch Curve—that this could still infringe, and advised

-24-

eFax to change its service. (SUF ¶ 38.) That alone is enough to establish that a reasonable litigant could have some expectation of success.

## IV. Catch Curve's Inclusion of Other Patents in Its Contentions Is Irrelevant to Whether This Suit Was Objectively Baseless.

IGC contends that, because Catch Curve included the '884 and '691 Patents (the "Continuation Patents") in its amended infringement contentions without first moving to amend the complaint, Catch Curve could not prevail and therefore had no expectation of success. (Dkt. No. 187 at 4-7.) This argument is a sideshow and IGC's focus on it merely underscores how weak its claim is.

*First*, IGC's argument makes no sense. IGC concedes that "Catch Curve never filed a lawsuit alleging that IGC made or used any product or device that infringed the [Continuation Patents]." (Dkt. No. 187 at 6.) Therefore, there could be no objectively baseless lawsuit based on the Continuation Patents. IGC cannot have it both ways—either the claims of the Continuation Patents are part of the suit and supported by the probable cause detailed in the infringement contentions, or they are not part of the suit and could not have caused IGC any injury, much less cognizable antitrust injury, especially since IGC did not respond to the Continuation Patents in its non-infringement contentions. (SUF ¶ 43.)

Either way, IGC's claims fail.[3]

      *Second*, even assuming these contentions were improper, that is, at most, a procedural issue.  IGC's complaint, at bottom, is that Catch Curve included the Continuation Patents in its contentions before moving to formally amend the complaint.  That is a procedural issue that should have been raised in a motion to strike the contentions if IGC believed it was prejudiced.  The *PRE* standard evaluates whether a claim is frivolous on its *merits*, *PRE*, 508 U.S. at 60-61, not whether the plaintiff at some point in the litigation made a procedural mistake.  *See In re Androgel Antitrust Litig*, 888 F. Supp. 2d. at 1345 ("[B]ecause the [objective baselessness] test is an objective one," procedural issues are not relevant).[4]

      *Third*, IGC mischaracterizes the record.  Catch Curve's 2011

---

[3] The inclusion of these patents was akin to identifying, in response to a contention interrogatory seeking the bases for a breach of contract claim, a further breach not specifically alleged in the complaint.  *See* L.P.R. 4.5(a).  That is not improper, much less grounds to vitiate Catch Curve's First Amendment *Noerr-Pennington* protection.

[4] In previous briefing of this issue, IGC has accused Catch Curve of making a misrepresentation to the Court based on a mischaracterization of an accurate statement by Catch Curve's counsel. (Dkt. No. 187 at 5.)  At a hearing, counsel accurately informed the Court that by including the Continuation Patents in its amended infringement contentions, Catch Curve had intended to provide as complete a scope of the alleged infringement as possible, rather than to add new claims to the lawsuit. (Ex. 47 at 4-5.)  That statement is accurate, consistent with Catch Curve's position now as before, and neither intended nor designed to mislead the Court in any way.

Infringement Contentions dropped four out of the five patents asserted in the Complaint. (SUF ¶ 15.) For the remaining patent, Catch Curve dropped 27 patent claims. (SUF ¶ 16.) Catch Curve also added claims from the Continuation Patents. But there was nothing nefarious about doing so—they were included to provide IGC with notice of the possible claims from the complete patent family, to provide a basis for Catch Curve to amend the complaint down the road if needed. Taken as a whole, the new infringement contentions reflected Catch Curve's attempt to narrow the case by dropping patents and claims in light of the Federal Circuit ruling, and also provide notice to IGC for Catch Curve's full fax-to-fax case. If anything, dropping four patents and 27 patent claims from the amended infringement contentions shows that Catch Curve is *not* a vexatious litigant.

Indeed, Catch Curve's actions throughout this litigation have been reasonable and demonstrate its good faith. When Catch Curve received an unfavorable claim construction from a different District Court, Catch Curve moved to stay this action pending its appeal to the Federal Circuit, rather than attempt to re-litigate claim construction here. (Dkt. No. 100.) IGC inexplicably opposed the motion. (Dkt. No. 101.) When the Federal Circuit affirmed, Catch Curve altered its contentions in this case to conform to the Federal Circuit's ruling, limiting its claims to the fax-to-fax capability described on IGC's website. And Catch Curve

voluntarily dismissed its infringement claims with prejudice (again, over IGC's inexplicable objection), *before any discovery was taken*. This is compelling evidence that Catch Curve is acting in good faith. *See Q-Pharma, Inc.*, 360 F.3d at 1304 ("[W]e fail to see how a changed legal theory that leads to the voluntary dismissal of a lawsuit can amount to bad faith litigation.")

## CONCLUSION

For the foregoing reasons, Catch Curve and j2 respectfully request that the Court grant their Motion for Summary Judgment.

Respectfully submitted, this 11th day of March, 2014.

/s/ Robert A. Sacks
Robert A. Sacks (*pro hac vice*)
Brian R. England (*pro hac vice*)
**SULLIVAN & CROMWELL, LLP**
1888 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 712-6600
Facsimile: (310) 712-8800

Scott A. Horstemeyer (Ga. Bar No. 367836)
Dan R. Gresham (Ga. Bar No. 310280)
**THOMAS HORSTEMEYER, LLP**
400 Interstate North Parkway, Suite 1500
Atlanta, Georgia 30339
Telephone: (770) 933-9500
Facsimile: (770) 951-0933

*Attorneys for Plaintiff / Counterclaim Defendant Catch Curve, Inc. and Additional Counterclaim Defendant*

-28-